**EXHIBIT B**

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2                      WESTERN DIVISION

3   ANNIE AGNEW and NAYSHAWN    )
    RDWARDS, as Independent     )
4   Co-Administrators of the    )
    Estate of NATHANIEL (NATE)  )
5   EDWARDS,                    )
                                )
6              Plaintiffs,      )
                                )
7          vs.                  )   No. 18 CV 50035
                                )
8   SERGEANT JONATHAN CATER,    )
    Individually and the CITY   )
9   OF ROCK FALLS,              )
                                )
10             Defendants.      )
```

11          The video-recorded deposition of JONATHAN

12   CATER, taken pursuant to the Federal Rules of Civil

13   Procedure, before Kathleen A. Hillgard, Certified

14   Shorthand Reporter No. 084-004093, at 140 South

15   Dearborn, Suite 1020, Chicago, Illinois, on

16   Wednesday, June 26, 2019, commencing at 1:07 p.m.

17   pursuant to notice.

18

19

20

21

22

23

24

**EXHIBIT B**

JONATHAN CATER, 06/26/2019          Page 2..5

---

Page 2

```
1    APPEARANCES:
2         THE COCHRAN FIRM, by
          MR. MELVIN L. BROOKS
3         (140 South Dearborn Street, Suite 1020
          Chicago, Illinois 60603
4         312.262.2880
          Mbrooks@cochranfirm.com)
5              -and-
          GREGORY E. KULIS & ASSOCIATES, LTD., by
6         MR. GREGORY E. KULIS
          (30 North LaSalle Street, Suite 2140
7         Chicago, Illinois  60602
          312.580.1830
8         Gkulis@kulislawltd.com)
               appeared on behalf of the plaintiffs;
9
          SCHAIN BANKS KENNY & SCHWARTZ LTD., by
10        MR. MICHAEL E. KUJAWA
          (70 West Madison Street, Suite 5300
11        Chicago, Illinois  60602
          312.345.5700
12        Mkujawa@schainbanks.com)
               appeared on behalf of the defendants.
13
          ALSO PRESENT:
14
          Ms. Brett Schatzle, Videographer
15
               *  *  *  *  *  *  *
16
17
18
19
20
21
22
23
24
```

Page 3

```
1              I N D E X
2
   Witness:                          Page
3
      JONATHAN CATER
4
      Examination by:
5
      Mr. Brooks...................     6
6     Mr. Kujawa...................   115
      Mr. Brooks...................   122
7
8
9
               E X H I B I T S
10
11 No.  Description          Marked/Referenced
12   1  Policy 300 - Use of Force..............  22
        Policy 305 - Officer-Involved
     2  Shooting and Deaths...................  28
        Policy 301 - Use of Force Review
     3  Boards................................  31
     4  Color Photograph - Rock Falls 2464.....  68
15   5  Color Photo - Rock Falls 2474..........  69
16
          (Exhibits attached/scanned.)
17
18              - - -
19
20
21
22
23
24
```

Page 4

1      THE VIDEOGRAPHER: Good afternoon. This is
2 the beginning of Media Unit 1. We are now on the
3 video record at 1:07.
4      This is the videotaped deposition of
5 Jonathan Cater being taken on June 26th, 2019.
6      We are located at 140 South Dearborn
7 Street, Suite 1020, Chicago, Illinois.
8      This deposition is being taken on
9 behalf of the plaintiff in the matter of Annie
10 Agnew, et al. v. Sergeant Jonathan Cater, et al.
11 The case number is 18 CV 50035, filed in the United
12 States District Court for the Northern District of
13 Illinois, Western Division.
14      My name is Brett Schatzle, legal
15 videographer representing Urlaub, Bowen &
16 Associates, Inc., with offices at 20 North Clark
17 Street, Suite 1260, Chicago, Illinois.
18      The court reporter today is Kathleen
19 Hillgard, also of Urlaub, Bowen & Associates.
20      Counsel, please identify yourselves
21 for the video record and the parties which you
22 represent.
23    MR. BROOKS: Melvin Brooks on behalf of the
24 plaintiff.

Page 5

1    MR. KULIS: Gregory Kulis on behalf of the
2 plaintiff.
3    MR. KUJAWA: Michael Kujawa on behalf of the
4 defendants.
5    THE VIDEOGRAPHER: Will the court --
6    MR. BROOKS: Quick question.
7      Is -- is that going to make it
8 really, really difficult?
9    THE VIDEOGRAPHER: No. I can -- it's okay.
10 It's picking it up.
11    MR. BROOKS: Okay.
12    THE VIDEOGRAPHER: But --
13    MR. KULIS: Like a dentist, he can't be
14 drilling forever.
15    MR. BROOKS: Yeah.
16    THE VIDEOGRAPHER: We can hear your voices
17 and everything.
18    MR. BROOKS: Oh, okay. All right.
19    THE VIDEOGRAPHER: Okay. Will the court
20 reporter please swear in the witness.
21    THE COURT REPORTER: Could you raise your
22 right hand, please.
23
24

**EXHIBIT B**

JONATHAN CATER, 06/26/2019                                    Page 6..9

Page 6

1          (Witness sworn.)

2               JONATHAN CATER

3 called as a witness herein, having been first duly

4 sworn, was examined and testified as follows:

5               EXAMINATION

6 BY MR. BROOKS:

7     Q.    Mr. Cater, would you state your full

8 name for the court reporter and spell your last

9 name.

10    A.    Jonathan Cater, C-a-t-e-r.

11         MR. BROOKS:  The record should reflect that

12 this is the deposition -- the discovery deposition

13 of Jonathan Cater, taken pursuant to the Federal

14 Rules of Civil Procedure and any other applicable

15 rules of court.

16 BY MR. BROOKS:

17    Q.    Mr. Cater, have you given a deposition

18 before?

19    A.    No.

20    Q.    Okay.  I'm sure counsel pretty much

21 explained to you the ground rules in terms of what

22 normally happens at a deposition.  Obviously, I

23 have a series of questions for you.

24         I would simply ask that if you do

Page 7

1 not understand a question, let me know, and I'll do

2 my best to restate it and rephrase it.  I want to

3 make sure we're on the same page in terms of the

4 dialogue that we have with each other.

5         I would also ask that if I ask you a

6 question and you need to take a break for whatever

7 reason, I would just add one thing, if you could

8 answer that question before we take the break.

9         Are you comfortable with that?

10    A.    Yes, I am.

11    Q.    And as I said, if you do not understand

12 a question that I ask, please let me know, and I'll

13 restate it.

14         If I do ask you a question and you

15 respond to it, is it fair for me to take from that

16 that you understood my question?

17    A.    That's correct, yes.

18    Q.    All right.  I understand that you are

19 currently a sergeant with the Rock Falls Police

20 Department, correct?

21    A.    Yes.

22    Q.    When were you promoted to sergeant?

23    A.    March 26th, 2018.

24    Q.    Prior to that you were a patrol

Page 8

1 officer?

2    A.    That is correct.

3    Q.    How long have you been a -- how long

4 have you been employed with Rock Falls Police

5 Department?

6    A.    11 years and 5 months.

7    Q.    So it would have been sometime in 2008

8 that you were first hired as a police officer with

9 Rock Falls?

10    A.    That's correct.

11    Q.    Had you worked with any other police

12 jurisdictions prior to Rock Falls?

13    A.    No.

14    Q.    Do you have any other law enforcement

15 experience, training, beyond your experience with

16 Rock Falls Police Department?

17    A.    No.

18    Q.    I understand you currently serve as a

19 reserve in the army.

20    A.    That's correct.

21    Q.    How long have you served in that

22 capacity?

23    A.    25 years.

24    Q.    When was the last time that you were on

Page 9

1 active duty?

2    A.    2016 to '17.

3    Q.    Okay.  Have you reviewed any materials

4 associated with the shooting of Nathaniel Edwards?

5    A.    Yes.

6    Q.    Tell us what you reviewed.

7    A.    The in-car video from Sugars' squad,

8 also my written statement.

9    Q.    Anything else?

10    A.    Not that I can think of offhand.

11    Q.    Have you reviewed any photographs?

12    A.    Yes.

13    Q.    Okay.  Tell me as best as you recall

14 how many photographs you've taken a look at?

15    A.    One, I believe.

16    Q.    All right.  Can you tell me the scene

17 that was shown in the photograph?

18    A.    It was the driveway of 1304 Franklin.

19    Q.    Were the -- let me restate it.

20         Was Nathaniel Edwards' Cadillac

21 still in place at that time, in the photograph?

22    A.    No.

23    Q.    The photograph that you reviewed which

24 showed the driveway, was it a daytime photo or a

**EXHIBIT B**

JONATHAN CATER, 06/26/2019                                        Page 10..13

Page 10

1 nighttime photo?
2    A.   Daytime photo.
3       Q.   Do you know when the photo was taken?
4    A.   I do not.
5       Q.   Do you know who took the photo?
6    A.   I do not.
7       Q.   Have you listened to any audio
8 recordings associated with the shooting of
9 Nathaniel Edwards?
10    A.   Just what was on the video of the --
11       Q.   Well --
12    A.   -- from squad.
13       Q.   Well, I'll ask it more specifically.
14          Have you reviewed any dispatch
15 communications, 911 communications, anything of
16 that nature?
17    A.   No.
18       Q.   I take it on the night of this
19 shooting, January 26, 2018, you did in fact
20 communicate with police dispatchers?
21    A.   Correct, yes.
22       Q.   Have you reviewed your communications
23 to police dispatch or any other persons from that
24 particular night of the shooting?

Page 11

1    A.   No.
2       Q.   When was the last time you viewed the
3 in-car dash video?
4    A.   Monday.
5       Q.   Where were you at when you viewed it?
6    A.   Rock Falls City Hall, the conference
7 room.
8       Q.   And who was present?
9    A.   Mr. Kujawa.
10       Q.   Anybody else present?
11    A.   No.
12       Q.   Prior to that particular either meeting
13 or viewing of the videotape or the in-car video,
14 when was the last time you viewed the video from
15 Sugars' police car?
16    A.   I don't -- I don't remember.
17       Q.   Now, I understand at some point you
18 gave statements to certain police personnel in
19 reference to this shooting, right?
20    A.   Yes.
21       Q.   Can you tell me what police
22 jurisdictions you have given statements to
23 concerning this shooting of Nathaniel Edwards?
24    A.   Illinois State Police.

Page 12

1       Q.   Anyone else?
2    A.   No.
3       Q.   I understand at some point after the
4 shooting there was I believe either a sergeant or
5 deputy from Sterling who arrived on the scene.
6          Do you recall any Sterling police
7 officers who were on the scene after the shooting?
8    A.   Yes.
9       Q.   Tell me what Sterling police officers
10 you recall being present at the scene after the
11 shooting.
12    A.   Sergeant Bartel and another officer,
13 but I can't think of his name.
14       Q.   Anyone else?
15    A.   No, I don't believe so.
16       Q.   All right.  Besides Rock Falls police
17 officers and Sergeant Bartel from Sterling, were
18 there any other police officers from other
19 jurisdictions who arrived at the scene after the
20 shooting?
21    A.   Yes.
22       Q.   That you are aware of?
23    A.   Yes.
24       Q.   Who?

Page 13

1    A.   Whiteside County Sheriff's Office,
2 would have been Deputy Elder.
3       MR. KULIS:  I'm sorry, I didn't hear your
4 answer.
5       THE WITNESS:  Excuse me.  Deputy Elder.
6 BY MR. BROOKS:
7       Q.   Did you say Elder?
8    A.   Elder, E-l-d-e-r.
9       Q.   All right.  Anyone else from Whiteside?
10    A.   Not that I know of.
11       Q.   Was Deputy Elder present at the time of
12 the shooting?
13    A.   I believe he was pulling up at the time
14 when it was actually occurring.
15       Q.   Have you seen any in-car video from any
16 police vehicle beyond what you viewed from Sugars'
17 vehicle?
18    A.   No.
19       Q.   You mentioned earlier that you gave a
20 statement to the Illinois State Police.
21    A.   That's correct.
22       Q.   From what I understand, that statement
23 was given several days after the shooting; is that
24 right?

**EXHIBIT B**

JONATHAN CATER, 06/26/2019                                    Page 14..17

Page 14

1    A.   I can't think exactly how many days.
2    **Q.   It was not on the day of the shooting?**
3    A.   No, it was not on the day of the
4 shooting.
5    **Q.   It was not the following day after the**
6 **shooting, was it?**
7    A.   No.
8    **Q.   So fair to say it was several days**
9 **after the shooting?**
10    MR. KUJAWA:  Objection, asked and answered.
11        You can -- if you're able to answer
12 it, you can go ahead.
13 BY MR. BROOKS:
14    **Q.   If you can answer.**
15    A.   Depends on your definition of several.
16    **Q.   All right.  More than two days?**
17    A.   Yes.
18    **Q.   Okay.  But it was less than a week**
19 **after the shooting that you gave a statement to**
20 **the -- or at least a statement was prepared for the**
21 **Illinois State Police, right?**
22    A.   Yes.
23    **Q.   I take it when you gave this statement**
24 **to the Illinois State Police, first of all, it --**

Page 15

1 **it was a written statement, correct?**
2    A.   Correct.
3    **Q.   You -- that statement was prepared with**
4 **you and counsel?**
5    A.   Yes.
6    **Q.   I take it when that statement was**
7 **prepared, it wasn't a question-and-answer session**
8 **with the Illinois State Police, was it?**
9    A.   No.
10    **Q.   You were permitted -- well, let me**
11 **restate it.**
12        **Explain to me how you went about**
13 **giving a written statement to the Illinois State**
14 **Police.**
15    A.   I met with the Illinois State Police at
16 the District 1 headquarters.  I can't remember
17 everybody's name.  Officer Vaughn Rhodes, or I
18 believe he's Agent Vaughn Rhodes now, was present
19 along with another officer.
20        It was all not exactly answer
21 questions, but it was, What happened?  Verbally
22 told him.  And Agent Rhodes took notes and typed.
23    **Q.   I take it the statement -- well, first**
24 **of all, it wasn't a recorded statement, right?  It**

Page 16

1 **was not recorded?**
2    A.   I do not believe so.
3    **Q.   All right.  And as we described**
4 **earlier, it was not a circumstance where the**
5 **troopers would ask you specific questions and then**
6 **you would respond to the question; it was not**
7 **conducted in that fashion, was it?**
8    A.   No, it was not.
9    **Q.   How long did it take you to prepare the**
10 **statement that you provided to the Illinois State**
11 **Police after the shooting?**
12    A.   I couldn't give you a good time frame.
13 It was a good couple hours.
14    **Q.   In preparing the statement, there was**
15 **input from your lawyer who was representing you at**
16 **the time?**
17    MR. KUJAWA:  I just want to object to any
18 questions that invade upon the attorney/client
19 privilege for that particular communication.
20    MR. BROOKS:  I'll restate it.
21 BY MR. BROOKS:
22    **Q.   Did you generate any notes from the**
23 **statement that was prepared for the Illinois State**
24 **Police?**

Page 17

1    A.   I did not.
2    **Q.   Did anyone generate notes for the**
3 **statement you provided to the Illinois State**
4 **Police?**
5    A.   Just the Illinois State Police.
6    **Q.   Before you gave your statement -- your**
7 **written statement to the Illinois State Police, you**
8 **reviewed the dash cam video or in-car video from**
9 **Sugars' car, didn't you?**
10    A.   Yes.
11    **Q.   You reviewed that with the other two**
12 **Rock Falls police officers who were at the scene at**
13 **the time of the shooting, right?**
14    A.   That's correct.
15    **Q.   So when you reviewed the video from**
16 **Sugars' car, present for the review of that video**
17 **was you, Officer Ethan Riley, and Officer Sugars,**
18 **right?**
19    A.   That's correct.
20    **Q.   Do you know how much time you guys**
21 **spent together viewing the video collectively?**
22    A.   No.
23    **Q.   Is that standard procedure when you**
24 **have an officer involved, let's say, in -- an**

**EXHIBIT B**

JONATHAN CATER, 06/26/2019                                    Page 18..21

Page 18

1 officer-involved shooting, is it standard procedure
2 that that officer -- assuming there is video
3 related to the incident, is it standard procedure
4 for Rock Falls police officers to have the
5 opportunity to view any video before they give
6 statements associated with the shooting?
7      MR. KUJAWA:  Objection; foundation,
8 speculation.
9           If you have an answer, you can go
10 ahead.
11     THE WITNESS:  I don't have an answer for
12 that.
13 BY MR. BROOKS:
14     Q.    You don't know whether it's standard
15 operating procedure?
16     A.    Never had an officer-involved shooting
17 before.
18     Q.    Based on your experience with the Rock
19 Falls Police Department, is it your understanding
20 that officers who are involved in a shooting on
21 duty, that assuming video exists of the incident
22 they will have an opportunity to view that video
23 before giving any statement associated with the
24 incident?

Page 19

1      A.    I believe they would.
2      Q.    When the three of you viewed the video
3 from Sugars' car, where was that at?
4      A.    Rock Falls Police Department.
5      Q.    Okay.  Can you tell me where in the
6 Rock Falls police station?
7      A.    It would been Commander
8 Ketz' (phonetic) office when he was working there.
9      Q.    Okay.  Was Commander Ketz present for
10 that?
11     A.    I can't remember if he was in the room
12 or not.
13     Q.    All right.  When -- as the three of you
14 viewed the video, did you talk at all?
15     A.    Very little.
16     Q.    But there was some discussion among the
17 three of you, right?
18     A.    Yes, some.
19     Q.    Tell me what you said during the course
20 of the review of the video with the three of you,
21 yourself, Sugars and Riley.
22     A.    I can't think of anything specific.
23     Q.    Give me your best recollection of what
24 you said during the course of that meeting.

Page 20

1      A.    I do remember something about the
2 actual gunshots themselves, how many compared to
3 reverberation off other buildings.  I think that's
4 the main -- main portion I could remember.
5      Q.    That was the main thing that you talked
6 about?
7      A.    Yes.
8      Q.    Give me your best recollection of what
9 Officer Riley said or talked about during the
10 course of that meeting to review the video?
11     A.    I can't remember him saying anything.
12     Q.    You don't believe he said anything
13 during the course of that meeting?
14     A.    I don't think so.
15     Q.    I have a report from -- it looks like
16 Commander Jay Koett, is that how pronounce --
17     A.    "Ket."
18     Q.    "Ket."  K-o-e-t-t?
19     A.    Yes.
20     Q.    The commander says that the viewing of
21 the video started at 10:15 and was completed at
22 10:58 a.m.; does that sound correct?
23     A.    If he -- if he wrote it down, it
24 definitely is correct.

Page 21

1      Q.    All right.  So one would say
2 approximately 45 minutes or so was spent viewing
3 the video?
4      A.    Yes.
5      Q.    And the only conversation that you
6 specifically recall is your raising something about
7 reverberation related to the shots?
8      A.    Correct.
9      Q.    All right.  Give me your best
10 recollection of what Officer Sugars mentioned or
11 discussed during the course of the three of you
12 viewing the in-car video.
13     A.    Okay.  Is there any more specific
14 question you can kind of direct me or ...
15     Q.    Well, your best recollection of
16 whatever Officer Sugars said during the course of
17 that 45 minutes or so that the three of you were
18 watching the video.
19     A.    I -- I can't recall.  I know there was
20 some conversation, but I can't recall what it was.
21     Q.    Have you had any discussions with
22 Officer Sugars since the shooting concerning the
23 shooting?
24     A.    No.

**EXHIBIT B**

JONATHAN CATER, 06/26/2019                    Page 22..25

Page 22

1    Q.   Have you had any conversations with
2 Officer Riley since the shooting related to the
3 shooting?
4    A.   No.
5    Q.   Sergeant, can you give me a -- let me
6 restate it.
7         I take it as part of your
8 responsibility as a Rock Falls police officers --
9 officer, you are expected to know various standards
10 or policies that police officers serving in your
11 capacity are expected to follow, right?
12   A.   Yes.
13   Q.   You are familiar with -- let me restate
14 it.
15        First of all, does Rock Falls have a
16 use of force policy?
17   A.   Absolutely.
18   Q.   Was there a use of force policy in
19 place in January of 2018?
20   A.   Yes, there was.
21            (Deposition Exhibit No. 1,
22            Witness Cater, was marked for
23            identification 06/26/2019.)
24

Page 23

1 BY MR. BROOKS:
2    Q.   All right.  I'm going to show you what
3 the court reporter has marked as Exhibit 1.  And I
4 would ask you -- you have it in front of you,
5 Exhibit 1?
6    A.   Yes.
7    Q.   Can you tell me whether or not, once
8 you have a chance to look through it, if this is
9 the use of force policy that Rock Falls Police
10 Department had in place in January of 2018?
11   A.   Yes.
12   Q.   I see at the very bottom it has
13 like a copyright date, and it looks like it's
14 October 30th, 2018.  So I just wanted to make sure
15 that just in terms of the language in this
16 particular policy, it would have been in effect in
17 January of 2018.
18   A.   I do not believe there's been any
19 changes to it.
20   Q.   There's a section in the use of force
21 policy which -- let's see if I can find it real
22 quick.
23        Well, let me ask it this way:  What
24 is your understanding of the policy as it relates

Page 24

1 to deadly force?
2    A.   You -- well, the use of deadly force is
3 basically the last-ditch effort.  If --
4    Q.   When you -- I'm sorry.  Go ahead.
5    A.   Yeah.  If there's no other means
6 available.
7    Q.   There is a section of the policy which
8 talks about, and it looks like it's page 5,
9 shooting at or from a moving vehicle.
10        You're familiar with that, right?
11   A.   Yes.
12   Q.   The policy itself says that, "Shots
13 fired at or from a moving vehicle are rarely
14 effective."
15        Do you agree with that?
16   A.   Yes.
17   Q.   So from a general perspective, shots
18 fired at a moving vehicle, just focused on that
19 language, are rarely effective.  You don't disagree
20 with that concept?
21   A.   No, I don't disagree with that.
22   Q.   All right.  Use of force as it relates
23 to a moving vehicle or an occupant in a vehicle, is
24 it your understanding that the use of force should

Page 25

1 be the last option in terms of when the individual
2 is an occupant in a moving vehicle?
3    A.   Say it one more time, please.
4         MR. BROOKS:  Could I have it read back?
5            (Record read.)
6 BY MR. BROOKS:
7    Q.   If you don't understand the question, I
8 can rephrase.
9    A.   If you would, please.
10   Q.   All right.  I'll rephrase it.
11        According to this policy -- and
12 first of all, this policy is what you are expected
13 to follow in terms of how you use force,
14 specifically deadly force, right?
15   A.   Absolutely, yes.
16   Q.   As it relates to an occupant, let's
17 say, in a moving vehicle, the use of deadly force
18 should be the last option that is used in either
19 detaining or arresting an individual.  Would you
20 agree with that?
21   A.   Yes.
22   Q.   In fact, according to the Rock Falls
23 Police Department policy as it relates to an
24 individual in a moving vehicle, you are to take

Page 26

1 every conceivable means to actually move out of the
2 path of the vehicle, right?
3      MR. KUJAWA:  I'm going to object to the form
4 of the question.  It assumes facts not in evidence,
5 foundation, and speculation.
6          If you have an answer -- if you
7 understand the question, you can go ahead and
8 answer.
9      MR. BROOKS:  I can have the court reporter
10 read it back, first of all.
11          Could you read it back?
12             (Record read.)
13      MR. BROOKS:  I'll restate it, actually, just
14 so we're on the same page.
15 BY MR. BROOKS:
16      **Q.   If you have an occupant in a vehicle**
17 **that's moving, according to police department**
18 **policy, you as an officer should make every effort**
19 **to move out of the path of the vehicle before**
20 **firing a shot, correct?**
21      MR. KUJAWA:  Object to the form of the
22 question.  It misstates the policy.
23          If you have an answer, you can go
24 ahead.

Page 27

1      THE WITNESS:  I think the answer is actually
2 in the very last sentence of the policy, "or if
3 deadly force other than the vehicle is directed at
4 the off -- officers or others."
5      THE COURT REPORTER:  I'm sorry, can you
6 repeat and speak up a little bit?
7      THE WITNESS:  Oh, I'm sorry.
8      THE COURT REPORTER:  This drill's in my ear.
9      THE WITNESS:  Yeah.  I believe your answer is
10 in the last sentence here of the policy itself, "or
11 if deadly force other than the vehicle is directed
12 at the officer or others."
13 BY MR. BROOKS:
14      **Q.   Well -- well, just to make sure that**
15 **there's no misunderstanding, the policy says on the**
16 **face of it, "Officers should move out of the path**
17 **of an approaching vehicle instead of discharging**
18 **their firearm at the vehicle or any of its**
19 **occupants."**
20          **It does state that, right?**
21 A.   Yes, it does state that.
22      **Q.   And as a general rule, you as an**
23 **officer encountering a circumstance where a vehicle**
24 **is moving in your direction, your first obligation**

Page 28

1 is to make an attempt to move out of the path of
2 the vehicle, right?
3 A.   If that is an option, yes.
4          (Deposition Exhibit No. 2,
5           Witness Cater, was marked for
6           identification 06/26/2019.)
7 BY MR. BROOKS:
8      **Q.   All right.  Sergeant, I'm going to show**
9 **you what has been marked as Deposition Exhibit**
10 **Number 2 for identification.  It's another Rock**
11 **Falls Police Department policy, and it looks like**
12 **it relates to the investigation of officer-involved**
13 **shootings, correct?**
14 A.   Yes.
15      **Q.   And basically this policy sets out what**
16 **generally the department is to do from an**
17 **investigation standpoint when one of its officers**
18 **is involved in a shooting, correct?**
19 A.   Correct.
20      **Q.   Do you know if the Rock Falls Police**
21 **Department investigated the shooting that you were**
22 **involved in resulting in the death of Nathaniel**
23 **Edwards?**
24 A.   Yes.

Page 29

1      **Q.   What did they do from an investigation**
2 **standpoint?**
3 A.   I -- I couldn't give you that answer.
4 It's not my -- that's not my lane, lack of a better
5 term.
6      **Q.   Well, how do you know they investigated**
7 **the incident, that is the Rock Falls Police**
8 **Department?**
9 A.   Yes.
10      **Q.   How do you know they investigated it?**
11 A.   Detective Pilgrim, it was detective at
12 the time, had mentioned that he was conducting an
13 internal -- internal review to see if any policies
14 were -- were broken.
15      **Q.   And this was in addition to the**
16 **Illinois State Police?**
17 A.   Yes.
18      **Q.   All right.  So it's your understanding**
19 **that the Rock Falls Police Department did an**
20 **internal investigation to determine whether or not**
21 **your actions violated any department policy?**
22 A.   That's correct.
23      **Q.   What was the outcome of that**
24 **investigation?**

**EXHIBIT B**

JONATHAN CATER, 06/26/2019                                    Page 30..33

Page 30

1    A.   I couldn't actually tell you what the

2 actual outcome was.

3    Q.   Were you interviewed for purposes of

4 that investigation?

5    A.   No.

6    Q.   But Detective Pilgrim told you that

7 there was an investigation?

8    A.   For -- for use of policy, yes.

9    Q.   When did he tell you that?

10   A.   I couldn't tell you.

11   Q.   Beyond Detective Pilgrim, from your

12 understanding who else would have been involved in

13 the investigation of this incident by Rock Falls

14 Police Department?

15   A.   I do not know.

16   Q.   Do you know if any of the other

17 officers who were present at the time of the

18 shooting, that is Rock Falls police officers, if

19 they were interviewed in reference to this

20 investigation that you're talking about?

21   A.   I do not know.

22   MR. BROOKS:  Just so the record is clear,

23 in -- in terms of what we received in discovery, if

24 there's an investigation, we haven't received it.

Page 31

1    MR. KUJAWA:  I -- you've got everything I've

2 got, so ...

3    MR. BROOKS:  All right.  Well, to the extent

4 the Sergeant says that there was an investigation,

5 just so the record is clear, we're making a request

6 for --

7    MR. KUJAWA:  Understood.

8    MR. BROOKS:  -- the investigation file.

9         (Deposition Exhibit No. 3,

10            Witness Cater, was marked for

11            identification 06/26/2019.)

12 BY MR. BROOKS:

13   Q.   Sergeant, I'm now going to show you

14 what has been marked as Exhibit Number 3 for

15 identification.  It's another policy.  And on the

16 face of it it says, Use of Force Review Boards.

17        Do you have an understanding of what

18 that is?

19   A.   Yes.

20   Q.   Explain that to us.

21   A.   Anytime use of force has been used, not

22 sure exactly who sits on the board, but they review

23 the case and see if any -- any policies have been

24 not followed through.

Page 32

1    Q.   Basically, they would make some

2 assessment in terms of whether or not your actions

3 were consistent with department policy, right?

4    A.   That is correct.

5    Q.   Do you know if a use of force review

6 board evaluated your actions to determine whether

7 or not they were consistent with department policy

8 in the shooting of Nathaniel Edwards?

9    A.   I believe that's what Detective Pilgrim

10 could have been talking about as the -- as this and

11 not an actual investigation.

12   Q.   Okay.  So from your understanding, it

13 is standard procedure when a Rock Falls police

14 officer's involved in a shooting, the use of force

15 review board will investigate the matter?

16   A.   I would assume so, yes.

17   MR. BROOKS:  And, again, Mike, you know, we

18 have not received -- if in fact there was a use of

19 force review board, we have not received that

20 documentation, so we are formally asking for it.

21 We can do it in a written form as well, so ...

22   MR. KUJAWA:  Okay.

23 BY MR. BROOKS:

24   Q.   Sergeant Cater, did you have any

Page 33

1 knowledge of Nathaniel Edwards prior to

2 January 26th, 2018?

3    A.   No.

4    Q.   Okay.  You didn't know who he was

5 period?

6    A.   No.

7    Q.   And to the best of your knowledge, you

8 had not had any law enforcement interaction with

9 him or outside of law enforcement, right?

10   A.   No, no interaction.

11   Q.   I understand on January -- I understand

12 on -- it's getting louder, isn't it?

13        Is it -- we're good.  We're good.

14        All right.  On January 26th, 2018, I

15 understand you were a field training officer,

16 right?

17   A.   That's correct.

18   Q.   Had you operated as a field training

19 officer before?

20   A.   Yes.

21   Q.   How frequently in your career?

22   A.   I'd have to -- I'd have to look at my

23 folder, but I -- five or six.

24   Q.   All right.  Relative to the officer you

**EXHIBIT B**

JONATHAN CATER, 06/26/2019                                Page 34..37

Page 34

1  were in the process of training, that was Ethan
2  Riley?
3      A.   That is correct.
4      Q.   Was Ethan a probationary officer at
5  that time?
6      A.   Yes.
7      Q.   All right.  And so how long had you
8  been working with Ethan Riley before January 26th,
9  2018?  And I'm talking about field training.
10     A.   Almost four weeks.  He was a couple
11 days from ending the phase with me.
12     Q.   As a field training officer, give us a
13 general sense of the scope of your role relative to
14 a trainee who's with you on a given shift?
15     A.   Lack of a better term, teach him how to
16 be a cop.
17     Q.   Would the field training officer
18 typically take the lead on an incident involving
19 police interaction with a private citizen?
20     A.   Depending on the situation, yes.
21     Q.   Give me an example where something like
22 that would occur.
23     A.   If I recall correctly, I believe he was
24 in the third phase, I believe.

Page 35

1      Q.   What does that mean when you say "he
2  was in the third phase"?
3      A.   Within the phases themselves, there's
4  different -- different situation, different case --
5  cases that they would -- that they would handle.
6      Q.   Such as what?
7      A.   Everything from criminal damage to
8  property to DUI to sexual assaults.  Each phase is
9  a little bit -- a little bit different.
10     Q.   And how many phases are there?
11     A.   Four phases.
12     Q.   The fourth phase, let's say, for a
13 probationary officer would involve generally what?
14     A.   It's referred to as a shadow phase.
15 They're basically on their own, but FTO is
16 following them around.
17     Q.   Is it typical that if you have a
18 trainee, the trainee will typically drive the car?
19     A.   Second and third phase, definitely.
20     Q.   Okay.  Sergeant, can you tell me a
21 little bit about your background beyond just
22 serving in law enforcement, your -- your work
23 background?
24     A.   Starting from when?

Page 36

1      Q.   Well, let -- let's stay within a
2  10-year period before you became a police officer.
3      A.   Okay.  I was active duty for a good
4  couple years.  I worked in security.  I also worked
5  as a truckdriver.
6      Q.   When you worked in security, did you
7  carry a weapon?
8      A.   No.
9      Q.   How long did you work in security?
10     A.   I can't really give you a time frame on
11 that one.
12     Q.   Okay.  Can you give me an
13 approximation?
14     A.   Couple years, two or three years.
15     Q.   And who would typically be your
16 employer when you worked in security?
17     A.   Stuart & Associates.
18     Q.   Were you assigned to a particular
19 business or company as far as security is
20 concerned?
21     A.   Typ- -- well, I worked for them in the
22 early '90s.  Then it was pretty much a specific
23 businesses.  When I worked for them again in the
24 early 2000s, kind of a float.  I would go from

Page 37

1  business to business and ...
2      Q.   And you said you also worked as a
3  truckdriver, right?
4      A.   Yes.
5      Q.   Who did you work for then?
6      A.   Duane Nelson.
7      Q.   Is that a company?
8      A.   It's a small company just south of Rock
9  Falls.
10     Q.   And how long did you do that for?
11     A.   2005 to 2008.
12     Q.   And I understand as far as your
13 education is concerned, you do have some college
14 coursework, right?
15     A.   Some college, yes.
16     Q.   All right.  You do not hold a college
17 degree, do you?
18     A.   I do not.
19     Q.   All right.  Can you tell me what
20 college you attended?
21     A.   Sauk Valley Community College.
22     Q.   And how long did you attend the
23 college, approximately?
24     A.   Well, most recent was early 2000s, and

EXHIBIT B

JONATHAN CATER, 06/26/2019                                    Page 38..41

Page 38

1 it was a semester of EMT course. And I started my
2 paramedic, unfortunately was deployed.
3     Q.   Do you -- do you hold any
4 certifications beyond certifications that you've
5 received as a police officer?
6     A.   Not anymore, no.
7     Q.   All right. So at some point were you
8 seeking to be a paramedic?
9     A.   Yes.
10     Q.   All right. Have you ever held any
11 certification or license as a paramedic?
12     A.   EMT basic, yes.
13     Q.   When was that approximately?
14     A.   2002, 2003.
15     Q.   I want to talk to you a little bit
16 about the date of January 26th, 2018. Now, I
17 understand that, as you told us earlier, you were a
18 field training officer.
19          What time did you start your patrol
20 that evening, or day?
21     A.   6:00 p.m.
22     Q.   Do you remember anything specifically
23 that you and Officer Riley would have been involved
24 in that stands out other than the shooting of

Page 39

1 Nathaniel Edwards on that day?
2     A.   I'm trying to think exactly what the --
3 what the case was. It was over on West 21st
4 Street.
5     Q.   That was in Rock Falls?
6     A.   Yes.
7     Q.   You don't remember the nature of it?
8     A.   Not offhand, no.
9     Q.   Okay. But for some reason, it stands
10 out in some fashion?
11     A.   It was the first call of the day.
12     Q.   I want to go back to your background a
13 little bit.
14          We received some information in
15 reference to your background as it relates to
16 traffic matters and things of that nature.
17          My question to you: Have you ever
18 been on probation?
19     A.   Yes.
20     Q.   What were you on probation for?
21     A.   Reckless driving.
22     Q.   And when was that, approximately?
23 Better yet, do you know how old you were when you
24 were on probation for reckless driving?

Page 40

1     A.   Early 2000s.
2     Q.   And what -- what was the length of your
3 probation?
4     A.   I believe two years.
5     Q.   Can you give me a general sense of the
6 factual basis for that reckless driving?
7     MR. KUJAWA: I'll just object to the
8 relevance.
9          But if you have a -- you can answer
10 the question.
11     THE WITNESS: The original charge was DUI.
12 It was negotiated to reckless driving.
13 BY MR. BROOKS:
14     Q.   So the DUI charge, was that initially
15 charged as a felony?
16     A.   No.
17     Q.   All right. What was -- was it charged
18 as a misdemeanor?
19     A.   Yes, as a misdemeanor.
20     Q.   All right. It was charged as a
21 misdemeanor and ultimately there was a negotiated
22 resolution, right?
23     A.   That's correct.
24     Q.   And you agreed to plead to a lessor

Page 41

1 offense as opposed to the DUI?
2     A.   Correct.
3     Q.   Beyond that one DUI charge, have you
4 been charged with any other DUI incidents?
5     MR. KUJAWA: Object to the relevance.
6          You can answer.
7 BY MR. BROOKS:
8     Q.   You can.
9     A.   Yes.
10     Q.   Tell me when the other incidents were.
11     MR. KUJAWA: Same objection.
12          You can answer.
13     THE WITNESS: Late '90s.
14 BY MR. BROOKS:
15     Q.   How many times?
16     A.   In total or --
17     Q.   In total.
18     A.   In total is two.
19     Q.   Okay. So you had one DUI charge in the
20 '90s and then you had one in the 2000s?
21     A.   Yes.
22     Q.   All right. The one in the '90s, was
23 there a plea agreement?
24     A.   Yes.

JONATHAN CATER, 06/26/2019                                              Page 42..45

Page 42

1    Q.   What was the plea?
2    A.   Same as the other.
3    Q.   You received probation?
4    A.   A very short time, yes.
5    Q.   Was it probation for DUI or a lessor
6 offense?
7    A.   Lesser offense.
8    Q.   What was the lesser offense?
9    A.   I believe it was also reckless driving.
10   Q.   Was this in Rock Falls?
11   A.   No.
12   Q.   Where?
13   A.   Montgomery -- excuse me.  Montgomery
14 County, Geor- -- one more time.  I believe it's
15 Montgomery County Tennessee.  It's Clarksville,
16 Tennessee.
17   Q.   And those DUI incidents, you had to
18 provide that information to the Rock Falls Police
19 Department when you sought employment there?
20   A.   Yes.
21   Q.   In addition to the reckless driving,
22 were you also charged with speeding in the 2000
23 incident?
24   A.   Yes.

Page 43

1    Q.   Did you plead guilty to the speeding?
2    MR. KUJAWA:  Let me just object to the
3 relevance of the whole line of questioning.
4         But you can answer.
5    THE WITNESS:  I don't remember.
6 BY MR. BROOKS:
7    Q.   All right.  In the incident, the DUI
8 that you talked about, the earlier one, were you
9 also charged with speeding in that incident?
10   A.   Yes.
11   Q.   Do you know if you pled guilty to
12 speeding in that incident?
13   A.   I don't remember.
14   Q.   All right.  Going back to the date of
15 January 26th, 2018.  In terms of the equipment that
16 you typically are armed with when you start your
17 tour of duty, can you tell me what that would
18 consist of?
19   A.   Like what's on my duty belt?
20   Q.   Yes.  Or on your body beyond your duty
21 belt.
22   A.   Okay.  Typically my uniform, my vest,
23 badge, nametag, rank insignia, duty belt,
24 handcuffs, duty pistol, baton, rubber glove case, a

Page 44

1 Leatherman.
2    Q.   Would you have that equipped with a
3 taser?
4    A.   Yes.
5    Q.   All right.  So you -- you were
6 certified in the use of a taser on January 26th,
7 2018?
8    A.   Yes, yes.
9    Q.   All right.  And when you would start
10 your tour of duty in January of 2018, you would
11 normally work with a taser on your body?
12   A.   Yes.
13   Q.   Your field training pupil, did he also
14 have a taser on his body?
15   A.   I can't remember.
16   Q.   Would a field training pupil, for lack
17 of a better word, in the third phase be qualified
18 to carry a taser?
19   A.   If they're tested and certified, yes.
20   Q.   So that wouldn't ne- -- that would not
21 be -- that would not be something unusual, to have,
22 let's say, a probationary officer in the third
23 phase who has been trained in the use of tasers?
24   A.   Yes.

Page 45

1    Q.   How is it on January 26th, 2018 that
2 you became aware of the presence of Nathaniel
3 Edwards?
4    A.   Sorry, that's little confusing, but --
5    Q.   All right.  I'll restate it.
6         At some point on January 26th, 2018,
7 you became aware of a white Cadillac was -- which
8 was being driven by Nathaniel Edwards, right?
9    A.   That's correct.
10   Q.   How did you become aware of the white
11 Cadillac with Nathaniel Edwards in it?
12   A.   Officer Sugars' radio traffic.
13   Q.   So Officer Sugars communicated
14 something about a traffic offense?
15   A.   Correct.
16   Q.   What's your best recollection of
17 the communication that was generated by
18 Officer -- I lost my train of thought.
19        What's your best recollection of the
20 communication that came from Officer Sugars in
21 reference to the traffic matter?
22   A.   He contacted dispatch via radio with
23 his location and -- and intent to the stop the
24 vehicle.

**EXHIBIT B**

JONATHAN CATER, 06/26/2019                          Page 46..49

Page 46

1    Q.   What did he say in reference to the
2  nature of the traffic offense?
3    A.   He didn't say anything about the
4  traffic offense itself.
5    Q.   All right.  Okay.  From what you
6  recall, there was nothing about a speeding vehicle,
7  right?
8    A.   Not that I can remember.
9    Q.   All right.  In fact, when you first saw
10  this white Cadillac with Nathaniel Edwards, is it
11  fair to say that the car was moving very slow?
12    A.   Yes.
13    Q.   In terms of your interaction with the
14  white Cadillac that Mr. Edwards was in which you
15  saw moving very slow, you followed it at some
16  point, right?
17    A.   Correct.
18    Q.   You -- you didn't engage in any type of
19  high-speed pursuit, did you?
20    A.   No.
21    Q.   It was just slow following of a white
22  Cadillac; is that fair?
23    A.   Correct.
24    Q.   At some point, you followed Mr. Edwards

Page 47

1  in this white Cadillac to Franklin Street?
2    A.   Correct.
3    Q.   And at some point the white Cadillac
4  with Mr. Edwards in it pulled up in a driveway,
5  correct?
6    A.   Correct.
7    Q.   By the way, when Mr. Edwards pulled his
8  car into the driveway, you now had information
9  concerning the address of that driveway, correct?
10    A.   Correct.
11    Q.   Fair to say that once the car pulled
12  into the driveway, the white Cadillac, you now had
13  the ability to gather any information you needed
14  relative to, let's say, the license plate, if you
15  needed that, right?
16    A.   If time would allow, sure, yes.
17    Q.   All right.  Well, let me ask it more
18  specifically.
19         When you were following the white
20  Cadillac, did you run a license plate check?
21    A.   No.
22    Q.   Do you know if anyone ran a license
23  plate check?
24    A.   The assumption can be made that

Page 48

1  dispatch did when Officer Sugars contacted them via
2  radio with the -- with the information.
3    Q.   Would you have heard that information?
4    A.   If I did, I don't remember.
5    Q.   Let's say, for instance, if Officer
6  Sugars requested a check on a license plate, would
7  that information be communicated such that you as
8  an officer who is assisting would also be able to
9  here that communication?
10    A.   Yes.
11    Q.   Describe for me what I guess your --
12  your partner at the time, Officer Riley, did in
13  reference to maneuvering the vehicle, your police
14  car, before Mr. Edwards pulled into the driveway on
15  Franklin Street.
16    A.   Can you be a little bit more specific?
17    Q.   Sure.
18         You told us at some point the
19  car that you were in, you -- you followed
20  Mr. Edwards' white Cadillac, correct?
21    A.   Yes.
22    Q.   In terms of following Mr. Edward's
23  white Cadillac before it pulled into the driveway,
24  did you and Officer Riley have any interaction with

Page 49

1  the white Cadillac?
2    A.   Yes.
3    Q.   Tell us what that interaction was.
4    A.   I believe on Sycamore I instructed
5  Riley to turn the car side -- mostly sideways in
6  the roadway.
7    Q.   Is Sycamore a one-way street?
8    A.   It is a two -- two-way street.
9    Q.   All right.  But you essentially
10  directed Officer Riley to position the car such
11  that it would block the passage of Mr. Edwards'
12  Cadillac?
13    A.   That is correct.
14    Q.   When Officer Riley positioned your
15  police car in such a fashion, or your police
16  vehicle in such a fashion, that it blocked the
17  roadway along Sycamore, fair to say that
18  Mr. Edwards, as he approached you, still continued
19  in a very slow fashion?
20    A.   That's correct.
21    Q.   And what he did as opposed to making
22  contact with your police vehicle, he actually took
23  actions to avoid any contact, didn't he?
24    A.   Yes.

**EXHIBIT B**

JONATHAN CATER, 06/26/2019                                    Page 50..53

Page 50

1    Q.   In fact, he maneuvered his Cadillac in
2  such a fashion that it went to the side of your
3  vehicle?
4    A.   In front, yes.
5    Q.   All right.  Without any contact?
6    A.   No contact.
7    Q.   If he had continued straight, I'm
8  presuming his vehicle would have crashed into your
9  vehicle, right?
10   A.   Correct.
11   Q.   But apparently -- let me restate it.
12       When Mr. Edwards was driving his
13 Cadillac in this slow fashion that you described
14 earlier, did you draw any conclusions in terms of
15 his state of mind?
16   A.   No.
17   Q.   All right.  You didn't have any reason
18 to think he was intoxicated, did you?
19   A.   I don't know how to answer that one.
20       MR. KUJAWA:  Yeah, but if you understand it,
21 you can answer.
22       THE WITNESS:  I didn't have enough contact
23 prior to that to -- or observations to lead me to
24 believe ...

Page 51

1  BY MR. BROOKS:
2    Q.   Well, what you could see in terms of
3  how Mr. Edwards operated his vehicle, he was able
4  to maneuver it such that he avoided hitting your
5  car, right?
6    A.   Yes.
7    Q.   He maneuvered his car in such a fashion
8  that you saw him pull into the driveway without any
9  problems, correct?
10   A.   Into the driveway ...
11   Q.   Into the driveway at 1304 Franklin,
12 right?
13   A.   I don't believe there was any issues.
14   Q.   Well, just so we're on the same page,
15 when Mr. Edwards pulled his car into the driveway
16 at 1304 Franklin, was there another car also in the
17 driveway?
18   A.   Yes.
19   Q.   The driveway is big enough to
20 accommodate two cars or vehicles parked side by
21 side?
22   A.   Yes.
23   Q.   From what you could see, Mr. Edwards
24 didn't have any problems negotiating the driveway

Page 52

1  such that he -- he did not make any contact with
2  the parked car, right?
3    A.   He did not make any contact with the
4  parked car.
5    Q.   All right.  He left some space between
6  his car and the car that was already parked in the
7  driveway?
8    A.   That's correct.
9    Q.   Fair to say when Mr. Edwards pulled
10 into the driveway, his car wasn't swaying from side
11 to side, was it?
12   A.   I do not know.  I don't know the answer
13 to that.
14   Q.   Well, from what you could see, it
15 appeared that he had absolutely no difficulty
16 pulling into the driveway and at least stopping the
17 car, right?
18   A.   Yes.
19   Q.   He didn't have any difficulty from what
20 you could see?
21   A.   That's correct.
22   Q.   Does Rock Falls Police Department have
23 a group of officers who, for lack of a better word,
24 deal with matters that involve crisis intervention?

Page 53

1    A.   Yes.
2    Q.   Okay.  What is your understanding of
3  the program that Rock Falls has as it relates to
4  crisis intervention?
5    A.   Hold on.  Crisis intervention like --
6  I'm sorry, you're going to have to elaborate.
7    Q.   Well, you've heard of the term crisis
8  intervention?
9    A.   Yes.
10   Q.   Okay.  What is your understanding of
11 that in the police or law enforcement context?
12   A.   Depends on the crisis.
13   Q.   Okay.  You have certain officers that
14 deal with matters that are not your typical police
15 matters.  Would you agree with that?
16   A.   Yes.
17   Q.   All right.  What would a crisis
18 intervention -- first, let me restate it.
19       Have you had any training in crisis
20 intervention?
21   A.   Again, it depends on what your level of
22 crisis, I guess you could say.  Because I'm SWAT
23 qualified, if that's what you're trying to get at.
24   Q.   Does Rock Falls have a training, let's

Urlaub Bowen & Associates, Inc.   312-781-9586

**EXHIBIT B**

JONATHAN CATER, 06/26/2019                    Page 54..57

Page 54

1 say, tool where officers receive specific
2 certification or training that's dedicated to
3 dealing with matters that require crisis
4 intervention?
5    A.   I believe we use mobile team training
6 unit for --
7    Q.   Mobile?
8    A.   It's Illinois Training and Standards
9 Board puts out training and -- broken down into
10 mobile training units, and I believe we go through
11 them through almost all -- all of our training.
12    Q.   Have you had training specifically
13 focused on crisis -- crisis intervention?
14    MR. KUJAWA:  Well, I'm going to object; it's
15 been asked and answered.  I think there's some --
16 there's some miscommunication as to what the term
17 means.
18       But if you understand the question,
19 you can go ahead.
20    THE WITNESS:  I -- I do know individuals have
21 gone to different types of crisis intervention.
22 BY MR. BROOKS:
23    Q.   Certain officers within the Rock Falls
24 Police Department, right?

Page 55

1    A.   Yes.
2    Q.   Have you -- were you one of those
3 officers?
4    A.   I'd have to go through my training
5 records.
6    Q.   Okay.  You're just not sure one way or
7 the other?
8    A.   Like I said, depends on the -- on the
9 crisis.
10    Q.   Well, give me an example where you have
11 deployed, let's say, tactics that you've learned
12 through crisis intervention training?
13    A.   Luckily enough, we haven't had to
14 deploy any type of active shooter training -- or
15 active shooter actual scenarios or anything like
16 that.
17    Q.   You -- you've heard of the term or
18 concept deescalation?
19    A.   Absolutely, yes.
20    Q.   What is your understanding of that
21 in -- in the law enforcement field?
22    A.   Lack of a better term, turn a shit
23 situation into something that's a lot calmer.
24    Q.   It's -- it's a means of making a

Page 56

1 situation calmer?
2    A.   Absolutely.
3    Q.   And would you agree with me that there
4 are certain circumstances where police can escalate
5 a situation depending on the factual circumstances?
6    A.   Yes.
7    Q.   There are also situations where police
8 can deescalate a situation, that is bring the
9 stress down, by using certain techniques in dealing
10 with an individual?
11    A.   Yes.
12    Q.   Give me your best recollection of how
13 long you were outside of your car before you fired
14 shots at Nathaniel Edwards.
15    A.   Minute or less.
16    Q.   Can you tell us why there was a short
17 period of time, as you said, a minute of -- or
18 less, between your exiting your car and firing
19 shots at Nathaniel Edwards?
20    A.   I'm sorry, I ...
21    Q.   You told us earlier that you were out
22 of your car for a minute or less before you fired
23 shots at Nathaniel Edwards, right?
24    A.   Correct.

Page 57

1    Q.   The only thing that you knew about
2 Nathaniel Edwards as he pulled into the driveway
3 was that potentially he had committed a traffic
4 violation, right?
5    MR. KUJAWA:  I'll object to the form of the
6 question.  It assumes facts not in evidence and
7 misstates his testimony.
8       If you understand the question, you
9 can go ahead and answer.
10    THE WITNESS:  I'm confused now.
11    MR. KUJAWA:  Sure.
12    THE WITNESS:  Sorry.
13    MR. KULIS:  If you -- if you understand the
14 question, you can go ahead answer.
15    MR. BROOKS:  Can we -- can we have it read
16 back?
17    THE WITNESS:  Yes, please.
18       (Record read.)
19    MR. BROOKS:  I'll actually restate it just so
20 we understand each other.
21 BY MR. BROOKS:
22    Q.   Based on everything that you saw
23 involving Nathaniel Edwards as he drove his
24 vehicle, his -- his Cadillac in a very slow

**EXHIBIT B**

JONATHAN CATER, 06/26/2019                              Page 58..61

Page 58

1 fashion, the only conceivable violation of the law
2 that he would have committed would be a traffic
3 violation, right?
4     A.   I believe so.
5     Q.   What was the traffic violation?
6     A.   I didn't know at that time.
7     Q.   All right.  Based on what you saw, did
8 you see him commit a traffic violation?
9     A.   There's Illinois statute for leaving
10 the roadway.  There's disregarding stop signs.  I
11 mean ...
12     Q.   Well, are you telling us that you saw
13 Nathaniel Edwards discard stop signs?
14     A.   Disregard a stop sign?
15     Q.   Yeah.
16     A.   At Sycamore and Martin.
17     Q.   Did you tell that to the Illinois State
18 Police when you gave your statement to them, that
19 you saw Nathaniel Edwards go through a stop sign or
20 disregard a stop sign?
21     A.   No.  I do not believe that's in my
22 statement.
23     Q.   Based on what you're telling us, the
24 only violation of the law that you witnessed as it

Page 59

1 relates to Nathaniel Edwards prior to him pulling
2 into the driveway was that he potentially committed
3 a minor traffic offense, right?
4     A.   That's right.
5     Q.   Is it standard that when you, let's
6 say, stop a driver who's committed a minor traffic
7 offense, that you approach that driver with your
8 weapon drawn?
9     MR. KUJAWA:  Object to the form of the
10 question.  It assumes facts not in evidence.
11     If you understand the question, you
12 can go ahead and -- and answer it.
13     THE WITNESS:  Depends on the situation.
14 BY MR. BROOKS:
15     Q.   All right.  When you stepped from the
16 car that you were in after Nathaniel pulled into
17 the driveway, you had your weapon out, right?
18     A.   Not initially, I don't believe so.
19     Q.   Did any officer have their weapon out
20 when Nathaniel Edwards stopped in the driveway at
21 1304 Franklin?
22     A.   After reviewing the video, I believe
23 Officer Sugars had -- has his out as he passes in
24 front of the car.

Page 60

1     Q.   But you didn't have your weapon out?
2     A.   Not initially.
3     Q.   At what point did you take your weapon
4 out?
5     A.   When -- when I -- can I go into this a
6 little farther than --
7     MR. KUJAWA:  (Nodding.)
8     THE WITNESS:  Initially when Mr. Edwards
9 pulled into the driveway, I believed he was going
10 to exit the car and run for the house.
11     When I exited my patrol car, I was
12 actually going for the corner of the house.  And
13 when I noticed he was not getting out of the car,
14 that's when I moved to -- to the vehicle itself and
15 drew my weapon.
16 BY MR. BROOKS:
17     Q.   Okay.  I just want to go through that a
18 little bit.
19     So when Mr. Edwards stopped in the
20 driveway, your first thought is that he's going to
21 get out of the car and run into the house?
22     A.   Absolutely.
23     Q.   All right.  You, at least in your mind,
24 thought there's a reason why he's pulling into this

Page 61

1 driveway, right?
2     A.   Yes.
3     Q.   The reason, at least in your mind, is
4 that he was pulling into this driveway because,
5 one, he had some famil- -- some knowledge of this
6 location, right?
7     A.   That I wouldn't know.
8     Q.   Well, what led you to believe that he
9 was going to run into the house?
10     A.   It's just a thought.  It's experience.
11 I've seen it a couple times before where somebody
12 would pull into a driveway and try to get to the
13 house.
14     Q.   All right.  I take it as Mr. Edwards is
15 traveling east on Franklin, he bypasses a number of
16 different houses that have driveways, right?
17     A.   That's correct.
18     Q.   He ultimately pulls into the driveway
19 at 1304 Franklin, correct?
20     A.   That's correct.
21     Q.   From that one could take that he had
22 some knowledge of that address which would prompt
23 him to pull into that particular driveway.  Would
24 you agree?

**EXHIBIT B**

JONATHAN CATER, 06/26/2019                                    Page 62..65

Page 62

1    A.   That could be assumed, absolutely.

2    Q.   In fact, you saw a female come out of

3 the house as Mr. Edwards pulled into the driveway?

4    A.   I do know she was farther south in the

5 driveway closer to the house. I'm not sure if I

6 seen her come out of the house or not.

7    Q.   Well, you looked at the video, right,

8 recently?

9    A.   Yes.

10    Q.   And fair to say you recall Officer

11 Sugars telling a female to -- at least direct the

12 female not to approach the car that Mr. Edwards was

13 in?

14    A.   That's correct.

15    Q.   Is it fair -- well, let me restate it.

16        Can you describe the female for us?

17    A.   Taller, blonde.

18    Q.   From what you could see, it appears

19 that she was walking in the direction of the car?

20    A.   Yes.

21    Q.   And Officer Sugars directed her not to

22 come to the car, correct?

23    A.   Correct.

24    Q.   The female that you saw approaching the

Page 63

1 car, did she have a cellphone?

2    A.   I do not know.

3    Q.   Well, when you saw Mr. Edwards pull

4 into the driveway at 1304 Franklin, he had a

5 cellphone, didn't he?

6    A.   I -- I -- I don't know if he did at

7 that point.

8    Q.   Okay. Fair to say when you saw

9 Mr. Edwards as he was traveling in that white

10 Cadillac, apparently he was on the cellphone with

11 someone, right?

12    A.   That's correct.

13    Q.   You just don't know whether it was that

14 female who came out of the house to meet him as he

15 pulled in the driveway?

16    A.   Yes, correct.

17    Q.   Did you say anything to the blonde

18 female who came out of the house?

19    A.   I think I repeated what Officer Sugars

20 said, Get back in the house.

21    Q.   You believe you said something to the

22 effect of, Get back in the house?

23    A.   Yes.

24    Q.   Why were you directing the female away

Page 64

1 from the car?

2    A.   There's -- as a traffic stop, it's kind

3 of our area and we definitely don't need any

4 interference, I guess you could say, from

5 bystanders.

6    Q.   Did the female respond to you when you

7 told her to -- when you directed her to stay away

8 from the car?

9    A.   I believe she went back in the house.

10    Q.   Did you see her go back into the house?

11    A.   I don't remember.

12    Q.   Okay. When you stepped out of your

13 car, you were on the passenger side, right?

14    A.   That's correct.

15    Q.   Did you and Officer Riley get out of

16 the car approximately the same time?

17    A.   I do not believe so. Within -- within

18 a few seconds of each other, sure.

19    Q.   You told us earlier that you recall at

20 the scene after the shooting a sergeant from the

21 Sterling Police Department, right?

22    A.   That's correct.

23    Q.   And that would be Sergeant Bartel?

24    A.   Bartel, correct.

Page 65

1    Q.   At some point you spoke with Sergeant

2 Bartel about the shooting?

3    A.   Could you be more specific?

4    Q.   Well, at some point after the shooting,

5 you spoke to Bartel to explain to him why you fired

6 your weapon. You recall that?

7    A.   Not that I can remember.

8    Q.   All right. Did you participate in any

9 type of walkthrough at the scene after the

10 shooting?

11    A.   No.

12    Q.   Okay. Do you know if any of the other

13 officers who were there at the time of the shooting

14 participated in a walkthrough?

15    A.   Not that I know of.

16    Q.   Okay. You do know what a walkthrough

17 is, right?

18    A.   Yes, yes.

19    Q.   Tell us generally what that would

20 involve in the context of an officer-involved

21 shooting.

22    A.   Typically would be the officers that

23 were involved that -- that would walk -- basically,

24 yeah, walkthrough, kind of tell what -- what

**EXHIBIT B**

JONATHAN CATER, 06/26/2019                                                  Page 66..69

Page 66

1 transpired when, where.

2    Q.   Sergeant Bartel prepared a report where
3 he says you showed him where you were at when you
4 fired your shots.  Do you recall that?

5    A.   I do not recall specifically saying
6 where I was, but we did find empty shell cases.

7    Q.   Is it fair to say that when a police
8 officer is involved, as you described, in a traffic
9 stop and the officer approaches with a weapon drawn
10 and is yelling at the individual, that can lead to
11 an escalation of the situation?

12    MR. KUJAWA:  I'm going to object to
13 foundation, incomplete hypothetical.

14         If you understand it and have an
15 answer, you can go ahead.

16    THE WITNESS:  It -- it could, yes,
17 absolutely.

18 BY MR. BROOKS:

19    Q.   All right.  Would you also agree with
20 me merely because an individual refuses to comply
21 with an order from a police officer, that is to
22 either get out of the car or show me your hands,
23 that in and of it itself does not give an officer a
24 right to fire a shot at the individual?

Page 67

1    A.   That would be correct.

2    Q.   It would be unreasonable in terms of
3 the actions of an officer if that officer chose as
4 a means of compliance to use deadly force merely
5 because the individual refuses to comply with the
6 officer's order to either get out of the car or
7 show me your hands?

8    A.   That's correct.

9    Q.   You know at least from this incident
10 that Nathaniel Edwards was not armed with a weapon,
11 correct?

12    A.   Not until afterwards.

13    Q.   Well, as you saw him in the car as he
14 was driving, there was no indication that he had a
15 weapon, correct?

16    MR. KUJAWA:  Other than the car?

17 BY MR. BROOKS:

18    Q.   No.  You can answer my question.

19    MR. KUJAWA:  If you understand the question,
20 you can go ahead.

21    THE WITNESS:  I did not observe a weapon.

22 BY MR. BROOKS:

23    Q.   All right.  And I take it from all the
24 communications that were made by Officer Sugars,

Page 68

1 there was never any indication that Mr. Edwards was
2 armed, correct?

3    A.   Correct.

4    Q.   I presume if Sugars had some knowledge
5 that Mr. Edwards was armed, he would have
6 communicated that, correct?

7    A.   Absolutely?

8    Q.   Beyond Sugars indicating that I have a
9 traffic stop or a traffic violation, was there
10 anything else that Officer Sugars said which would
11 indicate that Mr. Edwards was something other than
12 a traffic violator?

13    A.   Not that I recall.  I don't believe so.

14    MR. BROOKS:  Ms. Reporter, if you could mark
15 this as Exhibit 4.

16         (Deposition Exhibit No. 4,
17          Witness Cater, was marked for
18          identification 06/26/2019.)

19    MR. BROOKS:  And for the record, this
20 Exhibit 4 is Bates stamped Rock Falls 2464.

21 BY MR. BROOKS:

22    Q.   Sergeant, do you have in front of you
23 what has been marked as Exhibit Number 4?

24    A.   That's correct.

Page 69

1    Q.   And you see the white Cadillac that
2 Mr. Edwards was in?

3    A.   That's correct.

4    Q.   You also made reference to a car that
5 was also parked in the driveway at 1304 Franklin?

6    A.   That's correct.

7    Q.   You see that car?

8    A.   Yes.

9    Q.   All right.  When Mr. Edwards pulled
10 into the driveway, a portion of the passenger side
11 of his car was in that grassy park -- I would say
12 yard area, wasn't it?

13    A.   I -- I don't recall.  I don't know if
14 it was off the driveway or if it was on the
15 driveway.

16    Q.   Okay.  And Officer Riley -- I'm sorry,
17 strike -- strike that.

18         Sergeant Cater, I'm going to show
19 you another photograph.

20         And if I can have this marked as
21 Exhibit 5.

22         (Deposition Exhibit No. 5,
23          Witness Cater, was marked for
24          identification 06/26/2019.)

**EXHIBIT B**

JONATHAN CATER, 06/26/2019                                Page 70..73

Page 70

1    MR. BROOKS: And for the record, Exhibit 5
2 has a Bates number on it, which is Rock Falls 2474.
3 BY MR. BROOKS:
4    **Q.   And again, Sergeant, Exhibit Number 5**
5 **shows the white Cadillac which was driven by**
6 **Mr. Edwards, correct?**
7    A.   That's correct.
8    **Q.   And that is the final resting place of**
9 **the white Cadillac after the shooting had occurred,**
10 **right?**
11   A.   That is correct.
12   **Q.   If you could, looking at Exhibit**
13 **Number 5, can you point out for us where you were**
14 **located when you first fired a shot?**
15   A.   Approximately where the front tire --
16 this picture.
17   **Q.   You're looking at Exhibit 5 or**
18 **Exhibit 4?**
19   A.   Exhibit 5.
20   **Q.   All right.  Exhibit 5.**
21       **Can you point out for us so we can**
22 **see it on camera?**
23   A.   Okay.
24   **Q.   You're going to have to hold the**

Page 71

1 photograph up.
2       **I don't know if you can zoom in on**
3 **it a little bit.**
4       **All right.  If you could point for**
5 **us where you were located when you fired -- first**
6 **fired shots at Mr. Edwards?**
7    A.   Approximately where the front tire is
8 in this picture currently.
9    **Q.   All right.  Can you put an X in that**
10 **area on -- is that Exhibit 5?**
11   A.   Yes.
12   **Q.   All right.  Put an X in that area where**
13 **you believe you were located when you first fired**
14 **shots at Mr. Edwards.**
15   MR. KUJAWA: You can go ahead and do it, with
16 the obvious stipulation that the car was not in
17 this position at the time the shots were fired.
18 Correct?
19   MR. BROOKS: Correct.
20   THE WITNESS: Yeah.
21 BY MR. BROOKS:
22   **Q.   Now, you also have Exhibit Number 4 in**
23 **front of you?**
24   A.   That's correct.

Page 72

1    **Q.   Exhibit Number 4 also shows a similar**
2 **area?**
3    A.   That's correct.
4    **Q.   It shows the area where you believe you**
5 **would have been standing when you first fired**
6 **shots?**
7    A.   Correct.
8    **Q.   Okay.  Can you also put an X on**
9 **Exhibit 4 to represent the area where you were**
10 **standing when you first fired shots?**
11   MR. KUJAWA: Again with the stipulation that
12 this is not where the car was at the time the shots
13 were fired.
14   MR. BROOKS: Understandable.
15   MR. KUJAWA: Okay.
16 BY MR. BROOKS:
17   **Q.   Sergeant, when you fired the shots, you**
18 **fired them in rapid succession?**
19   A.   Relatively, yes.
20   **Q.   All right.  Were you moving when you**
21 **fired the shots?**
22   A.   Yes.
23   **Q.   Can you demonstrate for us how you were**
24 **moving?  Better yet, you tell us.**

Page 73

1    A.   I was backpedaling.
2    **Q.   Backpedaling.  Backpedaling in what**
3 **direction?**
4    A.   Backwards, backwards and to the right.
5    **Q.   All right.  You see where the car is**
6 **situated?  When you first fired shots, how close**
7 **were you to the car?**
8    A.   Less than a foot.
9    **Q.   All right.  Were you -- understanding**
10 **the photographs show the final resting place of the**
11 **white Cadillac.**
12   A.   Correct.
13   **Q.   Where were you standing in reference to**
14 **the passenger side of Mr. Edwards' car when you**
15 **fired the first -- when you fired your shots, the**
16 **first shot?**
17   A.   Clarify that just a little bit.
18   **Q.   Sure.**
19       **You can see the entire side pro- --**
20 **passenger side profile of Mr. Edwards' Cadillac in**
21 **both Exhibits 4 and 5.**
22   A.   Yes, sir.
23   **Q.   All right.  Using the side profile**
24 **which is shown in Exhibits 4 and 5, can you tell us**

**EXHIBIT B**

JONATHAN CATER, 06/26/2019                    Page 74..77

Page 74

1 what portion of the car, the passenger side, you
2 would have been closest to, either the front door,
3 the back -- the passenger door, or what when you
4 fired your shot?
5     A.   The rear taillight.
6     MR. KULIS:  Can you repeat that?  I didn't
7 hear it.
8     THE WITNESS:  The rear taillight.
9 BY MR. BROOKS:
10    Q.   And by the way, when you were situated
11 near the rear taillight of the white Cadillac, you
12 weren't in contact with the Cadillac, were you?
13    A.   No.
14    Q.   Fair to say whatever movement the
15 Cadillac had, the car never struck you, correct?
16    A.   Not that I can recall.
17    Q.   Well, you had an opportunity to at
18 least get checked out at a hospital?
19    A.   Yes.
20    Q.   And of course when you went to the
21 hospital, you basically indicated that you didn't
22 have any injuries.  You recall that?
23    A.   Correct.
24    Q.   The car never made contact with your

Page 75

1 body, correct?
2     MR. KUJAWA:  Objection, asked and answered.
3     You can answer it again.
4     THE WITNESS:  Not that I can recall.
5 BY MR. BROOKS:
6     Q.   If the car had made contact with your
7 body and you fired shots, isn't that something you
8 would remember?
9     MR. KUJAWA:  Objection; foundation,
10 speculation.
11    If you have an answer, you can go
12 ahead.
13    THE WITNESS:  I don't have an answer for
14 that.
15 BY MR. BROOKS:
16    Q.   All right.  Mr. -- I'm sorry, Sergeant,
17 the area where, as you described, you backpedaled
18 into, that would be that grassy area that's shown
19 in Exhibits 4 and 5, a portion of it?
20    A.   I would assume so, comparing to where
21 I -- where I know I ended up.
22    Q.   When -- when you were backpedaling,
23 there was no obstructions that prevented you from
24 backpedaling, right?

Page 76

1     A.   Correct.
2     Q.   You had let's say to the right of your
3 body a completely open front yard area, right?
4     A.   I believe it's completely open.
5     Q.   All right.
6     A.   I don't know where it -- trees and such
7 are off the pictures, but ...
8     Q.   Right.
9          But as best as you recall, there
10 were no trees that prevented you from moving, let's
11 say, to the right of the Cadillac?
12    A.   No.
13    Q.   No obstructions, correct?
14    A.   No.
15    Q.   Just so -- I just want to make sure the
16 record is clear.
17         When you say no, you mean no, there
18 were no --
19    A.   No, no obstructions.  I'm sorry.
20    Q.   You had an opportunity to view the
21 video recently, the in-car video from Sugars'
22 police vehicle, correct?
23    A.   Correct.
24    Q.   How did the Cadillac come to a stop

Page 77

1 after you fired shots?
2     A.   Mr. Edwards applied the brake.
3     Q.   Did you ever tell anyone that you saw
4 Mr. Edwards put the car in park after he was shot?
5     A.   Yes.
6     Q.   You're telling me -- let me restate it.
7          How many times did you shoot
8 Mr. Edwards?
9     A.   After reviewing the video and
10 everything, six rounds.
11    Q.   You fired --
12    A.   Five actually struck.
13    Q.   -- six shots?
14    A.   Yes.
15    Q.   You fired six shots?
16    A.   Yes.
17    Q.   Five shots struck him?
18    A.   That's correct.
19    Q.   And you're telling us that after he was
20 shot five times, you saw him then change the car
21 gear and put it in park?
22    A.   Yes, sir.
23    Q.   Do you know of any other officers who
24 were there at the scene saw that?

**EXHIBIT B**

JONATHAN CATER, 06/26/2019                                    Page 78..81

Page 78

1    A.   I do not know.
2        Q.   All right.  Have -- has any other
3    officers told you that they saw Mr. Edwards put --
4    change the gears after he was shot, put the car in
5    park?
6    A.   Not that I can think of.
7        Q.   Okay.  I take it when Mr. Edwards was
8    shot, he physically was not able to get out of the
9    car, was he?
10   A.   That's correct.
11       Q.   How is it that he was able to get out
12   of the car?
13       MR. KUJAWA:  I'm going to object to the form
14   of the question.  I'm not -- it's vague and
15   ambiguous.
16           If you understand it, you can go
17   ahead.
18       THE WITNESS:  He was removed by the -- from
19   the vehicle by Deputy and Officer Sugars, I
20   believe.
21   BY MR. BROOKS:
22       Q.   Was that because he was physically
23   unable to remove himself from the car after being
24   shot?

Page 79

1    A.   I would assume so, yes.
2        Q.   Okay.  But you -- did it take two
3    individuals to remove Mr. Edwards from the car
4    after he'd been shot?
5    A.   I don't know if that's what it would
6    taken, but that's what they used.
7        Q.   Right.
8            Well, based on what you saw, you saw
9    two individuals, two officers, remove Mr. Edwards
10   from the car after he was shot?
11   A.   That is correct.
12       Q.   You gathered from everything that you
13   could see physically he was not able to lift
14   himself or remove himself from the car, right?
15   A.   I would assume that, yes.
16       Q.   But is your testimony he had enough
17   strength to put the car in --
18       THE COURT REPORTER:  I'm sorry, can you start
19   over?
20   BY MR. BROOKS:
21       Q.   It's your testimony that he had enough
22   strength to put the car -- change the gear and put
23   the car in park after he was shot?
24   A.   Absolutely.

Page 80

1        Q.   When you fired your shots, how much
2    time would you say transpired between the first
3    shot to the last shot?
4    A.   Seconds.  I ...
5        Q.   Tell us what your distance would have
6    been away from the car when you fired your last
7    shot.
8    A.   I truly couldn't tell.
9        Q.   Can you give me your best estimate?
10   A.   No.
11       Q.   You told us earlier when you fired
12   your -- when you first fired your weapon, you were
13   probably about a foot away from this car?
14   A.   Foot away from rear bumper, yes, that's
15   correct.
16       Q.   And you told us that you started
17   backpedaling?
18   A.   That's correct.
19       Q.   How many steps did you take when you
20   were backpedaling?
21   A.   No idea.
22       Q.   All right.  And you don't know how far
23   you went away from the car.
24   A.   I don't think any, but -- yeah.  I

Page 81

1    don't -- I don't think I was -- definitely wasn't
2    gaining ground.
3        Q.   Well, if you -- fair to say, though,
4    that if you're backpedaling, you're moving away
5    from the car, correct?
6    A.   Attempting to, yes.
7        Q.   You've seen on the video where the car
8    moves in a slow-fashion backwards?
9        MR. KUJAWA:  Object to the form of the
10   question, assumes facts not in evidence.
11   BY MR. BROOKS:
12       Q.   You've seen that, right?
13   A.   I've seen the -- the vehicle move
14   backwards in the vehicle, yes.
15       Q.   All right.  Fair to say when you see
16   Mr. Edwards' car moving backwards, it is not
17   accelerating backwards, is it?
18   A.   I couldn't tell you.
19       Q.   Well, you're familiar with the term
20   "acceleration," right?
21   A.   Absolutely, yes.
22       Q.   That would suggest that something's
23   moving at a fast pace, right?
24   A.   Or beginning to, yes.

**EXHIBIT B**

JONATHAN CATER, 06/26/2019                                    Page 82..85

Page 82

1   Q.   All right.  At any point on the video,
2 do you see Mr. Edwards' vehicle moving backwards at
3 a fast pace?
4   A.   I can't give you a rate or a pace on
5 the video.
6   Q.   What you do see is a vehicle moving
7 back in a slow fashion, would you agree with that?
8      MR. KUJAWA:  Object, misstates the evidence.
9         If you understand it, you can go
10 ahead and answer.
11     THE WITNESS:  I understand -- yeah.
12 Absolutely understand the question.  I do not
13 believe it's a slow pace.
14 BY MR. BROOKS:
15     Q.   It appears that the car is rolling
16 backwards, doesn't it?
17     A.   Yes.  The vehicle is moving backwards,
18 yes.
19     Q.   Going back to the video.  When Officer
20 Sugars first approaches Mr. Edwards' car, would you
21 describe the car as being in a position where it's
22 completely stopped?
23     A.   Yes.
24     Q.   The engine apparently is still on,

Page 83

1 correct?
2   A.   That is correct.
3   Q.   Do you know whether or not Mr. Edwards'
4 foot was on his brake?
5   A.   I do not believe so.
6   Q.   Okay.  Do you know with certainly
7 whether or not his foot was on his brake?
8   A.   Not with certainty, no.
9   Q.   You saw the manner in which Officer
10 Sugars approached Mr. Edwards' car with his gun
11 drawn?
12     A.   Yes.
13     Q.   All right.  Can you demonstrate for us
14 how he held his weapon?
15     A.   It -- it's not a technique that we
16 teach or anything like that, but he did have his --
17 I guess right-handed -- his pistol drawn.
18     Q.   All right.
19     A.   And ...
20     Q.   He -- he held his weapon in a fashion
21 that typically law enforcement officers would not
22 do when they're approaching an individual in a
23 traffic stop; would you agree with that?
24     MR. KUJAWA:  I'm going to object to

Page 84

1 foundation, speculation, incomplete hypothetical.
2        If you understand it and have an
3 answer, you can go ahead.
4     THE WITNESS:  There's multiple ways to
5 instruct somebody how to fire a weapon.  If for
6 whatever reason his vest and all that stuff
7 constricted him to have his weapon like that, I
8 don't know.
9 BY MR. BROOKS:
10     Q.   All right.  You -- you would agree but
11 that's not what Rock Falls teaches in terms of how
12 officers are to basically aim or point their
13 firearms?
14     A.   Not typically, but a canted weapon
15 can -- can work.
16     Q.   I understand that, but -- but that's
17 not the method that's taught by Rock Falls Police
18 Department, is it?
19     A.   Typically no, not -- not that far.
20     Q.   Do you know why Officer Sugars had
21 his -- essentially his arm raised somewhere near
22 his head with his weapon pointed at Mr. Edwards as
23 he sat in his car?
24     A.   No.

Page 85

1     Q.   When you have -- when you as you
2 described stood near Mr. Edwards' vehicle, where
3 was Officer Riley before you pulled your weapon
4 out?
5     A.   Between the car -- between our patrol
6 car and the white Cadillac.  I couldn't tell you
7 exactly where Officer Riley was.
8     Q.   When you fired your weapon, where was
9 Officer Riley?
10     A.   To my left and behind.
11     Q.   So was he backpedaling?
12     A.   I believe so.
13     Q.   He's to your left and behind?
14     A.   Yes, about one step or so.
15     Q.   Were you guys at arm's length of each
16 other?
17     A.   Yes, just about.
18     Q.   In the course of this incident, Officer
19 Sugars never fired his weapon.  You understand
20 that?
21     A.   That's correct.
22     Q.   Do you know why Officer Sugars never
23 fired his weapon?
24     A.   Because he was bent down retrieving the

**EXHIBIT B**

JONATHAN CATER, 06/26/2019                    Page 86..89

---

Page 86

1 baton that I rolled across the hood -- or rolled
2 across the roof to him.
3    **Q. Is that what he told you?**
4    A.  That's what I know.
5    **Q. All right. How do you know that?**
6    A.  Because I seen him bend over after the
7 baton rolled to the ground.
8    **Q. Has Officer Sugars ever told you that**
9 **he was in fear of his life?**
10    A.  We never had that conversation.
11    **Q. All right. But just based on your**
12 **interaction with Officer Sugars after this**
13 **shooting, including the 45 minutes that you guys**
14 **spent watching this video, at no point did he ever**
15 **indicate that he was in fear of his life, did he?**
16    A.  I can't give you an answer on that one.
17    **Q. Are you suggesting that he told you**
18 **that he was in fear of his life?**
19    MR. KUJAWA:  If you recall.
20    THE WITNESS.  I -- I don't recall.
21 BY MR. BROOKS:
22    **Q. Okay. You also know that Officer Riley**
23 **never fired his weapon, right?**
24    A.  That's correct.

---

Page 87

1    **Q. Do you know why Officer Riley never**
2 **fired his weapon?**
3    A.  Yes.
4    **Q. And -- and what -- what is the reason**
5 **he didn't fire his weapon?**
6    A.  Line of fire.
7    **Q. What do you mean line of fire?**
8    A.  He didn't have a line of fire.
9    **Q. Explain that to me.**
10    A.  He wouldn't have been able to hit his
11 target through the C and B-pillar as he moved
12 backwards.
13    **Q. Okay. Can you show me, let's say on**
14 **Exhibit 5, where -- where you were referencing that**
15 **Officer Riley would have hit the B and C-pillar?**
16    A.  The B-pillar is basically the pillar
17 between the front and rear doors and then the
18 C-pillar is the portion of steel between the
19 passenger door and rear glass.
20    **Q. You're saying Officer Riley didn't have**
21 **a line of sight?**
22    A.  Not when the -- also with Officer
23 Sugars where he was.
24    **Q. Where was Officer Sugars when you fired**

---

Page 88

1 **your first shot?**
2    A.  He was bent over and knelt down by the
3 driver's door.
4    **Q. So let me get this right. When you**
5 **fired your shot, were your arms extended?**
6    A.  Yes.
7    **Q. All right.**
8    A.  To an extent at least.
9    **Q. All right. You just demonstrated your**
10 **arms being slightly extended.**
11    **Were they completely extended or**
12 **what when you fired your shots?**
13    A.  My elbows weren't locked out or
14 anything like that.
15    **Q. All right.**
16    A.  The vest and everything prevents --
17    **Q. All right.**
18    A.  -- full extension of the arms.
19    **Q. Can you give me your best illustration**
20 **of --**
21    A.  Something of that nature.
22    **Q. All right. And so when you fired your**
23 **shots, you fired through a window in the -- in the**
24 **car, right?**

---

Page 89

1    A.  That's correct.
2    **Q. Which window did you fire through?**
3    A.  The rear window.
4    **Q. So you fired through the rear window,**
5 **the back window, of this white Cadillac?**
6    A.  That's correct.
7    **Q. Officer Sugars would have been**
8 **somewhere near the driver's compartment area when**
9 **you fired those shots, right?**
10    A.  That's correct.
11    **Q. So although Officer Riley didn't have a**
12 **good line of sight or there was some fear of**
13 **possibly injuring Officer Sugars, when you fired**
14 **Officer Sugars was in an area where the driver**
15 **compartment is located on the white Cadillac,**
16 **right?**
17    A.  That's correct.
18    **Q. And you didn't have any concerns about**
19 **firing in that direction?**
20    A.  No, not at that time.
21    MR. KUJAWA:  Good time to take a break?
22    MR. BROOKS:  Oh, yeah.
23    THE VIDEOGRAPHER:  Going off the record at
24 2:54 at the end of Media Unit 1.

---

**EXHIBIT B**

JONATHAN CATER, 06/26/2019         Page 90..93

Page 90

1        (Recess taken.)

2      THE VIDEOGRAPHER:  We're back on the record

3 at 3:10 at the beginning of Media Unit 2.

4 BY MR. BROOKS:

5     **Q.**    **All right.  Sergeant Cater, you told us**

6 **earlier that you recently reviewed the in-car video**

7 **from Officer Sugars' vehicle, correct?**

8     A.    That is correct.

9     **Q.**    **All right.  I'm going to show you a**

10 **portion of the video and I'd like to ask you some**

11 **questions concerning it.  So I'm going to try to**

12 **position this so it doesn't interfere with the**

13 **video that's being recorded for your deposition.**

14       **Initially I want you to listen to a**

15 **bit of the audio, and if you can help me in terms**

16 **of the voices that I'm hearing.**

17     A.    Um-hmm.

18     **Q.**    **All right.  So going to start.**

19       (Video playing.)

20       All right.  And -- and by the way,

21 so it looks like the time is 19:08:23 on January

22 26th, 2018.

23       The vehicle that's recording the

24 image that we see and the light that's being shown

Page 91

1 on Mr. Edwards' Cadillac, that's from Sugar's

2 vehicle?

3     A.    That's correct.

4     **Q.**    **In reference to the vehicles that are**

5 **now following Mr. Edwards at this time of 19:08:23**

6 **on the video, where is your car in relationship to**

7 **Sugar's?**

8     A.    It would be Officer Sugars' car, Deputy

9 Coutts's car, and then our car, so third.

10     **Q.**    **Deputy Coutts, he's with Sterling?**

11     A.    Whiteside.

12     **Q.**    **Oh, Whiteside County.**

13       **Have you had any conversations with**

14 **Deputy Coutts concerning this shooting?**

15     A.    No.

16     **Q.**    **Have you reviewed the video with him?**

17     A.    No.

18       (Video playing.)

19     **Q.**    **Do you recognize any of those voices?**

20 **Could you hear it well enough?**

21     A.    No.  I -- all I can hear was siren.

22 I'm sorry.

23     **Q.**    **All right.  I don't think I can make it**

24 **any louder.**

Page 92

1     A.    Yeah.  The siren just gets louder

2 and ...

3     **Q.**    **Are those communications that are**

4 **somewhere around 19:08:48, is that coming from**

5 **Sugar's vehicle; do you know?**

6     A.    From his radio, but that is Sergeant

7 Schmidt from Whiteside County Sheriff's Office.  I

8 believe he's advising or instructing Deputy Coutts

9 to just observe and help if needed.

10     **Q.**    **Who is that?**

11     A.    That is Officer Sugars.

12     **Q.**    **All right.  And that's at 19:08:53.**

13       **When Officer Sugars makes that**

14 **communication, do you actually hear that in your**

15 **vehicle or is it just limited to his vehicle**

16 **communicating with a dispatcher?**

17     A.    No.  Hear it on our frequency.

18     **Q.**    **You would have heard it?**

19     A.    Absolutely, yes.

20     **Q.**    **All right.**

21       (Video playing.)

22       All right.  The individual who's

23 talking now, that's Officer Sugars, right?

24     A.    Correct.

Page 93

1     **Q.**    **And you told us earlier in terms of how**

2 **Deputy Coutts -- I'm sorry, Officer Sugars was**

3 **holding his weapon.  You see him with his weapon**

4 **raised somewhere at the height of his face?**

5     A.    Yes.

6     **Q.**    **And you told us earlier that's not how**

7 **Rock Falls typically teaches its officers in terms**

8 **of either aiming their weapon or directing their**

9 **weapon at an individual, right?**

10     A.    Typically, correct.

11       (Video playing.)

12     **Q.**    **You heard Officer Sugars at least say**

13 **to someone, Get away from the car?**

14     A.    Yes.

15     **Q.**    **Fair to say he's telling the female**

16 **who's approaching Mr. Edwards' car to get away from**

17 **it?**

18     A.    Yes.

19     **Q.**    **And you believe you also yelled some**

20 **things as well?**

21     A.    Correct.

22     **Q.**    **Given the action of Officer Sugars, the**

23 **yelling, the screaming, approaching with his weapon**

24 **in that fashion, wouldn't you agree that that could**

**EXHIBIT B**

JONATHAN CATER, 06/26/2019                              Page 94..97

Page 94

1  escalate the situation, the tension?
2      A.   It could, I'm sure.
3      Q.   Would you also agree that there would
4  be a better approach from a law enforcement
5  standpoint to make the situation calmer?
6      MR. KUJAWA:  Object to foundation,
7  speculation, incomplete hypothetical.
8          If you understand the question, you
9  can go ahead and answer.
10     THE WITNESS:  At that point we had no idea
11  what was going on.  I -- with -- within that
12  vehicle.  We had no idea if the person has weapons,
13  if -- if they do, if they don't, but -- hand
14  weapons, I -- I should say, firearms, knives, what
15  have you.
16          It's always better to have the
17  tactical advantage.  Reaction is so much slower
18  than action.
19  BY MR. BROOKS:
20     Q.   So you're saying in terms of how
21  Officer Sugars is approaching the vehicle at the
22  point in the video, 19:09.3, that you do not have
23  any issues with how he approached the vehicle?
24     A.   No.

Page 95

1      Q.   When you stepped from your vehicle, you
2  saw Officer Sugars with his weapon out, right?
3      A.   I don't know.  I -- I wasn't focused
4  that way.  I may have.  I may not.  I don't
5  remember.
6      Q.   Where were you focused?
7      A.   Between the front of the car and the
8  house.
9      Q.   So as you're focused on the front of
10  car and the house, you told us earlier you didn't
11  have your weapon out, correct?
12     A.   Not initially, no.
13     Q.   So as you're approaching Mr. Edwards'
14  vehicle in the front of the house, your weapon
15  remained holstered.  Is that what you're telling
16  us?
17     A.   Yes.
18     Q.   You didn't perceive Mr. Edwards as a
19  threat at this point of 19:09.03 on the video?
20     A.   It -- I wouldn't say that I didn't --
21  did or didn't perceive him as a threat.  If I'm
22  going to be running after somebody and ultimately
23  either tackling them or grabbing onto them, or
24  whatever I got to do, doesn't work so well with a

Page 96

1  gun in your hand.
2      Q.   You didn't perceive Mr. Edwards as a
3  threat to the level that you would have your weapon
4  drawn at 19.09.03 as shown in this video; is that
5  right?
6      A.   I didn't have my gun out, if that -- I
7  mean, I don't -- I'm not sure what exactly ...
8      Q.   Well, if you had perceived Mr. Edwards
9  as a threat at this particular point on the video,
10  19.09.03, a threat to your safety, would you have
11  had your weapon out?
12     A.   I may or may not.  It would -- I don't
13  remember exactly how far away from the car we were.
14     Q.   When you pulled up, I believe behind
15  Sugars' vehicle, right?
16     A.   Yes.
17     Q.   How close did you get to his vehicle
18  when you stopped?
19     A.   We were canted more -- pointed towards
20  the white Cadillac at the time.  I don't recall how
21  much space was between the rear end of his car and
22  our -- our driver's side.
23     Q.   Fair to say that Sugars was loud enough
24  that you could hear what he was saying?

Page 97

1      A.   Absolutely.
2      Q.   He was yelling?
3      A.   Yes.
4          (Video playing.)
5      Q.   Is that Sugars again, speaking, saying,
6  Do not move?  Was what Sugars?
7      A.   That was me.
8      Q.   Oh, that was you?
9      A.   Yes.
10     Q.   What did you say?
11     A.   Do not move, shithead.
12     Q.   Why did you call Mr. Edwards shithead?
13     A.   I have no idea.
14     Q.   All right.  The only thing you knew is
15  that he had committed a traffic violation, right?
16     A.   Correct.  At the time, correct.
17     Q.   All right.  You now had Mr. Edwards
18  apparently stopped in a driveway where you had the
19  address of the resident at -- the resident at that
20  particular point, right?
21     A.   The address, yes.
22     Q.   You also had his license plate,
23  correct?
24     A.   Yes.

**EXHIBIT B**

JONATHAN CATER, 06/26/2019                                    Page 98..101

Page 98

1    Q.   Is that something that the police
2  department teaches you, when you approach an
3  individual who from all indications has committed a
4  traffic violation but is now stopped where you have
5  an address and a license plate, that you approach
6  them and use that type of language?
7    A.   Minus the shithead, yes.
8    Q.   They just don't teach you to use the
9  language shithead?
10   A.   Absolutely.
11   Q.   By using that language, that could
12  escalate the situation, correct?
13   A.   It could.
14   Q.   Because you're directing it at
15  Mr. Edwards who's seated in the car, right?
16   A.   Yes.
17   Q.   You weren't directing it at the female
18  who had first come out of the house, right?
19   A.   No.
20   Q.   Do you know if the female was still out
21  of the house at that point?
22   A.   I don't remember.
23        (Video playing.)
24   Q.   Who was that, do you know, who said,

Page 99

1  Got him?
2    A.   Sugars.
3        (Video playing.)
4    Q.   All right.  Whose voice is that saying,
5  Get out of the car?
6    A.   That was Sugars.
7        Hold on one second.  Back up.
8    Q.   Want me to take it back little bit?
9    A.   Yes.
10   Q.   Okay.
11       (Video playing.)
12   A.   That was -- get out of the car was
13  Sugars.  Open the door was me.
14   Q.   When you're saying open the door, where
15  are you in reference to Mr. Edwards' vehicle?
16   A.   I'm at the back bumper near the
17  taillight.
18   Q.   And by the way, when you say you're at
19  the back bumper, are you on the side of the bumper,
20  the -- basically to the side of the car, or what?
21   A.   Behind the car.
22   Q.   How far behind the car?
23   A.   Less than a foot.
24   Q.   All right.  Give me your best

Page 100

1  approximation where you would be situated if you
2  divided the back of the car in half and you had a
3  line going right down the middle.
4    A.   Technically a quarter way across from
5  right to left, so splitting the half in half again.
6    Q.   The only way we would be able to know
7  that is if the car that's captured --
8    A.   Was in view.
9    Q.   -- in the video was positioned in a
10  fashion to capture it, right?
11   A.   Correct.
12       (Video playing.)
13   Q.   You heard that?
14   A.   Open the door.
15   Q.   Is that you again?
16   A.   I believe that was Sugars.
17       (Video playing.)
18   Q.   Who said that, You -- you're going to
19  get shot?
20   A.   Sugars.
21   Q.   All right.  So in response to
22  Mr. Edwards' failure to either open the door, an
23  officer says, You're going to get shot, correct?
24   A.   That's what he said, yes.

Page 101

1    Q.   And that's Sugars?
2    A.   Yes.
3    Q.   Do you know why Officer Sugars would
4  say to Mr. Edwards because of his noncompliance
5  that he is not getting out of the car or opening
6  the door that he would get shot?  Do you know why
7  he would say that?
8    A.   No.
9    Q.   For an officer to say to an individual,
10  such as Sugars has done in this video at 19:09.22,
11  directing it to Mr. Edwards, essentially for his
12  failure to get out of the car, indicating that he
13  or the police would shoot him, doesn't that have
14  the potential to escalate the situation?
15   A.   Yes.
16       (Video playing.)
17   Q.   Can you tell me what was being said in
18  the mix of all of that?
19   A.   Between myself and Sugars?
20   Q.   Yes.
21   A.   Asked if I had a baton.
22   Q.   Anything beyond that that you could
23  hear?
24   A.   Just the Mr. Edwards.

**EXHIBIT B**

JONATHAN CATER, 06/26/2019                    Page 102..105

Page 102

1    Q.    Right.  I want to focus on what the two
2 of you are saying.  Okay?
3            So I'm going to play it.  Just back
4 it up a little bit.
5            (Video playing.)
6            By the way, is Ethan Riley heard at
7 all on the video?
8    A.    I don't think so.
9    Q.    And was that Sugars again or was it --
10   A.    I --
11   Q.    Do you want me to play it again?
12   A.    I wasn't listening --
13   Q.    All right.
14   A.    -- to that part, I'm sorry.
15   Q.    All right.  I'm sorry.  I'll just play
16 it again.
17           (Video playing.)
18           Did you hear Mr. Edwards say, Okay?
19 Did you hear that?
20   A.    Just now, yes.
21   Q.    Okay.  So in response to what you
22 all -- what the officers, you, Sugars, are yelling
23 at him, at some point he does say, Okay, right?
24 Which would --

Page 103

1    A.    Yes.
2    Q.    -- suggest that he wants to comply,
3 correct?
4        MR. KUJAWA:  Object, foundation, speculation.
5            If you have an answer, you can go
6 ahead.
7    BY MR. BROOKS:
8    Q.    That's indicative of someone indicating
9 they want to comply, right?
10       MR. KUJAWA:  Same objection.
11           If you have an answer, you can go
12 ahead.
13       THE WITNESS:  I -- I don't -- I don't have an
14 answer for you.
15   BY MR. BROOKS:
16   Q.    Okay.  Let me ask you this:  Why the
17 rush to get him out of the car if he's in a
18 driveway where you have the address, you have the
19 license plate, it appears that even someone at the
20 home knows who he is, why the rush to get him out
21 of the car?
22   A.    What's in the car?  I have no idea
23 what's in that car.
24   Q.    I take it from the point you follow his

Page 104

1 car till the point he's parked in the driveway,
2 you're not aware of anything in the car that would
3 harm you, right?
4    A.    Can you say it one more time, please?
5 I'm sorry.
6        MR. BROOKS:  Can you read it back?
7            (Record read.)
8        THE WITNESS:  Correct.  Not aware of
9 anything.
10           (Video playing.)
11   BY MR. BROOKS:
12   Q.    Okay.  You -- you heard something that
13 said something like, Do not -- I was trying to
14 figure out -- you -- did you hear that?
15   A.    Yeah, Sugars, I don't ...
16   Q.    Do you know what he was saying?  Do
17 not --
18   A.    I don't -- other than that, I think he
19 cut himself off.
20           (Video playing.)
21   Q.    The words, Do you have a baton, is that
22 Sugars?
23   A.    That's correct, Sugars.
24   Q.    All right.  And then you responded to

Page 105

1 him, or did you?
2    A.    No, I didn't respond at that time.
3    Q.    All right.
4            (Video playing.)
5            Is it your testimony that as we see
6 Mr. Edwards' vehicle rolling back at 19.09.41, that
7 it's moving at a fast pace?
8    A.    It's moving backwards.
9    Q.    Okay.  It's not moving fast, though,
10 right?
11       MR. KUJAWA:  Object to the form of the
12 question, foundation, speculation.
13           If you have an answer, you can go
14 ahead.
15   BY MR. BROOKS:
16   Q.    It doesn't appear to be moving fast,
17 does it?
18       MR. KUJAWA:  Same objection.
19       THE WITNESS:  I don't know the definition of
20 fast versus slow.
21   BY MR. BROOKS:
22   Q.    As we see Mr. Edwards' vehicle at
23 19.09.41, you're somewhere in the grassy area of
24 the front yard firing shots, right?

**EXHIBIT B**

JONATHAN CATER, 06/26/2019                              Page 106..109

Page 106

1   A.   I'm confused now.

2   Q.   All right.  At 19.09.41 in the video,
3 as the car is rolling backwards, you are somewhere
4 in the front yard of this location firing shots,
5 right?

6   A.   Behind the car firing through the back
7 window, yes.

8   Q.   You're telling me as the car is moving
9 backwards you're behind it?

10   A.   The entire time, yes.

11   Q.   At 19:09:46, we see Officer Sugars and
12 Riley, right?

13   A.   Correct.

14   Q.   You said that you were somewhere behind
15 Mr. Edwards' vehicle.  At -- at any point, at least
16 in the video and where you see an image of
17 Mr. Edwards' car moving backwards, do you see
18 yourself?

19   A.   I do not.

20   Q.   At 19:09.46 on the video, you see
21 Sugars with his weapon raised at about eye level?

22   A.   Yes.

23   Q.   His arms are extended?

24   A.   Yes.

Page 107

1   Q.   Is -- is that typical firing position?

2   A.   I can't 100 percent make it out, but it
3 looks like he's somewhere within that realm.

4   Q.   Somewhere within the realm, a little
5 better than how he initially approached the car?

6   A.   It appears that way, yes.

7        (Video playing.)

8   Q.   Is that Officer Sugars who's doing all
9 the yelling, Show me your hands?

10   A.   That was me.

11   Q.   Oh, that's you.  All right.  I'm sorry.
12        Again, you're -- you're not shown in
13 the images that are captured on the video at
14 19:09:51?

15   A.   That's correct.

16   Q.   Where are you standing when you say,
17 Show me your hands?

18   A.   At the rear passenger door of the
19 vehicle looking through the rear passenger door at
20 the driver.

21   Q.   And how close are you to the car?

22   A.   My muzzle probably was 8 to 10 inches
23 from the window.

24        (Video playing.)

Page 108

1   Q.   We're now at the point of 19:10.01, and
2 it appears that Officer Sugars is using the baton
3 to at least break a portion of the passenger area,
4 drive side window correct, right?

5   A.   Correct.

6   Q.   Up until this point, from the moment
7 the shots are fired until 19:10:01, has anyone
8 said, He's moving?

9   A.   No.

10        (Video playing.)

11   Q.   Who said, Where's the door handle at?

12   A.   Sugars.

13   Q.   All right.  At 19:10.15 when someone
14 referenced, Shots fired, who was that?

15   A.   I believe that was Ethan.

16   Q.   Who is he communicating with?

17   A.   Dispatcher.

18   Q.   Up until that point, you had not
19 communicated with the dispatcher in terms of firing
20 shots, correct?

21   A.   I believe I did, but my radio was on
22 the wrong frequency.

23   Q.   What do you mean it was on the wrong
24 frequency?

Page 109

1   A.   When I run -- our old radios, when I
2 ran it would twist my dial and I would end up on
3 who knows what channel.  And we'd recently switched
4 to a consolidated dispatch, so hitting my home
5 button didn't do anything.

6   Q.   So if you communicated with dispatcher
7 before Ethan, which we've just heard somewhere
8 around 19:10.15, would there be a record of it?

9   A.   Only if it was crossed on our
10 frequency, unless whatever frequency I was
11 transmitting on actually recorded it.

12   Q.   Do you know what frequency conceivably
13 it would been recorded on?

14   A.   No.

15        (Video playing.)

16   Q.   I hear your voice.

17   A.   Yes.

18   Q.   What -- what are you saying at that
19 point, 19:10:26?

20   A.   I told Dustin and Ethan that I called
21 it shots fired twice and didn't get a response.
22 And at that point, I figured, Well, now my radio's
23 on the wrong frequency.

24        (Video playing.)

EXHIBIT B

JONATHAN CATER, 06/26/2019                                    Page 110..113

Page 110

1    Q.   On the video around 19:10:40, 43, you
2 hear some additional noise.  Is -- is that the
3 baton being used again?
4    A.   Yes.
5    Q.   In reference to the car?
6    A.   Yes.
7    Q.   By Sugars?
8    A.   Yes.
9    Q.   What is he doing at that point?
10   A.   Trying to break out the passenger
11 window, front passenger window.
12        (Video playing.)
13   Q.   Who was that who said, You're good,
14 John?
15   A.   That would have been Deputy Elder.
16   Q.   All right.  Elder from Sterling?
17   A.   Whiteside County.
18   Q.   Whiteside County.
19   A.   Deputy.
20        (Video playing.)
21   Q.   The person that we just saw running at
22 19:11:04, was what Ethan?
23   A.   Yes.
24   Q.   Okay.  Where is he headed to?

Page 111

1    A.   We have a -- he's going back to the
2 squad to get a duty bag that we keep our medical
3 supplies in, our AEDs, those type of supplies.
4    Q.   At 19:11:20, you see two officers that
5 are standing near the driver's side of Mr. Edwards'
6 car?
7    A.   It appears that way, yes.
8    Q.   Is one of those officers you?
9    A.   No.
10   Q.   Okay.  Who -- who are those officers,
11 if you can --
12   A.   Looks like Sugars and I believe it was
13 Deputy Coutts on that side.  Because I believe
14 Deputy Elder was still coming back out of the car.
15   Q.   Just going to play a little bit more.
16        (Video playing.)
17        Who was the person who was saying,
18 What's his name?  You just heard that?
19   A.   I think it was Deputy Elder, but I'm
20 not for certain.  I would assume it was him.
21   Q.   Was that you responding to him?
22   A.   That was Sugars responding.
23        (Video playing.)
24   Q.   Another officer has appeared in the

Page 112

1 video at 19:11:38, and it looks like he's in a
2 different uniform, right?  Can you tell?
3    A.   Yeah.  That would be the county.
4    Q.   Whiteside County?
5    A.   Yes.
6    Q.   Do you know who that is?
7    A.   I can't make it out from here.
8    Q.   Would it help bring it a little closer?
9    A.   That actually might be Coutts.  He's
10 pretty tall, so ...
11   Q.   All right.
12   A.   Deputy Elder's a little bit shorter, a
13 bit wider in the shoulders.
14        (Video playing.)
15   Q.   All right.  At 19:11:53, we see Sugars;
16 we see a Whiteside County officer?
17   A.   Deputy Elder would be the one kneeling
18 down.  Deputy Coutts would be the one standing up.
19   Q.   All right.  And the person who is with
20 the -- looks like a flashlight -- is that a
21 flashlight?
22   A.   Yes.
23   Q.   Is that you?
24   A.   That is correct.

Page 113

1    Q.   All right.  And that's at 19:11:53.
2        (Video playing.)
3        In -- in terms of medical care, you
4 told us that you have some training as a paramedic,
5 EMT?
6    A.   I do, yes.
7    Q.   All right.  And when treatment is being
8 administered to Mr. Edwards at 19:12:09, you were
9 not involved in administering any of that first
10 aid, were you?
11   A.   No.
12        (Video playing.)
13   Q.   Now you appear to be walking back and
14 forth at 19:12:32.  You see that?
15   A.   Yes.
16   Q.   All right.  Can you tell us what was
17 running through your mind at that time?
18   A.   Everything.  I -- I --
19   Q.   Such as?
20   A.   What I need to do at the scene.
21 what -- securing the scene.  Getting other
22 officers.  Other officers are on their way, you can
23 hear that.
24   Q.   If there was any thought that

**EXHIBIT B**

JONATHAN CATER, 06/26/2019                                    Page 114..117

---

Page 114

1 Mr. Edwards had a weapon, let's say, in his
2 vehicle, I presume at this point someone would have
3 started searching his vehicle, correct?
4   A.   No.
5            (Video playing.)
6   Q.   You told us earlier -- and we're at
7 19:12:52 -- Elders would have been on the scene,
8 and he is on the scene, right?
9   A.   Yes.
10   Q.   He's part of that group that's
11 providing first aid?
12   A.   Yes.
13            (Video playing.)
14   Q.   At 19:13:47, you step away from the
15 scene a little bit.  You see that?
16   A.   Yes.
17   Q.   Who are you talking to?
18   A.   Sergeant Bartel.
19   Q.   All right.  So apparently you and
20 Bartel apparently are engaging in a conversation at
21 19:13:47?
22   A.   Yes.
23   Q.   Okay.  Is that when he asked you what
24 happened?

Page 115

1   A.   I don't think so.  He asked me what I
2 needed.
3            (Video playing.)
4   Q.   Is that Bartel who's talking?
5   A.   No.  I believe that was Deputy Elder.
6 I don't think we can hear -- (video playing) -- no.
7 That's Sugars talking on the radio.
8   Q.   I'm going to stop it at 19:14:17.
9            You would agree that within a
10 relatively short period of time of your exiting,
11 stepping out of your car, you fired at least six
12 shots?
13   A.   Correct.
14   MR. BROOKS:  If I could have just a moment.
15   THE VIDEOGRAPHER:  Off the record at 3:46.
16            (Brief pause.)
17   MR. BROOKS:  I don't think we have any other
18 questions at this point.
19   MR. KUJAWA:  Okay.  I have some.
20   THE VIDEOGRAPHER:  One second.
21            Back on the record at 3:46.
22            EXAMINATION
23 BY MR. KUJAWA:
24   Q.   John, you were asked some questions

Page 116

1 about the use of force policy, which is Exhibit
2 Number 1.
3            Do you remember talking about that?
4   A.   Yes.
5   Q.   If you look on page 1 of Exhibit 1
6 under Section 300.3, Use of Force, the last
7 sentence at the bottom of page 1 says, regarding
8 the reasonableness of force, Any evaluation of
9 reasonableness must allow for the fact that
10 officers are often forced to make split-second
11 decisions about the amount of force that reasonably
12 appears necessary in a particular situation with
13 limited information and circumstances that are
14 tense, uncertain, and rapidly involving.
15            Do you see that?
16   A.   Absolutely, yes.
17   Q.   When you exited your squad car because
18 you felt that whoever was driving the white
19 Cadillac was going to flee from the car and either
20 run into the house or run somewhere, was that a
21 situation where you had limited information and it
22 was circumstances that were tense, uncertain, and
23 rapidly evolving?
24   A.   Yes.

Page 117

1   Q.   There's been some questions about what
2 you knew at the time that you exited the squad car.
3 And the question each time was that all -- the only
4 thing that you knew was that there had been a minor
5 traffic violation committed.  Is that -- do you
6 remember those questions?
7   A.   Yes, that's correct.
8   Q.   Isn't it true, though, that when -- by
9 the time this -- you got out of your squad car in
10 front of the house at 1304 Franklin, that you knew
11 that whoever was driving this white Cadillac had
12 spent probably the last five to seven minutes
13 failing to stop for the police car driven by
14 Officer Sugars who had his lights and siren on the
15 entire time following him?
16   A.   Yes, that's correct.
17   Q.   That is a violation in and of itself,
18 correct?
19   A.   Yes.
20   Q.   You also had Officer Riley put his
21 squad car to block the roadway in an attempt to
22 stop this vehicle, correct?
23   A.   Yes.
24   Q.   And that vehicle exited the roadway,

**EXHIBIT B**

JONATHAN CATER, 06/26/2019                                      Page 118..121

Page 118

1 drove down into the ditch and into somebody's front
2 yard to go around your squad car, correct?
3    A.   That's correct.
4    Q.   That's a violation, correct?
5    A.   Correct.
6    Q.   At that point, couldn't the officer --
7 whoever was driving the white Cadillac be -- be
8 considered fleeing and alluding from a traffic
9 stop?
10   A.   Yes.
11       MR. BROOKS:  Objection, form.
12 BY MR. KUJAWA:
13   Q.   And then after you had Officer Riley
14 attempt to block the street, did you also observe
15 Officer Sugars pull his car up in front of the
16 white Cadillac and attempt to stop the car that
17 way?
18   A.   Yes.
19   Q.   What happened when Officer Sugars did
20 that?
21   A.   The white Cadillac pulled around on his
22 left-hand side and went down through the ditch
23 again, so back onto the roadway.
24   Q.   Into somebody else's yard now into the

Page 119

1 grass and up -- back onto the roadway so he could
2 keep fleeing from the police?
3    A.   That's correct.
4    Q.   And that, again, is another violation,
5 correct?
6    A.   Correct.
7    Q.   So beyond all of that, you didn't have
8 any information about who exactly was driving the
9 vehicle, did you?
10   A.   No.
11   Q.   So you don't know whether this vehicle
12 is stolen, correct?
13   A.   No, I didn't.
14   Q.   You -- although you had a license
15 plate, you don't know whether the -- the driver
16 of that car is actually the owner of the car or
17 has any connection to the information on the
18 driver's -- on the license plate, correct?
19   A.   Correct.
20   Q.   And you have no idea of what the
21 relationship is between -- if any, between
22 whoever's driving that white Cadillac and the
23 owners or occupants of the residence at 1304
24 Franklin?

Page 120

1    A.   That's correct.
2    Q.   If you look at page 4 of the Use of
3 Force policy, Exhibit 1.  Down at the bottom,
4 300.4(a) says, An officer may use deadly force to
5 protect him/herself or others from what he/she
6 reasonably believes be an imminent threat of
7 death or serious bodily injury.
8        At the time you fired your weapon at
9 the Cadillac as it was backing up towards you, were
10 you doing so to protect you and your fellow
11 officers from what you reasonably believed would be
12 an imminent threat of death or serious bodily
13 injury?
14   A.   That's correct.
15   Q.   Next page, 5, under Section 300.4.1,
16 which is the section entitled Shooting At or From
17 Moving Vehicles.
18        You were asked some questions
19 earlier about whether you knew whether Mr. Edwards
20 had a weapon on him at any time during this
21 incident.  Do you remember those questions?
22   A.   Yes.
23   Q.   Can a car be a deadly weapon?
24   A.   Absolutely.

Page 121

1    Q.   This policy says -- although it does
2 say that, Officers should move out of the path of
3 an approaching vehicle instead of discharging their
4 firearm at the vehicle or any of its occupants --
5 you see that sentence in there, correct?
6    A.   Yes.
7    Q.   It also goes on to say that, An officer
8 should only discharge a firearm at a moving vehicle
9 or its occupants when the officer reasonably
10 believes there are no other reasonable means
11 available to avert the threat of the vehicle.
12        When you were attempting to back up
13 as the -- Mr. Edwards was backing that Cadillac
14 towards you and you fired your weapon, did you
15 reasonably believe that there were no other
16 reasonable means available to you to avert the
17 threat of the vehicle?
18   A.   That is correct.
19   Q.   Did you believe that Mr. Edwards was
20 using that vehicle as a deadly weapon and
21 attempting to run you over?
22   A.   That is correct.
23   Q.   Or perhaps run over Officer Riley or
24 Officer Sugars?

**EXHIBIT B**

JONATHAN CATER, 06/26/2019                                    Page 122..125

Page 122

1    A.   That is correct.

2    MR. KUJAWA:  Those are all my questions,

3 John.  Thanks.

4         FURTHER EXAMINATION

5 BY MR. BROOKS:

6    **Q.   Sergeant, as Mr. Edwards' car was**

7 **rolling backwards, there was nothing preventing you**

8 **from moving to the right of the car, right?**

9    A.   Physically?

10   **Q.   Yeah.**

11   A.   Not allowing me to move?

12   **Q.   Yes.**

13   A.   That's correct.

14   **Q.   All right.  You could have chose to do**

15 **that as opposed to firing your weapon, couldn't**

16 **you?**

17   A.   I don't believe so at that time.

18   **Q.   As far as your status as a police**

19 **officer, do you have to undergo certain physical**

20 **tests?**

21   A.   When we're hired, yes.

22   **Q.   All right.  After you're hired, you**

23 **don't have to undergo any more physical tests?**

24   A.   That is correct.

Page 123

1    **Q.   All right.  I take it you have to**

2 **maintain good health, though, right?**

3    A.   Absolutely.

4    **Q.   All right.  There was nothing from a**

5 **health standpoint that prevented you from moving**

6 **quickly if you needed to move quickly, right?**

7    A.   That is correct.

8    **Q.   Instead of moving out of the path of**

9 **Mr. Edwards' vehicle as it rolled back slowly, you**

10 **fired shots, correct?**

11   MR. KUJAWA:  I'll object to the form of the

12 question.  It misstates his testimony and assumes

13 facts not in evidence.

14       If you understand and have an

15 answer, you can go ahead.

16   THE WITNESS:  I do not have an answer for

17 you.

18 BY MR. BROOKS:

19   **Q.   What do you mean you don't have an**

20 **answer for me?**

21   A.   Not that the -- the context of the

22 sentence is --

23   **Q.   Let me ask it again.**

24       **As opposed to moving out of the path**

Page 124

1 of Mr. Edwards' car as it was rolling backwards,

2 you chose to fire shots, correct?

3    A.   Correct.

4    MR. BROOKS:  I don't have any other

5 questions.

6    MR. KUJAWA:  Nothing else.  We're good.

7 We'll -- we'll waive signature.

8    THE VIDEOGRAPHER:  This completes today's

9 proceedings.  We are going off the record at 3:55

10 at the end of Media Unit 2.

11       (The proceedings adjourned at

12       3:55 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

Page 125

1

         REPORTER'S CERTIFICATE

2

    I, Kathleen A. Hillgard, do hereby certify

3 that JONATHAN CATER was duly sworn to testify the

whole truth, that the foregoing deposition was

4 recorded stenographically by us and was reduced to

computerized transcript under my direction, and

5 that said deposition constitutes a true record of

the testimony given by said witness.

6

    I further certify that the reading and

7 signing of the deposition was waived by agreement

of deponent and deponent's counsel.

8

    I further certify that I am not a relative or

9 employee or attorney or counsel of any of the

parties, or a relative or employee of such attorney

10 or counsel, or financially interested directly or

indirectly in this action.

11

    IN WITNESS WHEREOF, I have hereunto set my

12 hand of office at Chicago, Illinois, this 26th day

of August 2019.

13

14

15

                Illinois CSR No. 084-004093

16

17

18

19

20

21

22

23

24

Urlaub Bowen & Associates, Inc.   312-781-9586

**Exhibits**

**1 Cater 062619-1** 22:21 23:3,5
116:1,2,5 120:3

**2 Cater 062619-2** 28:4,9,10

**3 Cater 062619-3** 31:9,14

**4 Cater 062619-4** 68:15,16,20,23
70:18 71:22 72:1,9

**5 Cater 062619-5** 69:21,22 70:1,
4,12,13,17,19,20 71:10 87:14

---
**0**
---

**06/26/2019** 22:23 28:6 31:11
68:18 69:24

---
**1**
---

**1** 4:2 15:16 22:21 23:3,5 89:24
116:2,5,7 120:3

**10** 107:22

**10-year** 36:2

**100** 107:2

**1020** 4:7

**10:15** 20:21

**10:58** 20:22

**11** 8:6

**1260** 4:17

**1304** 9:18 51:11,16 59:21 61:19
63:4 69:5 117:10 119:23

**140** 4:6

**17** 9:2

**18** 4:11

**19.09.03** 96:4,10

**19.09.41** 105:6,23 106:2

**19:08:23** 90:21 91:5

**19:08:48** 92:4

**19:08:53** 92:12

**19.09.03** 95:19

**19.09.22** 101:10

**19.09.3** 94:22

**19.09.46** 106:20

**19:09:46** 106:11

**19:09:51** 107:14

**19:10.01** 108:1

**19:10.15** 108:13 109:8

**19:10.01** 108:7

**19:10.26** 109:19

**19:10.40** 110:1

**19:11.04** 110:22

**19:11.20** 111:4

**19:11.38** 112:1

**19:11.53** 112:15 113:1

**19:12.09** 113:8

**19:12.32** 113:14

**19:12.52** 114:7

**19:13.47** 114:14,21

**19:14.17** 115:8

**1:07** 4:3

---
**2**
---

**2** 28:4,10 90:3 124:10

**20** 4:16

**2000** 42:22

**2000s** 36:24 37:24 40:1 41:20

**2002** 38:14

**2003** 38:14

**2005** 37:11

**2008** 8:7 37:11

**2016** 9:2

**2018** 7:23 10:19 22:19 23:10,14,17
33:2,14 34:9 38:16 43:15 44:7,10
45:1,6 90:22

**2019** 4:5

**21st** 39:3

**2464** 68:20

**2474** 70:2

**25** 8:23

**26** 10:19

**26th** 4:5 7:23 33:2,14 34:8 38:16
43:15 44:6 45:1,6 90:22

**2:54** 89:24

---
**3**
---

**3** 31:9,14

**300.3** 116:6

**300.4(a)** 120:4

**300.4.1** 120:15

**30th** 23:14

**3:10** 90:3

**3:46** 115:15,21

**3:55** 124:9,12

---
**4**
---

**4** 68:15,16,20,23 70:18 71:22 72:1,
9 73:21,24 75:19 120:2

**43** 110:1

**45** 21:2,17 86:13

---
**5**
---

**5** 8:6 24:8 69:21,22 70:1,4,13,17,
19,20 71:10 73:21,24 75:19 87:14
120:15

**50035** 4:11

---
**6**
---

**6:00** 38:21

---
**8**
---

**8** 107:22

---
**9**
---

**90s** 36:22 41:13,20,22

**911** 10:15

---
**A**
---

**a.m.** 20:22

**ability** 47:13

**absolutely** 22:17 25:15 52:15
55:19 56:2 60:22 62:1 66:17 68:7

79:24 81:21 82:12 92:19 97:1 98:10 116:16 120:24 123:3

**accelerating** 81:17

**acceleration** 81:20

**accommodate** 51:20

**action** 93:22 94:18

**actions** 29:21 32:2,6 49:23 67:3

**active** 9:1 36:3 55:14,15

**actual** 20:2 30:2 32:11 55:15

**add** 7:7

**addition** 29:15 42:21

**additional** 110:2

**address** 47:9 61:22 97:19,21 98:5 103:18

**adjourned** 124:11

**administered** 113:8

**administering** 113:9

**advantage** 94:17

**advising** 92:8

**AEDS** 111:3

**afternoon** 4:1

**Agent** 15:18,22

**Agnew** 4:10

**agree** 24:15 25:20 53:15 56:3 61:24 66:19 82:7 83:23 84:10 93:24 94:3 115:9

**agreed** 40:24

**agreement** 41:23

**ahead** 14:12 18:10 24:4 26:7,24 54:19 57:9,14 59:12 66:15 67:20 71:15 75:12 78:17 82:10 84:3 94:9 103:6,12 105:14 123:15

**aid** 113:10 114:11

**aim** 84:12

**aiming** 93:8

**allowing** 122:11

**alluding** 118:8

**ambiguous** 78:15

**amount** 116:11

**Annie** 4:9

**anymore** 38:6

**Anytime** 31:21

**apparently** 50:11 63:10 82:24 97:18 114:19,20

**appeared** 52:15 111:24

**appears** 62:18 82:15 103:19 107:6 108:2 111:7 116:12

**applicable** 6:14

**applied** 77:2

**approach** 59:7 62:12 94:4 98:2,5

**approached** 49:18 83:10 94:23 107:5

**approaches** 66:9 82:20

**approaching** 27:17 62:24 83:22 93:16,23 94:21 95:13 121:3

**approximately** 21:2 37:23 38:13 39:22 64:16 70:15 71:7

**approximation** 36:13 100:1

**area** 64:3 69:12 71:10,12 72:2,4,9 75:17,18 76:3 89:8,14 105:23 108:3

**arm** 84:21

**arm's** 85:15

**armed** 43:16 67:10 68:2,5

**arms** 88:5,10,18 106:23

**army** 8:19

**arresting** 25:19

**arrived** 12:5,19

**assaults** 35:8

**assessment** 32:2

**assigned** 36:18

**assisting** 48:8

**Associates** 4:16,19 36:17

**assume** 32:16 75:20 79:1,15 111:20

**assumed** 62:1

**assumes** 26:4 57:6 59:10 81:10 123:12

**assuming** 18:2,21

**assumption** 47:24

**attempt** 28:1 117:21 118:14,16

**attempting** 81:6 121:12,21

**attend** 37:22

**attended** 37:20

**attorney/client** 16:18

**audio** 10:7 90:15

**avert** 121:11,16

**avoid** 49:23

**avoided** 51:4

**aware** 12:22 45:2,7,10 104:2,8

**B**

**B-PILLAR** 87:11,16

**back** 25:4 26:10,11 39:12 43:14 57:16 63:20,22 64:9,10 74:3 82:7, 19 89:5 90:2 99:7,8,16,19 100:2 102:3 104:6 105:6 106:6 111:1,14 113:13 115:21 118:23 119:1 121:12 123:9

**background** 35:21,23 39:12,15

**backing** 120:9 121:13

**backpedaled** 75:17

**backpedaling** 73:1,2 75:22,24 80:17,20 81:4 85:11

**backwards** 73:4 81:8,14,16,17 82:2,16,17 87:12 105:8 106:3,9,17 122:7 124:1

**badge** 43:23

**bag** 111:2

**Bartel** 12:12,17 64:23,24 65:2,5 66:2 114:18,20 115:4

**based** 18:18 57:22 58:7,23 79:8 86:11

**basic** 38:12

**basically** 24:3 28:15 32:1 35:15 65:23 74:21 84:12 87:16 99:20

**basis** 40:6

**Bates** 68:20 70:2

**baton** 43:24 86:1,7 101:21 104:21 108:2 110:3

**beginning** 4:2 81:24 90:3

**behalf** 4:9,23 5:1,3

**believed** 60:9 120:11

**believes** 120:6 121:10

**belt** 43:19,21,23

**bend** 86:6

**bent** 85:24 88:2

**big** 51:19

**bit** 27:6 35:9,21 38:15 39:13 48:16 60:18 71:3 73:17 90:15 99:8 102:4 111:15 112:12,13 114:15

**block** 49:11 117:21 118:14

**blocked** 49:16

**blonde** 62:17 63:17

**board** 31:22 32:6,15,19 54:9

**Boards** 31:16

**bodily** 120:7,12

**body** 43:20 44:11,14 75:1,7 76:3

**bottom** 23:12 116:7 120:3

**Bowen** 4:15,19

**brake** 77:2 83:4,7

**break** 7:6,8 89:21 108:3 110:10

**Brett** 4:14

**bring** 56:8 112:8

**broken** 29:14 54:9

**Brooks** 4:23 5:6,11,15,18 6:6,11, 16 13:6 14:13 16:20,21 18:13 23:1 25:4,6 26:9,13,15 27:13 28:7 30:22 31:3,8,12 32:17,23 40:13 41:7,14 43:6 51:1 54:22 57:15,19,21 59:14 60:16 66:18 67:17,22 68:14,19,21 70:1,3 71:19,21 72:14,16 74:9 75:5,15 78:21 79:20 81:11 82:14 84:9 86:21 89:22 90:4 94:19 103:7, 15 104:6,11 105:15,21 115:14,17 118:11 122:5 123:18 124:4

**buildings** 20:3

**bumper** 80:14 99:16,19

**business** 36:19 37:1

**businesses** 36:23

**button** 109:5

**bypasses** 61:15

**bystanders** 64:5

**C**

**C-A-T-E-R** 6:10

**C-PILLAR** 87:15,18

**Cadillac** 9:20 45:7,11 46:10,14,22 47:1,3,12,20 48:20,23 49:1,12 50:1,13 57:24 63:10 69:1 70:5,9 73:11,20 74:11,12,15 76:11,24 85:6 89:5,15 91:1 96:20 116:19 117:11 118:7,16,21 119:22 120:9 121:13

**call** 39:11 97:12

**called** 6:3 109:20

**calmer** 55:23 56:1 94:5

**cam** 17:8

**camera** 70:22

**canted** 84:14 96:19

**capacity** 8:22 22:11

**capture** 100:10

**captured** 100:7 107:13

**car** 11:15 17:9,16 19:3 35:18 46:11 47:8,11 48:14,19 49:5,10,15 51:5, 7,15,16 52:2,4,6,10,17 56:13,18,22 59:16,24 60:10,11,13,21 62:12,19, 24 63:1 64:1,8,13,16 66:22 67:6, 13,16 69:4,7,11 71:16 72:12 73:5, 7,14 74:1,15,24 75:6 77:4,20 78:4, 9,12,23 79:3,10,14,17,22,23 80:6, 13,23 81:5,7,16 82:15,20,21 83:10 84:23 85:5,6 88:24 91:6,8,9 93:13, 16 95:7,10 96:13,21 98:15 99:5,12, 20,21,22 100:2,7 101:5,12 103:17, 21,22,23 104:1,2 106:3,6,8,17 107:5,21 110:5 111:6,14 115:11 116:17,19 117:2,9,13,21 118:2,15, 16 119:16 120:23 122:6,8 124:1

**care** 113:3

**career** 33:21

**carry** 36:7 44:18

**cars** 51:20

**case** 4:11 31:23 35:4 39:3 43:24

**cases** 35:5 66:6

**Cater** 4:5,10 6:2,7,10,13,17 22:22 28:5 31:10 32:24 68:17 69:18,23 90:5

**cellphone** 63:1,5,10

**certainty** 83:8

**certification** 38:11 54:2

**certifications** 38:4

**certified** 44:6,19

**chance** 23:8

**change** 77:20 78:4 79:22

**channel** 109:3

**charge** 40:11,14 41:3,19

**charged** 40:15,17,20 41:4 42:22 43:9

**check** 47:20,23 48:6

**checked** 74:18

**Chicago** 4:7,17

**chose** 67:3 122:14 124:2

**circumstance** 16:4 27:23

**circumstances** 56:4,5 116:13,22

**citizen** 34:19

**City** 11:6

**Civil** 6:14

**Clarify** 73:17

**Clark** 4:16

**Clarksville** 42:15

**clear** 30:22 31:5 76:16

**close** 73:6 96:17 107:21

**closer** 62:5 112:8

**closest** 74:2

**collectively** 17:21

**college** 37:13,15,16,20,21,23

**comfortable** 7:9

**commander** 19:7,9 20:16,20

**commit** 58:8

**committed** 57:3 58:2 59:2,6 97:15 98:3 117:5

**communicate** 10:20

**communicated** 45:13 48:7 68:6 108:19 109:6

**communicating** 92:16 108:16

**communication** 16:19 45:17,20 48:9 92:14

**communications** 10:15,22 67:24 92:3

**Community** 37:21

**company** 36:19 37:7,8

**compared** 20:2

**comparing** 75:20

**compartment** 89:8,15

**completed** 20:21

**completely** 76:3,4 82:22 88:11

**completes** 124:8

**compliance** 67:4

**comply** 66:20 67:5 103:2,9

**conceivable** 26:1 58:1

**conceivably** 109:12

**concept** 24:20 55:18

**concerned** 36:20 37:13

**concerns** 89:18

**conclusions** 50:14

**conducted** 16:7

**conducting** 29:12

**conference** 11:6

**confused** 57:10 106:1

**confusing** 45:4

**connection** 119:17

**considered** 118:8

**consist** 43:18

**consistent** 32:3,7

**consolidated** 109:4

**constricted** 84:7

**contact** 49:22,23 50:5,6,22 52:1,3 74:12,24 75:6

**contacted** 45:22 48:1

**context** 53:11 65:20 123:21

**continued** 49:18 50:7

**conversation** 21:5,20 86:10 114:20

**conversations** 22:1 91:13

**cop** 34:16

**copyright** 23:13

**corner** 60:12

**correct** 7:17,20 8:2,10,20 10:21 13:21 15:1,2 17:14,19 20:22,24 21:8 26:20 28:13,18,19 29:22 32:4 33:17 34:3 40:23 41:2 45:9,15 46:17,23 47:2,5,6,9,10 48:20 49:13,20 50:10 51:9 52:8,21 56:24 61:17,19,20 62:14,22,23 63:12,16 64:14,22,24 67:1,8,11,15 68:2,3,6, 24 69:3,6 70:6,7,11 71:18,19,24 72:3,7 73:12 74:15,23 75:1 76:1, 13,22,23 77:18 78:10 79:11 80:15, 18 81:5 83:1,2 85:21 86:24 89:1,6, 10,17 90:7,8 91:3 92:24 93:10,21 95:11 97:16,23 98:12 100:11,23 103:3 104:8,23 106:13 107:15 108:4,5,20 112:24 114:3 115:13 117:7,16,18,22 118:2,3,4,5 119:3, 5,6,12,18,19 120:1,14 121:5,18,22 122:1,13,24 123:7,10 124:2,3

**correctly** 34:23

**counsel** 4:20 6:20 15:4

**county** 13:1 42:14,15 91:12 92:7 110:17,18 112:3,4,16

**couple** 16:13 34:10 36:4,14 61:11

**coursework** 37:14

**court** 4:12,18 5:5,19,21 6:8,15 23:3 26:9 27:5,8 79:18

**Coutts** 91:10,14 92:8 93:2 111:13 112:9,18

**Coutts's** 91:9

**crashed** 50:8

**criminal** 35:7

**crisis** 52:24 53:4,5,7,12,17,19,22 54:3,13,21 55:9,12

**crossed** 109:9

**cut** 104:19

**CV** 4:11

---

**D**

**damage** 35:7

**dash** 11:3 17:8

**date** 23:13 38:16 43:14

**day** 14:2,3,5 38:20 39:1,11

**days** 13:23 14:1,8,16 34:11

**daytime** 9:24 10:2

**deadly** 24:1,2 25:14,17 27:3,11 67:4 120:4,23 121:20

**deal** 52:24 53:14

**dealing** 54:3 56:9

**Dearborn** 4:6

**death** 28:22 120:7,12

**decisions** 116:11

**dedicated** 54:2

**deescalate** 56:8

**deescalation** 55:18

**defendants** 5:4

**definition** 14:15 105:19

**degree** 37:17

**demonstrate** 72:23 83:13

**demonstrated** 88:9

**dentist** 5:13

**department** 7:20 8:5,16 18:19 19:4 23:10 25:23 26:17 28:11,16, 21 29:8,19,21 30:14 32:3,7 42:19 52:22 54:24 64:21 84:18 98:2

**depending** 34:20 56:5

**depends** 14:15 53:12,21 55:8 59:13

**deploy** 55:14

**deployed** 38:2 55:11

**deposition** 4:4,8 6:12,17,22 22:21 28:4,9 31:9 68:16 69:22 90:13

**deputy** 12:5 13:2,5,11 78:19 91:8, 10,14 92:8 93:2 110:15,19 111:13, 14,19 112:12,17,18 115:5

**describe** 48:11 62:16 82:21

**detaining** 25:19

**detective** 29:11 30:6,11 32:9

**determine** 29:20 32:6

**dial** 109:2

**dialogue** 7:4

**difficult** 5:8

**difficulty** 52:15,19

**direct** 21:14 62:11

**directed** 27:3,11 49:10 62:21 64:7

**directing** 63:24 93:8 98:14,17 101:11

**direction** 27:24 62:19 73:3 89:19

**disagree** 24:19,21

**discard** 58:13

**discharge** 121:8

**discharging** 27:17 121:3

**discovery** 6:12 30:23

**discussed** 21:11

**discussion** 19:16

**discussions** 21:21

**dispatch** 10:14,23 45:22 48:1 109:4

**dispatcher** 92:16 108:17,19 109:6

**dispatchers** 10:20

**disregard** 58:14,20

**disregarding** 58:10

**distance** 80:5

**District** 4:12 15:16

**ditch** 118:1,22

**divided** 100:2

**Division** 4:13

**documentation** 32:20

**door** 74:2,3 87:19 88:3 99:13,14 100:14,22 101:6 107:18,19 108:11

**doors** 87:17

**draw** 50:14

**drawn** 59:8 66:9 83:11,17 96:4

**drew** 60:15

**drill's** 27:8

**drilling** 5:14

**drive** 35:18 108:4

**driven** 45:8 70:5 117:13

**driver** 59:6,7 89:14 107:20 119:15

**driver's** 88:3 89:8 96:22 111:5 119:18

**driveway** 9:18,24 47:4,8,9,12 48:14,23 51:8,10,11,15,17,19,24 52:7,10,16 57:2 59:2,17,20 60:9,20 61:1,4,12,18,23 62:3,5 63:4,15 69:5,10,14,15 97:18 103:18 104:1

**driveways** 61:16

**driving** 39:21,24 40:6,12 42:9,21 50:12 67:14 116:18 117:11 118:7 119:8,22

**drove** 57:23 118:1

**Duane** 37:6

**DUI** 35:8 40:11,14 41:1,3,4,19 42:5,17 43:7

**duly** 6:3

**Dustin** 109:20

**duty** 9:1 18:21 36:3 43:17,19,20, 23,24 44:10 111:2

---

**E**

**E-L-D-E-R** 13:8

**ear** 27:8

**earlier** 13:19 16:4 38:17 43:8 50:14 56:21 64:19 80:11 90:6 93:1, 6 95:10 114:6 120:19

**early** 36:22,24 37:24 40:1

**east** 61:15

**education** 37:13

**Edward's** 48:22

**Edwards** 9:4 10:9 11:23 28:23 32:8 33:1 39:1 45:3,8,11 46:10,14, 24 47:4,7 48:14 49:18 50:12 51:3, 15,23 52:9 56:14,19,23 57:2,23 58:13,19 59:1,20 60:8,19 61:14 62:3,12 63:3,9 67:10 68:1,5,11 69:2,9 70:6 71:6,14 77:2,4,8 78:3,7 79:3,9 84:22 91:5 95:18 96:2,8 97:12,17 98:15 101:4,11,24 102:18 113:8 114:1 120:19 121:13,19

**Edwards'** 9:20 48:20 49:11 73:14, 20 81:16 82:2,20 83:3,10 85:2 91:1 93:16 95:13 99:15 100:22 105:6,22 106:15,17 111:5 122:6 123:9 124:1

**effect** 23:16 63:22

**effective** 24:14,19

**effort** 24:3 26:18

**elaborate** 53:6

**elbows** 88:13

**Elder** 13:2,5,7,8,11 110:15,16 111:14,19 112:17 115:5

**Elder's** 112:12

**Elders** 114:7

**else's** 118:24

**employed** 8:4

**employer** 36:16

**employment** 42:19

**empty** 66:6

**EMT** 38:1,12 113:5

**encountering** 27:23

**end** 89:24 96:21 109:2 124:10

**ended** 75:21

**ending** 34:11

**enforcement** 8:14 33:8,9 35:22 53:11 55:21 83:21 94:4

**engage** 46:18

**engaging** 114:20

**engine** 82:24

**entire** 73:19 106:10 117:15

**entitled** 120:16

**equipment** 43:15

**equipped** 44:2

**escalate** 56:4 94:1 98:12 101:14

**escalation** 66:11

**essentially** 49:9 84:21 101:11

**estimate** 80:9

**et al** 4:10

**Ethan** 17:17 34:1,4,8 102:6 108:15 109:7,20 110:22

**evaluated** 32:6

**evaluation** 116:8

**evening** 38:20

**everybody's** 15:17

**evidence** 26:4 57:6 59:10 81:10 82:8 123:13

**evolving** 116:23

**EXAMINATION** 6:5 115:22 122:4

**examined** 6:4

**excuse** 13:5 42:13

**Exhibit** 22:21 23:3,5 28:4,9 31:9, 14 68:15,16,20,23 69:21,22 70:1,4,

JONATHAN CATER, 06/26/2019

12,17,18,19,20 71:10,22 72:1,9 87:14 116:1,5 120:3

**Exhibits** 73:21,24 75:19

**exists** 18:21

**exit** 60:10

**exited** 60:11 116:17 117:2,24

**exiting** 56:18 115:10

**expected** 22:9,11 25:12

**experience** 8:15 18:18 61:10

**explain** 15:12 31:20 65:5 87:9

**explained** 6:21

**extended** 88:5,10,11 106:23

**extension** 88:18

**extent** 31:3 88:8

**eye** 106:21

---

**F**

**face** 27:16 31:16 93:4

**fact** 10:19 25:22 32:18 46:9 50:1 62:2 116:9

**facts** 26:4 57:6 59:10 81:10 123:13

**factual** 40:6 56:5

**failing** 117:13

**failure** 100:22 101:12

**fair** 7:15 14:8 46:11,22 47:11 49:17 52:9 62:10,15 63:8 66:7 74:14 81:3,15 93:15 96:23

**Falls** 7:19 8:4,9,12,16 11:6 12:16 17:12 18:4,19 19:4,6 22:8,15 23:9 25:22 28:11,20 29:7,19 30:13,18 32:13 37:9 39:5 42:10,18 52:22 53:3,24 54:23 68:20 70:2 84:11,17 93:7

**famil-** 61:5

**familiar** 22:13 24:10 81:19

**farther** 60:6 62:4

**fashion** 16:7 39:10 49:15,16,19 50:2,13 51:7 58:1 82:7 83:20 93:24 100:10

**fast** 81:23 82:3 105:7,9,16,20

**fear** 86:9,15,18 89:12

**Federal** 6:13

**fellow** 120:10

**felony** 40:15

**felt** 116:18

**female** 62:2,11,12,16,24 63:14,18, 24 64:6 93:15 98:17,20

**field** 33:15,18 34:9,12,17 38:18 44:13,16 55:21

**figure** 104:14

**figured** 109:22

**file** 31:8

**filed** 4:11

**final** 70:8 73:10

**find** 23:21 66:6

**fire** 66:24 84:5 87:5,6,7,8 89:2 124:2

**firearm** 27:18 121:4,8

**firearms** 84:13 94:14

**fired** 24:13,18 56:13,22 65:5 66:4 70:14 71:5,6,13,17 72:5,10,13,17, 18,21 73:6,15 74:4 75:7 77:1,11,15 80:1,6,11,12 85:8,19,23 86:23 87:2,24 88:5,12,22,23 89:4,9,13 108:7,14 109:21 115:11 120:8 121:14 123:10

**firing** 26:20 56:18 89:19 105:24 106:4,6 107:1 108:19 122:15

**flashlight** 112:20,21

**flee** 116:19

**fleeing** 118:8 119:2

**float** 36:24

**focus** 102:1

**focused** 24:18 54:13 95:3,6,9

**folder** 33:23

**follow** 22:11 25:13 103:24

**foot** 73:8 80:13,14 83:4,7 99:23

**force** 22:16,18 23:9,20 24:1,2,22, 24 25:13,14,17 27:3,11 31:16,21 32:5,14,19 67:4 116:1,6,8,11 120:3,4

**forced** 116:10

**forever** 5:14

**form** 26:3,21 32:21 57:5 59:9 78:13 81:9 105:11 118:11 123:11

**formally** 32:20

**foundation** 18:7 26:5 66:13 75:9 84:1 94:6 103:4 105:12

**fourth** 35:12

**frame** 16:12 36:10

**Franklin** 9:18 47:1 48:15 51:11,16 59:21 61:15,19 63:4 69:5 117:10 119:24

**frequency** 92:17 108:22,24 109:10,12,23

**frequently** 33:21

**front** 23:4 50:4 59:24 68:22 70:15 71:7,23 74:2 76:3 87:17 95:7,9,14 105:24 106:4 110:11 117:10 118:1, 15

**FTO** 35:15

**full** 6:7 88:18

---

**G**

**gaining** 81:2

**gather** 47:13

**gathered** 79:12

**gave** 11:18 13:19 14:19,23 17:6 58:18

**gear** 77:21 79:22

**gears** 78:4

**general** 24:17 27:22 34:13 40:5

**generally** 28:16 35:13 65:19

**generate** 16:22 17:2

**generated** 45:17

**Geor-** 42:14

**give** 16:12 18:5 19:23 20:8 21:9 22:5 29:3 34:12,21 36:10,12 40:5 55:10 56:12 66:23 80:9 82:4 86:16 88:19 99:24

**giving** 15:13 18:23

**glass** 87:19

**glove** 43:24

**good** 4:1 16:12,13 33:13 36:3 89:12,21 110:13 123:2 124:6

**EXHIBIT B**

**grabbing** 95:23

**grass** 119:1

**grassy** 69:11 75:18 105:23

**Gregory** 5:1

**ground** 6:21 81:2 86:7

**group** 52:23 114:10

**guess** 48:11 53:22 64:4 83:17

**guilty** 43:1,11

**gun** 83:10 96:1,6

**gunshots** 20:2

**guys** 17:20 85:15 86:13

---

**H**

**half** 100:2,5

**Hall** 11:6

**hand** 5:22 94:13 96:1

**handcuffs** 43:24

**handle** 35:5 108:11

**hands** 66:22 67:7 107:9,17

**happened** 15:21 114:24 118:19

**harm** 104:3

**he/she** 120:5

**head** 84:22

**headed** 110:24

**headquarters** 15:16

**health** 123:2,5

**hear** 5:16 13:3 74:7 91:20,21 92:14,17 96:24 101:23 102:18,19 104:14 109:16 110:2 113:23 115:6

**heard** 48:3 53:7 55:17 92:18 93:12 100:13 102:6 104:12 109:7 111:18

**hearing** 90:16

**height** 93:4

**held** 38:10 83:14,20

**high-speed** 46:19

**Hillgard** 4:19

**him/herself** 120:5

**hired** 8:8 122:21,22

**hit** 87:10,15

**hitting** 51:4 109:4

**hold** 37:16 38:3 53:5 70:24 99:7

**holding** 93:3

**holstered** 95:15

**home** 103:20 109:4

**hood** 86:1

**hospital** 74:18,21

**hours** 16:13

**house** 60:10,12,21 61:9,13 62:3,5, 6 63:14,18,20,22 64:9,10 95:8,10, 14 98:18,21 116:20 117:10

**houses** 61:16

**hypothetical** 66:13 84:1 94:7

---

**I**

**idea** 80:21 94:10,12 97:13 103:22 119:20

**identification** 22:23 28:6,10 31:11,15 68:18 69:24

**identify** 4:20

**Illinois** 4:7,13,17 11:24 13:20 14:21,24 15:8,13,15 16:10,23 17:3, 5,7 29:16 54:8 58:9,17

**illustration** 88:19

**image** 90:24 106:16

**images** 107:13

**imminent** 120:6,12

**in-car** 9:7 11:3,13 13:15 17:8 21:12 76:21 90:6

**inches** 107:22

**incident** 18:3,21,24 29:7 30:13 34:18 42:23 43:7,9,12 67:9 85:18 120:21

**incidents** 41:4,10 42:17

**including** 86:13

**incomplete** 66:13 84:1 94:7

**indicating** 68:8 101:12 103:8

**indication** 67:14 68:1

**indications** 98:3

**indicative** 103:8

**individual** 25:1,19,24 56:10 66:10,

20,24 67:5 83:22 92:22 93:9 98:3 101:9

**individuals** 54:20 79:3,9

**information** 39:14 42:18 47:8,13 48:2,3,7 116:13,21 119:8,17

**initially** 40:14 59:18 60:2,8 90:14 95:12 107:5

**injuries** 74:22

**injuring** 89:13

**injury** 120:7,13

**input** 16:15

**insignia** 43:23

**instance** 48:5

**instruct** 84:5

**instructed** 49:4

**instructing** 92:8

**intent** 45:23

**interaction** 33:8,10 34:19 46:13 48:24 49:3 86:12

**interfere** 90:12

**interference** 64:4

**internal** 29:13,20

**intervention** 52:24 53:4,5,8,18,20 54:4,13,21 55:12

**interviewed** 30:3,19

**intoxicated** 50:18

**invade** 16:18

**investigate** 32:15

**investigated** 28:21 29:6,10

**investigation** 28:12,17 29:1,20,24 30:4,7,13,20,24 31:4,8 32:11

**involve** 35:13 52:24 65:20

**involved** 17:24 18:20 28:18,22 30:12 32:14 38:23 65:23 66:8 113:9

**involving** 34:18 57:23 116:14

**issues** 51:13 94:23

---

**J**

**January** 10:19 22:19 23:10,17 33:2,11,14 34:8 38:16 43:15 44:6,

EXHIBIT B

JONATHAN CATER, 06/26/2019

10 45:1,6 90:21

**Jay** 20:16

**John** 110:14 115:24 122:3

**Jonathan** 4:5,10 6:2,10,13

**June** 4:5

**jurisdictions** 8:12 11:22 12:19

---
## K

**K-O-E-T-T** 20:18

**Kathleen** 4:18

**Ket** 20:17,18

**Ketz** 19:9

**Ketz'** 19:8

**kind** 21:14 36:24 64:2 65:24

**kneeling** 112:17

**knelt** 88:2

**knew** 57:1 97:14 117:2,4,10 120:19

**knives** 94:14

**knowledge** 33:1,7 61:5,22 68:4

**Koett** 20:16

**Kujawa** 5:3 11:9 14:10 16:17 18:7 26:3,21 31:1,7 32:22 40:7 41:5,11 43:2 50:20 54:14 57:5,11 59:9 60:7 66:12 67:16,19 71:15 72:11,15 75:2,9 78:13 81:9 82:8 83:24 86:19 89:21 94:6 103:4,10 105:11,18 115:19,23 118:12 122:2 123:11 124:6

**Kulis** 5:1,13 13:3 57:13 74:6

---
## L

**lack** 29:4 34:15 44:16 52:23 55:22

**lane** 29:4

**language** 23:15 24:19 98:6,9,11

**last-ditch** 24:3

**Late** 41:13

**law** 8:14 33:8,9 35:22 53:11 55:21 58:1,24 83:21 94:4

**lawyer** 16:15

**lead** 34:18 50:23 66:10

**learned** 55:11

**Leatherman** 44:1

**leaving** 58:9

**led** 61:8

**left** 52:5 85:10,13 100:5

**left-hand** 118:22

**legal** 4:14

**length** 40:2 85:15

**lesser** 42:7,8

**lessor** 40:24 42:5

**level** 53:21 96:3 106:21

**license** 38:11 47:14,20,22 48:6 97:22 98:5 103:19 119:14,18

**life** 86:9,15,18

**lift** 79:13

**light** 90:24

**lights** 117:14

**limited** 92:15 116:13,21

**listen** 90:14

**listened** 10:7

**listening** 102:12

**located** 4:6 70:14 71:5,13 89:15

**location** 45:23 61:6 106:4

**locked** 88:13

**long** 8:3,21 16:9 34:7 36:9 37:10, 22 56:13

**looked** 62:7

**lost** 45:18

**lot** 55:23

**loud** 96:23

**louder** 33:12 91:24 92:1

**Luckily** 55:13

---
## M

**made** 47:24 67:24 69:4 74:24 75:6

**main** 20:4,5

**maintain** 123:2

**make** 5:7 7:3 23:14 26:18 27:14 28:1 32:1 52:1,3 76:15 91:23 94:5

107:2 112:7 116:10

**makes** 92:13

**making** 31:5 49:21 55:24

**maneuver** 51:4

**maneuvered** 50:1 51:7

**maneuvering** 48:13

**manner** 83:9

**March** 7:23

**mark** 68:14

**marked** 22:22 23:3 28:5,9 31:10, 14 68:17,23 69:20,23

**Martin** 58:16

**materials** 9:3

**matter** 4:9 32:15 45:21

**matters** 39:16 52:24 53:14,15 54:3

**means** 24:5 26:1 54:17 55:24 67:4 121:10,16

**Media** 4:2 89:24 90:3 124:10

**medical** 111:2 113:3

**meet** 63:14

**meeting** 11:12 19:24 20:10,13

**Melvin** 4:23

**mentioned** 13:19 21:10 29:12

**met** 15:15

**method** 84:17

**Michael** 5:3

**middle** 100:3

**Mike** 32:17

**mind** 50:15 60:23 61:3 113:17

**minor** 59:3,6 117:4

**Minus** 98:7

**minute** 56:15,17,22

**minutes** 21:2,17 86:13 117:12

**miscommunication** 54:16

**misdemeanor** 40:18,19,21

**misstates** 26:22 57:7 82:8 123:12

**misunderstanding** 27:15

**mix** 101:18

**EXHIBIT B**

**mobile** 54:5,7,10

**moment** 108:6 115:14

**Monday** 11:4

**Montgomery** 42:13,15

**months** 8:6

**move** 26:1,19 27:16 28:1 81:13
97:6,11 121:2 122:11 123:6

**moved** 60:14 87:11

**movement** 74:14

**moves** 81:8

**moving** 24:9,13,18,23 25:2,17,24
26:17 27:24 46:11,15 72:20,24
76:10 81:4,16,23 82:2,6,17 105:7,
8,9,16 106:8,17 108:8 120:17
121:8 122:8 123:5,8,24

**multiple** 84:4

**muzzle** 107:22

## N

**nametag** 43:23

**Nathaniel** 9:4,20 10:9 11:23 28:22
32:8 33:1 39:1 45:2,8,11 46:10
56:14,19,23 57:2,23 58:13,19 59:1,
16,20 67:10

**nature** 10:16 39:7,16 46:2 88:21

**ne-** 44:20

**needed** 47:13,15 92:9 115:2 123:6

**negotiated** 40:12,21

**negotiating** 51:24

**Nelson** 37:6

**night** 10:18,24

**nighttime** 10:1

**Nodding** 60:7

**noise** 110:2

**noncompliance** 101:4

**North** 4:16

**Northern** 4:12

**notes** 15:22 16:22 17:2

**noticed** 60:13

**number** 4:11 28:10 31:14 61:15
68:23 70:2,4,13 71:22 72:1 116:2

## O

**object** 16:17 26:3,21 40:7 41:5
43:2 54:14 57:5 59:9 66:12 78:13
81:9 82:8 83:24 94:6 103:4 105:11
123:11

**objection** 14:10 18:7 41:11 75:2,9
103:10 105:18 118:11

**obligation** 27:24

**observations** 50:23

**observe** 67:21 92:9 118:14

**obstructions** 75:23 76:13,19

**obvious** 71:16

**occupant** 24:23 25:2,16 26:16

**occupants** 27:19 119:23 121:4,9

**occur** 34:22

**occurred** 70:9

**occurring** 13:14

**October** 23:14

**offense** 41:1 42:6,7,8 45:14 46:2,4
59:3,7

**offhand** 9:10 39:8

**office** 13:1 19:8 92:7

**officer** 8:1,8 12:12 15:17,19 17:17,
24 18:2 20:9 21:10,16,22 22:2,9
26:18 27:12,23 33:15,19,24 34:4,
12,17 35:13 36:2 38:5,18,23 44:22
45:12,13,18,20 48:1,5,8,12,24
49:10,14 59:19,23 62:10,21 63:19
64:15 66:8,9,21,23 67:3,24 68:10
69:16 78:19 82:19 83:9 84:20 85:3,
7,9,18,22 86:8,12,22 87:1,15,20,
22,24 89:7,11,13,14 90:7 91:8
92:11,13,23 93:2,12,22 94:21 95:2
100:23 101:3,9 106:11 107:8 108:2
111:24 112:16 117:14,20 118:6,13,
15,19 120:4 121:7,9,23,24 122:19

**officer's** 32:14 67:6

**officer-involved** 18:1,16 28:12
65:20

**officers** 12:7,9,17,18 17:12 18:4,
20 22:8,10 27:4,16 28:17 30:17,18
52:23 53:13 54:1,23 55:3 65:13,22
77:23 78:3 79:9 83:21 84:12 93:7
102:22 111:4,8,10 113:22 116:10
120:11 121:2

**offices** 4:16

**one-way** 49:7

**open** 76:3,4 99:13,14 100:14,22

**opening** 101:5

**operated** 33:18 51:3

**operating** 18:15

**opportunity** 18:5,22 74:17 76:20

**opposed** 41:1 49:21 122:15
123:24

**option** 25:1,18 28:3

**order** 66:21 67:6

**original** 40:11

**outcome** 29:23 30:2

**owner** 119:16

**owners** 119:23

## P

**p.m.** 38:21 124:12

**pace** 81:23 82:3,4,13 105:7

**paramedic** 38:2,8,11 113:4

**park** 69:11 77:4,21 78:5 79:23

**parked** 51:20 52:2,4,6 69:5 104:1

**part** 22:7 102:14 114:10

**participate** 65:8

**participated** 65:14

**parties** 4:21

**partner** 48:12

**passage** 49:11

**passenger** 64:13 69:10 73:14,20
74:1,3 87:19 107:18,19 108:3
110:10,11

**passes** 59:23

**path** 26:2,19 27:16 28:1 121:2
123:8,24

**patrol** 7:24 38:19 60:11 85:5

**pause** 115:16

**perceive** 95:18,21 96:2

**perceived** 96:8

**percent** 107:2

**EXHIBIT B**

**period** 33:5 36:2 56:17 115:10

**permitted** 15:10

**person** 94:12 110:21 111:17 112:19

**personnel** 11:18

**persons** 10:23

**perspective** 24:17

**phase** 34:11,24 35:2,8,12,14,19 44:17,23

**phases** 35:3,10,11

**phonetic** 19:8

**photo** 9:24 10:1,2,3,5

**photograph** 9:17,21,23 69:19 71:1

**photographs** 9:11,14 73:10

**physical** 122:19,23

**physically** 78:8,22 79:13 122:9

**picking** 5:10

**picture** 70:16 71:8

**pictures** 76:7

**Pilgrim** 29:11 30:6,11 32:9

**pillar** 87:16

**pistol** 43:24 83:17

**place** 9:21 22:19 23:10 70:8 73:10

**plaintiff** 4:9,24 5:2

**plate** 47:14,20,23 48:6 97:22 98:5 103:19 119:15,18

**play** 102:3,11,15 111:15

**playing** 90:19 91:18 92:21 93:11 97:4 98:23 99:3,11 100:12,17 101:16 102:5,17 104:10,20 105:4 107:7,24 108:10 109:15,24 110:12, 20 111:16,23 112:14 113:2,12 114:5,13 115:3,6

**plea** 41:23 42:1

**plead** 40:24 43:1

**pled** 43:11

**point** 11:17 12:3 38:7 45:6 46:16, 24 47:3 48:18 60:3 63:7 65:1,4 70:13,21 71:4 82:1 84:12 86:14 94:10,22 95:19 96:9 97:20 98:21 102:23 103:24 104:1 106:15 108:1, 6,18 109:19,22 110:9 114:2 115:18

118:6

**pointed** 84:22 96:19

**police** 7:19 8:4,8,11,16 10:20,23 11:15,18,21,24 12:6,9,16,18 13:16, 20 14:21,24 15:8,14,15 16:11,24 17:4,5,7,12 18:4,19 19:4,6 22:8,10 23:9 25:23 26:17 28:11,20 29:7,16, 19 30:14,18 32:13 34:19 36:2 38:5 42:18 48:13 49:15,22 52:22 53:11, 14 54:24 56:4,7 58:18 64:21 66:7, 21 76:22 84:17 98:1 101:13 117:13 119:2 122:18

**policies** 22:10 29:13 31:23

**policy** 22:16,18 23:9,16,21,24 24:7,12 25:11,12,23 26:18,22 27:2, 10,15 28:11,15 29:21 30:8 31:15 32:3,7 116:1 120:3 121:1

**portion** 20:4 69:10 74:1 75:19 87:18 90:10 108:3

**position** 49:10 71:17 82:21 90:12 107:1

**positioned** 49:14 100:9

**possibly** 89:13

**potential** 101:14

**potentially** 57:3 59:2

**prepare** 16:9

**prepared** 14:20 15:3,7 16:23 66:2

**preparing** 16:14

**presence** 45:2

**present** 11:8,10 12:10 13:11 15:18 17:16 19:9 30:17

**presume** 68:4 114:2

**presuming** 50:8

**pretty** 6:20 36:22 112:10

**prevented** 75:23 76:10 123:5

**preventing** 122:7

**prevents** 88:16

**prior** 7:24 8:12 11:12 33:1 50:23 59:1

**private** 34:19

**privilege** 16:19

**pro-** 73:19

**probation** 39:18,20,24 40:3 42:3,5

**probationary** 34:4 35:13 44:22

**problems** 51:9,24

**procedure** 6:14 17:23 18:1,3,15 32:13

**proceedings** 124:9,11

**process** 34:1

**profile** 73:20,23

**program** 53:3

**promoted** 7:22

**prompt** 61:22

**pronounce** 20:16

**property** 35:8

**protect** 120:5,10

**provide** 42:18

**provided** 16:10 17:3

**providing** 114:11

**pull** 51:8 61:12,23 63:3 118:15

**pulled** 47:4,7,11 48:14,23 51:15 52:9 57:2 59:16 60:9 62:3 63:15 69:9 85:3 96:14 118:21

**pulling** 13:13 52:16 59:1 60:24 61:4

**pulls** 61:18

**pupil** 44:13,16

**purposes** 30:3

**pursuant** 6:13

**pursuit** 46:19

**put** 71:9,12 72:8 77:4,21 78:3,4 79:17,22 117:20

**puts** 54:9

---

**Q**

**qualified** 44:17 53:23

**quarter** 100:4

**question** 5:6 7:1,6,8,12,14,16 16:6 21:14 25:7 26:4,7,22 39:17 40:10 54:18 57:6,8,14 59:10,11 67:18,19 78:14 81:10 82:12 94:8 105:12 117:3 123:12

**question-and-answer** 15:7

**questioning** 43:3

**EXHIBIT B**

JONATHAN CATER, 06/26/2019

**questions** 6:23 15:21 16:5,18 90:11 115:18,24 117:1,6 120:18,21 122:2 124:5

**quick** 5:6 23:22

**quickly** 123:6

**R**

**radio** 45:12,22 48:2 92:6 108:21 115:7

**radio's** 109:22

**radios** 109:1

**raise** 5:21

**raised** 84:21 93:4 106:21

**raising** 21:6

**ran** 47:22 109:2

**rank** 43:23

**rapid** 72:18

**rapidly** 116:14,23

**rarely** 24:13,19

**rate** 82:4

**Reaction** 94:17

**read** 25:4,5 26:10,11,12 57:15,18 104:6,7

**real** 23:21

**realm** 107:3,4

**rear** 74:5,8,11 80:14 87:17,19 89:3, 4 96:21 107:18,19

**reason** 7:7 39:9 50:17 60:24 61:3 84:6 87:4

**reasonable** 121:10,16

**reasonableness** 116:8,9

**recall** 9:13 12:6,10 21:6,19,20 34:23 46:6 62:10 64:19 65:6 66:4,5 68:13 69:13 74:16,22 75:4 76:9 86:19,20 96:20

**receive** 54:1

**received** 30:23,24 32:18,19 38:5 39:14 42:3

**recent** 37:24

**recently** 62:8 76:21 90:6 109:3

**recess** 90:1

**reckless** 39:21,24 40:6,12 42:9,21

**recognize** 91:19

**recollection** 19:23 20:8 21:10,15 45:16,19 56:12

**record** 4:3,21 6:11 25:5 26:12 30:22 31:5 57:18 68:19 70:1 76:16 89:23 90:2 104:7 109:8 115:15,21 124:9

**recorded** 15:24 16:1 90:13 109:11,13

**recording** 90:23

**recordings** 10:8

**records** 55:5

**reference** 11:19 30:19 39:15 45:21 46:1 48:13 69:4 73:13 91:4 99:15 110:5

**referenced** 108:14

**referencing** 87:14

**referred** 35:14

**reflect** 6:11

**refuses** 66:20 67:5

**related** 18:3 21:7 22:2

**relates** 23:24 24:22 25:16,23 28:12 39:15 53:3 59:1

**relationship** 91:6 119:21

**relative** 33:24 34:13 47:14

**relevance** 40:8 41:5 43:3

**remained** 95:15

**remember** 11:16 15:16 19:11 20:1,4,11 38:22 39:7 43:5,13 44:15 46:8 48:4 64:11 65:7 75:8 95:5 96:13 98:22 116:3 117:6 120:21

**remove** 78:23 79:3,9,14

**removed** 78:18

**repeat** 27:6 74:6

**repeated** 63:19

**rephrase** 7:2 25:8,10

**report** 20:15 66:2

**reporter** 4:18 5:20,21 6:8 23:3 26:9 27:5,8 68:14 79:18

**represent** 4:22 72:9

**representing** 4:15 16:15

**request** 31:5

**requested** 48:6

**require** 54:3

**reserve** 8:19

**residence** 119:23

**resident** 97:19

**resolution** 40:22

**respond** 7:15 16:6 64:6 105:2

**responded** 104:24

**responding** 111:21,22

**response** 100:21 102:21 109:21

**responsibility** 22:8

**restate** 7:2,13 9:19 15:11 16:20 22:6,13 26:13 45:5 50:11 53:18 57:19 62:15 77:6

**resting** 70:8 73:10

**resulting** 28:22

**retrieving** 85:24

**reverberation** 20:3 21:7

**review** 17:16 19:20 20:10 29:13 31:16,22 32:5,15,19

**reviewed** 9:3,6,11,23 10:14,22 17:8,11,15 90:6 91:16

**reviewing** 59:22 77:9

**Rhodes** 15:17,18,22

**right-handed** 83:17

**Riley** 17:17 19:21 20:9 22:2 34:2,8 38:23 48:12,24 49:5,10,14 64:15 69:16 85:3,7,9 86:22 87:1,15,20 89:11 102:6 106:12 117:20 118:13 121:23

**roadway** 49:6,17 58:10 117:21,24 118:23 119:1

**Rock** 7:19 8:4,9,12,16 11:6 12:16 17:12 18:4,18 19:4,6 22:8,15 23:9 25:22 28:10,20 29:7,19 30:13,18 32:13 37:8 39:5 42:10,18 52:22 53:3,24 54:23 68:20 70:2 84:11,17 93:7

**role** 34:13

**rolled** 86:1,7 123:9

**rolling** 82:15 105:6 106:3 122:7 124:1

**roof** 86:2

**room** 11:7 19:11

**rounds** 77:10

**rubber** 43:24

**rule** 27:22

**rules** 6:14,15,21

**run** 47:20 60:10,21 61:9 109:1 116:20 121:21,23

**running** 95:22 110:21 113:17

**rush** 103:17,20

**S**

**safety** 96:10

**sat** 84:23

**Sauk** 37:21

**scenarios** 55:15

**scene** 9:16 12:5,7,10,19 17:12 64:20 65:9 77:24 113:20,21 114:7, 8,15

**Schatzle** 4:14

**Schmidt** 92:7

**scope** 34:13

**screaming** 93:23

**searching** 114:3

**seated** 98:15

**seconds** 64:18 80:4

**section** 23:20 24:7 116:6 120:15, 16

**securing** 113:21

**security** 36:4,6,9,16,19

**seeking** 38:8

**semester** 38:1

**sense** 34:13 40:5

**sentence** 27:2,10 116:7 121:5 123:22

**sergeant** 4:10 7:19,22 12:4,12,17 22:5 28:8 31:4,13 32:24 35:20 64:20,23 65:1 66:2 68:22 69:18 70:4 72:17 75:16 90:5 92:6 114:18 122:6

**series** 6:23

**serve** 8:18

**served** 8:21

**serving** 22:10 35:22

**session** 15:7

**sets** 28:15

**sexual** 35:8

**shadow** 35:14

**shell** 66:6

**Sheriff's** 13:1 92:7

**shift** 34:14

**shit** 55:22

**shithead** 97:11,12 98:7,9

**shoot** 77:7 101:13

**shooter** 55:14,15

**shooting** 9:4 10:8,19,24 11:19,23 12:4,7,11,20 13:12,23 14:2,4,6,9, 19 16:11 17:13 18:1,6,16,20 21:22, 23 22:2,3 24:9 28:18,21 30:18 32:8,14 38:24 64:20 65:2,4,10,13, 21 70:9 86:13 91:14 120:16

**shootings** 28:13

**short** 42:4 56:16 115:10

**shorter** 112:12

**shot** 26:20 66:24 70:14 73:16 74:4 77:4,20 78:4,8,24 79:4,10,23 80:3, 7 88:1,5 100:19,23 101:6

**shots** 21:7 24:12,17 56:14,19,23 66:4 71:6,14,17 72:6,10,12,17,21 73:6,15 75:7 77:1,13,15,17 80:1 88:12,23 89:9 105:24 106:4 108:7, 14,20 109:21 115:12 123:10 124:2

**shoulders** 112:13

**show** 23:2 28:8 31:13 66:22 67:7 69:18 73:10 87:13 90:9 107:9,17

**showed** 9:24 66:3

**shown** 9:17 73:24 75:18 90:24 96:4 107:12

**shows** 70:5 72:1,4

**side** 49:5 50:2 51:20,21 52:10,11 64:13 69:10 73:14,19,20,23 74:1 96:22 99:19,20 108:4 111:5,13 118:22

**sideways** 49:5

**sight** 87:21 89:12

**sign** 58:14,19,20

**signature** 124:7

**signs** 58:10,13

**similar** 72:1

**simply** 6:24

**sir** 73:22 77:22

**siren** 91:21 92:1 117:14

**sits** 31:22

**situated** 73:6 74:10 100:1

**situation** 34:20 35:4 55:23 56:1,5, 8 59:13 66:11 94:1,5 98:12 101:14 116:12,21

**situations** 56:7

**slightly** 88:10

**slow** 46:11,15,21 49:19 50:13 57:24 82:7,13 105:20

**slow-fashion** 81:8

**slower** 94:17

**slowly** 123:9

**small** 37:8

**somebody's** 118:1

**something's** 81:22

**sought** 42:19

**sound** 20:22

**south** 4:6 37:8 62:4

**space** 52:5 96:21

**speak** 27:6

**speaking** 97:5

**specific** 16:5 19:22 21:13 36:22 48:16 54:1 65:3

**specifically** 10:13 21:6 25:14 38:22 47:18 54:12 66:5

**speculation** 18:8 26:5 75:10 84:1 94:7 103:4 105:12

**speeding** 42:22 43:1,9,12 46:6

**spell** 6:8

**spent** 17:21 21:2 86:14 117:12

**split-second** 116:10

**splitting** 100:5

**EXHIBIT B**

JONATHAN CATER, 06/26/2019

**spoke** 65:1,5

**squad** 9:7 10:12 111:2 116:17 117:2,9,21 118:2

**stamped** 68:20

**standard** 17:23 18:1,3,14 32:13 59:5

**standards** 22:9 54:8

**standing** 72:5,10 73:13 107:16 111:5 112:18

**standpoint** 28:17 29:2 94:5 123:5

**stands** 38:24 39:9

**start** 38:19 43:16 44:9 79:18 90:18

**started** 20:21 38:1 80:16 114:3

**Starting** 35:24

**state** 6:7 11:24 13:20 14:21,24 15:8,13,15 16:10,23 17:3,5,7 27:20,21 29:16 50:15 58:17

**statement** 9:8 13:20,22 14:19,20, 23 15:1,3,6,13,23,24 16:10,14,23 17:3,6,7 18:23 58:18,22

**statements** 11:18,22 18:6

**States** 4:12

**station** 19:6

**status** 122:18

**statute** 58:9

**stay** 36:1 64:7

**steel** 87:18

**step** 85:14 114:14

**stepped** 59:15 64:12 95:1

**stepping** 115:11

**steps** 80:19

**Sterling** 12:5,6,9,17 64:21 91:10 110:16

**stipulation** 71:16 72:11

**stolen** 119:12

**stood** 85:2

**stop** 45:23 58:10,13,14,19,20 59:6 64:2 66:9 68:9 76:24 83:23 115:8 117:13,22 118:9,16

**stopped** 59:20 60:19 82:22 96:18 97:18 98:4

**stopping** 52:16

**straight** 50:7

**street** 4:7,17,19 39:4 47:1 48:15 49:7, 8 118:14

**strength** 79:17,22

**stress** 56:9

**strike** 69:17

**struck** 74:15 77:12,17

**Stuart** 36:17

**stuff** 84:6

**succession** 72:18

**Sugar's** 91:1,7 92:5

**Sugars** 17:17 19:21 21:10,16,22 45:13,20 48:1,6 59:23 62:11,21 63:19 67:24 68:4,8,10 78:19 82:20 83:10 84:20 85:19,22 86:8,12 87:23,24 89:7,13,14 92:11,13,23 93:2,12,22 94:21 95:2 96:23 97:5,6 99:2,6,13 100:16,20 101:1,3,10,19 102:9,22 104:15,22,23 106:11,21 107:8 108:2,12 110:7 111:12,22 112:15 115:7 117:14 118:15,19 121:24

**Sugars'** 9:7 11:15 13:16 17:9,16 19:3 45:12 76:21 90:7 91:8 96:15

**suggest** 81:22 103:2

**suggesting** 86:17

**Suite** 4:7,17

**supplies** 111:3

**SWAT** 53:22

**swaying** 52:10

**swear** 5:20

**switched** 109:3

**sworn** 6:1,4

**Sycamore** 49:4,7,17 58:16

---

**T**

---

**tackling** 95:23

**tactical** 94:17

**tactics** 55:11

**taillight** 74:5,8,11 99:17

**talk** 19:14 38:15

**talked** 20:5,9 43:8

**talking** 30:20 32:10 34:9 92:23 114:17 115:4,7 116:3

**talks** 24:8

**tall** 112:10

**Taller** 62:17

**target** 87:11

**taser** 44:3,6,11,14,18

**tasers** 44:23

**taught** 84:17

**teach** 34:15 83:16 98:8

**teaches** 84:11 93:7 98:2

**team** 54:5

**Technically** 100:4

**technique** 83:15

**techniques** 56:9

**telling** 58:12,23 62:11 77:6,19 93:15 95:15 106:8

**Tennessee** 42:15,16

**tense** 116:14,22

**tension** 94:1

**term** 29:5 34:15 53:7 54:16 55:17, 22 81:19

**terms** 6:21 7:3 23:15 25:1,13 30:23 32:2 43:15 46:13 48:22 50:14 51:2 67:2 84:11 90:15 93:1,7 94:20 108:19 113:3

**tested** 44:19

**testified** 6:4

**testimony** 57:7 79:16,21 105:5 123:12

**tests** 122:20,23

**thing** 7:7 20:5 57:1 97:14 117:4

**things** 39:16 93:20

**thought** 45:18 60:20,24 61:10 113:24

**threat** 95:19,21 96:3,9,10 120:6,12 121:11,17

**till** 104:1

**time** 8:24 9:21 11:2,14 13:11,13 16:12,16 17:13,20 25:3 29:12 30:17 34:5 36:10 38:19 42:4,14 47:16 48:12 56:17 58:6 64:16 65:13 71:17 72:12 80:2 89:20,21

**EXHIBIT B**

90:21 91:5 96:20 97:16 104:4 105:2 106:10 113:17 115:10 117:2, 3,9,15 120:8,20 122:17

**times** 41:15 61:11 77:7,20

**tire** 70:15 71:7

**today** 4:18

**today's** 124:8

**told** 15:22 30:6 38:17 48:18 56:21 64:7,19 78:3 80:11,16 86:3,8,17 90:5 93:1,6 95:10 109:20 113:4 114:6

**tool** 54:1

**total** 41:16,17,18

**tour** 43:17 44:10

**traffic** 39:16 45:12,14,21 46:2,4 57:3 58:2,5,8 59:3,6 64:2 66:8 68:9,12 83:23 97:15 98:4 117:5 118:8

**train** 45:18

**trained** 44:23

**trainee** 34:14 35:18

**training** 8:15 33:15,18 34:1,9,12, 17 38:18 44:13,16 53:19,24 54:2,5, 8,9,10,11,12 55:4,12,14 113:4

**transmitting** 109:11

**transpired** 66:1 80:2

**traveling** 61:15 63:9

**treatment** 113:7

**trees** 76:6,10

**troopers** 16:5

**truckdriver** 36:5 37:3

**true** 117:8

**turn** 49:5 55:22

**twist** 109:2

**two-way** 49:8

**Typ-** 36:21

**type** 46:18 55:14 65:9 98:6 111:3

**typed** 15:22

**types** 54:21

**typical** 35:17 53:14 107:1

**typically** 34:18 35:18 36:15 43:16, 22 65:22 83:21 84:14,19 93:7,10

---

**U**

**ultimately** 40:21 61:18 95:22

**Um-hmm** 90:17

**unable** 78:23

**uncertain** 116:14,22

**undergo** 122:19,23

**understand** 7:1,11,18 8:18 11:17 12:3 13:22 25:7 26:7 33:11,15 37:12 38:17 50:20 54:18 57:8,13, 20 59:11 66:14 67:19 78:16 82:9, 11,12 84:2,16 85:19 94:8 123:14

**Understandable** 72:14

**understanding** 18:19 23:24 24:24 29:18 30:12 31:17 32:12 53:2,10 55:20 73:9

**understood** 7:16 31:7

**uniform** 43:22 112:2

**unit** 4:2 54:6 89:24 90:3 124:10

**United** 4:11

**units** 54:10

**unreasonable** 67:2

**unusual** 44:21

**Urlaub** 4:15,19

---

**V**

**vague** 78:14

**Valley** 37:21

**Vaughn** 15:17,18

**vehicle** 13:16,17 24:9,13,18,23 25:2,17,24 26:2,16,19 27:3,11,17, 18,23 28:2 45:24 46:6 48:13 49:16, 22 50:3,8,9 51:3 57:24 60:14 76:22 78:19 81:13,14 82:2,6,17 85:2 90:7,23 91:2 92:5,15 94:12,21,23 95:1,14 96:15,17 99:15 105:6,22 106:15 107:19 114:2,3 117:22,24 119:9,11 121:3,4,8,11,17,20 123:9

**vehicles** 51:20 91:4 120:17

**Verbally** 15:21

**versus** 105:20

**vest** 43:22 84:6 88:16

---

**video** 4:3,21 9:7 10:10 11:3,13,14 13:15 17:8,15,16,21 18:2,5,21,22 19:2,14,20 20:10,21 21:3,12,18 59:22 62:7 76:21 77:9 81:7 82:1,5, 19 86:14 90:6,10,13,19 91:6,16,18 92:21 93:11 94:22 95:19 96:4,9 97:4 98:23 99:3,11 100:9,12,17 101:10,16 102:5,7,17 104:10,20 105:4 106:2,16,20 107:7,13,24 108:10 109:15,24 110:1,12,20 111:16,23 112:1,14 113:2,12 114:5,13 115:3,6

**videotape** 11:13

**view** 18:5,22 76:20 100:8

**viewed** 11:2,5,14 13:16 19:2,14

**viewing** 11:13 17:21 20:20 21:2,12

**violated** 29:21

**violation** 57:4 58:1,3,5,8,24 68:9 97:15 98:4 117:5,17 118:4 119:4

**violator** 68:12

**voice** 99:4 109:16

**voices** 5:16 90:16 91:19

---

**W**

**waive** 124:7

**walk** 65:23

**walking** 62:19 113:13

**walkthrough** 65:9,14,16,24

**wanted** 23:14

**watching** 21:18 86:14

**ways** 84:4

**weapon** 36:7 59:8,17,19 60:1,3,15 65:6 66:9 67:10,15,21 80:12 83:14, 20 84:5,7,14,22 85:3,8,19,23 86:23 87:2,5 93:3,8,9,23 95:2,11,14 96:3, 11 106:21 114:1 120:8,20,23 121:14,20 122:15

**weapons** 94:12,14

**week** 14:18

**weeks** 34:10

**West** 39:3

**Western** 4:13

**white** 45:7,10 46:10,14,21 47:1,3, 12,19 48:20,23 49:1 63:9 69:1 70:5,9 73:11 74:11 85:6 89:5,15

96:20 116:18 117:11 118:7,16,21
119:22

**Whiteside** 13:1,9 91:11,12 92:7
110:17,18 112:4,16

**whoever's** 119:22

**wider** 112:13

**window** 88:23 89:2,3,4,5 106:7
107:23 108:4 110:11

**witnessed** 58:24

**word** 44:17 52:23

**words** 104:21

**work** 35:22 36:9 37:5 44:11 84:15
95:24

**worked** 8:11 36:4,6,16,21,23 37:2

**working** 19:8 34:8

**written** 9:8 15:1,13 17:7 32:21

**wrong** 108:22,23 109:23

**wrote** 20:23

---

Y

---

**yard** 69:12 76:3 105:24 106:4
118:2,24

**years** 8:6,23 36:4,14 40:4

**yelled** 93:19

**yelling** 66:10 93:23 97:2 102:22
107:9

---

Z

---

**zoom** 71:2

**EXHIBIT B**

Rock Falls Police Department
Policy Manual



EXHIBIT #
WIT: Carter
DATE: 6/26/19
Kathleen A. Hillgard, CSR

# Use of Force

### 300.1 PURPOSE AND SCOPE
This policy provides guidelines on the reasonable use of force. While there is no way to specify the exact amount or type of reasonable force to be applied in any situation, every member of this department is expected to use these guidelines to make such decisions in a professional, impartial and reasonable manner.

#### 300.1.1 DEFINITIONS
Definitions related to this policy include:

**Deadly force** - Force reasonably anticipated and intended to create a substantial likelihood of causing death or very serious injury.

**Force** - The application of physical techniques or tactics, chemical agents or weapons to another person. It is not a use of force when a person allows him/herself to be searched, escorted, handcuffed or restrained.

### 300.2 POLICY
The use of force by law enforcement personnel is a matter of critical concern, both to the public and to the law enforcement community. Officers are involved on a daily basis in numerous and varied interactions and, when warranted, may use reasonable force in carrying out their duties.

Officers must have an understanding of, and true appreciation for, their authority and limitations. This is especially true with respect to overcoming resistance while engaged in the performance of law enforcement duties.

The Department recognizes and respects the value of all human life and dignity without prejudice to anyone. Vesting officers with the authority to use reasonable force and to protect the public welfare requires monitoring, evaluation and a careful balancing of all interests.

#### 300.2.1 DUTY TO INTERCEDE
Any officer present and observing another officer using force that is clearly beyond that which is objectively reasonable under the circumstances shall, when in a position to do so, intercede to prevent the use of unreasonable force. An officer who observes another employee use force that exceeds the degree of force permitted by law should promptly report these observations to a supervisor.

### 300.3 USE OF FORCE
Officers shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose.

The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably

Case: 3:18-cv-50035 Document #: 138-2 Filed: 06/14/21 Page 49 of 69 PageID #:768
Rock Falls Police Department
**EXHIBIT B**
Policy Manual

Use of Force

appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain and rapidly evolving.

Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident.

It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the tools, weapons or methods provided by the Department. Officers may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.

While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possible physical injury before applying reasonable force.

### 300.3.1 USE OF FORCE TO EFFECT AN ARREST
An officer may use any force which he/she reasonably believes to be necessary to effect an arrest and may use any force which he/she reasonably believes to be necessary to defend him/herself or another from bodily harm while making an arrest (720 ILCS 5/7-5).

### 300.3.2 FACTORS USED TO DETERMINE THE REASONABLENESS OF FORCE
When determining whether to apply force and evaluating whether an officer has used reasonable force, a number of factors should be taken into consideration, as time and circumstances permit. These factors include, but are not limited to:

- (a) Immediacy and severity of the threat to officers or others.
- (b) The conduct of the individual being confronted, as reasonably perceived by the officer at the time.
- (c) Officer/subject factors (age, size, relative strength, skill level, injuries sustained, level of exhaustion or fatigue, the number of officers available vs. subjects).
- (d) The effects of drugs or alcohol.
- (e) Subject's mental state or capacity.
- (f) Proximity of weapons or dangerous improvised devices.
- (g) The degree to which the subject has been effectively restrained and his/her ability to resist despite being restrained.
- (h) The availability of other options and their possible effectiveness.
- (i) Seriousness of the suspected offense or reason for contact with the individual.
- (j) Training and experience of the officer.

Rock Falls Police Department

Policy Manual

## Use of Force

(k)   Potential for injury to officers, suspects and others.

(l)   Whether the person appears to be resisting, attempting to evade arrest by flight or is attacking the officer.

(m)   The risk and reasonably foreseeable consequences of escape.

(n)   The apparent need for immediate control of the subject or a prompt resolution of the situation.

(o)   Whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the officer or others.

(p)   Prior contacts with the subject or awareness of any propensity for violence.

(q)   Any other exigent circumstances.

### 300.3.3   PAIN COMPLIANCE TECHNIQUES

Pain compliance techniques may be effective in controlling a physically or actively resisting individual. Officers may only apply those pain compliance techniques for which they have successfully completed department-approved training. Officers utilizing any pain compliance technique should consider:

(a)   The degree to which the application of the technique may be controlled given the level of resistance.

(b)   Whether the person can comply with the direction or orders of the officer.

(c)   Whether the person has been given sufficient opportunity to comply.

The application of any pain compliance technique shall be discontinued once the officer determines that compliance has been achieved.

### 300.3.4   CAROTID CONTROL HOLD

The proper application of the carotid control hold may be effective in restraining a violent or combative individual. However, due to the potential for injury, the use of the carotid control hold is subject to the following:

(a)   The officer shall have successfully completed department-approved training in the use and application of the carotid control hold.

(b)   The carotid control hold may only be used when circumstances perceived by the officer at the time indicate that such application reasonably appears necessary to control a person in any of the following circumstances:

1.   The subject is violent or physically resisting.

2.   The subject, by words or actions, has demonstrated an intention to be violent and reasonably appears to have the potential to harm officers, him/herself or others.

Copyright Lexipol, LLC 2018/10/30, All Rights Reserved.
Published with permission by Rock Falls Police Department

 (c) The application of a carotid control hold on the following individuals should generally be avoided unless the totality of the circumstances indicates that other available options reasonably appear ineffective, or would present a greater danger to the officer, the subject or others, and the officer reasonably believes that the need to control the individual outweighs the risk of applying a carotid control hold:

  1. Females who are known to be pregnant

  2. Elderly individuals

  3. Obvious juveniles

  4. Individuals who appear to have Down syndrome or who appear to have obvious neck deformities or malformations, or visible neck injuries

 (d) Any individual who has had the carotid control hold applied, regardless of whether he/she was rendered unconscious, shall be promptly examined by paramedics or other qualified medical personnel and should be monitored until examined by paramedics or other appropriate medical personnel.

 (e) The officer shall inform any person receiving custody, or any person placed in a position of providing care, that the individual has been subjected to the carotid control hold and whether the subject lost consciousness as a result.

 (f) Any officer attempting or applying the carotid control hold shall promptly notify a supervisor of the use or attempted use of such hold.

 (g) The use or attempted use of the carotid control hold shall be thoroughly documented by the officer in any related reports.

### 300.3.5 USE OF FORCE TO SEIZE EVIDENCE

In general, officers may use reasonable force to lawfully seize evidence and to prevent the destruction of evidence. However, officers are discouraged from using force solely to prevent a person from swallowing evidence or contraband. In the instance when force is used, officers should not intentionally use any technique that restricts blood flow to the head, restricts respiration or which creates a reasonable likelihood that blood flow to the head or respiration would be restricted. Officers are encouraged to use techniques and methods taught by the Rock Falls Police Department for this specific purpose.

### 300.4 DEADLY FORCE APPLICATIONS

Use of deadly force is justified in the following circumstances:

 (a) An officer may use deadly force to protect him/herself or others from what he/she reasonably believes would be an imminent threat of death or serious bodily injury.

 (b) An officer may use deadly force to stop a fleeing subject when the officer has probable cause to believe that the person has committed, or intends to commit, a felony involving the infliction or threatened infliction of serious bodily injury or death, and

the officer reasonably believes that there is an imminent risk of serious bodily injury or death to any other person if the subject is not immediately apprehended. Under such circumstances, a verbal warning should precede the use of deadly force, where feasible.

Imminent does not mean immediate or instantaneous. An imminent danger may exist even if the suspect is not at that very moment pointing a weapon at someone. For example, an imminent danger may exist if an officer reasonably believes any of the following:

1. The person has a weapon or is attempting to access one and it is reasonable to believe the person intends to use it against the officer or another.

2. The person is capable of causing serious bodily injury or death without a weapon and it is reasonable to believe the person intends to do so.

### 300.4.1 SHOOTING AT OR FROM MOVING VEHICLES

Shots fired at or from a moving vehicle are rarely effective. Officers should move out of the path of an approaching vehicle instead of discharging their firearm at the vehicle or any of its occupants. An officer should only discharge a firearm at a moving vehicle or its occupants when the officer reasonably believes there are no other reasonable means available to avert the threat of the vehicle, or if deadly force other than the vehicle is directed at the officer or others.

Officers should not shoot at any part of a vehicle in an attempt to disable the vehicle.

### 300.4.2 CHOKEHOLDS

A member shall not apply direct pressure to the throat, windpipe or airway of a person with the intent to reduce or prevent the intake of air (chokehold) unless deadly force is justified (720 ILCS 5/7-5.5). A member shall not use a chokehold or any lesser contact with the throat or neck area of another in order to prevent the destruction of evidence by ingestion (720 ILCS 5/7-5.5).

### 300.5 REPORTING THE USE OF FORCE

Any use of force by a member of this department shall be documented promptly, completely and accurately in an appropriate report, depending on the nature of the incident. The officer should articulate the factors perceived and why he/she believed the use of force was reasonable under the circumstances. To collect data for purposes of training, resource allocation, analysis and related purposes, the Department may require the completion of additional report forms, as specified in department policy, procedure or law.

### 300.5.1 NOTIFICATION TO SUPERVISORS

Supervisory notification shall be made as soon as practicable following the application of force in any of the following circumstances:

(a) The application caused a visible injury.

(b)   The application would lead a reasonable officer to conclude that the individual may have experienced more than momentary discomfort.

(c)   The individual subjected to the force complained of injury or continuing pain.

(d)   The individual indicates intent to pursue litigation.

(e)   Any application of the TASER device or control device.

(f)   Any application of a restraint device other than handcuffs, shackles or belly chains.

(g)   The individual subjected to the force was rendered unconscious.

(h)   An individual was struck or kicked.

(i)   An individual alleges any of the above has occurred.

### 300.6  MEDICAL CONSIDERATIONS

Prior to booking or release, medical assistance shall be obtained for any person who exhibits signs of physical distress, who has sustained visible injury, expresses a complaint of injury or continuing pain, or who was rendered unconscious. Any individual exhibiting signs of physical distress after an encounter should be continuously monitored until he/she can be medically assessed.

Based upon the officer's initial assessment of the nature and extent of the subject's injuries, medical assistance may consist of examination by fire personnel, paramedics, hospital staff or medical staff at the jail. If any such individual refuses medical attention, such a refusal shall be fully documented in related reports and, whenever practicable, should be witnessed by another officer and/or medical personnel. If a recording is made of the contact or an interview with the individual, any refusal should be included in the recording, if possible.

The on-scene supervisor or, if the on-scene supervisor is not available, the primary handling officer shall ensure that any person providing medical care or receiving custody of a person following any use of force is informed that the person was subjected to force. This notification shall include a description of the force used and any other circumstances the officer reasonably believes would be potential safety or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration).

Persons who exhibit extreme agitation, violent irrational behavior accompanied by profuse sweating, extraordinary strength beyond their physical characteristics and imperviousness to pain (sometimes called "excited delirium"), or who require a protracted physical encounter with multiple officers to be brought under control, may be at an increased risk of sudden death. Calls involving these persons should be considered medical emergencies. Officers who reasonably suspect a medical emergency should request medical assistance as soon as practicable and have medical personnel stage away if appropriate.

### 300.7  SUPERVISOR RESPONSIBILITIES

When a supervisor is able to respond to an incident in which there has been a reported application of force, the supervisor is expected to:

Rock Falls Police Department
**EXHIBIT B**

Policy Manual

*Use of Force*

(a) Obtain the basic facts from the involved officers. Absent an allegation of misconduct or excessive force, this will be considered a routine contact in the normal course of duties.

(b) Ensure that any injured parties are examined and treated

(c) Once any initial medical assessment has been completed or first aid has been rendered, ensure that photographs have been taken of any areas involving visible injury or complaint of pain, as well as overall photographs of uninjured areas. These photographs should be retained until all potential for civil litigation has expired.

(d) Identify any witnesses not already included in related reports.

(e) Review and approve all related reports.

(f) Determine if there is any indication that the subject may pursue civil litigation.

    1. If there is an indication of potential civil litigation, the supervisor should complete and route a notification of a potential claim through the appropriate channels.

(g) Evaluate the circumstances surrounding the incident and initiate an administrative investigation if there is a question of policy non-compliance or if for any reason further investigation may be appropriate.

In the event that a supervisor is unable to respond to the scene of an incident involving the reported application of force, the supervisor is still expected to complete as many of the above items as circumstances permit.

### 300.7.1 SHIFT SERGEANT RESPONSIBILITY

The Shift Sergeant shall review each use of force by any personnel within his/her command to ensure compliance with this policy and to address any training issues.

### 300.8 TRAINING

Officers will receive periodic training on this policy and demonstrate their knowledge and understanding.

### 300.9 USE OF FORCE ANALYSIS

At least annually, the Patrol Commander should prepare an analysis report on use of force incidents. The report should be submitted to the Chief of Police. The report should not contain the names of officers, suspects or case numbers, and should include:

(a) The identification of any trends in the use of force by members.

(b) Training needs recommendations.

(c) Equipment needs recommendations.

(d) Policy revision recommendations.

**EXHIBIT B**

| Policy | Rock Falls Police Department |
| --- | --- |
| **305** | Policy Manual |



EXHIBIT # 2
WIT: ____
DATE: 6/26/19
Kathleen A. Hillgard, CSR

# Officer-Involved Shooting and Deaths

## 305.1 PURPOSE AND SCOPE

The purpose of this policy is to establish policy and procedures for the investigation of an incident in which a person is injured or dies as the result of an officer-involved shooting or dies as a result of other action of an officer (50 ILCS 727/1-10).

In other incidents not covered by this policy, the Chief of Police may decide that the investigation will follow the process provided in this policy.

### 305.1.1 DEFINITIONS

Definitions related to this policy include:

**Officer-involved death** - Any death of an individual that results directly from an action or directly from an intentional omission, including unreasonable delay involving a person in custody or intentional failure to seek medical attention when the need for treatment is apparent, of a law enforcement officer while the officer is on-duty, or otherwise acting within the scope of his/her employment, or while the officer is off-duty, but performing activities that are within the scope of his/her law enforcement duties. It also includes any death resulting from a motor vehicle crash, if the law enforcement officer was engaged in law enforcement activity involving the individual or the individual's vehicle in the process of apprehension or an attempt to apprehend (50 ILCS 727/1-5).

## 305.2 POLICY

The policy of the Rock Falls Police Department is to ensure that officer-involved shootings and deaths are investigated in a thorough, fair and impartial manner.

## 305.3 TYPES OF INVESTIGATIONS

Officer-involved shootings and deaths involve several separate investigations. The investigations may include:

- A criminal investigation of the suspect's actions.
- A criminal investigation of the involved officer's actions.
- An administrative investigation as to policy compliance by involved officers.
- A civil investigation to determine potential liability.

## 305.4 CONTROL OF INVESTIGATIONS

The following scenarios outline the jurisdictional responsibilities for investigating officer-involved shootings and deaths.

### 305.4.1 CRIMINAL INVESTIGATION OF SUSPECT ACTIONS

The investigation of any possible criminal conduct by the suspect is controlled by the agency in whose jurisdiction the suspect's crime occurred. For example, the Rock Falls Police Department would control the investigation if the suspect's crime occurred in Rock Falls .

Copyright Lexipol, LLC 2018/05/22, All Rights Reserved.
Published with permission by Rock Falls Police Department

## Officer-Involved Shooting and Deaths

If multiple crimes have been committed in multiple jurisdictions, identification of the agency that will control the investigation may be reached in the same way as with any other crime. The investigation may be conducted by the agency in control of the criminal investigation of the involved officer, at the discretion of the Chief of Police and with concurrence from the other agency.

### 305.4.2   CRIMINAL INVESTIGATION OF OFFICER ACTIONS

The control of the criminal investigation into the involved officer's conduct during the incident will be determined by the employing agency's protocol. When an officer from this department is involved, the criminal investigation will be handled according to the Criminal Investigation section of this policy.

Requests made of this department to investigate a shooting or death involving an outside agency's officer shall be referred to the Chief of Police or the authorized designee for approval.

### 305.4.3   ADMINISTRATIVE AND CIVIL INVESTIGATION

Regardless of where the incident occurs, the administrative and civil investigation of each involved officer is controlled by the respective employing agency.

### 305.5   INVESTIGATION PROCESS

The following procedures are guidelines used in the investigation of an officer-involved shooting or death.

### 305.5.1   UNINVOLVED OFFICER RESPONSIBILITIES

Upon arrival at the scene of an officer-involved shooting or death, the first uninvolved RFPD officer will be the officer-in-charge and will assume the responsibilities of a supervisor until properly relieved. This officer should, as appropriate:

- (a) Secure the scene and identify and eliminate hazards for all those involved.
- (b) Take reasonable steps to obtain emergency medical attention for injured individuals.
- (c) Request additional resources from the Department or other agencies.
- (d) Coordinate a perimeter or pursuit of suspects.
- (e) Check for injured persons and evacuate as needed.
- (f) Brief the supervisor upon arrival.

### 305.5.2   SUPERVISOR RESPONSIBILITIES

Upon arrival at the scene, the first uninvolved RFPD supervisor should ensure completion of the duties as outlined above, plus:

- (a) Attempt to obtain a brief overview of the situation from any uninvolved officers.
  - 1. In the event that there are no uninvolved officers who can supply adequate overview, the supervisor should attempt to obtain a brief voluntary overview from one involved officer.

## Officer-Involved Shooting and Deaths

(b)   If necessary, the supervisor may administratively order any RFPD officer to immediately provide public safety information necessary to secure the scene, identify injured parties and pursue suspects.

1.   Public safety information shall be limited to such things as outstanding suspect information, number and direction of any shots fired, perimeter of the incident scene, identity of known or potential witnesses and any other pertinent information.

2.   The initial on-scene supervisor should not attempt to order any involved officer to provide any information other than public safety information.

(c)   Provide all available information to the Shift Sergeant and Dispatch. If feasible, sensitive information should be communicated over secure networks.

(d)   Take command of and secure the incident scene with additional RFPD members until properly relieved by another supervisor or other assigned personnel or investigator.

(e)   As soon as practicable, ensure that involved officers are transported (separately, if feasible) to a suitable location for further direction.

1.   Each involved RFPD officer should be given an administrative order not to discuss the incident with other involved officers or RFPD members pending further direction from a supervisor.

2.   When an involved officer's weapon is taken or left at the scene for other than officer-safety reasons (e.g., evidence), ensure that he/she is provided with a comparable replacement weapon or transported by other officers.

### 305.5.3   SHIFT SERGEANT RESPONSIBILITIES
Upon learning of an officer-involved shooting or death, the Shift Sergeant shall be responsible for coordinating all aspects of the incident until relieved by the Chief of Police or a Commander.

All outside inquiries about the incident shall be directed to the Shift Sergeant.

### 305.5.4   NOTIFICATIONS
The following persons shall be notified as soon as practicable:

•   Chief of Police

•   Administrative Commander and Operations Commander

•   Detective Sergeant

•   Coroner (if necessary)

•   Involved officer's agency representative (if requested)

### 305.5.5   INVOLVED OFFICERS
The following shall be considered for the involved officer:

(a)   Any request for legal or union representation will be accommodated.

Rock Falls Police Department

**EXHIBIT B**

Policy Manual

*Officer-Involved Shooting and Deaths*

      1.    Involved RFPD officers shall not be permitted to meet collectively or in a group with an attorney or any representative prior to providing a formal interview or report.

      2.    Requests from involved non-RFPD officers should be referred to their employing agencies.

(b)    Discussions with licensed attorneys will be considered privileged as attorney-client communications.

(c)    Discussions with agency representatives/employee groups will be privileged only as to the discussion of non-criminal information.

(d)    A licensed psychotherapist shall be provided by the Department to each involved RFPD officer. A licensed psychotherapist may also be provided to any other affected RFPD members, upon request.

      1.    Interviews with a licensed psychotherapist will be considered privileged.

      2.    An interview or session with a licensed psychotherapist may take place prior to the member providing a formal interview or report. However, involved members shall not be permitted to consult or meet collectively or in a group with a licensed psychotherapist prior to providing a formal interview or report.

      3.    A separate fitness-for-duty exam may also be required (see the Fitness for Duty Policy).

(e)    Although the Department will honor the sensitivity of communications with peer counselors, there is no legal privilege to such communications. Peer counselors are cautioned against discussing the facts of any incident with an involved or witness officer.

Care should be taken to preserve the integrity of any physical evidence present on the involved officer's equipment or clothing, such as blood or fingerprints, until investigators or lab personnel can properly retrieve it.

Each involved RFPD officer shall be given reasonable paid administrative leave following an officer-involved shooting or death. It shall be the responsibility of the Shift Sergeant to make schedule adjustments to accommodate such leave.

### 305.6 CRIMINAL INVESTIGATION

An outside agency will be contacted and be responsible for the criminal investigation into the circumstances of any officer-involved shooting that does not result in death. Officer-involved deaths shall be investigated by outside agency investigators as provided in the applicable intergovernmental agreements.

If available, investigative personnel from this department may be assigned to partner with investigators from outside agencies or the State Attorney's Office to avoid duplicating efforts in related criminal investigations.

Case: 3:18-cv-50035 Document #: 138-2 Filed: 06/14/21 Page 59 of 69 PageID #:778
Rock Falls Police Department
**EXHIBIT B**

Policy Manual

## Officer-Involved Shooting and Deaths

Once public safety issues have been addressed, criminal investigators should be given the opportunity to obtain a voluntary statement from involved officers and to complete their interviews. The following shall be considered for the involved officer:

(a) RFPD Command and Investigations personnel should not participate directly in any voluntary interview of RFPD officers. This will not prohibit such personnel from monitoring interviews or providing the criminal investigators with topics for inquiry.

(b) If requested, any involved officer will be afforded the opportunity to consult individually with a representative of his/her choosing or an attorney prior to speaking with criminal investigators. However, in order to maintain the integrity of each involved officer's statement, involved officers shall not consult or meet with a representative or an attorney collectively or in groups prior to being interviewed.

(c) If any involved officer is physically, emotionally or otherwise not in a position to provide a voluntary statement when interviewed by criminal investigators, consideration should be given to allowing a reasonable period for the officer to schedule an alternate time for the interview.

(d) Any voluntary statement provided by an involved officer will be made available for inclusion in any related investigation, including administrative investigations. However, no administratively coerced statement will be provided to any criminal investigators unless the officer consents.

### 305.6.1  OFFICER-INVOLVED DEATH INVESTIGATIONS
The Chief of Police should ensure that the Rock Falls Police Department enters into appropriate intergovernmental agreements to investigate officer-involved deaths involving members of the RFPD by appropriately trained outside investigators as required by the Police and Community Relations Improvement Act (50 ILCS 727/1-1 et seq.). The agreement should establish any compensation arrangement for participation in investigations and establish responsibilities for expeditiously providing a complete report to the State's Attorney and a public report if no charge or indictment is brought against the officer.

### 305.6.2  REPORTS BY INVOLVED RFPD OFFICERS
In the event that suspects remain outstanding or subject to prosecution for related offenses, this department shall retain the authority to require involved RFPD officers to provide sufficient information for related criminal reports to facilitate the apprehension and prosecution of those individuals.

While the involved RFPD officer may write the report, it is generally recommended that such reports be completed by assigned investigators, who should interview all involved officers as victims/witnesses. Since the purpose of these reports will be to facilitate criminal prosecution, statements of involved officers should focus on evidence to establish the elements of criminal activities by suspects. Care should be taken not to duplicate information provided by involved officers in other reports.

Nothing in this section shall be construed to deprive an involved RFPD officer of the right to consult with legal counsel prior to completing any such criminal report.

## Officer-Involved Shooting and Deaths

Reports related to the prosecution of criminal suspects will be processed according to normal procedures but should also be included for reference in the investigation of the officer-involved shooting or death.

### 305.6.3 WITNESS IDENTIFICATION AND INTERVIEWS

Because potential witnesses to an officer-involved shooting or death may become unavailable or the integrity of their statements compromised with the passage of time, a supervisor should take reasonable steps to promptly coordinate with criminal investigators to utilize available law enforcement personnel for the following:

(a) Identification of all persons present at the scene and in the immediate area.

1. When feasible, a recorded statement should be obtained from those persons who claim not to have witnessed the incident but who were present at the time it occurred.

2. Any potential witness who is unwilling or unable to remain available for a formal interview should not be detained absent reasonable suspicion to detain or probable cause to arrest. Without detaining the individual for the sole purpose of identification, attempts to identify the witness prior to his/her departure should be made whenever feasible.

(b) Witnesses who are willing to provide a formal interview should be asked to meet at a suitable location where criminal investigators may obtain a recorded statement. Such witnesses, if willing, may be transported by a member of the Department.

1. A written, verbal or recorded statement of consent should be obtained prior to transporting a witness. When the witness is a minor, consent should be obtained from the parent or guardian, if available, prior to transportation.

(c) Promptly contacting the suspect's known family and associates to obtain any available and untainted background information about the suspect's activities and state of mind prior to the incident.

### 305.6.4 INVESTIGATIVE PERSONNEL

Once notified of an officer-involved shooting or death, it shall be the responsibility of the designated Detective Section supervisor to assign appropriate investigative personnel to handle the investigation of related crimes. Department investigators will be assigned to work with investigators from outside investigatory agencies and may be assigned to separately handle the investigation of any related crimes not being investigated by outside investigatory agencies.

All related department reports, except administrative and/or privileged reports, will be forwarded to the designated Detective Section supervisor for approval. Privileged reports shall be maintained exclusively by members who are authorized such access. Administrative reports will be forwarded to the appropriate Commander.

Case: 3:18-cv-50035 Document #: 138-2 Filed: 06/14/21 Page 61 of 69 PageID #:780
Rock Falls Police Department
**EXHIBIT B**

Policy Manual

*Officer-Involved Shooting and Deaths*

## 305.7 ADMINISTRATIVE INVESTIGATION

In addition to all other investigations associated with an officer-involved shooting or death, this department will conduct an internal administrative investigation of involved RFPD officers to determine conformance with department policy. This investigation will be conducted under the supervision of the Detective Sergeant and will be considered a confidential officer personnel file.

Interviews of members shall be subject to department policies and applicable laws (see the Personnel Complaints Policy) (50 ILCS 725/1 et seq.).

(a) Any officer involved in a shooting or death of a person may be requested or administratively compelled to provide a blood sample for alcohol/drug screening. Absent consent from the officer, such compelled samples and the results of any such testing shall not be disclosed to any criminal investigative agency, unless through appropriate judicial process.

1. A sample shall be compelled in the case of a shooting that caused injury or death of a person as soon as practicable but no later than the end of the officer's shift or tour of duty (50 ILCS 727/1-25).

(b) If any officer has voluntarily elected to provide a statement to criminal investigators, the assigned administrative investigator should review that statement before proceeding with any further interview of that involved officer.

1. If a further interview of the officer is deemed necessary to determine policy compliance, care should be taken to limit the inquiry to new areas, with minimal, if any, duplication of questions addressed in the voluntary statement. The involved officer shall be provided with a copy of his/her prior statement before proceeding with any subsequent interviews.

(c) In the event that an involved officer has elected to not provide criminal investigators with a voluntary statement, the assigned administrative investigator shall conduct an administrative interview to determine all relevant information.

1. Although this interview should not be unreasonably delayed, care should be taken to ensure that the officer's physical and psychological needs have been addressed before commencing the interview.

2. The interview shall take place at the facility to which the administrative investigator is assigned or the police facility that has jurisdiction over the place where the incident occurred. The interview shall also be conducted at a reasonable time of day and during the time when the officer is on-duty as operational requirements and the nature of the incident permit. The interview shall be of reasonable duration and allow for reasonable periods of rest and personal necessities of the officer (50 ILCS 725/3.1; 50 ILCS 725/3.3; 50 ILCS 725/3.5).

3. The officer shall not be subject to professional or personal abuse, including offensive language (50 ILCS 725/3.6).

4. If requested, the officer shall have the opportunity to select an uninvolved representative to be present during the interview and shall inform the RFPD of any person who will be present on his/her behalf (50 ILCS 725/3.4; 50 ILCS

Case: 3:18-cv-50035 Document #: 138-2 Filed: 06/14/21 Page 62 of 69 PageID #:781
Rock Falls Police Department
**EXHIBIT B**

Policy Manual

*Officer-Involved Shooting and Deaths*

725/3.9). The officer shall have the right to be represented by counsel and may request counsel at any time before or during the interview and shall have a reasonable time and opportunity to obtain counsel (50 ILCS 725/3.9). However, in order to maintain the integrity of each individual officer's statement, involved officers shall not consult or meet with a representative or attorney collectively or in groups prior to being interviewed.

5.  A complete record of the administrative interview shall be made and a complete transcript or copy shall be made available to the officer without charge and without undue delay. Such record may be electronically recorded (50 ILCS 725/3.7). The officer may also record the interview.

6.  The officer shall be informed in writing of the nature of the investigation and the name, rank and unit/command of the assigned administrative investigator, the interviewers and all persons who will be present on behalf of the RFPD (50 ILCS 725/3.2; 50 ILCS 725/3.4). If an officer refuses to answer questions, he/she should be given his/her *Garrity* rights in writing and ordered to provide full and truthful answers to all questions. The officer shall be informed that the interview will be for administrative purposes only and that the statement cannot be used criminally (50 ILCS 725/3.8).

7.  The Detective Sergeant shall compile all relevant information and reports necessary for the Department to determine compliance with applicable policies.

8.  Regardless of whether the use of force is an issue in the case, the completed administrative investigation shall be submitted to the Use of Force Review Board, which will restrict its findings as to whether there was compliance with the Use of Force Policy.

9.  Any other indications of potential policy violations shall be determined in accordance with standard disciplinary procedures.

(d)  Investigators should take reasonable steps to avoid interfering with the outside criminal investigation conducted under the requirements of 50 ILCS 727/1-10 (50 ILCS 727/1-15).

## 305.8 CIVIL LIABILITY RESPONSE

A member of this department may be assigned to work exclusively under the direction of the legal counsel for the Department to assist in the preparation of materials deemed necessary in anticipation of potential civil litigation.

All materials generated in this capacity shall be considered attorney work product and may not be used for any other purpose. The civil liability response is not intended to interfere with any other investigation but shall be given reasonable access to all other investigations.

## 305.9 AUDIO AND VIDEO RECORDINGS

Any officer involved in a shooting or death may be permitted to review available Mobile Audio/ Video (MAV), body-worn video, or other video or audio recordings prior to providing a recorded statement or completing reports.

Rock Falls Police Department

**EXHIBIT B**

Policy Manual

*Officer-Involved Shooting and Deaths*

Upon request, non-law enforcement witnesses who are able to verify their presence and their ability to contemporaneously perceive events at the scene of an incident may also be permitted to review available MAV, body-worn video, or other video or audio recordings with approval of assigned investigators or a supervisor.

Any MAV, body-worn and other known video or audio recordings of an incident should not be publicly released during an ongoing investigation without consulting the prosecuting attorney or City Attorney's Office as appropriate.

### 305.10 DEBRIEFING
Following an officer-involved shooting or death, the Rock Falls Police Department should conduct both a critical incident/stress debriefing and a tactical debriefing.

### 305.10.1 CRITICAL INCIDENT/STRESS DEBRIEFING
A critical incident/stress debriefing should occur as soon as practicable. The Administration Commander is responsible for organizing the debriefing. Notes and recorded statements should not be taken because the sole purpose of the debriefing is to help mitigate the stress-related effects of a traumatic event.

The debriefing is not part of any investigative process. Care should be taken not to release or repeat any communication made during a debriefing unless otherwise authorized by policy, law or a valid court order.

Attendance at the debriefing shall only include those members of the Department directly involved in the incident, which can include support personnel (e.g., dispatchers, other non-sworn). Family or other support personnel may attend with the concurrence of those involved in the incident. The debriefing shall be closed to the public and should be closed to all other members of the Department.

### 305.10.2 TACTICAL DEBRIEFING
A tactical debriefing should take place to identify any training or areas of policy that need improvement. The Chief of Police or the authorized designee should identify the appropriate participants. This debriefing should not be conducted until all involved members have provided recorded or formal statements to criminal and/or administrative investigators.

### 305.11 MEDIA RELATIONS
Any media release shall be prepared with input and concurrence from the supervisor and department representative responsible for each phase of the investigation. Releases will be available to the Shift Sergeant, Investigation Commander and Command Staff in the event of inquiries from the media.

No involved RFPD officer shall make any comment to the media unless he/she is authorized by the Chief of Police or a Commander.

## Officer-Involved Shooting and Deaths

Department members receiving inquiries regarding officer-involved shootings or deaths occurring in other jurisdictions shall refrain from public comment and will direct those inquiries to the agency having jurisdiction and primary responsibility for the investigation.

### 305.12  REPORTING

The Patrol Commander will ensure that the Records Clerk is provided with enough information to meet the reporting requirements for any officer-involved shooting or death that qualifies to be reported to the Department of State Police (50 ILCS 709/5-12).

**EXHIBIT B**

Rock Falls Police Department

Policy Manual



EXHIBIT # _3_
WIT: _Gofer_
DATE: _6/26/19_
Kathleen A. Hillgard, CSR

# Use of Force Review Boards

### 301.1 PURPOSE AND SCOPE
This policy establishes a process for the Rock Falls Police Department to review the use of force by its employees.

This review process shall be in addition to any other review or investigation that may be conducted by any outside or multi-agency entity having jurisdiction over the investigation or evaluation of the use of deadly force.

### 301.2 POLICY
The Rock Falls Police Department will objectively evaluate the use of force by its members to ensure that their authority is used lawfully, appropriately and is consistent with training and policy.

### 301.3 REMOVAL FROM LINE DUTY ASSIGNMENT
Generally, whenever an employee's actions or use of force in an official capacity, or while using department equipment, results in death or very serious injury to another, that employee will be placed in a temporary administrative assignment pending an administrative review. The Chief of Police may exercise discretion and choose not to place an employee in an administrative assignment in any case.

### 301.4 REVIEW BOARD
The Use of Force Review Board will be convened when the use of force by a member results in very serious injury or death to another.

The Use of Force Review Board will also investigate and review the circumstances surrounding every discharge of a firearm, whether the employee was on- or off-duty, excluding training or recreational use.

The Chief of Police may request the Use of Force Review Board to investigate the circumstances surrounding any use of force incident.

The Administration Commander will convene the Use of Force Review Board as necessary. It will be the responsibility of the Commander or supervisor of the involved employee to notify the Administration Commander of any incidents requiring board review. The involved employee's Commander or supervisor will also ensure that all relevant reports, documents and materials are available for consideration and review by the board.

#### 301.4.1 COMPOSITION OF THE BOARD
The Administration Commander should select five Use of Force Review Board members from the following, as appropriate:

- Representatives of each section
- Commanding officer in the involved member's chain of command

Copyright Lexipol, LLC 2018/10/30, All Rights Reserved.
Published with permission by Rock Falls Police Department

Policy Manual

*Use of Force Review Boards*

- Administration
- Non-administrative supervisor
- A peer officer
- A sworn peace officer from an outside law enforcement agency
- Department instructor for the type of weapon, device or technique used

The senior ranking command representative who is not in the same section as the involved employee will serve as chairperson.

### 301.4.2 RESPONSIBILITIES OF THE BOARD

The Use of Force Review Board is empowered to conduct an administrative review and inquiry into the circumstances of an incident.

The board members may request further investigation, request reports be submitted for the board's review, call persons to present information and request the involved employee to appear. The involved employee will be notified of the meeting of the board and may choose to have a representative through all phases of the review process.

The board does not have the authority to recommend discipline.

The Chief of Police will determine whether the board should delay its review until after completion of any criminal investigation, review by any prosecutorial body, filing of criminal charges, the decision not to file criminal charges, or any other action. The board should be provided all relevant available material from these proceedings for its consideration.

The review shall be based upon those facts which were reasonably believed or known by the officer at the time of the incident, applying any legal requirements, department policies, procedures and approved training to those facts. Facts later discovered but unknown to the officer at the time shall neither justify nor call into question an officer's decision regarding the use of force.

Any questioning of the involved employee conducted by the board will be in accordance with department's disciplinary procedures, the Personnel Complaints Policy, the current collective bargaining agreement and any applicable state or federal law.

The board shall make one of the following recommended findings:

    (a)    The employee's actions were within department policy and procedure.

    (b)    The employee's actions were in violation of department policy and procedure.

A recommended finding requires a majority vote of the board. The board may also recommend additional investigations or reviews, such as disciplinary investigations, training reviews to consider whether training should be developed or revised, and policy reviews, as may be appropriate. The board chairperson will submit the written recommendation to the Chief of Police.

The Chief of Police shall review the recommendation, make a final determination as to whether the employee's actions were within policy and procedure and will determine whether any additional

*Use of Force Review Boards*

---

actions, investigations or reviews are appropriate. The Chief of Police's final findings will be forwarded to the involved employee's Commander for review and appropriate action. If the Chief of Police concludes that discipline should be considered, a disciplinary process will be initiated.

At the conclusion of any additional reviews, copies of all relevant reports and information will be filed with the Chief of Police.

Copyright Lexipol, LLC 2018/10/30, All Rights Reserved.
Published with permission by Rock Falls Police Department

EXHIBIT B



CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Rock Falls 2464

EXHIBIT # 4
WIT: Cosher
DATE: 6/26/19
Kathleen A. Hillgard, CSR

EXHIBIT B

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Rock Falls 2474



EXHIBIT # 5
WIT: Coster
DATE: 6/26/19
Kathleen A. Hilgard, CSR