**EXHIBIT C**

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2                      WESTERN DIVISION

3   ANNIE AGNEW and NAYSHAWN    )
    EDWARDS, as Independent     )
4   Co-Administrators of the    )
    Estate of NATHANIEL (NATE)  )
5   EDWARDS,                    )
                                )
6                Plaintiffs,    )
                                )
7           vs.                 )   No. 18 CV 50035
                                )
8   SERGEANT JONATHAN CATER,    )
    Individually, and the CITY  )
9   OF ROCK FALLS,              )
                                )
10               Defendants.    )
```

11          The video-recorded deposition of ETHAN

12 PATRICK RILEY, taken pursuant to the Federal Rules

13 of Civil Procedure, before Nicole M. Cheney,

14 Certified Shorthand Reporter No. 084-0004744, at

15 140 South Dearborn Street, Suite 1020, Chicago,

16 Illinois, on Thursday, June 27, 2019, commencing

17 at 11:12 a.m., pursuant to notice.

18

19

20

21

22

23

24

**EXHIBIT C**

ETHAN RILEY, 06/27/2019                                    Page 2..5

Page 2

```
 1    APPEARANCES:
 2          THE COCHRAN FIRM by
            MR. MELVIN L. BROOKS
 3          (140 South Dearborn Street, Suite 1020
            Chicago, Illinois  60603
 4          312.262.2880
            mbrooks@cochranfirm.com)
 5          -and-
            GREGORY E. KULIS & ASSOCIATES, LTD., by
 6          MR. GREGORY E. KULIS
            (30 North LaSalle Street, Suite 2140
 7          Chicago, Illinois  60602
            312.580.1830
 8          gkulis@kulislawltd.com)
            appeared on behalf of plaintiffs;
 9
            SCHAIN BANKS KENNY & SCHWARTZ, by
10          MR. MICHAEL E. KUJAWA
            (70 West Madison Street, Suite 5300
11          Chicago, Illinois  60602
            312.345.5700
12          mkujawa@schainbanks.com)
            appeared on behalf of the defendants.
13
            ALSO PRESENT:
14
            MS. BRETT SCHATZLE, Video Technician.
15
                  * * * * * * * *
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1              I N D E X
 2
    Witness:                           Page
 3
       ETHAN PATRICK RILEY
 4
          Examination by:
 5
          Mr. Brooks.....................   5
 6
          Mr. Kujawa.....................  120
 7
 8
 9
              E X H I B I T S
10
11  No.   Description          Marked/Referenced
12   1  Use of Force Policy..................  13
13   2  Photograph, Rock Falls Bates 2485. ...  34
14   3  Statement with Cover Page............  49
15          (Exhibits attached/scanned.)
16
                  - - -
17
18
19
20
21
22
23
24
```

Page 4

```
 1      THE VIDEO TECHNICIAN:  Good morning.  This is
 2  the beginning of media unit one, and we are now on
 3  the video record at 11:14.
 4          This is the videotaped deposition of
 5  Ethan Riley being taken on June 27th, 2019.
 6          We are located at 140 South Dearborn
 7  Street, suite 1020, Chicago, Illinois.
 8          This deposition is being taken on
 9  behalf of the plaintiff in the matter of Annie
10  Agnew, et al., versus Sergeant Johnson Cater,
11  et al.
12          The case number is 18 CV 50035,
13  filed in the United States District Court for the
14  Northern District of Illinois, Western Division.
15          My name is Brett Schatzle, legal
16  videographer representing Urlaub Bowen &
17  Associates, Inc., with offices at 20 North Clark
18  Street, suite 1260, Chicago, Illinois.
19          The court reporter today is Nikki
20  Cheney, also of Urlaub Bowen & Associates.
21          Counsel, please identify yourselves
22  for the video record and the parties which you
23  represent.
24      MR. BROOKS:  Mel Brooks on behalf of the
```

Page 5

```
 1  plaintiffs.
 2      MR. KULIS:  Gregory Kulis on behalf of the
 3  plaintiffs.
 4      MR. KUJAWA:  Michael Kujawa on behalf of the
 5  defendants.
 6      THE VIDEO TECHNICIAN:  Will the court
 7  reporter please swear in the witness?
 8          (Witness sworn.)
 9      ETHAN PATRICK RILEY
10  called as a witness herein, having been first duly
11  sworn, was examined and testified as follows:
12          EXAMINATION
13  BY MR. BROOKS:
14      Q.   Sir, would you tell us your full name,
15  and if you could spell both your first and your
16  last name for us.
17      A.   Ethan, E-t-h-a-n, Patrick Riley,
18  R-i-l-e-y.
19      MR. BROOKS:  The record should reflect that
20  this is the deposition -- discovery deposition of
21  Ethan Patrick Riley, taken pursuant to the Federal
22  Rules of Civil Procedure and also the applicable --
23  applicable rules of the Northern District of the
24  State of Illinois.
```

**EXHIBIT C**

ETHAN RILEY, 06/27/2019                                    Page 6..9

Page 6

1 BY MR. BROOKS:

2    Q.    Mr. Riley, have you ever given a

3 deposition before?

4    A.    No.

5    Q.    All right.  I'm sure counsel explained

6 to you some of the general things which happen in a

7 deposition and some of the ground rules.

8          I'm not going to rehash the specific

9 ground rules.  There's just a couple of things

10 I'd like to make sure we both have a clear

11 understanding in regards to.

12   A.    Um-hmm.

13   Q.    At some point during the course of the

14 deposition, you may anticipate a question that I

15 intend to ask; and what happens is that you and I

16 will start talking at the same time.  That makes it

17 really difficult for the court reporter to take

18 down what's being said.

19          So if you give me an opportunity to

20 fully ask my question, I of course will give you an

21 opportunity to fully respond.

22          Is that fair now?

23   A.    Yep.

24   Q.    Would it also be fair for me to

Page 7

1 basically presume that if you answer a question,

2 that you fully understood the question before you

3 answer?

4    A.    Yes.

5    Q.    All right.  If you need to take a

6 break, just let me know.  I'm not here to try to

7 make this difficult or anything of that nature.

8          The only qualifier I would add is

9 that, if there's a question pending, I would ask

10 that you answer that question before you take a

11 break.

12          Is that fair?

13   A.    Yep.

14   Q.    And the other thing, just be aware, a

15 lot of times in casual conversations we'll say

16 things like uh-huh or uh-uh.

17          I don't even know if the court

18 reporter is able to take that down, but it's

19 difficult.

20          If you can respond yes or no, please

21 respond yes, no, as opposed to some of the common

22 verbiage we use in conversation.  Okay?

23   A.    Yes.

24   Q.    All right.  I understand you're

Page 8

1 currently employed by the Rock -- Rock Falls Police

2 Department?

3    A.    Yes.

4    Q.    You were hired in June of 2017?

5    A.    Yes.

6    Q.    And so I understand, in January of

7 2018, you would have been a probationary officer?

8    A.    Yes.

9    Q.    The probationary period lasts for how

10 long?

11   A.    Four months.

12   Q.    On January 26th, 2018, would your

13 status have been that of a probationary officer or

14 something different?

15   A.    A training officer.

16   Q.    All right.  So you would have made it

17 through the probationary stage?  For the most part.

18   A.    Field training is the probationary

19 stage.  So ...

20   Q.    All right.  In January of 2018, you had

21 a field training officer?

22   A.    Yes.

23   Q.    Who was that?

24   A.    Jonathan Cater.

Page 9

1    Q.    And how long was I would say Sergeant

2 Cater your field training officer as of January 26,

3 2018?

4    A.    A little over two weeks.

5    Q.    Sergeant Cater mentioned that there

6 were certain levels of progression for a

7 probationary officer?

8    A.    Yes.

9    Q.    Can you tell me what those different

10 stages are?

11   A.    There's four stages.  The first through

12 three is just basically you're getting a general

13 outline for police patrol activities; and then the

14 fourth phase, on the fourth month, is a shadow

15 phase where I would be alone in a squad car, and

16 then my field training officer would follow me to

17 calls and observe me.

18   Q.    So you had not reached the fourth phase

19 as of January 26th, 2018?

20   A.    No.

21   Q.    You were effectively in the third stage?

22   A.    In the second stage.

23   Q.    Oh, sec- -- the second stage.  Okay.

24          Can you tell us a little bit about

**EXHIBIT C**

ETHAN RILEY, 06/27/2019            Page 10..13

Page 10

1  your educational background starting with high
2  school?
3      A.   I graduated from high school, from
4  Lanark in 2009.
5      Q.   Let me just stop you.
6           Can you spell that for us?
7      A.   L-a-n-a-r-k.
8      Q.   And where is that located?
9      A.   It's Lanark.  The high school's name's
10  actually Eastland High School.
11      Q.   All right.  What -- what state is that
12  in?
13      A.   It's in Illinois.
14      Q.   Oh.  And after high school, any other
15  formal education?
16      A.   I did about a year of college.
17      Q.   What college?
18      A.   Highland Community College in Freeport,
19  Illinois.
20      Q.   I take it you didn't receive any type
21  of --
22      A.   No.
23      Q.   -- degree, correct?
24           All right.  What were you studying

Page 11

1  basically?
2      A.   Wind turbine technology.
3      Q.   Now, are you married, single?
4      A.   I'm single.
5      Q.   I want to talk a little bit about your
6  initial training as a police officer.
7           From what I understand, it's -- is
8  it 14 weeks of training?
9      A.   It's 16 weeks.
10      Q.   16 weeks of training.
11      A.   Yes.
12      Q.   Where did you do the 16 weeks of
13  training at?
14      A.   The Cook County Sheriff's Training
15  Academy.
16      Q.   As part of that 16 weeks of training,
17  were you also being trained on various law
18  enforcement policies that the Rock Falls Police
19  Department had?
20      A.   I was given a policy manual with all of
21  our general orders and things to study while I was
22  at the academy.
23      Q.   And those would be the general orders
24  and policies for the Rock Falls Police Department,

Page 12

1  right?
2      A.   Yes.
3      Q.   In terms of -- of the training,
4  presuming that one aspect of the training related
5  to use of force?
6      A.   Yes.
7      Q.   The use of deadly force, correct?
8      A.   Yes.
9      Q.   Are you familiar with the Rock Falls
10  Police Department policy as it relates to use of
11  force and more specifically deadly force?
12      A.   Yes.  I can't recite it verbatim, but
13  I know the general outline.
14      Q.   Sure.  When was the last time you
15  reviewed the Rock Falls Police Department policy
16  on use of force?
17      A.   Month or two ago, I would say.
18      Q.   Was it in connection with any specific
19  matter or issue?
20      A.   No.  Just the monthly refresher
21  training from online.
22      Q.   So, from a general standpoint, you're
23  the type of officer who would typically review
24  certain police department policies on a monthly

Page 13

1  basis?
2      A.   Yes.  We receive several, just general
3  study materials through like -- it's an inter- --
4  internet website that we have to go through there
5  and read and review.
6      MR. BROOKS:  Off the record for a second.
7      THE VIDEO TECHNICIAN:  Off the record at
8  11:22.
9           (Discussion off the record.)
10      MR. BROOKS:  Back on the record, please.
11      THE VIDEO TECHNICIAN:  Back on the record at
12  11:23.
13  BY MR. BROOKS:
14      Q.   Officer Riley, we were talking earlier
15  about the use of force policy; and you said, as far
16  as you recall, you more likely than not reviewed
17  that policy about a month ago, right?
18      A.   Yes.
19      MR. BROOKS:  All right.  Could I have this
20  marked as Exhibit Number 1?
21           (Deposition Exhibit Number 1,
22            Witness Riley, was marked for
23            identification 06/27/2019.)
24

**EXHIBIT C**

ETHAN RILEY, 06/27/2019                                          Page 14..17

Page 14

1 BY MR. BROOKS:

2      Q.   Officer Riley, I'm showing you what
3 has been marked as Exhibit -- Deposition Exhibit
4 Number 1 for identification purposes.

5           That's the use of force policy that
6 you reviewed?

7      A.   Yes.

8      Q.   From your understanding, that was the
9 Rock Falls Police Department policy that existed
10 as -- that existed on January 26th, 2018, as it
11 related to use of force by its officers?

12     A.   To my knowledge, yes.

13     Q.   All right.  Well, take a look at it;
14 and if you see any glaring discrepancy from what
15 your understanding would have been as of
16 January 26th, 2018, just let us know.

17     MR. KULIS:  Sorry.  I don't know how to take
18 and shut it off.

19     THE WITNESS:  Can you repeat the initial
20 question?

21     MR. BROOKS:  Can you read the question back?

22

23

24

Page 15

1           (Record read as follows:
2            "Q.  Well, take a look at it;
3            and if you see any glaring
4            discrepancy from what your
5            understanding would have been
6            as of January 26th, 2018, just
7            let us know."
8     THE WITNESS:  No.
9 BY MR. BROOKS:

10     Q.   Very good.

11          If you turn to the last page -- and
12 I'm looking at paragraph 300.8 which says Training,
13 do you see that?

14     A.   Um-hmm.  Yes.

15     Q.   All right.  It says:  Officers will
16 receive periodic training on this policy.

17          And based on what you've told me
18 earlier, you have in -- you have in fact received
19 periodic training with respect to this policy, I
20 take it?

21     A.   I have, yes.

22     Q.   All right.  Would that have been the
23 case leading up to January 26th, 2018?

24     A.   Yes.

Page 16

1      Q.   It also goes on further, paragraph
2 300.8, which said:  Officers will receive periodic
3 training on this policy and demonstrate their
4 knowledge and understanding.

5           That is what it says, right?

6      A.   Yes.

7      Q.   When you have your periodic training,
8 let's say specifically on the policy related to use
9 of force, how is it that you as an officer would
10 demonstrate your knowledge and training of this
11 policy and -- I'm sorry, your knowledge and
12 understanding of this policy?

13     A.   We do several ranges both with live
14 ammunition and we go through different scenarios
15 with the Tasers and then the actual firearms; and
16 we -- to give our verbal commands, we basically go
17 through the whole cycle of the escalation of force.

18          We also have an electronic
19 simulation facility at Sauk Valley Community
20 College nearby where we go through virtual
21 scenarios where we have both Taser, OC spray, and
22 firearms to where we can go through an entire I
23 guess scenario and then we discuss it afterwards.

24     Q.   The simulations that you have

Page 17

1 experienced as part of your training as a police
2 officer -- and specifically Rock Falls --

3      A.   Yes.

4      Q.   -- has any of that simulation involved
5 interaction with a motorist --

6      A.   Yes.

7      Q.   -- that is, someone in a car?

8      A.   Yes.

9      Q.   All right.  There is a section in this
10 policy, 300.4.1 which reference shooting at or from
11 moving vehicles.

12          Do you see that?

13     A.   Yes.

14     Q.   Is it fair to say that that portion of
15 the policy places limitations on when an officer
16 may use deadly force against an occupant in a
17 vehicle?

18     A.   Yes.

19     Q.   All right.  Does it -- let me ask you
20 this as well.

21          The very first line of that
22 paragraph says:  Shots fired at or from a moving
23 vehicle are rarely effective.

24          Do you see that?

**EXHIBIT C**

ETHAN RILEY, 06/27/2019                                    Page 18..21

Page 18

1   A.   Yes.
2       Q.   I just want to focus on this part where
3   it says:  Shots fired at a moving vehicle are
4   rarely effective.
5           Do you agree with that?
6   A.   It depends on the situation.
7       Q.   As a general rule, do you agree with
8   that?
9       MR. KUJAWA:  Object.  Asked and answered.
10          If you have another answer, you can
11  go ahead.
12      THE WITNESS:  I believe there are certain
13  cir- -- circumstances where it is effective, but
14  this is just what the policy states.
15  BY MR. BROOKS:
16      Q.   So the policy on its face states that
17  shots fired at a moving vehicle are rarely
18  effective; and that's what you have been taught
19  as a Rock Falls police officer, correct?
20      A.   This is what our policy states.  This
21  is what we were told to use.
22      Q.   And you were taught that?
23      A.   Yes.
24      Q.   The policy goes on further and says --

Page 19

1   and says:  Officers should move out of the path of
2   an approaching vehicle instead of discharging their
3   firearm at any of its occupants.
4           It does say that, right?
5   A.   Yes.
6       Q.   It goes on further and says:  An
7   officer should only discharge a firearm at a
8   moving vehicle or its occupants when the officer
9   reasonably believes that there are no other
10  reasonable means available to avert the threat of
11  the vehicle.
12          It says that, correct?
13  A.   Yes.
14      Q.   So in other words -- let me restate it.
15          Listening to what I just read, that
16  last sentence, what is your understanding of that?
17      A.   The only reason to discharge your
18  firearm is if there's no other rea- -- means to get
19  out of the way or remove yourself from harm from
20  the vehicles.
21      Q.   Right.  If you have the option of
22  moving out of the path of a moving vehicle, you,
23  as a Rock Falls police officer, are to do that as
24  opposed to firing your weapon, correct?

Page 20

1       MR. KUJAWA:  I'm going to object to the form
2   of the question.  It assumes facts not in evidence.
3   It's an incomplete hypothetical.
4           If you understand the question and
5   have an answer, you can go ahead.
6       THE WITNESS:  I'm going to wait.
7       MR. KUJAWA:  You can -- you can answer if
8   you -- if you understand it.
9       MR. BROOKS:  I can have the court reporter
10  read the question back to give you --
11      THE WITNESS:  All right.  I --
12      MR. BROOKS:  -- a clearer understanding.
13          (Record read as follows:
14          "Q.  If you have the option of
15          moving out of the path of a
16          moving vehicle, you, as a Rock
17          Falls police officer, are to do
18          that as opposed to firing your
19          weapon, correct?")
20      THE WITNESS:  If you have the option, yes.
21  BY MR. BROOKS:
22      Q.   All right.  Is it fair to say, as this
23  policy is written, if there is any available option
24  to a police officer as it relates to a vehicle,

Page 21

1   let's say, moving in their direction, they have
2   to exhaust all options before firing a weapon,
3   correct?
4       MR. KUJAWA:  I'm going to object to the form
5   of the question.  It's an incomplete hypothetical.
6   It assumes facts not in evidence.  It misstates the
7   policy.
8           If you understand it and have an
9   answer, you can go ahead.
10      THE WITNESS:  No.
11  BY MR. BROOKS:
12      Q.   What?  You don't understand it?
13      A.   I just -- go ahead and repeat it.
14      MR. BROOKS:  All right.  If you could repeat
15  it.
16          (Record read as follows:
17          "Q.  Is it fair to say, as this
18          policy is written, if there is
19          any available option to a
20          police officer as it relates to
21          a vehicle, let's say, moving in
22          their direction, they have
23          to exhaust all options before
24          firing a weapon, correct?")

**EXHIBIT C**

ETHAN RILEY, 06/27/2019                                    Page 22..25

Page 22

1      THE WITNESS: Once again, if there is no
2 other options, then he is allowed to discharge his
3 firearm.
4           But if there is an option to move
5 out of the way, then he can, yes; and he's
6 theoretically supposed to.
7 BY MR. BROOKS:
8      Q.   As opposed to firing his weapon?
9      A.   As opposed to if there's a means to
10 get out of the way of the vehicle to avert the
11 threat.
12      Q.   So, in other words, let's say you
13 have a scenario where a vehicle is moving in the
14 direction of a police officer and the police
15 officer has to his right, let's say, an open field
16 with no objects, no obstruction, if that officer
17 can move to the right out of the path of the
18 particular vehicle that's approaching, policy would
19 dictate that he move as opposed to firing his
20 weapon, correct?
21      MR. KUJAWA: I'm going to object to the form
22 of the question. It's an incomplete hypothetical.
23           If you understand it and have an
24 answer, you can go ahead.

Page 23

1      THE WITNESS: If he is able -- physically
2 able to make it out of the path of a vehicle in
3 time, then he can, yes.
4 BY MR. BROOKS:
5      Q.   One of the things you have reviewed is
6 the in-car video from Officer Sugars' vehicle,
7 correct?
8      A.   Yes.
9      Q.   When was the last time you saw that?
10      A.   Earlier this week.
11      Q.   When you say "earlier this week," what
12 day was that?
13      A.   Tuesday? Monday I believe.
14      MR. KUJAWA: I can't help you.
15      THE WITNESS: Oh. Monday or Tuesday. I'm
16 not for sure on the day.
17 BY MR. BROOKS:
18      Q.   Sure. So earlier this week, either
19 Monday or Tuesday, you viewed the video that was
20 captured by the in-car recording device in Officer
21 Sugars' vehicle, correct?
22      A.   Yes.
23      Q.   Who did you view the video with?
24      A.   My attorney.

Page 24

1      Q.   Anyone else?
2      A.   No.
3      Q.   Now, at some point, you did view that
4 video from Sugars' vehicle with Officer Cater and
5 Officer Sugars, right?
6      A.   You mean when -- all at the same time?
7      Q.   Yes.
8      A.   Yes.
9      Q.   When was that?
10      A.   Shortly after the shooting I would
11 imagine.
12      Q.   All right. Do you know how it was
13 coordinated that the three of you would view the
14 video together?
15      A.   I do not.
16      Q.   How did you become aware that the video
17 would be made available for you to -- to view?
18      A.   We were called in --
19      Q.   Who called you in?
20      A.   -- to the department.
21      Q.   Who called you?
22      A.   Our -- one of our commanders.
23      Q.   Can you tell me the name of the
24 commander?

Page 25

1      A.   I couldn't tell you for sure which one
2 it was.
3      Q.   All right. And when the commander
4 called you in, was that a direct communication
5 between you and the commander?
6      A.   Yes.
7      Q.   Tell me what the commander said to you.
8      A.   He said we needed to come in and have
9 the -- a meeting about the video before -- I
10 believe it was before our interview.
11      Q.   All right. So the commander said to
12 you -- well, let me restate it.
13           Had you reached out to the commander
14 before the commander communicated with you?
15      A.   No.
16      Q.   So you got a telephone call from the
17 commander?
18      A.   Yes.
19      Q.   All right. Were you on duty at the
20 time?
21      A.   No.
22      Q.   All right. When the commander called
23 you, did he call you, what, on your personal cell
24 phone?

**EXHIBIT C**

ETHAN RILEY, 06/27/2019                                            Page 26..29

Page 26

1    A.   Yes.

2    Q.   Did he tell you why you needed to view
3  the video before you gave a statement?

4    A.   No.

5    Q.   All right.  But he essentially said,
6  You need to view the video before you give a
7  statement?

8    A.   He made -- he made it an option.  We
9  didn't need to, but ...

10   Q.   You took him up on that option, though --

11   A.   Yes.

12   Q.   -- right?

13       Did you talk to either Caters or
14 Sugars once you received that call from the
15 commander?

16   A.   No.

17   Q.   Did you know the other two officers
18 would be present?

19   A.   No.

20   Q.   Your commander didn't make you aware of
21 that?

22   A.   No.

23   Q.   When you went to view the video, I
24 understand it was actually at the Rock Falls Police

Page 27

1  Department, correct?

2    A.   Yes.

3    Q.   Do you know whose office it was in?

4    A.   I believe it was our Commander
5  Koett's --

6    Q.   Can you spell that?

7    A.   -- office.

8        K-o-e-t-t.

9    Q.   All right.  When you arrived to view
10 the video, the recording from Sugars' vehicle, when
11 did you become aware -- let me restate it.

12       Was there any conversation between
13 you, Caters, or Sugars once you arrived at the
14 station but before you started looking at the video?

15   A.   No, not that I recall.

16   Q.   On the day you went to -- view the
17 video, was that an off-duty day?

18   A.   Yes.

19   Q.   All right.  Do you know if Caters was
20 off-duty?

21   A.   I believe we were all three on
22 administrative leave.

23   Q.   All right.  When you're on the
24 administrative leave, does that mean effectively

Page 28

1  you do not work at all in the station?

2    A.   Yes.

3    Q.   All right.  When you viewed the video,
4  can you tell me about how much time you guys spent
5  together viewing it?

6    A.   Just the entirety of the video.

7    Q.   All right.  Which was about how long?

8    A.   I honestly couldn't tell you.

9    Q.   Was it an hour?

10   A.   It wasn't the unedited one.  So we
11 stopped after the EMT showed up in the video, and
12 that's when we essentially stopped.

13   Q.   Give me your best recollection of how
14 much time you guys spent together watching the
15 video.

16   A.   Eight, nine minutes maybe.

17   Q.   All right.  If your commander prepared
18 a report showing that it was about 45 minutes or so
19 that you guys viewed it, would you have any reason
20 to dispute that?

21   A.   No.  I mean, it was a long time ago.  I
22 can't really remember --

23   Q.   All right.

24   A.   -- but I remember the video -- some --

Page 29

1  one of the videos was about eight or nine minutes
2  long.

3    Q.   All right.  How many videos did you
4  view?

5    A.   Just one.

6    Q.   So the video you viewed actually was
7  about eight minutes long?

8    A.   To my knowledge, yes.

9    Q.   All right.  If it was 30-plus minutes,
10 I would think that would be something you would
11 remember, wouldn't you?

12       MR. KUJAWA:  I'm going to object to the form
13 of the question.

14       If you have an answer, you can go
15 ahead.

16       THE WITNESS:  It was a long time ago.  It
17 very well could have been 30 minutes, but --

18 BY MR. BROOKS:

19   Q.   Your best recollection is -- is the
20 video itself was about eight to nine minutes?

21   A.   From the -- the -- I would say the
22 important parts where the chase was initiated and
23 then to when the EMTs left the scene.

24   Q.   All right.

**EXHIBIT C**

ETHAN RILEY, 06/27/2019                                    Page 30..33

Page 30

1   A.   So ...
2   Q.   When -- when you say "the chase,"
3 explain to me what you would describe as a chase as
4 it relates to this particular incident involving
5 Nathaniel Edwards.
6   A.   How I -- how I would describe it?
7   Q.   Yeah.  You -- you characterize
8 apparently the incident as a chase.
9        So, if you could, describe for us
10 either the actions of Edwards or yourself as a
11 driver of a police vehicle what amounted to a
12 chase.
13   A.   Attempting to perform a traffic stop
14 and then the driver of the suspect vehicle failing
15 to comply with pulling over and averting us when
16 our attempt to block him from proceeding through
17 the roadway.
18   Q.   There's been some testimony in
19 describing the interaction between your vehicle and
20 Nathaniel Edwards as following.
21        Would you agree with that?
22   A.   We weren't -- well, we were following
23 him, but we were also attempting to pull him over
24 for a traffic stop.

Page 31

1   Q.   All right.  But we're not taking about
2 anything high speed, are we?
3   A.   Not necessarily.  It was around
4 20 miles an hour as I recall.
5   Q.   All right.  Let me -- let me ask you
6 this:  What would you characterize the speed of a
7 vehicle if someone described it as very slow?
8   A.   Five miles an hour.
9   Q.   All right.  So based on your view of
10 Mr. Edwards' vehicle as you were behind it, you
11 would not characterize it as very slow?
12   A.   No.
13   Q.   I want to go back to this point where
14 the three of you -- when I say the three of you,
15 Officer Cater, now Sergeant Cater, and Sugars were
16 together viewing the video.
17        I would take it there was some
18 communication between the three of you?
19   A.   Not during the video.
20   Q.   Well, while the three of you were in
21 the room together.
22   A.   No.
23   Q.   There was absolutely no communication?
24   A.   No.  We'd watched the video and then we

Page 32

1 left the room, and that was that.
2   Q.   So let me see if I have this correct.
3        While you, Caters, and Sugars are
4 viewing the video and throughout the total amount
5 of time that you guys spent in that room together
6 watching the video, no one ever said a word?
7   A.   To my knowledge, no.
8   Q.   You didn't say anything about the
9 substance of what was shown on the video?
10   A.   I don't -- not that I can recall.
11   Q.   Did Caters say anything about the
12 substance of what was on the video?
13   A.   I don't believe so.
14   Q.   Did Sugars say anything about the
15 substance of the -- what was on the video?
16   A.   I do not believe so.
17   Q.   And just so I'm not confused, when you
18 say you do not believe so, your best recollection
19 is that the three of you had absolutely no vocal
20 communication concerning the substance of what was
21 on the video?
22   A.   Yes.  I do not recall any conversation
23 while it was happening.
24   Q.   Well, throughout the period of time

Page 33

1 that the video --
2   A.   Yeah, that we were viewing the video.
3   Q.   All right.  Could you tell us what
4 you have reviewed in relation to the shooting of
5 Nathaniel Edwards other than the video from Officer
6 Sugars' vehicle?
7   A.   My initial report for the state police.
8   Q.   Anything else?
9   A.   Nope.
10   Q.   Photographs?
11   A.   No.
12   Q.   You have not seen a single photograph
13 associated with --
14   A.   I saw a photograph of the -- the house,
15 with the driveway.
16   Q.   All right.  When did you see that
17 photograph?
18   A.   When I viewed the video this last week
19 on Monday or Tuesday.
20   Q.   How many photographs did you see?
21   A.   Just the one of the -- the front-facing
22 view of the house.
23   Q.   In the photograph that you saw, did it
24 have the police vehicle that you were driving that

Urlaub Bowen & Associates, Inc.   312-781-9586

**EXHIBIT C**

ETHAN RILEY, 06/27/2019                                    Page 34..37

Page 34

1 night?
2    A.   No.
3    **Q.   It was just the front of the house?**
4    A.   Yes.
5    **Q.   Just the front of the house?**
6    A.   The front of the house and the
7 driveway.
8    **Q.   All right.  But none -- none of the**
9 **vehicles were present?**
10    A.   No.  I don't believe it was a scene
11 photo.  I think it was just a street view photo.
12    **Q.   Like a Google --**
13    A.   Yeah.
14    **Q.   -- Map?**
15         **Have you seen any photos taken of**
16 **the scene after the shooting?**
17    A.   No.
18    MR. BROOKS:  Could I have this marked as
19 Exhibit 2?
20         (Deposition Exhibit Number 2,
21          Witness Riley, was marked for
22          identification 06/27/2019.)
23    MR. BROOKS:  For the record, I've had the
24 court reporter mark as Exhibit 2 a photograph which

Page 35

1 has the Bates number on the bottom of Rock Falls
2 2485.
3 BY MR. BROOKS:
4    **Q.   Officer, I'm showing you what has been**
5 **marked as Exhibit Number 2 and ask you to take a**
6 **quick look at that.**
7         **You do recognize what's shown in the**
8 **photograph, right?**
9    A.   Yes.
10    **Q.   It is a photo of a portion of the scene**
11 **after the shooting of Nathaniel Edwards, correct?**
12    A.   Yes.
13    **Q.   Where the video -- I'm sorry.**
14         **Where the two police vehicles, SUVs,**
15 **are parked, each of those are Rock Falls police**
16 **vehicles?**
17    A.   Yes.
18    **Q.   Which of those vehicles is your vehicle?**
19    A.   The rear vehicle.
20    **Q.   All right.  So if you look to the very**
21 **left of Exhibit Number 2, the photograph, the video**
22 **that's closest to the left end of the photograph is**
23 **your vehicle, right?**
24    A.   My vehicle would be farthest to the

Page 36

1 left side of the picture --
2    **Q.   All right.**
3    A.   -- of the photograph.
4    **Q.   Can you do me a favor and put an X on**
5 **your vehicle?**
6    A.   (Complying.)
7    **Q.   All right.  And can you hold that up**
8 for the videographer so she can zoom in on that?
9    A.   (Complying.)
10    **Q.   Before we get into the substance of**
11 **the shooting, I -- I do want to ask you just a**
12 **couple of questions about some things that happened**
13 **at the scene.**
14         **You see where the Cadillac is**
15 **located?**
16    A.   Yes.
17    **Q.   That's the resting point of the**
18 **Cadillac after the shooting?**
19    A.   Yes, unless it was moved.
20    **Q.   All right.**
21    A.   After our -- after we left.
22    **Q.   Well, with your vehicle still present**
23 **at the scene, would you have still been at the**
24 **scene?**

Page 37

1    A.   No.  Our vehicles remained at the
2 scene.  We were escorted off the crime scene.
3    **Q.   All right.  Who -- who took you from**
4 **the scene?**
5    A.   Officer James Holloway took me
6 separately.
7         We all left separately and were kept
8 separate until ...
9    **Q.   Is James Holloway a Rock Falls police**
10 **officer?**
11    A.   Yes.
12    **Q.   Where did he take you to?**
13    A.   The police station.
14    **Q.   How long were -- were you at the police**
15 **station?**
16    A.   I would say three hours.
17    **Q.   During that three-hour period of time,**
18 **were you interviewed by anyone in reference to the**
19 **shooting?**
20    A.   We were just -- the initial phases of
21 the investigation for the state police.  So our --
22 we were photographed in our uniforms, our magazines
23 were counted for rounds, our weapon was
24 photographed, and we were given counsel by our

**EXHIBIT C**

ETHAN RILEY, 06/27/2019                                    Page 38..41

Page 38
1 union representatives. We just met with him.
2    Q.    But you didn't give any statements to
3 the Illinois State Police, correct?
4    A.    No.
5    Q.    That is correct, yes?
6    A.    Yes.
7    Q.    Where your SUV is parked in Exhibit
8 Number 2, that is the spot you parked after
9 Nathaniel pulled into the driveway?
10    A.    I believe so.
11    Q.    You don't have any reason to think the
12 vehicle would have been moved from that location
13 prior to these photographs being taken, do you?
14    A.    No. Unless it was moved for crime
15 scene-like photographing, lighting purposes for --
16 illuminate the scene a little more.
17    Q.    As best as you recall, though, this
18 photograph, Exhibit Number 2, accurately shows
19 where your vehicle would have -- would have been
20 parked after Nathaniel pulled into the driveway?
21    A.    Yes.
22    Q.    All right. If you could -- I
23 understand you were the driver of the SUV?
24    A.    Yes.

Page 39
1    Q.    Can you illustrate on Exhibit Number 2
2 what path you took to actually approach Nathaniel
3 Edwards' car?
4    A.    I honestly probably -- I couldn't tell
5 you for sure. I just made a direct line towards
6 the vehicle, followed my FTO.
7    Q.    Okay. Well, when you say you made a
8 direct line toward the vehicle, did you go to the
9 driver's side, passenger side, or what?
10    A.    I approached the vehicle from the rear
11 driver's side.
12    Q.    All right.
13    A.    That's where I positioned myself.
14    Q.    Well, can you illustrate that? Don't
15 draw on it yet.
16    A.    Oh, okay.
17    Q.    All right. Can you -- can you just
18 illustrate it, you know, while it's in front of you
19 with your hand? Are you able to do that?
20    MR. KUJAWA: When you say illustrate it, what
21 do you mean?
22 BY MR. BROOKS:
23    Q.    Well, just in -- can you demonstrate
24 it? Like using Exhibit Number 2 with your finger

Page 40
1 or something, just --
2    A.    Oh. I mean, I -- I exited the driver's
3 seat and then I walked towards the back of the
4 vehicle.
5        The vehicle wasn't parked there,
6 though. It was much farther up the driveway.
7    Q.    I understand.
8        So for purposes of Exhibit Number 2,
9 can you draw on that photograph what you believe
10 your general path was after you stepped from your
11 SUV?
12    A.    (Complying.)
13    Q.    All right. Can you hold that up just
14 so ...
15    A.    (Complying.)
16    MR. BROOKS: Are you able to zoom in on that?
17 BY MR. BROOKS:
18    Q.    So on Exhibit Number 2, you've drawn
19 a line from your SUV up towards an area where the
20 white Cadillac is located, right?
21    A.    Yes, where it was parked.
22    Q.    I understand.
23    A.    Yes.
24    Q.    When you approached, you approached

Page 41
1 towards the passenger side of the SUV?
2    A.    I approached from the driver's side of
3 my vehicle directly towards the driver's side of
4 the Cadillac, the rear driver's side taillight
5 area.
6    Q.    All right. So, just so I'm clear, when
7 you approached, you went between the Cadillac and
8 where the other car was parked in the driveway?
9    MR. KUJAWA: I'm going to object to the form
10 of the question. It misstates his testimony.
11        If you understand it and have an
12 answer, you can go ahead.
13    THE WITNESS: Repeat it for me.
14 BY MR. BROOKS:
15    Q.    All right. When Mr. Edwards pulled
16 into the driveway, there was another car that was
17 already parked in the driveway, correct?
18    A.    Yes.
19    Q.    That car was to the left of
20 Mr. Edwards' white Cadillac, correct?
21    A.    Yes.
22    Q.    When you approached Mr. Edwards'
23 Cadillac, did you ultimately approach in between
24 the parked car and the white Cadillac?

**EXHIBIT C**

ETHAN RILEY, 06/27/2019                                    Page 42..45

Page 42

1    A.   I was -- the parked car was to my left.
2    Q.   All right.
3    A.   And Nate -- Mr. Edwards' car was in
4 front of me.  I don't know if that constitutes
5 going in between them, but that's ...
6    Q.   Well, there was some space between
7 Mr. Edwards' white Cadillac and the car that was
8 parked in the driveway, correct?
9    A.   Yes.
10    Q.   At some point, did you travel along
11 that path where the two cars were spaced between
12 each other?
13    A.   I didn't move in between the two
14 vehicles until after the vehicle was moving in
15 reverse, in my direction.
16    Q.   I want to go back to the point where
17 the three of you -- Sugars, yourself, and Cater --
18 were viewing the video.
19        After you finished viewing the
20 video, did you talk to the commander who told you
21 you should come in?
22    A.   I don't believe so, no.
23    Q.   All right.  And based on what you're
24 telling me, you didn't talk to Cater or Sugars

Page 43

1 after you had finished viewing the video?
2    A.   Maybe just, you know, talking on the
3 way out to the vehicle or the parking lot or
4 whatever, but it wasn't anything significant.
5    Q.   What -- did it have anything to do with
6 what you had seen on the video?
7    A.   No.
8    Q.   Did it have anything to do with the
9 shooting?
10    A.   No.
11    Q.   After viewing the video at your
12 commander's request, you at some point later gave
13 a statement to the Illinois State Police?
14    A.   Yes.
15    Q.   All right.  But you were told
16 initially, before you give a statement to the
17 Illinois State Police, you should view this video,
18 correct?
19    A.   They gave us the option.  We weren't
20 told we had to, but they were -- they gave us the
21 option.
22    Q.   Well, the commander said you should
23 view it, correct?
24    A.   No.  He just said, You have the option.

Page 44

1 If you want to come in and look at the video, then
2 you can.
3    Q.   Look -- did you feel looking at the
4 video would be helpful for you?
5    A.   Yes.
6    Q.   All right.  I understand that you,
7 Cater, and Sugars provided written statements to
8 the Illinois State Police?
9    A.   Yes.
10    Q.   The statements each of you provided,
11 they were not based on a series of questions that
12 the Illinois State Police directly asked you, were
13 they?
14    A.   I don't know.
15    Q.   It wasn't like a question/answer
16 session?
17    A.   No.
18    Q.   When you prepared the written statement
19 for the Illinois State Police, how long did it take
20 you to prepare the statement?
21    A.   I would say roughly about two hours.
22    Q.   All right.  And during that two-hour
23 period of time, when you were preparing the
24 statement, was that with the assistance -- that

Page 45

1 was with the assistance of someone else, right?
2    A.   The testimony was mine.  My union
3 representative was there to just basically help me
4 through the process.
5    Q.   All right.  Can you tell me what the
6 Illinois State Police told you, what they wanted,
7 prior to your preparing the statement?
8    A.   I don't understand the question.
9    Q.   Well, you received a notification from
10 the Illinois State Police to provide a written
11 statement, right?
12    A.   I received a notification from my union
13 rep and Illinois State Police contacted my union
14 rep.
15    Q.   All right.  You didn't have any direct
16 contact with the Illinois State Police?
17    A.   No.
18    Q.   Did your union rep tell you to come in
19 on the 30th of January?
20    A.   If that was the date of my statement,
21 then yes.
22    Q.   Okay.  It looks like the statement was
23 on January 30th.
24        But -- but that date was provided

Urlaub Bowen & Associates, Inc.   312-781-9586

ETHAN RILEY, 06/27/2019                                               Page 46..49

Page 46

1 you through your union rep?

2    A.  Yes.

3    Q.  Were you aware that Officer Cater also

4 provided a written statement on the 30th?

5    A.  I believe so, yes.  We were all -- I

6 think we all went on the same day.

7    Q.  All right.  Did you know in advance

8 that the three of you would be there the same day?

9    A.  I did.

10    Q.  How do you know that?

11    A.  They were -- we were given a schedule

12 through a text message saying who was going to

13 which times.

14         We were never there at the same

15 time, though.

16    Q.  But you were all told, Come in on the

17 30th and prepare a written statement?

18    A.  Yes.  We were given the time at the --

19 to be at the Illinois State Police headquarters.

20    Q.  You said in preparing the statement it

21 took about two hours?

22    A.  Yes.

23    Q.  During that two-hour period of time,

24 was someone physically typing the statement?

Page 47

1    A.  Yes.

2    Q.  Who was typing the statement?

3    A.  One of the investigators for the state

4 police.

5    Q.  All right.  So did you initially --

6 in terms of preparing your statement, did you

7 initially write in out?

8    A.  No.

9    Q.  Okay.  Were there notes taken in

10 reference to the statement?

11    A.  No.  I -- I gave a summary of events

12 from my recollection; and they typed -- went

13 through it and confirmed certain details and facts

14 and ...

15    Q.  So over this two-hour period of time,

16 were you given a draft of, let's say, an initial

17 document; then made some changes?

18    A.  I --

19    Q.  Is that what happened?

20    A.  I was given a draft and I made changes.

21 If he made a mistake on something that I witnessed

22 or saw, I would acknowledge it and then he would

23 redo it; and I think I viewed two drafts.

24    Q.  The drafts that you received, the

Page 48

1 drafts were given to you in written form, right?

2    A.  Yes.

3    Q.  And then you made changes on the draft

4 and gave it back to the investigator?

5    A.  Yes.

6    Q.  So, after the first draft, the

7 investigate -- the investigator gave you a new --

8 let's say a second draft, correct?

9    A.  Yes.

10    Q.  When you got the second draft, there

11 were still changes you made?

12    A.  There could have been.  I'm -- I'm not

13 for sure.  But I know I at least -- I at least had

14 one corrections I had to make.  I don't ...

15    Q.  Okay.  Do you remember what the

16 correction was?

17    A.  I do not.  I think it was just some

18 simple date or time nature.  Something.  I can't

19 remember for sure.

20    Q.  The fact that you made changes in the

21 first draft, that's something that you turned over

22 to the Illinois State Police?

23    A.  Yes.

24    Q.  You didn't keep the draft?

Page 49

1    A.  No.

2    MR. BROOKS:  Could I have this marked as

3 Exhibit 3?

4    MR. KUJAWA:  Is this the statement?

5    MR. BROOKS:  It's the statement, but it has

6 the cover page on it.

7        (Deposition Exhibit Number 3,

8          Witness Riley, was marked for

9          identification 06/27/2019.)

10 BY MR. BROOKS:

11    Q.  Officer Riley, I'm showing you what has

12 been marked as Deposition Exhibit Number 3 for

13 identification.

14         That's the statement that you

15 provided to the Illinois State Police over a

16 two-hour period of time?

17    A.  Yes.

18    Q.  All right.  And when I say "over a

19 two-hour period of time," that was the time span it

20 took you to get to the final statement that we have

21 marked as Exhibit 3?

22    A.  I believe so, yes.

23    Q.  And as you told us earlier, just in

24 terms of any assistance, you had a union

**EXHIBIT C**

ETHAN RILEY, 06/27/2019                                    Page 50..53

Page 50

1 representative present with you --

2    A.   Yes.

3    Q.   -- as part of preparing this statement?

4    A.   Yes.

5    Q.   If there was any inaccuracy in your

6 statement, you were permitted to make those changes?

7    A.   Yes.

8    Q.   After it was typed up by the Illinois

9 State Police investigator?

10    A.   Yes.

11    Q.   Is part of the reason it took about two

12 hours to prepare this final statement is because

13 there were certain changes, rewrites, and re-reads?

14         Do you understand?

15    A.   Can you repeat the question?

16    Q.   All right.  Is part of the reason it

17 took over two hours is because the investigator

18 would prepare this statement, give it back to you,

19 and then you would make changes; and then if those

20 changes needed to be made, they were in fact made?

21    A.   Well, yes.

22    Q.   The two-hour prep that it took to

23 generate Exhibit Number 3, the final statement is

24 what you would say it accurately reflects your best

Page 51

1 recollection of everything that happened in

2 reference to the shooting, correct?

3    A.   Yes.

4    Q.   Officer Riley, are you familiar with

5 the concept of crisis intervention?

6    A.   Yes.

7    Q.   All right.  I take it there are certain

8 officers with the Rock Falls Police Department who

9 have some training --

10    A.   Yes.

11    Q.   -- in the area of crisis intervention?

12    A.   Yes.

13    Q.   Do you have training in that area?

14    A.   Yes.

15    Q.   Tell me generally what that training is.

16    A.   It was a week-long portion at the last

17 week of our academy where we were certified for

18 crisis intervention training.

19    Q.   You received a certification for that?

20    A.   Yes.

21    Q.   Did you have that certification on

22 January 26th, 2018?

23    A.   Yes.

24    Q.   As part of crisis intervention, is one

Page 52

1 of the goals to de-escalate certain situations you

2 encounter?

3    A.   Yes.  You have to fully evaluate the

4 situation and then, if possible, de-escalate the

5 situation too.

6    Q.   Were you also taught that certain --

7 were you also taught that certain actions by police

8 officers can escalate a situation?

9    A.   In certain circumstances, yes.

10    Q.   Were you taught that certain ways to

11 escalate a situation would be using profanity

12 against the person you're dealing with?

13    A.   I wouldn't say profanity.  Just a -- in

14 certain situations, an aggressive nature from the

15 beginning can be escalating a situation.

16    Q.   When you say certain -- I'm trying to

17 understand when you use -- when you use the phrase

18 aggressive, are you referring to aggressive

19 behavior on the part of the officer?

20    A.   It depends on the situation.  If

21 they're -- if they're -- the subject is being

22 aggressive, sometimes it's not helpful to be, you

23 know, very soft-spoken.  Sometimes you need to

24 assert yourself and try to gain control of the

Page 53

1 situation again.

2    Q.   When Nathaniel Edwards first pulled

3 into the driveway and the car stopped, had he been

4 aggressive to any officer from the point they got

5 out of their vehicle until the point they first

6 communicated verbally with Mr. Edwards?

7    A.   I wouldn't say aggressive, but he had

8 broken some traffic laws and he had refused to

9 comply with our officers for four or five minutes

10 during the pursuit.

11    Q.   Fair to say, though, you would not

12 consider his behavior -- as he sat in the car, from

13 the moment you got out of your car until, let's

14 say, the first verbal command was made by a police

15 officer, he was not aggressive, right?

16    A.   Well, it's hard to say whether he was

17 aggressive.  It -- I mean, in a certain sense, he

18 wasn't aggressive because we couldn't see what he

19 was doing, what he was saying; but he was

20 disobeying the police officers, and he was running

21 for some reason.  And we don't know what that

22 reason was.

23         So it's impossible for us to say

24 whether he was being aggressive or not.

EXHIBIT C

ETHAN RILEY, 06/27/2019                                    Page 54..57

Page 54

1    Q.   Are you telling us that you would
2 characterize his behavior up to that point as
3 aggressive, from the point you get out of your car
4 until the first time an officer shouts words?
5    A.   I wouldn't say it was aggressive.
6         I said it's -- we were completely
7 oblivious as to what his state of mind was --
8    Q.   Okay.
9    A.   -- because he refused to comply with us
10 for the first five minutes of our interaction.
11   Q.   All right.  But during that brief
12 period of interaction, he was not aggressive,
13 correct?
14   A.   Not particularly aggressive, no.
15   Q.   All right.  By the way, is it fair to
16 say that the only thing that you had seen Nathaniel
17 Edwards do from the moment you first spotted him
18 until the moment he pulled up in the driveway and
19 the car stopped was a traffic violation?
20   A.   Several traffic violations.
21   Q.   Several traffic violations.
22   A.   Him driving into someone's yard through
23 the ditch and neglecting to pull over for police
24 officers, disobeying police officers, fleeing.

Page 55

1    Q.   All right.  Are you telling us that, as
2 a police officer, you would have charged Nate --
3 well, let me ask you:  What would you have charged
4 Nathaniel Edwards with from the moment you first
5 saw him until the moment he pulled up and stopped
6 in the driveway?
7    A.   I wouldn't have charged him with
8 anything because I wasn't the initiating officer.
9    Q.   All right.  But based on what you're
10 telling me, you saw him commit a traffic offense,
11 right?
12   A.   Yes.
13   Q.   But you would not have charged him with
14 a traffic offense?
15   A.   I would not, no.  The initiating
16 officer charged him with the violations because he
17 has the evidence on his camera.
18   Q.   So based on what you're telling us,
19 that as a general -- from a general perspective,
20 you as a police officer could have charged
21 Nathaniel with traffic violations?
22   A.   Yes.  If I was the initiating officer,
23 I would have.
24   Q.   Would you agree that what you saw were

Page 56

1 relatively minor traffic violations?
2    A.   I mean, in -- in the -- if they were
3 the traffic violations in and of themselves, yes;
4 but when he fails to pull over police -- for police
5 for five minutes, it becomes something more
6 serious.
7    Q.   Would you agree with me that what you
8 saw up to the point Mr. Edwards pulled into the
9 driveway was minor traffic violations?
10   A.   No.
11   MR. KUJAWA:  Object.  Asked and answered.
12        But go ahead.
13 BY MR. BROOKS:
14   Q.   Would you consider a DUI to be a
15 serious traffic violation?
16   A.   Yes.
17   Q.   Would you consider what Mr. Edwards did
18 to be on par with a DUI traffic violation?
19   A.   No.  During -- in and of itself; but
20 with the combination of not pulling over for us.
21   Q.   Are you telling us that you would
22 consider it -- Mr. -- Mr. Edwards' action up to the
23 point he pulled in the driveway to be on par with a
24 DUI?

Page 57

1    A.   At the very least, yes.
2    Q.   Throughout the course that you're
3 following Mr. Edwards, he never speeds, does he?
4    A.   Not that I could see, no.
5    Q.   All right.  In fact, I believe, at
6 least in terms of how he maneuvered his vehicle,
7 at some point he maneuvered his vehicle so it would
8 not strike your car, right?
9    A.   Yes.
10   Q.   When you saw Mr. Edwards maneuver his
11 vehicle in a fashion that it wouldn't strike your
12 car, was he on his cell phone?
13   A.   Yes.
14   Q.   All right.  Anything about Mr. Edwards'
15 ability to maneuver his vehicle while on a cell
16 phone would lead you to think he was intoxicated?
17   A.   I had no reason to believe he was
18 intoxicated.  At that point, I had no idea what the
19 initial traffic stop was even for, but ...
20   Q.   So fair to say that, when you pull up
21 to the address of 1304 Franklin, which is the
22 driveway where Mr. Edwards pulled into --
23   A.   Yes.
24   Q.   -- when you pull up and you stop your

**EXHIBIT C**

ETHAN RILEY, 06/27/2019                                    Page 58..61

Page 58

1 vehicle, what you do know at least -- you don't --
2 you're not under the impression that this gentleman
3 is intoxicated, correct?
4    A.   Not at that point, no.
5    Q.   Okay.  You also know -- at least your
6 impression -- you have someone who's not
7 intoxicated but they have committed traffic
8 violations?
9    A.   Yes.
10   Q.   When Mr. Edwards pulled into the
11 driveway, was he still on his cell phone?
12   A.   I -- I couldn't tell you.  I don't
13 recall.
14   Q.   You took your eyes off of him?
15   A.   No.  I had my eyes on him, but I
16 couldn't really see through the back windshield.
17        I know he was for a little bit; and
18 then, when we got there, he -- I -- I think he did
19 put the phone down.
20   Q.   You -- you said you think.
21        Do you know that to be accurate?
22   A.   I do not.  There was a female standing
23 in the yard when we showed up, and I think that
24 might have been who he was on the phone with.

Page 59

1    Q.   The female who you saw after you pulled
2 up, she came out of the house at 1304 Franklin?
3    A.   I believe she was already out in the
4 yard when we were -- when he was pulling up to the
5 residence.
6    Q.   You -- you -- at some point, did you
7 see her -- well, let me restate it.
8        At some point, you learned she lived
9 at 1304 Franklin?
10   A.   I didn't know for sure she lived there.
11 I just knew that that's the house she was in front
12 of.
13   Q.   At some point, did you learn that she
14 lived there?
15   A.   No.
16   Q.   The -- the female that you saw, fair to
17 say she was approaching Mr. Edwards' vehicle?
18   A.   I didn't see her actually approach.
19        She was just standing on the
20 sidewalk in front of the residence when I witnessed
21 her.
22   Q.   Did you hear any officers say anything
23 to her?
24   A.   Officer Sugars instructed her to go

Page 60

1 back in the house.
2    Q.   How -- how did he say that?
3    A.   Go back in the house.
4    Q.   What; sweet, nice manner?
5    A.   I don't -- I don't recall exact words.
6 I just know he instructed her to go back in the
7 house.
8    Q.   You listened to the audio from the
9 videotape, right?
10   A.   Yes.
11   Q.   How would you describe Mr. -- I'm
12 sorry.  How would you describe Officer Sugars'
13 tone?
14   A.   Authoritative.
15   Q.   Loud?
16   A.   Yes.
17   Q.   Aggressive?
18   A.   I wouldn't say aggressive, but
19 authoritative to get the point across.
20   Q.   Okay.  It -- it was more of an order as
21 opposed to a request?
22   A.   Yes.
23   Q.   Would you agree with that?
24   A.   Yes.

Page 61

1    Q.   Fair to say it was very loud in terms
2 of his vocal comments to the young lady who was
3 out?
4    A.   It was loud enough for her to hear and
5 understand him.
6    Q.   I understand that at some point, as
7 Mr. Edwards is seated in his car, that one of the
8 officers tried to knock out one of the windows to
9 his car, right?
10   A.   Yes.
11   Q.   I understand that the officer initially
12 used a flashlight to try to knock out the window?
13   A.   Yes.
14   Q.   That would be -- be Officer Sugars?
15   A.   Yes.
16   Q.   Would you agree with me that, using a
17 flashlight in an effort to knock out a car window
18 while the person is still seated in the car, that
19 can escalate the situation?
20   A.   I think the situation was already
21 pretty escalated.
22   Q.   Wouldn't that escalate it even more?
23   A.   Well, if it's necessary to secure the
24 driver.

EXHIBIT C

ETHAN RILEY, 06/27/2019                                    Page 62..65

Page 62

1     Q.   Would it escalate the situation even
2 more if you have a circumstance where the officer
3 chooses to use a flashlight to try to smash the car
4 window out?
5     A.   It escalates the situation further, but
6 it's not on the officer's fault because he could
7 have complied and got out of the vehicle on his own
8 free will but he chose not to.
9     Q.   Were you trained as a police officer
10 that, after you stop a motorist and the motorist
11 refuses to get out of the car, that you should
12 immediately take the action of trying to smash the
13 windows if the windows are up?
14     MR. KUJAWA: I'm going to object to the form
15 of the question. It's an incomplete hypothetical.
16          If you have an answer, you can go
17 ahead.
18     THE WITNESS: I don't have an answer for that.
19 BY MR. BROOKS:
20     Q.   What do you mean, you don't have an
21 answer for it?
22     A.   I need it rephrased, if you would.
23     MR. BROOKS: Could you read the question back?
24          (Record read as follows:

Page 63

1          "Q. Were you trained as a
2          police officer that, after you
3          stop a motorist and the
4          motorist refuses to get out
5          of the car, that you should
6          immediately take the action of
7          trying to smash the windows if
8          the windows are up?")
9     THE WITNESS: You need to get the driver out
10 of the vehicle as soon as possible in a safe
11 manner.
12          So if he's not going to -- if the
13 door's not locked or unlocked, then you have to do
14 what you need to do to secure the driver and make
15 sure he's detained.
16 BY MR. BROOKS:
17     Q.   Well, in this particular situation,
18 let's presume you have a circumstance where you
19 have at least three police vehicles on the scene
20 essentially surrounding the motorist who's in the
21 vehicle.
22          Under those circumstances, are you
23 telling me you -- it's routine practice for a
24 police officer, if the individual refuses to get

Page 64

1 out of the car and the windows are up, to start
2 using some object to smash the windows in?
3     MR. KUJAWA: I'm going to object to form,
4 foundation, incomplete hypothetical.
5          If you understand the question and
6 you have an answer, you can go ahead.
7     THE WITNESS: I don't have -- I don't have an
8 answer for that, that --
9     MR. BROOKS: Well, you -- you -- you know,
10 the whole notion of if you have an answer is I --
11 you know, just in terms of that narrative, is
12 inappropriate.
13          You can make the objection. You
14 know, if the witness doesn't understand the
15 question, I'll be happy to rephrase it.
16     THE WITNESS: Can you try to rephrase it for
17 me, please?
18 BY MR. BROOKS:
19     Q.   All right. Assume for me that you have
20 a motorist in a car. The car stops. Police
21 approach the car. The windows are up.
22          The police tell the individual to
23 get out of the car, and the individual refuses to
24 get out of the car, sits in his car.

Page 65

1          Is it your understanding, from a
2 police training standpoint, that the officer should
3 then engage in the practice of using a flashlight
4 to try to smash the windows in?
5     MR. KUJAWA: Objection. Form. Foundation.
6 Incomplete hypothetical.
7          If you understand the question and
8 are able to answer it, you can go ahead.
9     THE WITNESS: That would be an appropriate
10 next step in order to detain the driver but doesn't
11 necessarily have to be a flashlight.
12          You could use whatever tools are at
13 your disposal, but the driver needs to be detained
14 and the situation needs to be neutralized.
15     Q.   Would you agree that Mr. Edwards was
16 detained in the driveway?
17     A.   No.
18     Q.   How is it that he was not detained if
19 the car was -- was stopped in the driveway?
20     A.   Because a car can be unstopped again.
21 It can be put into gear.
22     Q.   Up to the point --
23     A.   He --
24     Q.   Up to the point when Officer Sugars

EXHIBIT C

ETHAN RILEY, 06/27/2019                                     Page 66..69

Page 66

1 first tries to smash in the windows with a
2 flashlight, was Mr. Edwards detained?
3      A.   He wasn't detained because he wasn't
4 in physical control.  We had no control over the
5 situation at that point.
6      Q.   What do you mean, he wasn't in physical
7 control?
8      A.   We had no control over him, over his
9 action.  So he --
10     Q.   You're saying you didn't have your
11 hands physically on him?
12     A.   We had no control over what he could
13 do.  Therefore, he wasn't detained.  We had no
14 physical control over him or the situation.
15     Q.   I understand that, when Officer Sugars
16 was banging on the window to smash the glass in,
17 Mr. Edwards remained in the car, right?
18     A.   Yes.
19     Q.   How long was Officer Sugars banging on
20 the window to smash the glass in?
21     A.   I couldn't tell you a -- a certain
22 number.
23     Q.   All right.  Apparently he took some
24 good whacks at the window?

Page 67

1      A.   Yes.
2      Q.   Was unable to break the glass?
3      A.   Yes.
4      Q.   Based on your statement, Officer Sugars
5 then decided to use a baton to try to bash the
6 windows in, right?
7      A.   Yes.
8      Q.   How much time did Officer Sugars spend
9 trying to bash the windows in the car that
10 Nathaniel was sitting in before he stopped?
11     MR. KUJAWA:  Let me just object to the form
12 of the question and the terminology, bash the
13 windows in.
14 BY MR. BROOKS:
15     Q.   You can answer.
16     MR. KUJAWA:  If you understand it and you are
17 able to answer it, you can go ahead.
18     THE WITNESS:  His attempt to get inside the
19 vehicle was -- I couldn't give you an exact time,
20 but it was probably between 45 seconds to a minute,
21 I would say.
22 BY MR. BROOKS:
23     Q.   Is it -- is it fair to say, though,
24 when Officer Sugars was using the baton, he -- he

Page 68

1 was striking the window hard?
2      A.   He was using the appropriate force he
3 felt that would neutralize the window and gain
4 access to the vehicle.
5      Q.   When you say "appropriate force," can
6 you give us some insight in terms of how hard he
7 was hitting the glass?
8      A.   I cannot.
9      Q.   I mean, he wasn't tapping the glass,
10 was he?
11     A.   I don't think, no.
12     Q.   Well, yeah.  Fair to say he was
13 striking the glass hard?
14     A.   He was -- he was striking it at
15 appropriate strength to try to attempt to break the
16 window.
17     Q.   He was striking it hard, correct?
18     MR. KUJAWA:  Objection.  Asked and answered.
19          You can go ahead and answer again.
20     THE WITNESS:  He was striking at appropriate
21 force.  I don't -- I wasn't in his shoes.  I don't
22 know how hard he was swinging it.
23 BY MR. BROOKS:
24     Q.   So as Nathaniel Edwards sat in the car

Page 69

1 and Officer Sugars is now banging on a window
2 trying to smash the window in with a baton, would
3 you agree that that can escalate a situation?
4      A.   If it was -- if that was the only
5 factors in the whole situation, then I would say,
6 yeah, it could.  But it was a whole other follow-up
7 of events that occurred before that.  So the
8 situation was already escalated.
9      Q.   And using the flashlight and the baton
10 further escalated the situation, didn't it?
11     A.   It was the next step and appropriate
12 response to -- in order to get him in -- under
13 control and in -- custody.
14     Q.   I -- I -- I understand it was the next
15 step.
16          My -- my question to you:  Did it
17 escalate the situation?
18     MR. KUJAWA:  Objection.  Asked and answered.
19          You can answer again.
20     THE WITNESS:  Yeah, I would say that it was
21 the appropriate response.  But I don't think any of
22 us escalated the situation whatsoever.
23 BY MR. BROOKS:
24     Q.   So -- and Mr. Edwards -- even after

**EXHIBIT C**

ETHAN RILEY, 06/27/2019                                    Page 70..73

Page 70

1 Officer Sugars was trying to smash the window in
2 with the baton, he still sat in the car, right?
3     A.   Yes.
4     Q.   Did he still have the cell phone in his
5 hand?
6     A.   I couldn't tell you.
7     Q.   Where was the female that had come out
8 earlier?
9     A.   She went back inside.
10    Q.   You saw her go back inside?
11    A.   I saw her, yes.  On my approach to the
12 house, I saw her go back inside.
13    Q.   All right.  I don't know if you
14 answered this or not, but did the female have a
15 phone with her?
16    A.   I wouldn't -- I didn't know for sure.
17    Q.   All right.  She could have had a phone,
18 right?
19    A.   She could have.
20    Q.   You weren't paying total attention to
21 her, I take it?
22    A.   No.
23    Q.   All right.  Let me ask you this,
24 Officer Riley: What was the rush to start using a

Page 71

1 baton to smash the windows in?  What was the need
2 for that?
3     MR. KUJAWA:  Objection.  Foundation.
4 Speculation.
5         If you understand the question
6 and are able to answer it, you can go ahead.
7     THE WITNESS:  That was Officer Sugars'
8 decision to start breaking the window immediately.
9 So ...
10 BY MR. BROOKS:
11    Q.   You never used your baton to try to
12 break the windows in, right?
13    A.   No.
14    Q.   Why not?
15    A.   I didn't have the -- I wasn't in the
16 position to break the windows.  It would have made
17 no sense for me being at the rear of the vehicle to
18 start breaking windows.
19    Q.   Well, couldn't you go to the driver's
20 side and break a window?
21    A.   Well, he's -- he was the first one out
22 of the vehicle.  So his job, as the initiating
23 officer, is to make contact with the driver.
24    Q.   You told us earlier that one of the

Page 72

1 things the officer was trying to do was to get
2 control of Mr. Edwards, right?
3     A.   He was trying to get control of the
4 situation, yeah; get him to comply to orders.
5     Q.   All right.  So, as part of that, if you
6 have other officers on the scene, why not have an
7 officer on the passenger side also trying to break
8 a window in?
9     A.   That's just how it happened.
10    Q.   All right.  But you elected never to
11 use your baton to attempt to break a window, right?
12    A.   Yes.
13    Q.   Did Officer Cater ever attempt to break
14 a window with his baton?
15    A.   No.
16    Q.   Was -- was Officer Cater more towards
17 the passenger side of Mr. Edwards' vehicle as
18 opposed to where you were standing?
19    A.   He was positioned behind the right rear
20 portion of the vehicle.
21    Q.   Okay.  That's more towards the
22 passenger side, isn't it?
23    A.   It's the passenger side of the vehicle.
24    Q.   All right.  Did Officer Cater ever

Page 73

1 attempt to use a baton to break a window?
2     A.   No.
3     Q.   By the way, do -- did you also carry a
4 flashlight similar to what Officer Sugars had?
5     A.   No.  I have a different flashlight.
6     Q.   Can you describe it for me?
7     A.   It's small.  It's just a handheld one.
8 It's only about six inches long.  So it wouldn't --
9     Q.   Can you describe the flashlight that
10 Officer Sugars used?
11    A.   I couldn't tell you exact dimensions,
12 but it's much larger.  It's a lot heavier.
13    Q.   Just much larger, sturdier, and
14 heavier?
15    A.   Yes.
16    Q.   All right.  During the course of
17 Officer Sugars striking the window, trying to break
18 it, he didn't break his flashlight, did he?
19    A.   I don't believe so.
20    Q.   All right.  The -- the force that
21 Officer Cater -- I'm -- let me restate it.
22        The -- the force or -- let me
23 restate it.
24        The method that Officer Sugars was

ETHAN RILEY, 06/27/2019                                        Page 74..77

Page 74

1 using to try to enter the car as it was stopped and
2 Mr. Edwards was inside it, whether it was with the
3 flashlight or the baton, your understanding is that
4 that behavior would be consistent with Rock Falls
5 Police Department policy?
6     A.   In that situation, yes.
7     Q.   You've heard of the Use of Force Review
8 Board?
9     A.   Yes.
10    Q.   All right.  That's something that Rock
11 Falls has in place to investigate or at least
12 analyze circumstances where officers use force?
13    A.   Yes.
14    Q.   Deadly force specifically, right?
15    A.   Yes.  It's included.
16    Q.   All right.  So it's your understanding
17 any time an officer uses force, whether it's deadly
18 or otherwise, the Use of Force Review Board will
19 get involved?
20    A.   Yes, depending on severity.
21    Q.   All right.  For sure, the Use of Force
22 Review Board is expected to get involved when
23 there's deadly force used against a citizen,
24 correct?

Page 75

1     A.   Yes.
2     Q.   Was the use of force board, Use of
3 Force Review Board, involved in making any analysis
4 in reference to the shooting of Nathaniel Edwards?
5     A.   I -- I am not sure.
6     Q.   No one's ever told you that the Use of
7 Force Review Board was involved in making any
8 analysis, correct?
9     A.   No.
10    Q.   If there was a Use of Force Review
11 Board making some analysis of Nathaniel Edwards'
12 shooting, the shooting of Nathaniel Edwards, would
13 you as an officer who was involved in the incident
14 be interviewed?
15    MR. KUJAWA:  Objection.  Foundation.
16 Speculation.
17        If you know, you can go ahead.
18    THE WITNESS:  I do not know the answer.
19 BY MR. BROOKS:
20    Q.   All right.  You would expect the
21 officer who actually pulled the trigger to be
22 interviewed, wouldn't you?
23    A.   I would, yes.
24    Q.   Do you know if in fact -- let me

Page 76

1 restate.
2     Q.   First of all, you don't even know if
3 a Use of Force Review Board analyzed the Nathaniel
4 Edwards shooting?
5     A.   I do not.
6     Q.   You told me earlier that it's your
7 understanding that, when deadly force is used
8 against a citizen, Rock Falls will have the Use of
9 Force Review Board get involved, right?
10    A.   Yes, I believe so.
11    Q.   If the review board did not make an
12 analysis of the shooting of Nathaniel Edwards, can
13 you tell us why they would not have done that?
14    A.   I do not know.
15    Q.   Beyond the statement that you gave to
16 the Illinois State Police, have you given a
17 statement to any other police jurisdiction in
18 reference to the shooting of Nathaniel Edwards?
19    A.   No.
20    Q.   Have you given a statement to any
21 investigatory body other than the Illinois State
22 Police?
23    A.   No.
24    Q.   Beyond the written statement you

Page 77

1 prepared over a two-hour period that you provided
2 to the Illinois State Police, have you prepared any
3 other documents associated with the shooting of
4 Nathaniel Edwards?
5     A.   Can you repeat the question?  I'm sorry.
6    MR. BROOKS:  Can you read it back?
7        (Record read as follows:
8            "Q. Beyond the written
9            statement you prepared over
10           a two-hour period that you
11           provided to the Illinois State
12           Police, have you prepared any
13           other documents associated with
14           the shooting of Nathaniel
15           Edwards?")
16    THE WITNESS:  No.
17 BY MR. BROOKS:
18    Q.   When an officer, a Rock Falls officer,
19 is involved in a shooting incident of a private
20 citizen, are the officers expected to generate a
21 report for the department to consider?
22    MR. KUJAWA:  Objection.  Foundation.
23 Speculation.
24        If you know, you can answer.

## EXHIBIT C

ETHAN RILEY, 06/27/2019                                          Page 78..81

Page 78

1    THE WITNESS:  I don't know the answer.
2  BY MR. BROOKS:
3    **Q.   Have you been involved in any shooting**
4  **incidents with the Rock Falls Police Department?**
5    A.   No.  Just this one.
6    **Q.   Beyond the shooting on January 26th,**
7  **2018, do you have any recollection of any other**
8  **police incident that you were involved in that**
9  **particular day that stands out?**
10   A.   On that day?
11   **Q.   Yes.**
12   A.   No, not to my knowledge.
13   **Q.   Let's focus a little bit on**
14 **January 26th, 2018, your start of duty that**
15 **particular day.  Okay?**
16   A.   Yes.
17   **Q.   I understand you were driving --**
18   A.   Yes.
19   **Q.   -- the vehicle?**
20   A.   Yes.
21   **Q.   Was -- was that as a matter of course**
22 **or there was some reason as to why you were driving**
23 **as opposed to Officer Cater?**
24   A.   The training officers always drive.

Page 79

1    **Q.   How is it that you became aware that**
2  **there was some incident involving Nathaniel Edwards?**
3    A.   We heard it on the radio.
4    **Q.   What did you hear?**
5    A.   We heard that there was a 10-80 in
6  progress which is a pursuit.
7    **Q.   Are you saying that it was a radio**
8  **communication from Officer Sugars where he used**
9  **the word "10-80"?**
10   A.   I believe so.  I'm not a hundred
11 percent sure if he said 10-80, but he acknowledged
12 that he wouldn't -- wasn't stopping.
13   **Q.   All right.  Your understanding:  A**
14 **10-80 in police jargon for Rock Falls equals a**
15 **pursuit?**
16   A.   Yes, a chase.
17   **Q.   A chase?**
18   A.   A chase or pursuit, yes.
19   **Q.   The acronym, the -- the 10-80, is -- is**
20 **that somewhere listed on some publication from the**
21 **Rock Falls Police Department?**
22   A.   We have a list of all the -- they call
23 them 10 codes.
24   **Q.   All right.**

Page 80

1    A.   So it's just easier to say it over the
2  radio.
3    **Q.   So a 10-80, that particular code equals**
4  **chase?**
5    A.   Yes.
6    **Q.   If it's a traffic stop, is there a**
7  **certain code that the officer would use?**
8    A.   Yes.
9    **Q.   What would that be?**
10   A.   10-38 is the initial code.
11   **Q.   A 10-38 can include any form of a**
12 **traffic violation?**
13   A.   Yes.  It's just acknowledges that he's
14 performing a traffic stop.
15       It doesn't -- you don't acknowledge
16 the citation or infraction when you're calling it
17 out.
18   **Q.   All right.  Fair enough.**
19       **So if there is a radio communication**
20 **where Sugars uses the code 10-38, that would let**
21 **you know it's a -- he's trying to stop someone for**
22 **a traffic offense, right?**
23   A.   Yes.
24   **Q.   Did you communicate at all with Officer**

Page 81

1  Cater?
2    A.   Not at that point, no.
3    **Q.   I'm sorry.  Let me restate it.**
4        **At some point as you and Caters hear**
5  **a communication pertaining to Nathaniel Edwards**
6  **from Sugars, did you guys respond in some fashion?**
7    A.   Not until he said he wasn't stopping.
8    **Q.   You heard that on the -- on the radio?**
9    A.   Yes.
10   **Q.   You told me you have not listened to**
11 **any of the audio associated with this incident?**
12   A.   I can't recall any of the radio traffic
13 from Officer Sugars to us initially, no.
14   **Q.   Have you listened to any of the radio**
15 **traffic aside from after the car was stopped and**
16 **the shooting?**
17   A.   I have initially when it first -- when
18 it -- right after the incident when we viewed the
19 video, I remember I listened to it, but I don't
20 recall specifics of what was said at all.
21   **Q.   All right.  Going back to when you**
22 **viewed the video, as part of viewing the video,**
23 **you also listened to some audio concerning that**
24 **incident?**

Urlaub Bowen & Associates, Inc.    312-781-9586

**EXHIBIT C**

ETHAN RILEY, 06/27/2019                                    Page 82..85

Page 82

1    A.   Yes.

2    Q.   And that would be the radio

3 communications that you described?

4    A.   It was, yes.  But I can't remember --

5 of the initial radio communication anyway.

6    Q.   Do you know how much of the radio

7 communication you listened during that meeting with

8 the two other officers?

9    A.   Like a time limit?

10    Q.   Yes.

11    A.   I do not know for sure, no.

12    Q.   All right.  So I have a clear

13 understanding, the meeting where you were called

14 in by the commander so you could take a look at the

15 video, it not only included the video but it also

16 included some of the radio communications?

17    A.   I believe so.

18    Q.   When you first saw Nathaniel Edwards,

19 the white Cadillac, where were you and where

20 were -- where was Mr. Edwards?

21    A.   When I -- like when I ran up on the

22 vehicle or when I --

23    Q.   When you first noticed Mr. Edwards'

24 white Cadillac, where were you and where was the

Page 83

1 Cadillac?

2    A.   When I first saw the the driver of the

3 vehicle, Nathaniel Edwards, he was driving in front

4 of my vehicle in a ditch to avoid us.

5    Q.   In terms of street locations, when you

6 first noticed the white Cadillac and the Cadillac

7 is moving, where was the Cadillac and where was

8 your car?

9    A.   My car was parked perpendicular on the

10 roadway in an attempt to block the road; and he was

11 traveling on the road parallel on Sycamore Street.

12    Q.   So Mr. Edwards was on Sycamore Street?

13    A.   Yes.

14    Q.   Where was your car?

15    A.   On Sycamore Street, parked

16 perpendicular.

17    Q.   Your first view of Mr. Edwards' car was

18 when your car was on Sycamore and his car was on

19 Sycamore?

20    A.   Yes.

21    Q.   And he's coming in your direction?

22    A.   Yes.

23    Q.   Does Sycamore travel east and west?

24    A.   Yes.

Page 84

1    Q.   Okay.  So was Nathaniel travel --

2 traveling west, in a west direction?

3    A.   Yes.  At that time, yes.

4    Q.   All right.  Were you already parked

5 across the road when you first saw Mr. Edwards?

6    A.   I turned onto Sycamore as they were

7 turning -- heading westbound, and then that's my

8 FTO told me to turn and park right there in an

9 attempt to block the traffic.

10    Q.   Fair to say that your first assessment

11 of Mr. Edwards' speed is as the car is moving in a

12 western direction towards you?

13    A.   Can -- can you repeat the question?

14    Q.   Is it fair to say that your first

15 estimation of Mr. Edwards' speed, the speed of his

16 vehicle, is when you are parked across the road,

17 Sycamore, and his car is coming towards you in a

18 western direction?

19    A.   Yes.

20    Q.   You believe that his car was traveling

21 about 20 miles per hour?

22    A.   Yes.

23    Q.   What's -- what's the speed limit on

24 that road?

Page 85

1    A.   I do not know for certain.  It's a 25

2 or 30.

3    Q.   All right.  20 miles per hour would not

4 be a violation of the speed limit, though?

5    A.   No.

6    Q.   He could have been going slower than

7 that?

8    A.   He could have.

9    Q.   If someone described his car as

10 traveling very slow, fair to say that that's

11 probably less than 20 miles per hour?

12    A.   I -- that entirely varies on each

13 person.

14    Q.   All right.  What if it's your training

15 officer who characterizes the vehicle as moving

16 very slow?  Would you have any question with his

17 assessment of a vehicle moving less than 20 miles

18 per hour?

19    A.   I have no idea.  He -- if he says it's

20 very slow, I said it's slow, that's just verbiage.

21 20 miles per hour is 20 miles per hour.

22    Q.   When Mr. Edwards maneuvers his car so

23 it does not contact your car and he continues west

24 on Sycamore, where did he go from there?

**EXHIBIT C**

ETHAN RILEY, 06/27/2019                              Page 86..89

Page 86

1    A.   He turned southbound on Martin Road

2 again and then he turned eastbound on Franklin.

3    Q.   How far on Martin did he travel?

4    A.   Just the -- it's just one block

5 difference between Sycamore and Franklin.

6    Q.   In terms of the total distance that --

7 that Mr. Edwards traveled, let's say from the point

8 he first maneuvers his car around your car to the

9 point he parks in the driveway, give me an

10 approximation in terms of distance from a block

11 standpoint.

12    A.   Two blocks, maybe.

13    Q.   Did Mr. Edwards have his lights on?

14    A.   I believe so.  I'm not for sure,

15 though.

16    Q.   All right.  You don't have any

17 recollection of lights being out, correct?

18    A.   No.

19    Q.   I take it Officer Sugars never

20 communicated his lights are out or anything to that

21 nature, right?

22    A.   No.

23    Q.   Give me your best estimate of how much

24 time passed from the moment you parked your SUV at

Page 87

1 1304 Franklin until shots are first fired.

2    A.   I honestly couldn't tell you.  It

3 was -- it can -- it was no longer than four

4 minutes.

5    Q.   You viewed the tape you said --

6    A.   Yes.

7    Q.   -- either Monday or Tuesday of this

8 week, correct?

9    A.   Um-hmm.

10    Q.   You have to answer yes or no.

11    A.   Yes.

12    Q.   And based on your review of the tape,

13 you believe it was about four minutes?

14    A.   That would be my best guess, yes.

15    Q.   All right.  If from the moment -- let

16 me restate it.

17         You saw Officer Sugars get out of

18 the car?

19    A.   Yes.  I saw him making his approach to

20 the vehicle, yes.

21    Q.   All right.  When Officer Sugars was

22 making his approach to Mr. Edwards' car, were you

23 outside of the car?

24    A.   I was -- I believe I was just putting

Page 88

1 my car into park and getting out myself.

2    Q.   I imagine it took you a couple of

3 seconds to do that?

4    A.   Yes.

5    Q.   All right.  So fair to say that, when

6 Officer Sugars starts to approach, a couple of

7 seconds later, you are actually outside of your

8 car?

9    A.   Yes.

10    Q.   Did you actually see Officer Sugars

11 go up to the driver's side window of Mr. Edwards'

12 car?

13    A.   Yes.

14    Q.   How long had you been out of your car

15 when you first saw Officer Sugars at the driver's

16 side window of Mr. Edwards' car?

17    A.   I could not tell you.

18    Q.   Just a matter of seconds?

19    A.   I would say yes.

20    Q.   When Officer Sugars started using his

21 flashlight to try to smash the window in, do you

22 know how long -- or, more importantly, give me your

23 understanding of how much time passed between

24 Officer Sugars making some verbal command to

Page 89

1 Nathaniel Edwards until he started using his

2 flashlight to try to break the window in?

3    A.   I have no idea.

4    Q.   Can you give me your best estimation?

5    A.   I can't.  I -- it could have been a

6 minute; it could have been ten seconds.  I'm not

7 sure.

8    Q.   All right.

9    A.   I don't want to make a broad

10 generalization.

11    Q.   You think it could be up to a minute?

12    A.   It could have been.  I'm not sure.

13    Q.   All right.  Your best estimation is

14 that it could have been a few seconds up to a

15 minute?

16    MR. KUJAWA:  I think that's --

17 BY MR. BROOKS:

18    Q.   Is that -- is that right?

19    MR. KUJAWA:  I'm going to object.  It

20 misstates his testimony.  He said he couldn't give

21 an estimate.

22    MR. BROOKS:  He just gave an estimate.

23    MR. KUJAWA:  No.  He said it could have been

24 from here to here, but he didn't want to make a

ETHAN RILEY, 06/27/2019                                      Page 90..93

Page 90

1 generalization.

2     MR. BROOKS: Okay.

3     MR. KUJAWA: So he didn't -- couldn't give an

4 estimate.

5 BY MR. BROOKS:

6     Q.   Fair to say -- fair to say, Officer,

7 your best recollection that the period of time

8 between when Officer Sugars first give -- gave a

9 command to -- a verbal command to Nathaniel Edwards

10 until the point he first started using the

11 flashlight, it could vary between a few seconds to

12 a minute?

13     MR. KUJAWA: Objection.

14     THE WITNESS: I -- I do not know a specific

15 time.

16 BY MR. BROOKS:

17     Q.   I understand you don't know a specific

18 time.

19           It could vary between a range of a

20 few seconds up to a minute, correct?

21     MR. KUJAWA: Objection. Asked and answered.

22 Misstates the testimony.

23     THE WITNESS: I don't know the answer to the

24 question.

Page 91

1 BY MR. BROOKS:

2     Q.   How much time passed between the point

3 Officer Sugars stopped using his flashlight to try

4 to smash the window in until the point he used his

5 baton to try to smash the window in?

6     A.   I couldn't tell you an exact time limit

7 on that as well.

8     Q.   I understand you can't tell me an exact

9 time. Give me your best estimation of time.

10     A.   I -- I honestly can't tell you.

11           I know the whole interaction was

12 only about four minutes from the time we were at

13 the vehicle. So ...

14     Q.   Could it have been less than four

15 minutes?

16     A.   It could have been.

17     Q.   Did you see Nathaniel Edwards do

18 anything in the car that you perceived as being

19 aggressive from the point Officer Sugars was

20 banging on the window with his flashlight or the

21 glass with his flashlight until the point he

22 started using his baton to try to bash the windows

23 in?

24     A.   Not at that point, no. Just basically

Page 92

1 verbal, just shouting.

2     Q.   All right. But nothing you would

3 characterize as aggressive, correct?

4     A.   Not necessarily; but failure to comply

5 and remaining in the vehicle was not advisable at

6 best.

7     Q.   Would you agree with me that, under the

8 circumstances where you have a motorist who is

9 stopped but who is refusing to get out of the

10 vehicle and the officer tries to bash in the

11 windows with either a baton or a flashlight and

12 also says to the person in the vehicle that, If you

13 don't get out -- words to the effect, If you don't

14 get out, I'll shoot you or will shoot you, that

15 that can escalate the situation?

16     MR. KUJAWA: Objection. Form. Foundation.

17 Incomplete hypothetical.

18           If you understand the question and

19 if you're able to answer it, you can.

20     MR. BROOKS: You shouldn't have any problems

21 understanding the question.

22     THE WITNESS: Can you repeat it for me,

23 please?

24     MR. BROOKS: Ms. Reporter, can you read it

Page 93

1 back?

2           (Record read as follows:

3           "Q. Would you agree with me

4            that, under the circumstances

5            where you have a motorist who

6            is stopped but who is refusing

7            to get out of the vehicle and

8            the officer tries to bash in

9            the windows with either a baton

10            or a flashlight and also says

11            to the person in the vehicle

12            that, If you don't get out --

13            words to the effect, If you

14            don't get out, I'll shoot you

15            or will shoot you, that that

16            can escalate the situation?")

17     MR. KUJAWA: And -- and you don't have to

18 take his characterization as to whether you should

19 be able to understand it or not.

20           If you understand it --

21     MR. BROOKS: Mike --

22     MR. KUJAWA: -- you can answer it. If you

23 don't --

24     MR. BROOKS: -- that's a nice narrative. You

ETHAN RILEY, 06/27/2019                          Page 94..97

Page 94

1  can't -- you can't just give narratives.  I mean,
2  what's the objection?
3      MR. KUJAWA:  You can't tell him he should be
4  able to understand the question.
5      MR. BROOKS:  Well, then, make the objection.
6      MR. KUJAWA:  I did.
7      MR. BROOKS:  Well, no, you gave a narrative.
8  I mean, you -- you know -- let's -- you know, let's
9  avoid the narratives.  If you have an objection,
10  make the objection.
11      MR. KUJAWA:  Well, then, let's avoid talking
12  to the witness and telling him whether he should
13  understand the question or not.
14      MR. BROOKS:  Well, if the -- I asked if the
15  witness doesn't understand question, then we'll
16  restate it.
17      MR. KUJAWA:  Exactly.
18  BY MR. BROOKS:
19      Q.   So you heard the question, sir, right?
20      A.   Your question is -- you're saying --
21      Q.   Better yet, let's just have the court
22  reporter read the question back.  Okay?  And you
23  let us know if you understand it.
24           If you don't understand it, we'll

Page 95

1  give you another question.
2      THE WITNESS:  Give me another question,
3  please.
4      MR. BROOKS:  Well, we're going to have the
5  court reporter read it back first.
6         (Record read as follows:
7          "Q.  Would you agree with me
8              that, under the circumstances
9              where you have a motorist who
10              is stopped but who is refusing
11              to get out of the vehicle and
12              the officer tries to bash in
13              the windows with either a baton
14              or a flashlight and also says
15              to the person in the vehicle
16              that, If you don't get out --
17              words to the effect, If you
18              don't get out, I'll shoot you
19              or will shoot you, that that
20              can escalate the situation?")
21      THE WITNESS:  It could, but that's not what
22  was said and that's not what happened.
23  BY MR. BROOKS:
24      Q.   What do you mean, that was not said?

Page 96

1      A.   He said he was -- he said if -- You're
2  going to get shot, after he put the vehicle in
3  reverse.
4      Q.   Okay.  Your understanding is that
5  Officer Sugars used the words, You're going to get
6  shot, after the car was moving in reverse?
7      A.   It wasn't moving in reverse.  He put
8  his foot on the brake and he -- I saw him shift the
9  vehicle into reverse.  It wasn't moving at that
10  point.
11           Officer said, Do not move in reverse
12  or you're going to get shot.
13      Q.   So -- so we're on the same page, was
14  the vehicle moving at all when Officer Sugars said,
15  You're going to get shot?
16      A.   I do not believe so, no.
17      Q.   All right.  If in fact you -- as you
18  described, you saw the vehicle being put in
19  reverse --
20      A.   Yes.
21      Q.   -- why not just move away from the
22  vehicle?
23      A.   I moved myself a little farther from
24  the side of the vehicle in order -- if I needed to

Page 97

1  make an escape, I could; but I wanted to make sure
2  I still had a -- good line of sight on him in
3  case -- we didn't know at that point if he had a
4  weapon in the vehicle or -- because I still had an
5  officer at the driver's side window there in direct
6  contact with him.  So I wanted to make sure I still
7  had an able line of sight on him in case I needed
8  to take action.
9      Q.   A line of sight in case you needed to
10  shoot?
11      A.   Yes.
12      Q.   So fair to say that you believe before
13  Mr. Edwards' vehicle started to move backwards,
14  that you put yourself in a position where you would
15  have a good line of sight to shoot him, correct?
16      A.   Yes.  I was already in a line of sight
17  to shoot him; but when he -- when I seen the
18  reverse lights go on, that's when I canted myself a
19  bit to make myself better able to move in case he
20  did move.
21      Q.   I just want to make sure that, just in
22  terms of your placement, is it fair to say that
23  moments before Mr. Edwards' vehicle moved in a
24  backwards direction that you had put yourself in

**EXHIBIT C**

ETHAN RILEY, 06/27/2019                                    Page 98..101

Page 98

1 a good line of sight where if you needed to shoot
2 Mr. Edwards, you could do that, correct?
3     A.   Yes.
4     Q.   You never fired your weapon at all
5 during this incident, correct?
6     A.   I did not.
7     Q.   Even though you had a good line of
8 sight as Mr. Edwards' vehicle was moving backwards,
9 you never fired your weapon?
10     A.   I moved to the side initially; and then
11 when I moved to the left, Officer Sugars was in my
12 cross fire so I wasn't able to make a safe shot.
13     MR. BROOKS:   Can I have my question read
14 back?
15          (Record read as follows:
16          "Q.   Even though you had a good
17           line of sight as Mr. Edwards'
18           vehicle was moving backwards,
19           you never fired your weapon?")
20     THE WITNESS:   No, I did not.
21 BY MR. BROOKS:
22     Q.   I take it Officer Sugars never fired
23 his weapon, correct?
24     A.   No.

Page 99

1     Q.   That's a no, he never fired?
2     A.   No, he never fired the weapon.
3     Q.   Is it fair to say that, when shots were
4 first fired, you did not know specifically where
5 those shots came from?
6     A.   I did not.  Not for sure, no.
7     Q.   All right.  Obviously at some point
8 later you learned where the shots came from?
9     A.   Yes.
10     Q.   But the moment the shots were fired,
11 were you under the impression that they came from
12 the driver or what?
13     A.   No.
14     Q.   What was your impression?
15     A.   I was -- I just was concentrating on
16 getting out of the way of the vehicle and then
17 assessing the situation afterwards.
18     Q.   Well, if you heard shots and you did
19 not know where the shots were coming from, were you
20 also trying to get away from what could be shots
21 that were fired?
22     A.   No.  I -- I could hear them coming from
23 the right, but we also had a deputy back there.  I
24 wasn't sure if it was coming from the deputy or

Page 100

1 Officer Cater.  So ...
2     Q.   All right.  The deputy, is that Colter?
3     A.   Coutts.
4     Q.   Coutts.  How do you spell that?
5     A.   C-o-u-t-t-s.
6     Q.   Did you know Deputy Coutts before this
7 incident?
8     A.   No.
9     Q.   Never met him before?
10     A.   I might have met him before, but I
11 didn't know him at all.
12     Q.   Where -- where was Coutts in reference
13 to Nathaniel Edwards' vehicle when you say the car
14 was put in reverse?
15     A.   He was still back on the roadway behind
16 our vehicles.
17     Q.   So he was not in the grassy area of the
18 front yard?
19     A.   I'm not sure.  Alls I know is he wasn't
20 in the driveway with us.
21     Q.   All right.  Did you see the deputy once
22 you were positioned, as you say, towards the
23 driver's side rear of the car?
24     A.   No.  I didn't see him.  I don't know

Page 101

1 where he was for sure.
2     Q.   The deputy was on the scene before you,
3 though, right?
4     A.   He was in the initial chase, yes.  So
5 he was second behind Officer Sugars in the chase
6 procession.  So ...
7     Q.   Since deputy -- since the deputy --
8 this is a Whiteside deputy, right?
9     A.   Yes.
10     Q.   Since the Whiteside deputy was on the
11 scene before you, when you stepped out of your car,
12 did you see the Whiteside deputy outside of the
13 car?
14     A.   I don't recall.  I don't for sure
15 remember seeing him.
16     Q.   Have you had any conversations with
17 any officer from the Whiteside Police Department
18 concerning this shooting?
19     A.   No.
20     Q.   Did you have any conversations with the
21 deputy after the shooting who was on the scene?
22     A.   No.
23     Q.   Have you had any conversations with
24 officers from the Sterling Police Department

EXHIBIT C

ETHAN RILEY, 06/27/2019                                   Page 102..105

Page 102

1 concerning this incident?

2    A.   No.

3       Q.   I understand that there was a sergeant

4 or a lieutenant from Sterling who came to the scene

5 after the shooting.

6          Do you recall that?

7    A.   I don't -- there was lots of officers.

8 I don't recall any specific ranks or ...

9       Q.   Do you recall any officers going

10 through a walk-through with an officer from

11 Sterling Police Department?

12    A.   No.

13       Q.   Did you go through a walk-through at

14 the scene with any officer?

15    A.   I don't know what you mean by a

16 walk-through.

17       Q.   You haven't heard the -- the term

18 walk -- walk -- some -- you haven't heard the term

19 walk-through in the context of law enforcement?

20    A.   Not really.  Not in this context.

21       Q.   Typically what happens at the scene is

22 that the officers involved will actually provide

23 information -- specifically location, placement,

24 and things of that nature -- when a supervising

Page 103

1 officer arrives on the scene.  That's typically

2 called a walk-through.

3          You never heard anything of that

4 nature?

5    A.   No.

6       Q.   I take it it's fair to say that, at

7 least in reference to this shooting, no superior

8 officer asked you to walk through and describe

9 where you were at and things of that nature?

10    A.   I don't recall ever doing a

11 walk-through, no.

12       Q.   All right.  Did any superior officers

13 from Rock Falls come to the scene while you were

14 there?

15    A.   Yes.

16       Q.   Who?  Who was the first superior

17 officer at the scene?

18    A.   I do not remember the first one.  I

19 walked back to where they were all parked.  It was

20 Commander Koett, Commander Coppotelli, and Chief

21 Nelson were all back there.

22       Q.   Commander Koett, is that the commander

23 who told you to come into the station to view the

24 video and other materials?

Page 104

1    A.   I believe so.

2       Q.   And you never spoke with the commander

3 at the scene about the incident?

4    A.   He just told us what was going to

5 happen.  He said there was going to be three

6 separate officers escorting us separately back to

7 the police station and wait for the Illinois State

8 Police to get there.

9       Q.   All right.  Did he say anything else in

10 reference to what would happen after the shooting?

11    A.   No.  He just told us what -- just keep

12 our mouths shut and don't tell anybody what

13 happened.

14       Q.   All right.  Did the commander tell you

15 that at some point that evening that the Illinois

16 State Police would try to talk with you?

17    A.   Yes.

18       Q.   But he told you to keep your mouth shut

19 and don't talk to anybody?

20    A.   He said, Don't release any information

21 regarding what happened.  Just wait for your

22 interview with the state police.

23       Q.   All right.  Did the Illinois State

24 Police try to talk to you that night?

Page 105

1    A.   Just the initial one that came and took

2 pictures of our uniforms and our equipment and

3 pistols and stuff.

4       Q.   I -- I take it, you know, during that

5 interaction you just basically kept your mouth

6 shut?

7    A.   Yes, right.

8       Q.   At some point, did a superior officer

9 from Sterling attempt to talk to you about the

10 incident?

11    A.   I don't recall, no.

12       Q.   If a superior officer from Sterling

13 Police Department sought to talk with you, would

14 you have kept your mouth shut?

15    A.   Yes.

16       Q.   If a superior officer from Whiteside

17 sought to speak with you concerning the shooting

18 incident, would you have kept your mouth shut?

19    A.   Yes.

20    MR. BROOKS:  Can we take a quick break, maybe

21 a five, ten -- five, ten-minute break?

22    MR. KUJAWA:  Yeah.

23    THE VIDEO TECHNICIAN:  Off the record at

24 12:59 at the end of media unit one.

**EXHIBIT C**

ETHAN RILEY, 06/27/2019                                    Page 106..109

Page 106

1          (Recess taken.)
2     THE VIDEO TECHNICIAN:  Back on the record at
3 1:06 at the beginning of media unit two.
4 BY MR. BROOKS:
5     Q.   Officer Riley, let's say moments before
6 the first shot was fired, where were you in
7 relationship to the parked car?
8     A.   I would say the -- the rear of the
9 Cadillac was very close to being like this.  I
10 don't know how to explain it.
11          Like if this was the -- the Cadillac
12 and this was the car parked next to it, it was
13 right about from the back to the front of this car.
14          It was very little space lengthwise
15 in between the bumpers.
16     Q.   Is it your testimony that, when the
17 white Cadillac pulled and stopped in the driveway,
18 it was a short distance as far as the rear of the
19 Cadillac in front of the parked car?
20     A.   That's as I recall, yes.
21     Q.   Can you tell me how close the rear of
22 the Cadillac was to the front of the -- I believe
23 it's a gray car that was parked in the driveway?
24     A.   Honestly I couldn't tell you specific.

Page 107

1     Q.   You had the ability to -- to travel
2 between the two cars if they were side by side?
3     A.   Yes.
4     Q.   All right.  When the first shot was
5 fired, can you tell me where you were at as far as
6 the Cadillac is concerned?
7     A.   I was just exiting the rear of the path
8 of the vehicle.
9     Q.   You got to explain that a little bit to
10 me.
11     A.   As the shot --
12     Q.   Well, the first shot -- so you hear a
13 shot.  Okay?
14     A.   Yes.
15     Q.   I understand the shots were in rapid
16 succession?
17     A.   As I recall, yes.
18     Q.   All right.  That's how you would
19 describe it, right?
20     A.   Yes.
21     Q.   Was there a period of time when you
22 heard a series of shots, short break, then another
23 shot?
24     A.   I don't recall that, no.

Page 108

1     Q.   All right.  If someone said, I heard
2 several shots, then the shots stopped, and then
3 there were additional shots, would that be
4 inaccurate?
5     A.   Would that be inaccurate?
6     Q.   Yes.
7     A.   I do not recall a short break and then
8 following shots.
9     Q.   The -- what you recall is a sequence of
10 shots in rapid succession?
11     A.   Yes.
12     Q.   When you hear the very first sound of a
13 gunshot, can you tell me how close you were to the
14 Cadillac?
15     A.   During the initial confrontation, I was
16 about a foot off the rear of the Cadillac.
17     Q.   I understand that.  But when you heard
18 the very first shot, where were you in relationship
19 to the Cadillac in terms of distance and placement?
20     A.   I was moving left out of the pathway of
21 the vehicle as it was moving in reverse.
22     Q.   Can you tell me, just in terms of
23 distance, when you hear that first shot -- I take
24 it, first of all, you're not in physical contact

Page 109

1 with the car, are you?
2     A.   No.
3     Q.   All right.  Just in terms of distance,
4 are you more than an arm length away from the car
5 when the sound of the first shot is heard?
6     A.   No -- I don't -- I can't tell you that
7 for sure.
8     Q.   You just --
9     A.   I had just gotten out of the pathway of
10 the vehicle when it was -- when it started moving
11 in reverse.
12     Q.   Are you telling us that you heard a
13 shot at the same time the car was moving in --
14 moving backwards?
15     A.   I heard the shot shortly after the
16 vehicle started moving in reverse.
17     Q.   Give me your best estimation of the
18 time between the car moving backwards and the sound
19 of a shot.
20     A.   It was split second.
21     Q.   You told us earlier you watched the
22 video --
23     A.   Um-hmm, yes.
24     Q.   -- of at least the video from Sugars'

**EXHIBIT C**

ETHAN RILEY, 06/27/2019                          Page 110..113

Page 110

1 SUV, correct?

2    A.   Yes.

3       Q.    At some point, you see the Cadillac

4 rolling backwards, correct?

5    A.   Yes.

6       Q.    Would you agree that the Cadillac is

7 moving backwards at a very, very slow pace?

8    A.   No.

9       Q.    Are you telling us that the Cadillac

10 was moving backwards at a fast pace?

11    A.   Initially.

12      Q.    Based on what you see in the video,

13 is the Cadillac moving at a fast pace?

14    A.   I don't recall how fast the vehicle is

15 moving in the video.  You only catch the -- the

16 last part of the vehicle moving in the video.

17      Q.    How -- how did the Cadillac come to a

18 stop?

19    A.   I do not know for sure.  I imagine it

20 was Nate Edwards because we still had not had

21 access to the vehicle.

22      Q.    You imagine that?

23    A.   Yes.

24      Q.    All right.  You don't know how the

Page 111

1 Cadillac came to a stop?

2    A.   No.

3       Q.    Did you ever see Nathaniel do anything

4 in the car after he was shot?

5    A.   No.

6       Q.    Did you see him move at all after he

7 was shot inside the car?

8    A.   I did not.

9       Q.    From your understanding, after

10 Nathaniel was shot, physically he was not able to

11 remove himself from the car, right?

12    A.   I do not know that.

13      Q.    Well, how did he manage to get out of

14 the car?

15    A.   We broke the window --

16      Q.    And did what?

17    A.   -- on the passenger side.

18         The passenger side of the vehicle,

19 we broke the window, unlocked the doors, and then

20 the deputies were able to extract him from the

21 driver's side once the doors were unlocked.

22      Q.    Fair to say Mr. Edwards could not

23 physically remove himself from the car after he

24 was shot?

Page 112

1    A.   It very well could be, but I -- I don't

2 know for sure.  I didn't assess him.

3       Q.    Well, what you could see, you didn't

4 see any movement in him after he was shot, did --

5 did you?

6    A.   No.

7       Q.    And you saw officers physically put

8 their hands on Mr. Edwards after he was shot to

9 remove him from the car, right?

10    A.   Yes.

11      Q.    Did they put him on the ground?

12    A.   Yes.  They did get him to a safe

13 distance behind the Cadillac and then they put him

14 on the ground.

15      Q.    When Mr. Edwards was -- was on the

16 ground, did you see him moving at all?

17    A.   I did not.

18      Q.    Could you tell whether he was breathing

19 once he was put on the ground?

20    A.   He was short, struggled breaths.

21      Q.    Describe it as -- as best as you could.

22    A.   Very sporadic.  Just -- just short and

23 deep breaths.  Very irregular.

24      Q.    Appeared he was gasping?

Page 113

1    A.   Yes.

2       Q.    How long did the gasping take place

3 while Mr. Edwards was on the ground after the

4 shooting?

5    A.   I only witnessed a few seconds of it,

6 and then I went to my car to retrieve my AED.

7       Q.    All right.  During that period of time

8 that you were watching Mr. Edwards as he was on the

9 ground, you believe it was only a few seconds

10 before you went to get your AED?

11    A.   Just a few seconds of me observing the

12 breaths.

13      Q.    All right.  Did you come back to the

14 area where Mr. Edwards was initially on the ground?

15    A.   Yes.

16      Q.    When you came back to the area, could

17 you still hear gasping from Mr. Edwards?

18    A.   I do not recall specifically if I did

19 at that point.

20      Q.    Did you pay any attention to determine

21 that?

22    A.   No.  I was getting the AED ready to put

23 on him.

24      Q.    You didn't put the AED on Mr. Edwards,

Urlaub Bowen & Associates, Inc.    312-781-9586

**EXHIBIT C**

ETHAN RILEY, 06/27/2019                                    Page 114..117

Page 114

1 did you?

2    A.   I did not.  I opened the thing and I

3 turned it on and then one of the -- I can't

4 remember who, but one of the other officers applied

5 the pads.

6    Q.   Would that be an officer from a

7 jurisdiction other than Rock Falls?

8    A.   I do not know for certain.

9    Q.   Do you recall any officer from Rock

10 Falls providing medical assistance when Mr. Edwards

11 was on the ground?

12    A.   I do not.  I believe the deputy that

13 was there initiated the CPR.

14    Q.   And that was the deputy from Whiteside?

15    A.   Yes.

16    Q.   When, as you described, the car being

17 physically shifted in gear to reverse -- do you

18 recall that?

19    A.   Yes.

20    Q.   Where was Officer Cater?

21    A.   I do not know when he was at that time.

22         When we official -- when we

23 initially approached the vehicle, he was behind the

24 right rear portion of the vehicle.

Page 115

1         I didn't have eyes on him after

2 that.  I was concentrating on the driver.

3    Q.   When Officer Sugars was using the baton

4 to try to smash the car window in, where was

5 Officer Cater?

6    A.   He was still by -- right rear portion

7 of the vehicle.

8    Q.   He stood there the whole time?

9    A.   Yes.  That's how we got the -- he threw

10 the baton over the top of the vehicle.  That's the

11 only way I know he was back there at that point.

12    Q.   Why throw the baton over the car as

13 opposed to just handing it to an officer?

14    A.   It was quicker.

15    Q.   It was quicker to just throw it over

16 the car?

17    A.   Yes.  And it's hard to see it in the

18 pitch black.

19    Q.   And are you saying that that's the

20 baton that Sugars used to try to smash the window

21 in?

22    A.   Yes.

23    Q.   So, from your understanding, Sugars

24 didn't have a baton with him?  Or not?

Page 116

1    A.   No, I don't believe he did.

2    Q.   All right.  You had a baton too?

3    A.   I believe I did.

4    Q.   Why didn't you --

5    A.   Actually I do not think I did actually.

6    Q.   Do you know for sure?

7    A.   I do not know for sure, but I -- I

8 don't carry one now.  So I'm assuming I didn't

9 didn't have one that day.

10    Q.   As part of your police equipment in

11 January of 2018, was a baton a standard piece of

12 equipment?

13    A.   It was optional.  You -- we weren't

14 required to wear it.

15    Q.   Did you have a Taser?

16    A.   Yes.

17    Q.   You just didn't have a baton?

18    A.   No.

19    Q.   When you say Mr. Edwards shifted the

20 gear in the car and then put it in reverse, based

21 on everything you're -- you've testified to, you

22 are telling us that you actually -- you physically

23 saw that?

24    A.   I saw his hand go up and move it and

Page 117

1 then the brake lights came on.

2    Q.   All right.  When -- when you saw

3 Mr. Edwards, as you describe, shift the gear, the

4 brake lights came on, did you say anything to

5 Cater?

6    A.   I do not recall if I did or not.

7    Q.   If you knew the car was about to move

8 in reverse, why didn't you say something to Cater?

9    A.   I do not know.

10         I know of -- at one point in the

11 audio someone said, Do not go backwards.

12         So that's -- that's pretty much all

13 I remember.

14    Q.   All right.  My question is:  Why didn't

15 you say something to your field training officer if

16 you noticed that the car was shifted in reverse?

17    A.   I very well could have.  I don't recall

18 what -- if I said anything, what I would have said.

19    Q.   If you said something, more likely than

20 not, wouldn't it have been on the video that was

21 generated by Officer Sugars' vehicle?

22    A.   Not necessarily.

23    Q.   Okay.  You don't think you would yelled

24 that out?

**EXHIBIT C**

ETHAN RILEY, 06/27/2019                                    Page 118..121

Page 118

1    A.   I have no idea.

2    Q.   All right.  As best as you -- as you

3  recall, you do not have any recollection of saying

4  anything to Cater in reference to the vehicle being

5  shifted in reverse?

6    A.   I do not.

7    Q.   From where you were standing and where

8  you have indicated Officer Cater was standing,

9  would Cater have been in a position where he would

10  see brake lights?

11    A.   Yes.

12    Q.   When you saw the brake lights, and as

13  you described your assumption that the vehicle was

14  in reverse, you started to move?

15    A.   I positioned myself, I braced myself;

16  if I needed to move, I could do it in a -- I was

17  more prepared to do it.

18    Q.   You -- you were able to do that in a

19  relatively easy fashion?

20    A.   Yes.

21    Q.   Okay.

22    A.   From the time limit that I had.

23    Q.   I want to go back to this point where

24  you say the vehicle started moving in reverse.

Page 119

1            Is it your testimony that the

2  vehicle was moving in reverse at a fast pace?

3    A.   Initially, when it -- about the first

4  half a second, when it first started going, you

5  could hear the engine rev; and it went back very,

6  very rapidly.

7    Q.   All right.  Can you give me some idea

8  of the speed of the vehicle?

9    A.   I do not.  It was such a short distance

10  I couldn't even begin to tell you.

11    Q.   But you're saying the vehicle was

12  moving in reverse at a rapid pace?

13    A.   Yes.

14    Q.   You saw on the video that the vehicle

15  appears to be rolling, correct?

16    A.   Yes.

17    Q.   Fair to say that the vehicle moved less

18  than a car length from the point it was parked

19  until the point it stopped in a backwards direction?

20    A.   I couldn't say for certain; but it

21  wasn't much more than that, if it was.

22    MR. BROOKS:  I don't think I have any other

23  questions at this point.

24

Page 120

1                EXAMINATION

2  BY MR. KUJAWA:

3    Q.   Ethan, you mentioned, when you were put

4  into one of the squad cars after the incident to go

5  back to the station, that one of the commanders

6  told you to keep your mouth shut, I believe is how

7  you said it; is that right?

8    A.   Yes.

9    Q.   Do you know what -- did he tell you not

10  to cooperate with the state police investigation?

11    A.   No.  What he -- what he meant was just

12  don't be talking to other people in the department

13  because they're -- it's still an -- an

14  investigation.  So we don't want to be divulging

15  information that people -- so it would get gossiped

16  around and stuff like that.

17            He was just merely telling us, Don't

18  tell anybody anything except when you go to the

19  state police to do your statement.

20    Q.   So the keep your mouth shut was, Don't

21  be talking to everybody else that you may see at

22  the police station --

23    A.   Yeah, and I don't know if that was his

24  exact verbiage; but it was -- that's what he told

Page 121

1  us.

2    Q.   Okay.  But you -- you understood that

3  you were supposed to cooperate completely with the

4  state police --

5    A.   Yes.

6    Q.   -- investigation?

7    A.   Yes.

8    MR. KUJAWA:  Okay.  I don't have anything

9  else.  Thanks.

10    MR. BROOKS:  I don't have any questions.

11    MR. KUJAWA:  All right.  We will waive

12  signature.

13    THE VIDEO TECHNICIAN:  This concludes today's

14  proceedings.  We are going off the record at 1:22

15  at the end of media unit two.

16            (The proceedings adjourned at

17              1:22 p.m.)

18

19

20

21

22

23

24

**EXHIBIT C**

ETHAN RILEY, 06/27/2019                                          Page 122

Page 122

```
 1            REPORTER'S CERTIFICATE
 2        I, Nicole M. Cheney, do hereby certify that
     ETHAN PATRICK RILEY was duly sworn by me to testify
 3   the whole truth, that the foregoing deposition was
     recorded stenographically by me and was reduced to
 4   computerized transcript under my direction, and
     that the said deposition constitutes a true record
 5   of the testimony given by said witness.
 6        I further certify that the reading and
     signing of the deposition was waived by the
 7   deponent's counsel.
 8        I further certify that I am not a relative
     or employee or attorney or counsel of any of the
 9   parties, or a relative or employee of such attorney
     or counsel, or financially interested directly or
10   indirectly in this action.
11        IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office at Chicago,
12   Illinois, this 27th day of August 2019.
13
14
15        Illinois CSR No. 084.004724
16
17
18
19
20
21
22
23
24
```

**EXHIBIT C**

**Exhibits**

**1 Riley 062719-1**  13:20,21 14:3,4

**2 Riley 062719-2**  34:19,20,24 35:5,21 38:7,8,18 39:1,24 40:8,18

**3 Riley 062719-3**  49:3,7,12,21 50:23

**0**

**06/27/2019**  13:23 34:22 49:9

**1**

**1**  13:20,21 14:4
**10**  79:23
**10-38**  80:10,11,20
**10-80**  79:5,9,11,14,19 80:3
**1020**  4:7
**11:14**  4:3
**11:22**  13:8
**11:23**  13:12
**1260**  4:18
**12:59**  105:24
**1304**  57:21 59:2,9 87:1
**14**  11:8
**140**  4:6
**16**  11:9,10,12,16
**18**  4:12
**1:06**  106:3
**1:22**  121:14,17

**2**

**2**  34:19,20,24 35:5,21 38:8,18 39:1,24 40:8,18
**20**  4:17 31:4 84:21 85:3,11,17,21
**2009**  10:4
**2017**  8:4
**2018**  8:7,12,20 9:3,19 14:10,16 15:6,23 51:22 78:7,14 116:11
**2019**  4:5

**2485**  35:2
**25**  85:1
**26**  9:2
**26th**  8:12 9:19 14:10,16 15:6,23 51:22 78:6,14
**27th**  4:5

**3**

**3**  49:3,7,12,21 50:23
**30**  29:17 85:2
**30-plus**  29:9
**300.4.1**  17:10
**300.8**  15:12 16:2
**30th**  45:19,23 46:4,17

**4**

**45**  28:18 67:20

**5**

**50035**  4:12

**A**

**ability**  57:15 107:1
**absolutely**  31:23 32:19
**academy**  11:15,22 51:17
**access**  68:4 110:21
**accurate**  58:21
**accurately**  38:18 50:24
**acknowledge**  47:22 80:15
**acknowledged**  79:11
**acknowledges**  80:13
**acronym**  79:19
**action**  56:22 62:12 63:6 66:9 97:8
**actions**  30:10 52:7
**activities**  9:13
**actual**  16:15
**add**  7:8
**additional**  108:3

**address**  57:21
**adjourned**  121:16
**administrative**  27:22,24
**advance**  46:7
**advisable**  92:5
**AED**  113:6,10,22,24
**aggressive**  52:14,18,22 53:4,7, 15,17,18,24 54:3,5,12,14 60:17,18 91:19 92:3
**Agnew**  4:10
**agree**  18:5,7 30:21 55:24 56:7 60:23 61:16 65:15 69:3 92:7 93:3 95:7 110:6
**ahead**  18:11 20:5 21:9,13 22:24 29:15 41:12 56:12 62:17 64:6 65:8 67:17 68:19 71:6 75:17
**allowed**  22:2
**Alls**  100:19
**ammunition**  16:14
**amount**  32:4
**amounted**  30:11
**analysis**  75:3,8,11 76:12
**analyze**  74:12
**analyzed**  76:3
**Annie**  4:9
**anticipate**  6:14
**apparently**  30:8 66:23
**Appeared**  112:24
**appears**  119:15
**applicable**  5:22,23
**applied**  114:4
**approach**  39:2 41:23 59:18 64:21 70:11 87:19,22 88:6
**approached**  39:10 40:24 41:2,7, 22 114:23
**approaching**  19:2 22:18 59:17
**approximation**  86:10
**area**  40:19 41:5 51:11,13 100:17 113:14,16
**arm**  109:4
**arrived**  27:9,13

**arrives** 103:1

**aspect** 12:4

**assert** 52:24

**assess** 112:2

**assessing** 99:17

**assessment** 84:10 85:17

**assistance** 44:24 45:1 49:24 114:10

**Associates** 4:17,20

**Assume** 64:19

**assumes** 20:2 21:6

**assuming** 116:8

**assumption** 118:13

**attempt** 30:16 67:18 68:15 72:11, 13 73:1 83:10 84:9 105:9

**attempting** 30:13,23

**attention** 70:20 113:20

**attorney** 23:24

**audio** 60:8 81:11,23 117:11

**authoritative** 60:14,19

**avert** 19:10 22:10

**averting** 30:15

**avoid** 83:4 94:9,11

**aware** 7:14 24:16 26:20 27:11 46:3 79:1

---

**B**

**back** 13:10,11 14:21 20:10 31:13 40:3 42:16 48:4 50:18 58:16 60:1, 3,6 62:23 70:9,10,12 77:6 81:21 93:1 94:22 95:5 98:14 99:23 100:15 103:19,21 104:6 106:2,13 113:13,16 115:11 118:23 119:5 120:5

**background** 10:1

**backwards** 97:13,24 98:8,18 109:14,18 110:4,7,10 117:11 119:19

**banging** 66:16,19 69:1 91:20

**based** 15:17 31:9 42:23 44:11 55:9,18 67:4 87:12 110:12 116:20

**bash** 67:5,9,12 91:22 92:10 93:8

95:12

**basically** 7:1 9:12 11:1 16:16 45:3 91:24 105:5

**basis** 13:1

**Bates** 35:1

**baton** 67:5,24 69:2,9 70:2 71:1,11 72:11,14 73:1 74:3 91:5,22 92:11 93:9 95:13 115:3,10,12,20,24 116:2,11,17

**begin** 119:10

**beginning** 4:2 52:15 106:3

**behalf** 4:9,24 5:2,4

**behavior** 52:19 53:12 54:2 74:4

**believes** 19:9

**bit** 9:24 11:5 58:17 78:13 97:19 107:9

**black** 115:18

**block** 30:16 83:10 84:9 86:4,10

**blocks** 86:12

**board** 74:8,18,22 75:2,3,7,11 76:3, 9,11

**body** 76:21

**bottom** 35:1

**Bowen** 4:16,20

**braced** 118:15

**brake** 96:8 117:1,4 118:10,12

**break** 7:6,11 67:2 68:15 71:12,16, 20 72:7,11,13 73:1,17,18 89:2 105:20,21 107:22 108:7

**breaking** 71:8,18

**breathing** 112:18

**breaths** 112:20,23 113:12

**Brett** 4:15

**broad** 89:9

**broke** 111:15,19

**broken** 53:8

**Brooks** 4:24 5:13,19 6:1 13:6,10, 13,19 14:1,21 15:9 18:15 20:9,12, 21 21:11,14 22:7 23:4,17 29:18 34:18,23 35:3 39:22 40:16,17 41:14 49:2,5,10 56:13 62:19,23 63:16 64:9,18 67:14,22 68:23 69:23 71:10 75:19 77:6,17 78:2

89:17,22 90:2,5,16 91:1 92:20,24 93:21,24 94:5,7,14,18 95:4,23 98:13,21 105:20 106:4 119:22 121:10

**bumpers** 106:15

---

**C**

**C-O-U-T-T-S** 100:5

**Cadillac** 36:14,18 40:20 41:4,7,20, 23,24 42:7 82:19,24 83:1,6,7 106:9,11,17,19,22 107:6 108:14, 16,19 110:3,6,9,13,17 111:1 112:13

**call** 25:16,23 26:14 79:22

**called** 5:10 24:18,19,21 25:4,22 82:13 103:2

**calling** 80:16

**calls** 9:17

**camera** 55:17

**canted** 97:18

**captured** 23:20

**car** 9:15 17:7 39:3 41:8,16,19,24 42:1,3,7 53:3,12,13 54:3,19 57:8, 12 61:7,9,17,18 62:3,11 63:5 64:1, 20,21,23,24 65:19,20 66:17 67:9 68:24 70:2 74:1 81:15 83:8,9,14, 17,18 84:11,17,20 85:9,22,23 86:8 87:18,22,23 88:1,8,12,14,16 91:18 96:6 100:13,23 101:11,13 106:7, 12,13,19,23 109:1,4,13,18 111:4,7, 11,14,23 112:9 113:6 114:16 115:4,12,16 116:20 117:7,16 119:18

**carry** 73:3 116:8

**cars** 42:11 107:2 120:4

**case** 4:12 15:23 97:3,7,9,19

**casual** 7:15

**catch** 110:15

**Cater** 4:10 8:24 9:2,5 24:4 31:15 42:17,24 44:7 46:3 72:13,16,24 73:21 78:23 81:1 100:1 114:20 115:5 117:5,8 118:4,8,9

**Caters** 26:13 27:13,19 32:3,11 81:4

**cell** 25:23 57:12,15 58:11 70:4

**certification** 51:19,21

**certified** 51:17

**characterization** 93:18

**characterize** 30:7 31:6,11 54:2 92:3

**characterizes** 85:15

**charged** 55:2,3,7,13,16,20

**chase** 29:22 30:2,3,8,12 79:16,17, 18 80:4 101:4,5

**Cheney** 4:20

**Chicago** 4:7,18

**Chief** 103:20

**chooses** 62:3

**chose** 62:8

**cir-** 18:13

**circumstance** 62:2 63:18

**circumstances** 18:13 52:9 63:22 74:12 92:8 93:4 95:8

**citation** 80:16

**citizen** 74:23 76:8 77:20

**Civil** 5:22

**Clark** 4:17

**clear** 6:10 41:6 82:12

**clearer** 20:12

**close** 106:9,21 108:13

**closest** 35:22

**code** 80:3,7,10,20

**codes** 79:23

**college** 10:16,17,18 16:20

**Colter** 100:2

**combination** 56:20

**command** 53:14 88:24 90:9

**commander** 24:24 25:3,5,7,11,13, 14,17,22 26:15,20 27:4 28:17 42:20 43:22 82:14 103:20,22 104:2,14

**commander's** 43:12

**commanders** 24:22 120:5

**commands** 16:16

**comments** 61:2

**commit** 55:10

**committed** 58:7

**common** 7:21

**communicate** 80:24

**communicated** 25:14 53:6 86:20

**communication** 25:4 31:18,23 32:20 79:8 80:19 81:5 82:5,7

**communications** 82:3,16

**Community** 10:18 16:19

**completely** 54:6 121:3

**complied** 62:7

**comply** 30:15 53:9 54:9 72:4 92:4

**Complying** 36:6,9 40:12,15

**concentrating** 99:15 115:2

**concept** 51:5

**concerned** 107:6

**concludes** 121:13

**confirmed** 47:13

**confrontation** 108:15

**confused** 32:17

**connection** 12:18

**consistent** 74:4

**constitutes** 42:4

**contact** 45:16 71:23 85:23 97:6 108:24

**contacted** 45:13

**context** 102:19,20

**continues** 85:23

**control** 52:24 66:4,7,8,12,14 69:13 72:2,3

**conversation** 7:22 27:12 32:22

**conversations** 7:15 101:16,20,23

**Cook** 11:14

**cooperate** 120:10 121:3

**coordinated** 24:13

**Coppotelli** 103:20

**correct** 10:23 12:7 18:19 19:12,24 20:19 21:3,24 22:20 23:7,21 27:1 32:2 35:11 38:3,5 41:17,20 42:8 43:18,23 48:8 51:2 54:13 58:3 68:17 74:24 75:8 86:17 87:8 90:20 92:3 97:15 98:2,5,23 110:1,4

119:15

**correction** 48:16

**corrections** 48:14

**counsel** 4:21 6:5 37:24

**counted** 37:23

**County** 11:14

**couple** 6:9 36:12 88:2,6

**court** 4:13,19 5:6 6:17 7:17 20:9 34:24 94:21 95:5

**Coutts** 100:3,4,6,12

**cover** 49:6

**CPR** 114:13

**crime** 37:2 38:14

**crisis** 51:5,11,18,24

**cross** 98:12

**custody** 69:13

**CV** 4:12

**cycle** 16:17

**D**

**date** 45:20,24 48:18

**day** 23:12,16 27:16,17 46:6,8 78:9, 10,15 116:9

**de-escalate** 52:1,4

**deadly** 12:7,11 17:16 74:14,17,23 76:7

**dealing** 52:12

**Dearborn** 4:6

**decided** 67:5

**decision** 71:8

**deep** 112:23

**defendants** 5:5

**degree** 10:23

**demonstrate** 16:3,10 39:23

**department** 8:2 11:19,24 12:10, 15,24 14:9 24:20 27:1 51:8 74:5 77:21 78:4 79:21 101:17,24 102:11 105:13 120:12

**depending** 74:20

**depends** 18:6 52:20

**EXHIBIT C**

**deposition** 4:4,8 5:20 6:3,7,14 13:21 14:3 34:20 49:7,12

**deputies** 111:20

**deputy** 99:23,24 100:2,6,21 101:2, 7,8,10,12,21 114:12,14

**describe** 30:3,6,9 60:11,12 73:6,9 103:8 107:19 112:21 117:3

**describing** 30:19

**details** 47:13

**detain** 65:10

**detained** 63:15 65:13,16,18 66:2, 3,13

**determine** 113:20

**device** 23:20

**dictate** 22:19

**difference** 86:5

**difficult** 6:17 7:7,19

**dimensions** 73:11

**direct** 25:4 39:5,8 45:15 97:5

**direction** 21:1,22 22:14 42:15 83:21 84:2,12,18 97:24 119:19

**directly** 41:3 44:12

**discharge** 19:7,17 22:2

**discharging** 19:2

**discovery** 5:20

**discrepancy** 14:14 15:4

**discuss** 16:23

**discussion** 13:9

**disobeying** 53:20 54:24

**disposal** 65:13

**dispute** 28:20

**distance** 86:6,10 106:18 108:19, 23 109:3 112:13 119:9

**District** 4:13,14 5:23

**ditch** 54:23 83:4

**Division** 4:14

**divulging** 120:14

**document** 47:17

**documents** 77:3,13

**door's** 63:13

**doors** 111:19,21

**draft** 47:16,20 48:3,6,8,10,21,24

**drafts** 47:23,24 48:1

**draw** 39:15 40:9

**drawn** 40:18

**drive** 78:24

**driver** 30:11,14 38:23 61:24 63:9, 14 65:10,13 71:23 83:2 99:12 115:2

**driver's** 39:9,11 40:2 41:2,3,4 71:19 88:11,15 97:5 100:23 111:21

**driveway** 33:15 34:7 38:9,20 40:6 41:8,16,17 42:8 53:3 54:18 55:6 56:9,23 57:22 58:11 65:16,19 86:9 100:20 106:17,23

**driving** 33:24 54:22 78:17,22 83:3

**DUI** 56:14,18,24

**duly** 5:10

**duty** 25:19 78:14

---

**E**

**E-T-H-A-N** 5:17

**earlier** 13:14 15:18 23:10,11,18 49:23 70:8 71:24 76:6 109:21

**easier** 80:1

**east** 83:23

**eastbound** 86:2

**Eastland** 10:10

**easy** 118:19

**education** 10:15

**educational** 10:1

**Edwards** 30:5,10,20 33:5 35:11 41:15 53:2,6 54:17 55:4 56:8,17 57:3,10,22 58:10 61:7 65:15 66:2, 17 68:24 69:24 72:2 74:2 75:4,12 76:4,12,18 77:4,15 79:2 81:5 82:18,20 83:3,12 84:5 85:22 86:7, 13 89:1 90:9 91:17 98:2 110:20 111:22 112:8,15 113:3,8,14,17,24 114:10 116:19 117:3

**Edwards'** 31:10 39:3 41:20,22 42:3,7 56:22 57:14 59:17 72:17 75:11 82:23 83:17 84:11,15 87:22 88:11,16 97:13,23 98:8,17 100:13

**effect** 92:13 93:13 95:17

**effective** 17:23 18:4,13,18

**effectively** 9:21 27:24

**effort** 61:17

**elected** 72:10

**electronic** 16:18

**employed** 8:1

**EMT** 28:11

**EMTS** 29:23

**encounter** 52:2

**end** 35:22 105:24 121:15

**enforcement** 11:18 102:19

**engage** 65:3

**engine** 119:5

**enter** 74:1

**entire** 16:22

**entirety** 28:6

**equals** 79:14 80:3

**equipment** 105:2 116:10,12

**escalate** 52:8,11 61:19,22 62:1 69:3,17 92:15 93:16 95:20

**escalated** 61:21 69:8,10,22

**escalates** 62:5

**escalating** 52:15

**escalation** 16:17

**escape** 97:1

**escorted** 37:2

**escorting** 104:6

**essentially** 26:5 28:12 63:20

**estimate** 86:23 89:21,22 90:4

**estimation** 84:15 89:4,13 91:9 109:17

**et al** 4:10,11

**Ethan** 4:5 5:9,17,21 120:3

**evaluate** 52:3

**evening** 104:15

**events** 47:11 69:7

**evidence** 20:2 21:6 55:17

**EXHIBIT C**

ETHAN RILEY, 06/27/2019

**exact**  60:5 67:19 73:11 91:6,8 120:24

**EXAMINATION**  5:12 120:1

**examined**  5:11

**exhaust**  21:2,23

**Exhibit**  13:20,21 14:3 34:19,20,24 35:5,21 38:7,18 39:1,24 40:8,18 49:3,7,12,21 50:23

**existed**  14:9,10

**exited**  40:2

**exiting**  107:7

**expect**  75:20

**expected**  74:22 77:20

**experienced**  17:1

**explain**  30:3 106:10 107:9

**explained**  6:5

**extract**  111:20

**eyes**  58:14,15 115:1

F

**face**  18:16

**facility**  16:19

**fact**  15:18 48:20 50:20 57:5 75:24 96:17

**factors**  69:5

**facts**  20:2 21:6 47:13

**failing**  30:14

**fails**  56:4

**failure**  92:4

**fair**  6:22,24 7:12 17:14 20:22 21:17 53:11 54:15 57:20 59:16 61:1 67:23 68:12 80:18 84:10,14 85:10 88:5 90:6 97:12,22 99:3 103:6 111:22 119:17

**Falls**  8:1 11:18,24 12:9,15 14:9 17:2 18:19 19:23 20:17 26:24 35:1, 15 37:9 51:8 74:4,11 76:8 77:18 78:4 79:14,21 103:13 114:7,10

**familiar**  12:9 51:4

**farther**  40:6 96:23

**farthest**  35:24

**fashion**  57:11 81:6 118:19

**fast**  110:10,13,14 119:2

**fault**  62:6

**favor**  36:4

**Federal**  5:21

**feel**  44:3

**felt**  68:3

**female**  58:22 59:1,16 70:7,14

**field**  8:18,21 9:2,16 22:15 117:15

**filed**  4:13

**final**  49:20 50:12,23

**finger**  39:24

**finished**  42:19 43:1

**fire**  98:12

**firearm**  19:3,7,18 22:3

**firearms**  16:15,22

**fired**  17:22 18:3,17 87:1 98:4,9,19, 22 99:1,2,4,10,21 106:6 107:5

**firing**  19:24 20:18 21:2,24 22:8,19

**flashlight**  61:12,17 62:3 65:3,11 66:2 69:9 73:4,5,9,18 74:3 88:21 89:2 90:11 91:3,20,21 92:11 93:10 95:14

**fleeing**  54:24

**focus**  18:2 78:13

**follow**  9:16

**follow-up**  69:6

**foot**  96:8 108:16

**force**  12:5,7,11,16 13:15 14:5,11 16:9,17 17:16 68:2,5,21 73:20,22 74:7,12,14,17,18,21,23 75:2,3,7,10 76:3,7,9

**form**  20:1 21:4 22:21 29:12 41:9 48:1 62:14 64:3 65:5 67:11 80:11 92:16

**formal**  10:15

**foundation**  64:4 65:5 71:3 75:15 77:22 92:16

**fourth**  9:14,18

**Franklin**  57:21 59:2,9 86:2,5 87:1

**free**  62:8

**Freeport**  10:18

**front**  34:3,5,6 39:18 42:4 59:11,20 83:3 100:18 106:13,19,22

**front-facing**  33:21

**FTO**  39:6 84:8

**full**  5:14

**fully**  6:20,21 7:2 52:3

G

**gain**  52:24 68:3

**gasping**  112:24 113:2,17

**gave**  26:3 43:12,19,20 47:11 48:4, 7 76:15 89:22 90:8 94:7

**gear**  65:21 114:17 116:20 117:3

**general**  6:6 9:12 11:21,23 12:13, 22 13:2 18:7 40:10 55:19

**generalization**  89:10 90:1

**generally**  51:15

**generate**  50:23 77:20

**generated**  117:21

**gentleman**  58:2

**give**  6:19,20 16:16 20:10 26:6 28:13 38:2 43:16 50:18 67:19 68:6 86:9,23 88:22 89:4,20 90:3,8 91:9 94:1 95:1,2 109:17 119:7

**glaring**  14:14 15:3

**glass**  66:16,20 67:2 68:7,9,13 91:21

**goals**  52:1

**good**  4:1 15:10 66:24 97:2,15 98:1, 7,16

**Google**  34:12

**gossiped**  120:15

**graduated**  10:3

**grassy**  100:17

**gray**  106:23

**Gregory**  5:2

**ground**  6:7,9 112:11,14,16,19 113:3,9,14 114:11

**guess**  16:23 87:14

**gunshot**  108:13

**EXHIBIT C**

**guys** 28:4,14,19 32:5 81:6

## H

**half** 119:4

**hand** 39:19 70:5 116:24

**handheld** 73:7

**handing** 115:13

**hands** 66:11 112:8

**happen** 6:6 104:5,10

**happened** 36:12 47:19 51:1 72:9
  95:22 104:13,21

**happening** 32:23

**happy** 64:15

**hard** 53:16 68:1,6,13,17,22 115:17

**harm** 19:19

**heading** 84:7

**headquarters** 46:19

**hear** 59:22 61:4 79:4 81:4 99:22
  107:12 108:12,23 113:17 119:5

**heard** 74:7 79:3,5 81:8 94:19
  99:18 102:17,18 103:3 107:22
  108:1,17 109:5,12,15

**heavier** 73:12,14

**helpful** 44:4 52:22

**high** 10:1,3,9,10,14 31:2

**Highland** 10:18

**hired** 8:4

**hitting** 68:7

**hold** 36:7 40:13

**Holloway** 37:5,9

**honestly** 28:8 39:4 87:2 91:10
  106:24

**hour** 28:9 31:4,8 84:21 85:3,11,18,
  21

**hours** 37:16 44:21 46:21 50:12,17

**house** 33:14,22 34:3,5,6 59:2,11
  60:1,3,7 70:12

**hundred** 79:10

**hypothetical** 20:3 21:5 22:22
  62:15 64:4 65:6 92:17

## I

**idea** 57:18 85:19 89:3 118:1 119:7

**identification** 13:23 14:4 34:22
  49:9,13

**identify** 4:21

**Illinois** 4:7,14,18 5:24 10:13,19
  38:3 43:13,17 44:8,12,19 45:6,10,
  13,16 46:19 48:22 49:15 50:8
  76:16,21 77:2,11 104:7,15,23

**illuminate** 38:16

**illustrate** 39:1,14,18,20

**imagine** 24:11 88:2 110:19,22

**immediately** 62:12 63:6 71:8

**important** 29:22

**importantly** 88:22

**impossible** 53:23

**impression** 58:2,6 99:11,14

**in-car** 23:6,20

**inaccuracy** 50:5

**inaccurate** 108:4,5

**inappropriate** 64:12

**inches** 73:8

**incident** 30:4,8 75:13 77:19 78:8
  79:2 81:11,18,24 98:5 100:7 102:1
  104:3 105:10,18 120:4

**incidents** 78:4

**include** 80:11

**included** 74:15 82:15,16

**incomplete** 20:3 21:5 22:22 62:15
  64:4 65:6 92:17

**individual** 63:24 64:22,23

**information** 102:23 104:20
  120:15

**infraction** 80:16

**initial** 11:6 14:19 33:7 37:20 47:16
  57:19 80:10 82:5 101:4 105:1
  108:15

**initially** 43:16 47:5,7 61:11 81:13,
  17 98:10 110:11 113:14 114:23
  119:3

**initiated** 29:22 114:13

**initiating** 55:8,15,22 71:22

**inside** 67:18 70:9,10,12 74:2 111:7

**insight** 68:6

**instructed** 59:24 60:6

**intend** 6:15

**inter-** 13:3

**interaction** 17:5 30:19 54:10,12
  91:11 105:5

**internet** 13:4

**intervention** 51:5,11,18,24

**interview** 25:10 104:22

**interviewed** 37:18 75:14,22

**intoxicated** 57:16,18 58:3,7

**investigate** 48:7 74:11

**investigation** 37:21 120:10,14
  121:6

**investigator** 48:4,7 50:9,17

**investigators** 47:3

**investigatory** 76:21

**involved** 17:4 74:19,22 75:3,7,13
  76:9 77:19 78:3,8 102:22

**involving** 30:4 79:2

**irregular** 112:23

**issue** 12:19

## J

**James** 37:5,9

**January** 8:6,12,20 9:2,19 14:10,16
  15:6,23 45:19,23 51:22 78:6,14
  116:11

**jargon** 79:14

**job** 71:22

**Johnson** 4:10

**Jonathan** 8:24

**June** 4:5 8:4

**jurisdiction** 76:17 114:7

## K

**K-O-E-T-T** 27:8

**EXHIBIT C**

ETHAN RILEY, 06/27/2019

**knew** 59:11 117:7

**knock** 61:8,12,17

**knowledge** 14:12 16:4,10,11 29:8 32:7 78:12

**Koett** 103:20,22

**Koett's** 27:5

**Kujawa** 5:4 18:9 20:1,7 21:4 22:21 23:14 29:12 39:20 41:9 49:4 56:11 62:14 64:3 65:5 67:11,16 68:18 69:18 71:3 75:15 77:22 89:16,19, 23 90:3,13,21 92:16 93:17,22 94:3, 6,11,17 105:22 120:2 121:8,11

**Kulis** 5:2 14:17

---

**L**

**L-A-N-A-R-K** 10:7

**lady** 61:2

**Lanark** 10:4,9

**larger** 73:12,13

**lasts** 8:9

**law** 11:17 102:19

**laws** 53:8

**lead** 57:16

**leading** 15:23

**learn** 59:13

**learned** 59:8 99:8

**leave** 27:22,24

**left** 29:23 32:1 35:21,22 36:1,21 37:7 41:19 42:1 98:11 108:20

**legal** 4:15

**length** 109:4 119:18

**lengthwise** 106:14

**levels** 9:6

**lieutenant** 102:4

**lighting** 38:15

**lights** 86:13,17,20 97:18 117:1,4 118:10,12

**limit** 82:9 84:23 85:4 91:6 118:22

**limitations** 17:15

**list** 79:22

**listed** 79:20

**listened** 60:8 81:10,14,19,23 82:7

**Listening** 19:15

**live** 16:13

**lived** 59:8,10,14

**located** 4:6 10:8 36:15 40:20

**location** 38:12 102:23

**locations** 83:5

**locked** 63:13

**long** 8:10 9:1 28:7,21 29:2,7,16 37:14 44:19 66:19 73:8 88:14,22 113:2

**longer** 87:3

**lot** 7:15 43:3 73:12

**lots** 102:7

**loud** 60:15 61:1,4

---

**M**

**made** 8:16 24:17 26:8 39:5,7 47:17,20,21 48:3,11,20 50:20 53:14 71:16

**magazines** 37:22

**make** 6:10 7:7 23:2 26:20 48:14 50:6,19 63:14 64:13 71:23 76:11 89:9,24 94:5,10 97:1,6,19,21 98:12

**makes** 6:16

**making** 75:3,7,11 87:19,22 88:24

**manage** 111:13

**maneuver** 57:10,15

**maneuvered** 57:6,7

**maneuvers** 85:22 86:8

**manner** 60:4 63:11

**manual** 11:20

**Map** 34:14

**mark** 34:24

**marked** 13:20,22 14:3 34:18,21 35:5 49:2,8,12,21

**married** 11:3

**Martin** 86:1,3

**materials** 13:3 103:24

**matter** 4:9 12:19 78:21 88:18

**means** 19:10,18 22:9

**meant** 120:11

**media** 4:2 105:24 106:3 121:15

**medical** 114:10

**meeting** 25:9 82:7,13

**Mel** 4:24

**mentioned** 9:5 120:3

**message** 46:12

**met** 38:1 100:9,10

**method** 73:24

**Michael** 5:4

**Mike** 93:21

**miles** 31:4,8 84:21 85:3,11,17,21

**mind** 54:7

**mine** 45:2

**minor** 56:1,9

**minute** 67:20 89:6,11,15 90:12,20

**minutes** 28:16,18 29:1,7,9,17,20 53:9 54:10 56:5 87:4,13 91:12,15

**misstates** 21:6 41:10 89:20 90:22

**mistake** 47:21

**moment** 53:13 54:17,18 55:4,5 86:24 87:15 99:10

**moments** 97:23 106:5

**Monday** 23:13,15,19 33:19 87:7

**month** 9:14 12:17 13:17

**monthly** 12:20,24

**months** 8:11

**morning** 4:1

**motorist** 17:5 62:10 63:3,4,20 64:20 92:8 93:5 95:9

**mouth** 104:18 105:5,14,18 120:6, 20

**mouths** 104:12

**move** 19:1 22:4,17,19 42:13 96:11, 21 97:13,19,20 111:6 116:24 117:7 118:14,16

**moved** 36:19 38:12,14 96:23 97:23 98:10,11 119:17

**movement** 112:4

**moving** 17:11,22 18:3,17 19:8,22
20:15,16 21:1,21 22:13 42:14 83:7
84:11 85:15,17 96:6,7,9,14 98:8,18
108:20,21 109:10,13,14,16,18
110:7,10,13,15,16 112:16 118:24
119:2,12

**N**

**name's** 10:9

**narrative** 64:11 93:24 94:7

**narratives** 94:1,9

**Nate** 42:3 55:2 110:20

**Nathaniel** 30:5,20 33:5 35:11
38:9,20 39:2 53:2 54:16 55:4,21
67:10 68:24 75:4,11,12 76:3,12,18
77:4,14 79:2 81:5 82:18 83:3 84:1
89:1 90:9 91:17 100:13 111:3,10

**nature** 7:7 48:18 52:14 86:21
102:24 103:4,9

**nearby** 16:20

**necessarily** 31:3 65:11 92:4
117:22

**needed** 25:8 26:2 50:20 96:24
97:7,9 98:1 118:16

**neglecting** 54:23

**Nelson** 103:21

**neutralize** 68:3

**neutralized** 65:14

**nice** 60:4 93:24

**night** 34:1 104:24

**Nikki** 4:19

**North** 4:17

**Northern** 4:14 5:23

**notes** 47:9

**noticed** 82:23 83:6 117:16

**notification** 45:9,12

**notion** 64:10

**number** 4:12 13:20,21 14:4 34:20
35:1,5,21 38:8,18 39:1,24 40:8,18
49:7,12 50:23 66:22

**O**

**object** 18:9 20:1 21:4 22:21 29:12
41:9 56:11 62:14 64:2,3 67:11
89:19

**objection** 64:13 65:5 68:18 69:18
71:3 75:15 77:22 90:13,21 92:16
94:2,5,9,10

**objects** 22:16

**oblivious** 54:7

**observe** 9:17

**observing** 113:11

**obstruction** 22:16

**OC** 16:21

**occupant** 17:16

**occupants** 19:3,8

**occurred** 69:7

**off-duty** 27:17,20

**offense** 55:10,14 80:22

**office** 27:3,7

**officer** 8:7,13,15,21 9:2,7,16 11:6
12:23 13:14 14:2 16:9 17:2,15
18:19 19:7,8,23 20:17,24 21:20
22:14,15,16 23:6,20 24:4,5 31:15
33:5 35:4 37:5,10 46:3 49:11 51:4
52:19 53:4,15 54:4 55:2,8,16,20,22
59:24 60:12 61:11,14 62:2,9 63:2,
24 65:2,24 66:15,19 67:4,8,24 69:1
70:1,24 71:7,23 72:1,7,13,16,24
73:4,10,17,21,24 74:17 75:13,21
77:18 78:23 79:8 80:7,24 81:13
85:15 86:19 87:17,21 88:6,10,15,
20,24 90:6,8 91:3,19 92:10 93:8
95:12 96:5,11,14 97:5 98:11,22
100:1 101:5,17 102:10,14 103:1,8,
17 105:8,12,16 106:5 114:6,9,20
115:3,5,13 117:15,21 118:8

**officer's** 62:6

**officers** 14:11 15:15 16:2 19:1
26:17 51:8 52:8 53:9,20 54:24
59:22 61:8 72:6 74:12 77:20 78:24
82:8 101:24 102:7,9,22 103:12
104:6 112:7 114:4

**offices** 4:17

**official** 114:22

**one's** 75:6

**online** 12:21

**open** 22:15

**opened** 114:2

**opportunity** 6:19,21

**opposed** 7:21 19:24 20:18 22:8,9,
19 60:21 72:18 78:23 115:13

**option** 19:21 20:14,20,23 21:19
22:4 26:8,10 43:19,21,24

**optional** 116:13

**options** 21:2,23 22:2

**order** 60:20 65:10 69:12 96:24

**orders** 11:21,23 72:4

**outline** 9:13 12:13

**P**

**p.m.** 121:17

**pace** 110:7,10,13 119:2,12

**pads** 114:5

**par** 56:18,23

**paragraph** 15:12 16:1 17:22

**parallel** 83:11

**park** 84:8 88:1

**parked** 35:15 38:7,8,20 40:5,21
41:8,17,24 42:1,8 83:9,15 84:4,16
86:24 103:19 106:7,12,19,23
119:18

**parking** 43:3

**parks** 86:9

**part** 8:17 11:16 17:1 18:2 50:3,11,
16 51:24 52:19 72:5 81:22 110:16
116:10

**parties** 4:22

**parts** 29:22

**passed** 86:24 88:23 91:2

**passenger** 39:9 41:1 72:7,17,22,
23 111:17,18

**path** 19:1,22 20:15 22:17 23:2 39:2
40:10 42:11 107:7

**pathway** 108:20 109:9

**Patrick** 5:9,17,21

**patrol** 9:13

**EXHIBIT C**

**pay** 113:20

**paying** 70:20

**pending** 7:9

**people** 120:12,15

**perceived** 91:18

**percent** 79:11

**perform** 30:13

**performing** 80:14

**period** 8:9 32:24 37:17 44:23 46:23 47:15 49:16,19 54:12 77:1, 10 90:7 107:21 113:7

**periodic** 15:16,19 16:2,7

**permitted** 50:6

**perpendicular** 83:9,16

**person** 52:12 61:18 85:13 92:12 93:11 95:15

**personal** 25:23

**perspective** 55:19

**pertaining** 81:5

**phase** 9:14,15,18

**phases** 37:20

**phone** 25:24 57:12,16 58:11,19,24 70:4,15,17

**photo** 34:11 35:10

**photograph** 33:12,14,17,23 34:24 35:8,21,22 36:3 38:18 40:9

**photographed** 37:22,24

**photographing** 38:15

**photographs** 33:10,20 38:13

**photos** 34:15

**phrase** 52:17

**physical** 66:4,6,14 108:24

**physically** 23:1 46:24 66:11 111:10,23 112:7 114:17 116:22

**picture** 36:1

**pictures** 105:2

**piece** 116:11

**pistols** 105:3

**pitch** 115:18

**place** 74:11 113:2

**placement** 97:22 102:23 108:19

**places** 17:15

**plaintiff** 4:9

**plaintiffs** 5:1,3

**point** 6:13 24:3 31:13 36:17 42:10, 16 43:12 53:4,5 54:2,3 56:8,23 57:7,18 58:4 59:6,8,13 60:19 61:6 65:22,24 66:5 81:2,4 86:7,9 90:10 91:2,4,19,21,24 96:10 97:3 99:7 104:15 105:8 110:3 113:19 115:11 117:10 118:23 119:18,19,23

**police** 8:1 9:13 11:6,18,24 12:10, 15,24 14:9 17:1 18:19 19:23 20:17, 24 21:20 22:14 26:24 30:11 33:7, 24 35:14,15 37:9,13,14,21 38:3 43:13,17 44:8,12,19 45:6,10,13,16 46:19 47:4 48:22 49:15 50:9 51:8 52:7 53:14,20 54:23,24 55:2,20 56:4 62:9 63:2,19,24 64:20,22 65:2 74:5 76:16,17,22 77:2,12 78:4,8 79:14,21 101:17,24 102:11 104:7, 8,16,22,24 105:13 116:10 120:10, 19,22 121:4

**policies** 11:18,24 12:24

**policy** 11:20 12:10,15 13:15,17 14:5,9 15:16,19 16:3,8,11,12 17:10,15 18:14,16,20,24 20:23 21:7,18 22:18 74:5

**portion** 17:14 35:10 51:16 72:20 114:24 115:6

**position** 71:16 97:14 118:9

**positioned** 39:13 72:19 100:22 118:15

**practice** 63:23 65:3

**prep** 50:22

**prepare** 44:20 46:17 50:12,18

**prepared** 28:17 44:18 77:1,2,9,12 118:17

**preparing** 44:23 45:7 46:20 47:6 50:3

**present** 26:18 34:9 36:22 50:1

**presume** 7:1 63:18

**presuming** 12:4

**pretty** 61:21 117:12

**prior** 38:13 45:7

**private** 77:19

**probationary** 8:7,9,13,17,18 9:7

**problems** 92:20

**Procedure** 5:22

**proceeding** 30:16

**proceedings** 121:14,16

**process** 45:4

**procession** 101:6

**profanity** 52:11,13

**progress** 79:6

**progression** 9:6

**provide** 45:10 102:22

**provided** 44:7,10 45:24 46:4 49:15 77:1,11

**providing** 114:10

**publication** 79:20

**pull** 30:23 54:23 56:4 57:20,24

**pulled** 38:9,20 41:15 53:2 54:18 55:5 56:8,23 57:22 58:10 59:1 75:21 106:17

**pulling** 30:15 56:20 59:4

**purposes** 14:4 38:15 40:8

**pursuant** 5:21

**pursuit** 53:10 79:6,15,18

**put** 36:4 58:19 65:21 96:2,7,18 97:14,24 100:14 112:7,11,13,19 113:22,24 116:20 120:3

**putting** 87:24

──────────

**Q**

──────────

**qualifier** 7:8

**question** 6:14,20 7:1,2,9,10 14:20, 21 20:2,4,10 21:5 22:22 29:13 41:10 45:8 50:15 62:15,23 64:5,15 65:7 67:12 69:16 71:5 77:5 84:13 85:16 90:24 92:18,21 94:4,13,15, 19,20,22 95:1,2 98:13 117:14

**question/answer** 44:15

**questions** 36:12 44:11 119:23 121:10

**quick** 35:6 105:20

**quicker** 115:14,15

EXHIBIT C

## R

**R-I-L-E-Y** 5:18

**radio** 79:3,7 80:2,19 81:8,12,14 82:2,5,6,16

**ran** 82:21

**range** 90:19

**ranges** 16:13

**ranks** 102:8

**rapid** 107:15 108:10 119:12

**rapidly** 119:6

**rarely** 17:23 18:4,17

**re-reads** 50:13

**rea-** 19:18

**reached** 9:18 25:13

**read** 13:5 14:21 15:1 19:15 20:10, 13 21:16 62:23,24 77:6,7 92:24 93:2 94:22 95:5,6 98:13,15

**ready** 113:22

**rear** 35:19 39:10 41:4 71:17 72:19 100:23 106:8,18,21 107:7 108:16 114:24 115:6

**reason** 19:17 28:19 38:11 50:11, 16 53:21,22 57:17 78:22

**reasonable** 19:10

**recall** 13:16 27:15 31:4 32:10,22 38:17 58:13 60:5 81:12,20 101:14 102:6,8,9 103:10 105:11 106:20 107:17,24 108:7,9 110:14 113:18 114:9,18 117:6,17 118:3

**receive** 10:20 13:2 15:16 16:2

**received** 15:18 26:14 45:9,12 47:24 51:19

**recess** 106:1

**recite** 12:12

**recognize** 35:7

**recollection** 28:13 29:19 32:18 47:12 51:1 78:7 86:17 90:7 118:3

**record** 4:3,22 5:19 13:6,7,9,10,11 15:1 20:13 21:16 34:23 62:24 77:7 93:2 95:6 98:15 105:23 106:2 121:14

**recording** 23:20 27:10

**redo** 47:23

**reference** 17:10 37:18 47:10 51:2 75:4 76:18 100:12 103:7 104:10 118:4

**referring** 52:18

**reflect** 5:19

**reflects** 50:24

**refresher** 12:20

**refused** 53:8 54:9

**refuses** 62:11 63:4,24 64:23

**refusing** 92:9 93:6 95:10

**rehash** 6:8

**related** 12:4 14:11 16:8

**relates** 12:10 20:24 21:20 30:4

**relation** 33:4

**relationship** 106:7 108:18

**release** 104:20

**remained** 37:1 66:17

**remaining** 92:5

**remember** 28:22,24 29:11 48:15, 19 81:19 82:4 101:15 103:18 114:4 117:13

**remove** 19:19 111:11,23 112:9

**rep** 45:13,14,18 46:1

**repeat** 14:19 21:13,14 41:13 50:15 77:5 84:13 92:22

**rephrase** 64:15,16

**rephrased** 62:22

**report** 28:18 33:7 77:21

**reporter** 4:19 5:7 6:17 7:18 20:9 34:24 92:24 94:22 95:5

**represent** 4:23

**representative** 45:3 50:1

**representatives** 38:1

**representing** 4:16

**request** 43:12 60:21

**required** 116:14

**residence** 59:5,20

**respect** 15:19

**respond** 6:21 7:20,21 81:6

**response** 69:12,21

**restate** 19:14 25:12 27:11 59:7 73:21,23 76:1 81:3 87:16 94:16

**resting** 36:17

**retrieve** 113:6

**rev** 119:5

**reverse** 42:15 96:3,6,7,9,11,19 97:18 100:14 108:21 109:11,16 114:17 116:20 117:8,16 118:5,14, 24 119:2,12

**review** 12:23 13:5 74:7,18,22 75:3, 7,10 76:3,9,11 87:12

**reviewed** 12:15 13:16 14:6 23:5 33:4

**rewrites** 50:13

**Riley** 4:5 5:9,17,21 6:2 13:14,22 14:2 34:21 49:8,11 51:4 70:24 106:5

**road** 83:10,11 84:5,16,24 86:1

**roadway** 30:17 83:10 100:15

**Rock** 8:1 11:18,24 12:9,15 14:9 17:2 18:19 19:23 20:16 26:24 35:1, 15 37:9 51:8 74:4,10 76:8 77:18 78:4 79:14,21 103:13 114:7,9

**rolling** 110:4 119:15

**room** 31:21 32:1,5

**roughly** 44:21

**rounds** 37:23

**routine** 63:23

**rule** 18:7

**rules** 5:22,23 6:7,9

**running** 53:20

**rush** 70:24

## S

**safe** 63:10 98:12 112:12

**sat** 53:12 68:24 70:2

**Sauk** 16:19

**scenario** 16:23 22:13

**scenarios** 16:14,21

**scene** 29:23 34:10,16 35:10 36:13, 23,24 37:2,4 38:16 63:19 72:6

101:2,11,21 102:4,14,21 103:1,13, 17 104:3

**scene-like** 38:15

**Schatzle** 4:15

**schedule** 46:11

**school** 10:2,3,10,14

**school's** 10:9

**seat** 40:3

**seated** 61:7,18

**sec-** 9:23

**seconds** 67:20 88:3,7,18 89:6,14 90:11,20 113:5,9,11

**section** 17:9

**secure** 61:23 63:14

**sense** 53:17 71:17

**sentence** 19:16

**separate** 37:8 104:6

**separately** 37:6,7 104:6

**sequence** 108:9

**sergeant** 4:10 9:1,5 31:15 102:3

**series** 44:11 107:22

**session** 44:16

**severity** 74:20

**shadow** 9:14

**Sheriff's** 11:14

**shift** 96:8 117:3

**shifted** 114:17 116:19 117:16 118:5

**shoes** 68:21

**shoot** 92:14 93:14,15 95:18,19 97:10,15,17 98:1

**shooting** 17:10 24:10 33:4 34:16 35:11 36:11,18 37:19 43:9 51:2 75:4,12 76:4,12,18 77:3,14,19 78:3,6 81:16 101:18,21 102:5 103:7 104:10 105:17 113:4

**short** 106:18 107:22 108:7 112:20, 22 119:9

**shortly** 24:10 109:15

**shot** 96:2,6,12,15 98:12 106:6 107:4,11,12,13,23 108:18,23 109:5,13,15,19 111:4,7,10,24

112:4,8

**shots** 17:22 18:3,17 87:1 99:3,5,8, 10,18,19,20 107:15,22 108:2,3,8, 10

**shouting** 92:1

**shouts** 54:4

**showed** 28:11 58:23

**showing** 14:2 28:18 35:4 49:11

**shown** 32:9 35:7

**shows** 38:18

**shut** 14:18 104:12,18 105:6,14,18 120:6,20

**side** 36:1 39:9,11 41:1,2,3,4 71:20 72:7,17,22,23 88:11,16 96:24 97:5 98:10 100:23 107:2 111:17,18,21

**sidewalk** 59:20

**sight** 97:2,7,9,15,16 98:1,8,17

**signature** 121:12

**significant** 43:4

**similar** 73:4

**simple** 48:18

**simulation** 16:19 17:4

**simulations** 16:24

**single** 11:3,4 33:12

**sir** 5:14 94:19

**sits** 64:24

**sitting** 67:10

**situation** 18:6 52:4,5,8,11,15,20 53:1 61:19,20 62:1,5 63:17 65:14 66:5,14 69:3,5,8,10,17,22 72:4 74:6 92:15 93:16 95:20 99:17

**situations** 52:1,14

**slow** 31:7,11 85:10,16,20 110:7

**slower** 85:6

**small** 73:7

**smash** 62:3,12 63:7 64:2 65:4 66:1,16,20 69:2 70:1 71:1 88:21 91:4,5 115:4,20

**soft-spoken** 52:23

**someone's** 54:22

**sought** 105:13,17

**sound** 108:12 109:5,18

**South** 4:6

**southbound** 86:1

**space** 42:6 106:14

**spaced** 42:11

**span** 49:19

**speak** 105:17

**specific** 6:8 12:18 90:14,17 102:8 106:24

**specifically** 12:11 16:8 17:2 74:14 99:4 102:23 113:18

**specifics** 81:20

**Speculation** 71:4 75:16 77:23

**speed** 31:2,6 84:11,15,23 85:4 119:8

**speeds** 57:3

**spell** 5:15 10:6 27:6 100:4

**spend** 67:8

**spent** 28:4,14 32:5

**split** 109:20

**spoke** 104:2

**sporadic** 112:22

**spot** 38:8

**spotted** 54:17

**spray** 16:21

**squad** 9:15 120:4

**stage** 8:17,19 9:21,22,23

**stages** 9:10,11

**standard** 116:11

**standing** 58:22 59:19 72:18 118:7, 8

**standpoint** 12:22 65:2 86:11

**stands** 78:9

**start** 6:16 64:1 70:24 71:8,18 78:14

**started** 27:14 88:20 89:1 90:10 91:22 97:13 109:10,16 118:14,24 119:4

**starting** 10:1

**starts** 88:6

**state** 5:24 10:11 33:7 37:21 38:3 43:13,17 44:8,12,19 45:6,10,13,16

**EXHIBIT C**

ETHAN RILEY, 06/27/2019

46:19 47:3 48:22 49:15 50:9 54:7 76:16,21 77:2,11 104:7,16,22,23 120:10,19 121:4

**statement** 26:3,7 43:13,16 44:18, 20,24 45:7,11,20,22 46:4,17,20,24 47:2,6,10 49:4,5,14,20 50:3,6,12, 18,23 67:4 76:15,17,20,24 77:9 120:19

**statements** 38:2 44:7,10

**states** 4:13 18:14,16,20

**station** 27:14 28:1 37:13,15 103:23 104:7 120:5,22

**status** 8:13

**step** 65:10 69:11,15

**stepped** 40:10 101:11

**Sterling** 101:24 102:4,11 105:9,12

**stood** 115:8

**stop** 10:5 30:13,24 57:19,24 62:10 63:3 80:6,14,21 110:18 111:1

**stopped** 28:11,12 53:3 54:19 55:5 65:19 67:10 74:1 81:15 91:3 92:9 93:6 95:10 106:17 108:2 119:19

**stopping** 79:12 81:7

**stops** 64:20

**street** 4:7,18 34:11 83:5,11,12,15

**strength** 68:15

**strike** 57:8,11

**striking** 68:1,13,14,17,20 73:17

**struggled** 112:20

**study** 11:21 13:3

**studying** 10:24

**stuff** 105:3 120:16

**sturdier** 73:13

**subject** 52:21

**substance** 32:9,12,15,20 36:10

**succession** 107:16 108:10

**Sugars** 24:5 26:14 27:13 31:15 32:3,14 42:17,24 44:7 59:24 61:14 65:24 66:15,19 67:4,8,24 69:1 70:1 73:4,10,17,24 79:8 80:20 81:6,13 86:19 87:17,21 88:6,10,15,20,24 90:8 91:3,19 96:5,14 98:11,22 101:5 115:3,20,23

**Sugars'** 23:6,21 24:4 27:10 33:6 60:12 71:7 109:24 117:21

**suite** 4:7,18

**summary** 47:11

**superior** 103:7,12,16 105:8,12,16

**supervising** 102:24

**supposed** 22:6 121:3

**surrounding** 63:20

**suspect** 30:14

**SUV** 38:7,23 40:11,19 41:1 86:24 110:1

**SUVS** 35:14

**swear** 5:7

**sweet** 60:4

**swinging** 68:22

**sworn** 5:8,11

**Sycamore** 83:11,12,15,18,19,23 84:6,17 85:24 86:5

---

**T**

**taillight** 41:4

**taking** 31:1

**talk** 11:5 26:13 42:20,24 104:16, 19,24 105:9,13

**talking** 6:16 13:14 43:2 94:11 120:12,21

**tape** 87:5,12

**tapping** 68:9

**Taser** 16:21 116:15

**Tasers** 16:15

**taught** 18:18,22 52:6,7,10

**TECHNICIAN** 4:1 5:6 13:7,11 105:23 106:2 121:13

**technology** 11:2

**telephone** 25:16

**telling** 42:24 54:1 55:1,10,18 56:21 63:23 94:12 109:12 110:9 116:22 120:17

**ten** 89:6 105:21

**ten-minute** 105:21

**term** 102:17,18

**terminology** 67:12

**terms** 12:3 47:6 49:24 57:6 61:1 64:11 68:6 83:5 86:6,10 97:22 108:19,22 109:3

**testified** 5:11 116:21

**testimony** 30:18 41:10 45:2 89:20 90:22 106:16 119:1

**text** 46:12

**theoretically** 22:6

**thing** 7:14 54:16 114:2

**things** 6:6,9 7:16 11:21 23:5 36:12 72:1 102:24 103:9

**threat** 19:10 22:11

**three-hour** 37:17

**threw** 115:9

**throw** 115:12,15

**time** 6:16 12:14 23:3,9 24:6 25:20 28:4,14,21 29:16 32:5,24 37:17 44:23 46:15,18,23 47:15 48:18 49:16,19 54:4 67:8,19 74:17 82:9 84:3 86:24 88:23 90:7,15,18 91:2, 6,9,12 107:21 109:13,18 113:7 114:21 115:8 118:22

**times** 7:15 46:13

**today** 4:19

**today's** 121:13

**told** 15:17 18:21 42:20 43:15,20 45:6 46:16 49:23 71:24 75:6 76:6 81:10 84:8 103:23 104:4,11,18 109:21 120:6,24

**tone** 60:13

**tools** 65:12

**top** 115:10

**total** 32:4 70:20 86:6

**traffic** 30:13,24 53:8 54:19,20,21 55:10,14,21 56:1,3,9,15,18 57:19 58:7 80:6,12,14,22 81:12,15 84:9

**trained** 11:17 62:9 63:1

**training** 8:15,18,21 9:2,16 11:6,8, 10,13,14,16 12:3,4,21 15:12,16,19 16:3,7,10 17:1 51:9,13,15,18 65:2 78:24 85:14 117:15

**travel** 42:10 83:23 84:1 86:3 107:1

**EXHIBIT C**

ETHAN RILEY, 06/27/2019

**traveled** 86:7

**traveling** 83:11 84:2,20 85:10

**trigger** 75:21

**Tuesday** 23:13,15,19 33:19 87:7

**turbine** 11:2

**turn** 15:11 84:8

**turned** 48:21 84:6 86:1,2 114:3

**turning** 84:7

**two-hour** 44:22 46:23 47:15 49:16,19 50:22 77:1,10

**type** 10:20 12:23

**typed** 47:12 50:8

**typically** 12:23 102:21 103:1

**typing** 46:24 47:2

---

**U**

**uh-huh** 7:16

**uh-uh** 7:16

**ultimately** 41:23

**Um-hmm** 6:12 15:14 87:9 109:23

**unable** 67:2

**understand** 7:24 8:6 11:7 20:4,8 21:8,12 22:23 26:24 38:23 40:7,22 41:11 44:6 45:8 50:14 52:17 61:5, 6,11 64:5,14 65:7 66:15 67:16 69:14 71:5 78:17 90:17 91:8 92:18 93:19,20 94:4,13,15,23,24 102:3 107:15 108:17

**understanding** 6:11 14:8,15 15:5 16:4,12 19:16 20:12 65:1 74:3,16 76:7 79:13 82:13 88:23 92:21 96:4 111:9 115:23

**understood** 7:2 121:2

**unedited** 28:10

**uniforms** 37:22 105:2

**union** 38:1 45:2,12,13,18 46:1 49:24

**unit** 4:2 105:24 106:3 121:15

**United** 4:13

**unlocked** 63:13 111:19,21

**unstopped** 65:20

**Urlaub** 4:16,20

---

**V**

**Valley** 16:19

**varies** 85:12

**vary** 90:11,19

**vehicle** 17:17,23 18:3,17 19:2,8, 11,22 20:16,24 21:21 22:10,13,18 23:2,6,21 24:4 27:10 30:11,14,19 31:7,10 33:6,24 35:18,19,23,24 36:5,22 38:12,19 39:6,8,10 40:4,5 41:3 42:14 43:3 53:5 57:6,7,11,15 58:1 59:17 62:7 63:10,21 67:19 68:4 71:17,22 72:17,20,23 78:19 82:22 83:3,4 84:16 85:15,17 87:20 91:13 92:5,10,12 93:7,11 95:11,15 96:2,9,14,18,22,24 97:4,13,23 98:8,18 99:16 100:13 107:8 108:21 109:10,16 110:14,16,21 111:18 114:23,24 115:7,10 117:21 118:4, 13,24 119:2,8,11,14,17

**vehicles** 17:11 19:20 34:9 35:14, 16,18 37:1 42:14 63:19 100:16

**verbal** 16:16 53:14 88:24 90:9 92:1

**verbally** 53:6

**verbatim** 12:12

**verbiage** 7:22 85:20 120:24

**versus** 4:10

**video** 4:1,3,22 5:6 13:7,11 23:6,19, 23 24:4,14,16 25:9 26:3,6,23 27:10,14,17 28:3,6,11,15,24 29:6, 20 31:16,19,24 32:4,6,9,12,15,21 33:1,2,5,18 35:13,21 42:18,20 43:1,6,11,17 44:1,4 81:19,22 82:15 103:24 105:23 106:2 109:22,24 110:12,15,16 117:20 119:14 121:13

**videos** 29:1,3

**videotape** 60:9

**view** 23:23 24:3,13,17 26:2,6,23 27:9,16 29:4 31:9 33:22 34:11 43:17,23 83:17 103:23

**viewed** 23:19 28:3,19 29:6 33:18 47:23 81:18,22 87:5

**viewing** 28:5 31:16 32:4 33:2 42:18,19 43:1,11 81:22

**violation** 54:19 56:15,18 80:12 85:4

**violations** 54:20,21 55:16,21 56:1, 3,9 58:8

**virtual** 16:20

**vocal** 32:19 61:2

---

**W**

**wait** 20:6 104:7,21

**waive** 121:11

**walk** 102:18 103:8

**walk-through** 102:10,13,16,19 103:2,11

**walked** 40:3 103:19

**wanted** 45:6 97:1,6

**watched** 31:24 109:21

**watching** 28:14 32:6 113:8

**ways** 52:10

**weapon** 19:24 20:19 21:2,24 22:8, 20 37:23 97:4 98:4,9,19,23 99:2

**wear** 116:14

**website** 13:4

**week** 23:10,11,18 33:18 51:17 87:8

**week-long** 51:16

**weeks** 9:4 11:8,9,10,12,16

**west** 83:23 84:2 85:23

**westbound** 84:7

**western** 4:14 84:12,18

**whacks** 66:24

**whatsoever** 69:22

**white** 40:20 41:20,24 42:7 82:19, 24 83:6 106:17

**Whiteside** 101:8,10,12,17 105:16 114:14

**Wind** 11:2

**window** 61:12,17 62:4 66:16,20,24 68:1,3,16 69:1,2 70:1 71:8,20 72:8, 11,14 73:1,17 88:11,16,21 89:2 91:4,5,20 97:5 111:15,19 115:4,20

**windows** 61:8 62:13 63:7,8 64:1,2, 21 65:4 66:1 67:6,9,13 71:1,12,16, 18 91:22 92:11 93:9 95:13

**windshield** 58:16

---

**witnessed** 47:21 59:20 113:5

**word** 32:6 79:9

**words** 19:14 22:12 54:4 60:5 92:13
93:13 95:17 96:5

**work** 28:1

**write** 47:7

**written** 20:23 21:18 44:7,18 45:10
46:4,17 48:1 76:24 77:8

---

### Y

**yard** 54:22 58:23 59:4 100:18

**year** 10:16

**yelled** 117:23

**young** 61:2

---

### Z

**zoom** 36:8 40:16

**EXHIBIT C**

| Policy | Rock Falls Police Department |  |
| 300 | Policy Manual | |

# Use of Force

### 300.1  PURPOSE AND SCOPE
This policy provides guidelines on the reasonable use of force. While there is no way to specify the exact amount or type of reasonable force to be applied in any situation, every member of this department is expected to use these guidelines to make such decisions in a professional, impartial and reasonable manner.

#### 300.1.1  DEFINITIONS
Definitions related to this policy include:

**Deadly force** - Force reasonably anticipated and intended to create a substantial likelihood of causing death or very serious injury.

**Force** - The application of physical techniques or tactics, chemical agents or weapons to another person. It is not a use of force when a person allows him/herself to be searched, escorted, handcuffed or restrained.

### 300.2  POLICY
The use of force by law enforcement personnel is a matter of critical concern, both to the public and to the law enforcement community. Officers are involved on a daily basis in numerous and varied interactions and, when warranted, may use reasonable force in carrying out their duties.

Officers must have an understanding of, and true appreciation for, their authority and limitations. This is especially true with respect to overcoming resistance while engaged in the performance of law enforcement duties.

The Department recognizes and respects the value of all human life and dignity without prejudice to anyone. Vesting officers with the authority to use reasonable force and to protect the public welfare requires monitoring, evaluation and a careful balancing of all interests.

#### 300.2.1  DUTY TO INTERCEDE
Any officer present and observing another officer using force that is clearly beyond that which is objectively reasonable under the circumstances shall, when in a position to do so, intercede to prevent the use of unreasonable force. An officer who observes another employee use force that exceeds the degree of force permitted by law should promptly report these observations to a supervisor.

### 300.3  USE OF FORCE
Officers shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose.

The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably

Copyright Lexipol, LLC 2018/10/30, All Rights Reserved.
Published with permission by Rock Falls Police Department

## Use of Force

appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain and rapidly evolving.

Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident.

It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the tools, weapons or methods provided by the Department. Officers may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.

While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possible physical injury before applying reasonable force.

### 300.3.1 USE OF FORCE TO EFFECT AN ARREST
An officer may use any force which he/she reasonably believes to be necessary to effect an arrest and may use any force which he/she reasonably believes to be necessary to defend him/herself or another from bodily harm while making an arrest (720 ILCS 5/7-5).

### 300.3.2 FACTORS USED TO DETERMINE THE REASONABLENESS OF FORCE
When determining whether to apply force and evaluating whether an officer has used reasonable force, a number of factors should be taken into consideration, as time and circumstances permit. These factors include, but are not limited to:

(a) Immediacy and severity of the threat to officers or others.

(b) The conduct of the individual being confronted, as reasonably perceived by the officer at the time.

(c) Officer/subject factors (age, size, relative strength, skill level, injuries sustained, level of exhaustion or fatigue, the number of officers available vs. subjects).

(d) The effects of drugs or alcohol.

(e) Subject's mental state or capacity.

(f) Proximity of weapons or dangerous improvised devices.

(g) The degree to which the subject has been effectively restrained and his/her ability to resist despite being restrained.

(h) The availability of other options and their possible effectiveness.

(i) Seriousness of the suspected offense or reason for contact with the individual.

(j) Training and experience of the officer.

## Use of Force

---

(k) Potential for injury to officers, suspects and others.

(l) Whether the person appears to be resisting, attempting to evade arrest by flight or is attacking the officer.

(m) The risk and reasonably foreseeable consequences of escape.

(n) The apparent need for immediate control of the subject or a prompt resolution of the situation.

(o) Whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the officer or others.

(p) Prior contacts with the subject or awareness of any propensity for violence.

(q) Any other exigent circumstances.

### 300.3.3 PAIN COMPLIANCE TECHNIQUES

Pain compliance techniques may be effective in controlling a physically or actively resisting individual. Officers may only apply those pain compliance techniques for which they have successfully completed department-approved training. Officers utilizing any pain compliance technique should consider:

(a) The degree to which the application of the technique may be controlled given the level of resistance.

(b) Whether the person can comply with the direction or orders of the officer.

(c) Whether the person has been given sufficient opportunity to comply.

The application of any pain compliance technique shall be discontinued once the officer determines that compliance has been achieved.

### 300.3.4 CAROTID CONTROL HOLD

The proper application of the carotid control hold may be effective in restraining a violent or combative individual. However, due to the potential for injury, the use of the carotid control hold is subject to the following:

(a) The officer shall have successfully completed department-approved training in the use and application of the carotid control hold.

(b) The carotid control hold may only be used when circumstances perceived by the officer at the time indicate that such application reasonably appears necessary to control a person in any of the following circumstances:

1. The subject is violent or physically resisting.

2. The subject, by words or actions, has demonstrated an intention to be violent and reasonably appears to have the potential to harm officers, him/herself or others.

---

*Use of Force*

---

(c) The application of a carotid control hold on the following individuals should generally be avoided unless the totality of the circumstances indicates that other available options reasonably appear ineffective, or would present a greater danger to the officer, the subject or others, and the officer reasonably believes that the need to control the individual outweighs the risk of applying a carotid control hold:

   1. Females who are known to be pregnant

   2. Elderly individuals

   3. Obvious juveniles

   4. Individuals who appear to have Down syndrome or who appear to have obvious neck deformities or malformations, or visible neck injuries

(d) Any individual who has had the carotid control hold applied, regardless of whether he/she was rendered unconscious, shall be promptly examined by paramedics or other qualified medical personnel and should be monitored until examined by paramedics or other appropriate medical personnel.

(e) The officer shall inform any person receiving custody, or any person placed in a position of providing care, that the individual has been subjected to the carotid control hold and whether the subject lost consciousness as a result.

(f) Any officer attempting or applying the carotid control hold shall promptly notify a supervisor of the use or attempted use of such hold.

(g) The use or attempted use of the carotid control hold shall be thoroughly documented by the officer in any related reports.

### 300.3.5 USE OF FORCE TO SEIZE EVIDENCE

In general, officers may use reasonable force to lawfully seize evidence and to prevent the destruction of evidence. However, officers are discouraged from using force solely to prevent a person from swallowing evidence or contraband. In the instance when force is used, officers should not intentionally use any technique that restricts blood flow to the head, restricts respiration or which creates a reasonable likelihood that blood flow to the head or respiration would be restricted. Officers are encouraged to use techniques and methods taught by the Rock Falls Police Department for this specific purpose.

### 300.4 DEADLY FORCE APPLICATIONS

Use of deadly force is justified in the following circumstances:

(a) An officer may use deadly force to protect him/herself or others from what he/she reasonably believes would be an imminent threat of death or serious bodily injury.

(b) An officer may use deadly force to stop a fleeing subject when the officer has probable cause to believe that the person has committed, or intends to commit, a felony involving the infliction or threatened infliction of serious bodily injury or death, and

Copyright Lexipol, LLC 2018/10/30, All Rights Reserved.
Published with permission by Rock Falls Police Department

Case: 3:18-cv-50035 Document #: 138-3 Filed: 06/14/21 Page 51 of 57 PageID #:839
Rock Falls Police Department
Policy Manual

*Use of Force*

the officer reasonably believes that there is an imminent risk of serious bodily injury or death to any other person if the subject is not immediately apprehended. Under such circumstances, a verbal warning should precede the use of deadly force, where feasible.

Imminent does not mean immediate or instantaneous. An imminent danger may exist even if the suspect is not at that very moment pointing a weapon at someone. For example, an imminent danger may exist if an officer reasonably believes any of the following:

1.    The person has a weapon or is attempting to access one and it is reasonable to believe the person intends to use it against the officer or another.

2.    The person is capable of causing serious bodily injury or death without a weapon and it is reasonable to believe the person intends to do so.

### 300.4.1   SHOOTING AT OR FROM MOVING VEHICLES
Shots fired at or from a moving vehicle are rarely effective. Officers should move out of the path of an approaching vehicle instead of discharging their firearm at the vehicle or any of its occupants. An officer should only discharge a firearm at a moving vehicle or its occupants when the officer reasonably believes there are no other reasonable means available to avert the threat of the vehicle, or if deadly force other than the vehicle is directed at the officer or others.

Officers should not shoot at any part of a vehicle in an attempt to disable the vehicle.

### 300.4.2   CHOKEHOLDS
A member shall not apply direct pressure to the throat, windpipe or airway of a person with the intent to reduce or prevent the intake of air (chokehold) unless deadly force is justified (720 ILCS 5/7-5.5). A member shall not use a chokehold or any lesser contact with the throat or neck area of another in order to prevent the destruction of evidence by ingestion (720 ILCS 5/7-5.5).

### 300.5   REPORTING THE USE OF FORCE
Any use of force by a member of this department shall be documented promptly, completely and accurately in an appropriate report, depending on the nature of the incident. The officer should articulate the factors perceived and why he/she believed the use of force was reasonable under the circumstances. To collect data for purposes of training, resource allocation, analysis and related purposes, the Department may require the completion of additional report forms, as specified in department policy, procedure or law.

### 300.5.1   NOTIFICATION TO SUPERVISORS
Supervisory notification shall be made as soon as practicable following the application of force in any of the following circumstances:

(a)    The application caused a visible injury.

## Use of Force

(b) The application would lead a reasonable officer to conclude that the individual may have experienced more than momentary discomfort.

(c) The individual subjected to the force complained of injury or continuing pain.

(d) The individual indicates intent to pursue litigation.

(e) Any application of the TASER device or control device.

(f) Any application of a restraint device other than handcuffs, shackles or belly chains.

(g) The individual subjected to the force was rendered unconscious.

(h) An individual was struck or kicked.

(i) An individual alleges any of the above has occurred.

### 300.6 MEDICAL CONSIDERATIONS

Prior to booking or release, medical assistance shall be obtained for any person who exhibits signs of physical distress, who has sustained visible injury, expresses a complaint of injury or continuing pain, or who was rendered unconscious. Any individual exhibiting signs of physical distress after an encounter should be continuously monitored until he/she can be medically assessed.

Based upon the officer's initial assessment of the nature and extent of the subject's injuries, medical assistance may consist of examination by fire personnel, paramedics, hospital staff or medical staff at the jail. If any such individual refuses medical attention, such a refusal shall be fully documented in related reports and, whenever practicable, should be witnessed by another officer and/or medical personnel. If a recording is made of the contact or an interview with the individual, any refusal should be included in the recording, if possible.

The on-scene supervisor or, if the on-scene supervisor is not available, the primary handling officer shall ensure that any person providing medical care or receiving custody of a person following any use of force is informed that the person was subjected to force. This notification shall include a description of the force used and any other circumstances the officer reasonably believes would be potential safety or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration).

Persons who exhibit extreme agitation, violent irrational behavior accompanied by profuse sweating, extraordinary strength beyond their physical characteristics and imperviousness to pain (sometimes called "excited delirium"), or who require a protracted physical encounter with multiple officers to be brought under control, may be at an increased risk of sudden death. Calls involving these persons should be considered medical emergencies. Officers who reasonably suspect a medical emergency should request medical assistance as soon as practicable and have medical personnel stage away if appropriate.

### 300.7 SUPERVISOR RESPONSIBILITIES

When a supervisor is able to respond to an incident in which there has been a reported application of force, the supervisor is expected to:

Copyright Lexipol, LLC 2018/10/30. All Rights Reserved.
Published with permission by Rock Falls Police Department

## Use of Force

(a) Obtain the basic facts from the involved officers. Absent an allegation of misconduct or excessive force, this will be considered a routine contact in the normal course of duties.

(b) Ensure that any injured parties are examined and treated

(c) Once any initial medical assessment has been completed or first aid has been rendered, ensure that photographs have been taken of any areas involving visible injury or complaint of pain, as well as overall photographs of uninjured areas. These photographs should be retained until all potential for civil litigation has expired.

(d) Identify any witnesses not already included in related reports.

(e) Review and approve all related reports.

(f) Determine if there is any indication that the subject may pursue civil litigation.

   1. If there is an indication of potential civil litigation, the supervisor should complete and route a notification of a potential claim through the appropriate channels.

(g) Evaluate the circumstances surrounding the incident and initiate an administrative investigation if there is a question of policy non-compliance or if for any reason further investigation may be appropriate.

In the event that a supervisor is unable to respond to the scene of an incident involving the reported application of force, the supervisor is still expected to complete as many of the above items as circumstances permit.

### 300.7.1 SHIFT SERGEANT RESPONSIBILITY
The Shift Sergeant shall review each use of force by any personnel within his/her command to ensure compliance with this policy and to address any training issues.

### 300.8 TRAINING
Officers will receive periodic training on this policy and demonstrate their knowledge and understanding.

### 300.9 USE OF FORCE ANALYSIS
At least annually, the Patrol Commander should prepare an analysis report on use of force incidents. The report should be submitted to the Chief of Police. The report should not contain the names of officers, suspects or case numbers, and should include:

(a) The identification of any trends in the use of force by members.

(b) Training needs recommendations.

(c) Equipment needs recommendations.

(d) Policy revision recommendations.

**EXHIBIT C**

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Rock Falls 2485

**CONFIDENTIAL ~~NOT SUBJECT TO PROTECTIVE~~ EXHIBIT C ~~CTIVE ORDER~~**

**INVESTIGATIVE REPORT**

| File No.: | Reporting Date(s). | | Reporting Agent(s): | | | ID No.: | Lead No.: |
|---|---|---|---|---|---|---|---|
| 18-10494 ST | 01/30/2018 | | S/A J. Normoyle ᒍᑌ ᕵᑊᑫᑊ | | | 6191 | |

| Title: | | Case Agent: | | ID No.: | Office. | Typed By: | Date: |
|---|---|---|---|---|---|---|---|
| Nathaniel T. Edwards | | S/A. V. Rhodes | | 5756 | Z2/ST | JVN | 01/31/2018 |

| Purpose: |
|---|
| Interview: Rock Falls Police Department, Officer Ethan Riley |

On Friday, January 26, 2018, Rock Falls, Illinois Police Department requested the Illinois State Police (ISP), Zone 2 Investigations, to conduct an investigation into the use of deadly force by the officer.

On Tuesday, January 30, 2018, at approximately 1:00 p.m., ISP, Special Agent (S/A) L. Kuehl #6414 and I, S/A J. Normoyle #6191, met with Rock Falls Police Department officer, Ethan Riley and Fraternal Order of Police Representative, Michael Powell. S/A Kuehl and I interviewed Officer Riley and a typed statement was completed, hereafter referred to as Exhibit #5. Exhibit #5 was signed by Officer Riley, S/A Kuehl and myself. Our interview of Officer Riley concluded at approximately 3:19 p.m.

On Wednesday, January 31, 2018, at approximately 9:00 a.m., I made a photocopy of Exhibit #5, which is attached to this report as a 1-A Exhibit. I placed Exhibit #5 in envelope, which was labeled, sealed and I initialed across the seal. Exhibit #5 was secured in Illinois State Police, District #1, Evidence Locker #6. End of report ᒍᑌ ᕵᑊᑫᑊ

**1-A Exhibit(s)**
1. Photocopy of Exhibit #5: Rock Falls Police Department Officer Riley's Statement

**Evidence**
1. Exhibit #5: Rock Falls Police Department Officer Riley's Statement

EXHIBIT # 3
WIT: Riley
DATE: 4/27/19
Nicole M. Cheney, CSR

Dissemination:

This document contains neither recommendations nor conclusions of the Illinois State Police.
It and its contents are not to be disseminated outside your agency.

IL 493-0117

ISP 4-3 (01/96)

**EXHIBIT C**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## ILLINOIS STATE POLICE
### ZONE 2 ROCKFORD



| | |
|---|---|
| Case No: | 18-10494ST |
| Date: | 1/30/18 |
| Start Time: | 1:00P.M. |

## STATEMENT

**Name:** Ethan P. Riley     **DOB:** 8-2-90     **Department:** Rock Falls Police Dept.

My name is Ethan Riley and I am employed as a police officer for the Rock Falls, IL Police Department. With me is Union Representative Mike Powell. Today, January 30th, 2018, I provided this statement to Special Agent L. Kuehl and Special Agent J. Normoyle from the Illinois State Police Zone 2 Investigations.

I was hired by Rock Falls Police Department in June of 2017. I graduated from the Cook County Police Academy which is a 17 week program. Since graduation I have participated in department firearms training. I am currently in the field training program.

On 1-26-18 I started my shift at 6:00PM along with my Field Training Officer Jon Cater. Officer Cater has been my assigned Field Training Officer for approximately one month. I was wearing a Rock Falls police uniform which included my duty belt. On my duty belt I carried my Taser, OC Spray, handcuffs, radio, a Glock 22 firearm, and an additional two magazines. My firearm was loaded with 15 rounds of ammunition as well as 15 rounds per magazine. My assigned squad car was a fully marked Ford Explorer bearing a light bar. Included in our squad cars are lock out kits, first aid kits, AED, and miscellaneous paperwork.

At the start of my shift I was conducting routine patrol duties. Officer Cater and I went back to the department to review video from a previous arrest. On my radio I heard Officer Sugars call out a pursuit of a vehicle. Officer Sugars requested an additional unit for assistance. Officer Cater and I left the Rock Falls Police Department driving towards Officer Sugars last known location. Once we arrived in the area we observed Officer Sugars' squad car with its activated emergency lights. I proceeded to drive north on Martin Road and east on Sycamore Drive. I turned my squad car with emergency lights activated sideways at Martin Road and Sycamore Drive in attempt to stop or block the suspect vehicle which I observed to be an older white Cadillac.

The Cadillac continued driving towards my squad car at approximately 20MPH. The Cadillac failed to stop and drove around my squad car driving into the ditch. As the Cadillac drove past my location I observed the sole occupant talking on a cell phone. As the Cadillac drove past my squad car, I maneuvered my squad car to allow the two pursuing squad cars through. Officer Sugars and a Whiteside County squad car drove past my squad car and I followed behind the Whiteside County squad car. The Cadillac turned east onto Franklin Street.

Before signing, I have read/or had read to me this page to make certain that it is my statement and that it is the truth.

Witness   SA J. Myl #Lm     Signed: _____

                                  Date:   1/30/17

Witness   SA 6414     Time Completed:   3:19 P.M. JVIM

Rock Falls 0201

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER** EXHIBIT C

## ILLINOIS STATE POLICE
### ZONE 2 STERLING

Case No:    18-10494ST

CONTINUATION OF STATEMENT OF   ETHAN P. RILEY (8/2/17)

The Cadillac traveled eastbound on Franklin Street turning into a drive way on the south side of the road. I later learned the address to be 1304 Franklin Street. Officer Sugars parked his squad car angled on Franklin Street where it met the drive way. The Whiteside County squad car was parked parallel to the road directly behind Officer Sugars' squad car. I positioned my squad car similar to Officer Sugars' squad car. As I approached the Cadillac I observed a white female standing in the drive way on the phone. Officer Sugars instructed the woman to go back inside the house. To my knowledge all officers had their weapons drawn.

I was positioned directly behind the Cadillac on the driver's side. I observed Officer Cater standing on the rear passenger side. Officer Sugars was at the driver's window giving verbal commands to the driver to turn the Cadillac off. All of the Cadillac's windows were rolled up, I heard the driver yelling "Fuck you, Fuck you." At this time Officer Sugars attempted to break out the front driver's window with a flashlight which was unsuccessful.

Officer Sugars asked Officer Cater for Cater's baton. Officer Cater slid his baton across the roof of the Cadillac to Officer Sugars which fell to the ground. Officer Sugars picked up the baton and attempted to break out the window and again was unsuccessful, all while giving verbal commands to the driver. I could hear the driver yelling but I was unable to make out what he was saying. I observed the driver shift the Cadillac into reverse and observed the reverse lights illuminate. As the driver was shifting the Cadillac Officer Sugars yelled do not put the vehicle in reverse. Officer Sugars informed the driver he would shoot him and the driver responded by yelling "Fucking kill me."

I heard the Cadillac's engine rev and accelerate into my direction. I had to move myself out of the path of the moving Cadillac in fear of being struck. I was able to get out of the way of the Cadillac and while doing so lost view of Officer Cater. I knew Officer Cater was last positioned near the right rear bumper of the Cadillac. I feared for the safety of myself and the other officers and considered firing my firearm but did not have a clear shot due to Officer Sugars' location. I retreated to cover behind a parked vehicle in the drive way located to the east of the Cadillac. I believe three shots came from the location where I knew Officer Cater was last at. I observed the Cadillac come to a stop following the shots.

Officer Sugars repositioned himself to the front passenger door of the Cadillac where he broke out the front passenger window. Officer Sugars reached in the Cadillac and unlocked the doors then went around to the driver's side. Officer Sugars and two unknown Whiteside County Deputies removed the driver from the Cadillac and immediately began CPR. I returned to my squad car and retrieved the AED. Officer Sugars and I applied the AED to the driver. Officers on scene continued CPR until EMS arrived on scene which was approximately twenty minutes.

After EMS arrived we secured the scene. I met with the command staff where I was instructed to return to the department and wait for Illinois State Police to arrive.

End of Statement

Before signing, I have read/or had read to me this page to make certain that it is my statement and that it is the truth.

Witness   S/A Y. M/L   #6471      Signed: _____

Witness   S/A _____   6414      Date:   1/30/18

                                   Time Completed:   3:19 p.m   JN 6.91

**Rock Falls 0202**