**EXHIBIT D**



# Transcript of Deputy Sean Coutts

**Date:** November 19, 2019
**Case:** Agnew, et al. -v- Cater, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

**EXHIBIT D**

Transcript of Deputy Sean Coutts

Conducted on November 19, 2019

1 (1 to 4)

---

**Page 1**

```
1   STATE OF ILLINOIS  )
                       ) SS:
2   WESTERN DIVISION   )

3        IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS
4                 WESTERN DIVISION

5   ANNIE AGNEW and NAYSHAWN  )
    EDWARDS, as Independent   )
6   Co-Administrators of the  )
    Estate of Nathaniel (Nate) )
7   Edwards,                  )
                              )
8            Plaintiffs,      )
                              )
9   vs.                       )  No. 18 CV 50035
                              )
10  City of Rock Falls, et al.,)
                              )
11           Defendants.      )

12              DEPOSITION OF

13           DEPUTY SEAN COUTTS

14

15            November 19, 2019

16              11:00 a.m.

17

18

19     The Holiday Inn Express & Suites

20          301 East 2nd Street

21           Rock Falls, Illinois

22

23

24     Konni L. Stapf, CSR No. 084-004144
```

---

**Page 2**

```
1            APPEARANCES OF COUNSEL

2   on Behalf of the Plaintiff(s),

3   MELVIN L. BROOKS
    The Cochran Firm
4   140 South Dearborn Street, Suite 1020
    Chicago, IL  60603
5   312.262.2880
    mbrooks@cochranfirm.com
6

7   on Behalf of the Defendant(s),

8   DEBORAH ANNE OSTVIG
    Schain, Banks, Kenny & Schwartz, Ltd.
9   70 West Madison Street, Suite 5300
    Chicago, IL  60602
10  312.345.5700
    dostvig@schainbanks.com
11

12  on Behalf of the Witness:

13  BENJAMIN JACOBI
    O'Halloran Kosoff Geitner & Cook, LLC
14  650 Dundee Road, #475
    Northbrook, IL  60062
15  224.406.8405
    bjacobi@okgc.com
16

17

18

19

20

21

22

23

24
```

---

**Page 3**

```
1              INDEX TO EXAMINATION

2   WITNESS:  DEPUTY SEAN COUTTS

3

4   EXAMINATION                        PAGE

5   By Mr. Brooks                     4, 106
    By Ms. Ostvig                    83, 118
6

7

8

9

10

11

12             INDEX TO EXHIBITS

13  EXHIBIT  DESCRIPTION              PAGE

14     1      Witness statement        18
       2      Photographs              55
15     3      Photographs              55

16

17

18

19

20

21

22

23

24
```

---

**Page 4**

```
1            DEPUTY SEAN COUTTS,

2   a witness herein, having been first duly sworn to

3   speak the truth and nothing but the truth, was

4   examined and testified as follows:

5

6                EXAMINATION

7   BY MR. BROOKS:

8       Q.    Sir, would you state your full name for

9   the court reporter and spell your last name.

10      A.    Sean Coutts, C-o-u-t-t-s.

11      Q.    It's just a common spelling for Sean,

12  S-e-a-n?

13      A.    Yes.

14      MR. BROOKS:  The record should reflect

15  that this is the discovery deposition of Deputy

16  Sean Coutts taken pursuant to the Federal Rules of

17  Civil Procedure and all applicable rules of the

18  Northern District of the State of Illinois.

19  BY MR. BROOKS:

20      Q.    Deputy, I'm sure you've given a

21  deposition before?

22      A.    Nope.

23      Q.    Welcome to this gala and opportunity to

24  give a deposition.  I'm sure counsel explained to
```

---

**EXHIBIT D**

Transcript of Deputy Sean Coutts

2 (5 to 8)

Conducted on November 19, 2019

---

**5**

1 you some of the ground rules in terms of what
2 normally happens in a deposition.
3        I'll just mention a couple of things.
4 One, there may come a time where you will
5 anticipate a question that I intend to ask and what
6 happens is that you and I, we will talk at the same
7 time. That makes it very difficult for the court
8 reporter.
9        So if you will give me an opportunity
10 to fully ask my question, I'll give you, obviously,
11 an opportunity to fully answer.
12        If at any time you do not understand my
13 question, let me know. I'll rephrase or restate
14 it. I want to make sure that you and I are both on
15 the same page.
16        The other thing, if you need to take a
17 break, it looks like you're on duty, for the most
18 part, if you need a break, let me know, of course I
19 will accommodate you. The only thing that I would
20 add if there is a question pending, that you answer
21 that question before we take a break. Fair enough?
22    **A.    Uh-huh.**
23    Q.    And the other thing, the court
24 reporter, obviously, can only take down verbal

**6**

1 responses, so sometimes in casual conversation we
2 say things like uh-huh, huh-uh. It makes it
3 difficult for the court reporter to take that down.
4 If you can answer yes or no, please do so.
5    **A.    All right.**
6    Q.    I understand you are with Whiteside
7 County Sheriff's Department?
8    **A.    Yes.**
9    Q.    How long have you been employed with
10 Whiteside County?
11    **A.    Six years in December.**
12    Q.    Have you worked with any other police
13 jurisdiction other than Whiteside County?
14    **A.    I worked for the Oregon Park District**
15 **Police Department for about a year and a half.**
16    Q.    Was your title police officer?
17    **A.    Yes.**
18    Q.    And, approximately, when was that?
19    **A.    April 2012 until December 2013.**
20    Q.    Any other police jurisdictions?
21    **A.    I work part-time, but this all came**
22 **after this incident.**
23    Q.    Part-time?
24    **A.    With the Erie Police Department,**

**7**

1    **E-r-i-e, and then Morrison Police Department.**
2    Q.    Erie, that's in Illinois, right?
3    **A.    Yes.**
4    Q.    Where is that in reference to Rock
5 Falls?
6    **A.    It's about a half an hour west of here.**
7    Q.    And you also work part-time with
8 Morrison Police Department?
9    **A.    Yes.**
10    Q.    Do you do that now?
11    **A.    I have not worked at either department**
12 **since about June just because I've been too busy.**
13    Q.    June of this year?
14    **A.    Yes.**
15    Q.    When you worked with the Oregon Park
16 District, can you give me a general sense of the
17 nature of the type of matters that you handle?
18    **A.    Mostly ordinance violations, various --**
19 **seldom did we do anything criminal.**
20    Q.    Before you obtained the title of
21 deputy, was there some other position that you had
22 with Whiteside County?
23    **A.    No.**
24    Q.    So a new officer who comes in, as far

**8**

1 as Whiteside County is concerned, they would take
2 on the title of deputy?
3    **A.    Yes.**
4    Q.    The next level up is what?
5    **A.    As far as promotion wise?**
6    Q.    Yes.
7    **A.    Sergeant.**
8    Q.    By the way, prior to the shooting of
9 Nathan Edwards, did you know Officer Jonathan
10 Cater?
11    **A.    Yes.**
12    Q.    In what capacity did you know him?
13    **A.    Professional.**
14    Q.    How long had you known him prior to the
15 shooting?
16    **A.    Basically, since I got hired with**
17 **Whiteside, so December 2013.**
18    Q.    I understand that these -- that there
19 are certain police jurisdictions in and around
20 Whiteside County where the officers will
21 collaborate on certain circumstances or situations,
22 right?
23    **A.    As far as friendship?**
24    Q.    No, professionally. Would you agree

---

**EXHIBIT D**

Transcript of Deputy Sean Coutts

Conducted on November 19, 2019

3 (9 to 12)

---

9

1 with that?

2     **A.**    **Sure.**

3     Q.    For instance, the incident involving

4 Nathaniel Edwards at some point Whiteside County

5 got involved, right?

6     **A.**    **Yes.**

7     Q.    Why did Whiteside County get involved?

8     **A.**    **Because the officer that initiated this**

9 **incident was by himself.**

10    Q.    Which officer was that who initiated

11 the incident?

12    **A.**    **Officer Dustin Sugars.**

13    Q.    What is it -- I take it you heard some

14 communication from Officer Sugars, which somehow

15 led you to get involved in this incident?

16    **A.**    **I did not hear directly from him. It**

17 **was from another deputy that was working the same**

18 **shift as I was.**

19    Q.    Would that be Deputy Elder?

20    **A.**    **Yes.**

21    Q.    Tell me what you heard from Deputy

22 Elder which prompted you to get involved with the

23 incident involving Nathan Edwards.

24    **A.**    **Rock Falls was attempting to stop a**

---

10

1 **vehicle that was failing to yield to their lights.**

2    Q.    So based on the information that you

3 had at that particular time, based on that

4 communication, you knew that there was some effort

5 to make a traffic stop?

6    **A.**    **Yes.**

7    Q.    Anything beyond a traffic stop --

8 anything beyond a traffic stop?

9          MR. JACOBI: Form.

10 BY MR. BROOKS:

11    Q.    Do you understand what I'm saying?

12    **A.**    **No.**

13    Q.    You heard a communication which led you

14 to conclude that Rock Falls officers were -- or an

15 officer was trying to make a traffic stop, right?

16    **A.**    **Correct.**

17    Q.    Did you hear any other information or

18 communication beyond the description of a traffic

19 stop?

20    **A.**    **Other than that they weren't stopping.**

21    Q.    But, again, it all relates to a traffic

22 stop?

23    **A.**    **Yes.**

24    Q.    Can you tell me where you were at when

---

11

1 you first saw this white Cadillac that you believe

2 Rock Falls' officer or officers were trying to

3 stop?

4    **A.**    **I believe it was Lincoln Street and**

5 **Martin Road.**

6    Q.    Is that in Rock Falls?

7    **A.**    **Yes.**

8    Q.    Prior to your getting involved in the

9 incident involving Nathan Edwards, you knew that

10 Deputy Elder was going to involve himself, right?

11          MR. JACOBI: Foundation.

12    **A.**    **Certainly felt that that was going to**

13 **be what happened, yes.**

14 BY MR. BROOKS:

15    Q.    All right. So now you have a Rock

16 Falls officer and an officer from Whiteside County,

17 what was the need to get an additional Whiteside

18 County officer involved?

19    **A.**    **As far as Deputy Elder?**

20    Q.    Yes.

21    **A.**    **He was at that time the canine handler**

22 **in the event the person that was driving that**

23 **vehicle fled from the vehicle, we could implement**

24 **the use of the canine.**

---

12

1    Q.    Deputy Elder drove a vehicle that had a

2 canine?

3    **A.**    **Yes.**

4    Q.    If Deputy Elder was going to -- when I

5 say deploy the canine, couldn't he have done that

6 by himself?

7    **A.**    **He could have, but typically that's not**

8 **the practice that they prefer.**

9    Q.    What was the practice that's preferred?

10    **A.**    **Usually, there is one person that goes**

11 **with the canine handler so the canine handler can**

12 **pay attention to the cues of the dog while the**

13 **second person pays attention more to the**

14 **surroundings.**

15    Q.    Deputy Coutts, you have reviewed some

16 material associated or related to either the

17 investigation of the shooting of Nathan Edwards?

18    **A.**    **Yes.**

19    Q.    Can you tell us what you have reviewed?

20    **A.**    **The dash cam videos and my report given**

21 **to the state police.**

22    Q.    Did you generate any report beyond the

23 statement that was provided to the Illinois State

24 Police?

---

**EXHIBIT D**

Transcript of Deputy Sean Coutts

Conducted on November 19, 2019

4 (13 to 16)

13

1    A.    Not that I can recall.
2    Q.    Have you reviewed any dispatch
3 communications?
4    **A.    No.  Aside from what was captured in**
5 **the dash cam videos.**
6    Q.    Fair enough.  Can you tell me how many
7 dash cam videos that you reviewed?
8    **A.    Three.**
9    Q.    And tell me from what cars were the
10 dash cam videos from?
11    **A.    My squad, Deputy Elder, and Officer**
12 **Sugars' squad car.**
13    Q.    Have you reviewed or seen any dash cam
14 video through a social media site?
15    **A.    As far as like the news?  I would**
16 **consider the news.  I seen some video on the news.**
17    Q.    Well, let's talk about the news.  Can
18 you tell me what dash cam video that you saw on the
19 news?
20    **A.    I don't remember specifically.  I think**
21 **it might have been Rock Falls.**
22    Q.    When was the last time that you saw
23 that?
24    **A.    Over a year.**

14

1    Q.    You told me earlier that you gave a
2 statement to the Illinois State Police?
3    **A.    Yes.**
4    Q.    When was the last time that you
5 reviewed that statement?
6    **A.    Yesterday.**
7    Q.    I take it you were in possession of
8 that statement at some point closer in time when
9 you gave that interview?
10    **A.    Can you rephrase that?**
11    Q.    All right.  The statement that you
12 reference which you gave to the Illinois State
13 Police, that -- the actual transcription for lack
14 of a better word, you have in your possession or
15 have had in your possession that statement?
16    **A.    Prior to yesterday?**
17    Q.    Yes.
18    **A.    Yes.**
19    Q.    All right.  I take it that you reviewed
20 it at some point prior to yesterday?
21    **A.    Yes.**
22    Q.    Can you tell me how close in time you
23 actually reviewed that written statement prior to
24 today?

15

1         MR. JACOBI:  Form.
2    **A.    Can you say that again?**
3 **BY MR. BROOKS:**
4    Q.    Sure.  Can you tell me how close in
5 time you actually reviewed or read over that
6 written statement after you had sat down with the
7 Illinois State Police investigators to give a
8 statement?
9    **A.    The next time that I saw that statement**
10 **was, approximately, two weeks ago.**
11    Q.    What was the circumstances that led to
12 you reviewing it two weeks ago?
13    **A.    The notice for this deposition.**
14    Q.    I take it that you read it over,
15 correct?
16    **A.    Yes.**
17    Q.    Did you notice any discrepancies in
18 terms of what you believe was initially provided to
19 Illinois State Police?
20    **A.    No.**
21    Q.    By the way, the statement itself did
22 you type it?
23    **A.    No.**
24    Q.    Who typed it?

16

1    **A.    I believe it was Special Agent Luke**
2 **Peal.**
3    Q.    I want to ask you about that interview
4 with the Illinois State Police.  How long would you
5 say the statement itself took?
6    **A.    I believe that I was there for about**
7 **four hours.**
8    Q.    Was that four hours in an interview?
9    **A.    Yes.**
10    Q.    And during that four hours that you
11 were providing the statement, for lack of a better
12 word, the investigator for the Illinois State
13 Police was taking notes?
14    **A.    Yes.**
15    Q.    Writing down what you said?
16    **A.    Not writing with a pen.  I believe he**
17 **was taking notes on a computer.**
18    Q.    When you were interviewed by the
19 Illinois State Police, was it a question/answer
20 session or did you simply provide a narrative?
21    **A.    Both.**
22    Q.    Explain that to me.
23    **A.    I believe that I gave a narrative of**
24 **what happened initially and then to clarify**

**EXHIBIT D**

Transcript of Deputy Sean Coutts

Conducted on November 19, 2019

---

**17**

1 details, they asked questions, and I answered them.

2    Q.   And that took, approximately, four

3 hours to accomplish?

4    **A.**   **Yes.**

5    Q.   Were you shown the completed statement

6 before you left the interview?

7    **A.**   **Yes.**

8    Q.   You were then given an opportunity to

9 make corrections if you wanted to make corrections?

10    **A.**   **Yes.**

11    Q.   Did you make any corrections?

12    **A.**   **Not that I remember.**

13    Q.   Do you feel when you gave the statement

14 to the Illinois State Police, you gave them what

15 you believe to be the important facts that you had

16 knowledge of?

17    **A.**   **Yes.**

18      (Exhibit 1 was marked for

19      identification.)

20 BY MR. BROOKS:

21    Q.   Deputy Coutts, Exhibit No. 1, you do

22 recognize what that is?

23    **A.**   **Yes.**

24    Q.   That's the statement, the written

**18**

1 statement, that you gave to the Illinois State

2 Police, correct?

3    **A.**   **Yes.**

4    Q.   Each of those pages has a signature

5 where it says, sign -- it has several signatures,

6 but your signature is on each page?

7    **A.**   **Yes.**

8    Q.   And at the very bottom of page 4 it

9 says, before signing, I have read or had read to me

10 this page to make certain that it is my statement

11 and that it is the truth. Do you see that?

12    **A.**   **Yes.**

13    Q.   That particular phrase actually appears

14 on each page, correct?

15    **A.**   **Yes.**

16    Q.   And so one can take from this statement

17 that you read it over, and everything contained in

18 this statement is true and correct to the best of

19 your recollection?

20    **A.**   **Yes.**

21    Q.   Would you consider this statement to be

22 what some departments call an official report?

23      MR. JACOBI: Form. Foundation.

24    **A.**   **As far as our department's concerned,**

**19**

1 our format is not like this.

2 **BY MR. BROOKS:**

3    Q.   Understanding the format of your

4 department might be different, but as an officer

5 who has some knowledge of a fatal shooting and

6 you're asked to give a statement, when you provide

7 that statement, would you consider it to be an

8 official report?

9    **A.**   **Sure.**

10    Q.   You told me that in terms of a dash cam

11 video, you also reviewed some video or saw some

12 video from Deputy Elder's vehicle?

13    **A.**   **Yes.**

14    Q.   Was there any audio in the dash cam

15 video from Elder's car?

16    **A.**   **I don't believe so.**

17    Q.   Can you tell me why there would be no

18 audio?

19      MR. JACOBI: Foundation.

20    **A.**   **Because when the lights are activated,**

21 **there is a separate microphone to carry on your**

22 **person. And at that time, I don't believe he**

23 **carried his personal microphone on his person. It**

24 **was in the charger.**

**20**

1    **So there may have been audio prior to**

2 **him arriving, as far as what was captured inside of**

3 **his squad car, but after that, I'm assuming because**

4 **microphone was still on the charger.**

5 **BY MR. BROOKS:**

6    Q.   Well, help me understand that a little

7 bit. So if you as a deputy for Whiteside County

8 are patrolling, when you have your dash cam video

9 on and recording, it will pick up sound, right?

10    **A.**   **From inside the car, yes.**

11    Q.   Right. So for instance if there is

12 dispatch communications that are coming through

13 while you're driving and your dash cam is running,

14 then you will pick up that audio, correct?

15    **A.**   **Most likely, yes.**

16    Q.   Why do you say most likely?

17    **A.**   **Depending on the quality of the sound**

18 **coming through the radio.**

19    Q.   It's anticipated that it will pick it

20 up, though, right?

21    **A.**   **Sure. Yes.**

22    Q.   If you continue to have your dash cam

23 running, let's say after you pull up -- let's take

24 a traffic stop, after you pull up the dash cam is

**EXHIBIT D**

Transcript of Deputy Sean Coutts

Conducted on November 19, 2019

6 (21 to 24)

---

21

1 still running, will it still record audio after you
2 step from the car?
3     **A.**     **Yes.**
4     Q.     So when you watched Elder's dash cam
5 video, do you recall one way or the other if you
6 have ever heard sound from that recording?
7     **A.**     **I don't recall.**
8     Q.     When you say you don't recall, does
9 that mean you just don't remember?
10     **A.**     **Yeah, I don't remember hearing anything**
11 **specifically, no.**
12     Q.     All right. So as best that you recall,
13 when you saw the video from Elder's vehicle, you
14 don't believe that there was any sound?
15     MR. JACOBI: Form. Asked and answered.
16 BY MR. BROOKS:
17     Q.     That's what I'm trying to understand.
18 Is that your testimony, you don't believe that
19 there was actual sound that was recorded through
20 Elder's dash cam?
21     **A.**     **No, I just don't remember listening to**
22 **it.**
23     Q.     Now, at some point when you got
24 involved in the Nathan Edwards' incident, you did

---

22

1 communicate with your dispatcher, right?
2     **A.**     **Yes.**
3     Q.     I recall in terms of listening to that
4 communication that at some point there was a
5 communication, I'm presuming from the sergeant,
6 which indicated that you should hang back. Do you
7 recall that?
8     **A.**     **Yes.**
9     Q.     Who was that?
10     **A.**     **Sergeant Kris Schmidt, K-r-i-s,**
11 **S-c-h-m-i-d-t.**
12     Q.     And that's your superior officer?
13     **A.**     **At that time, yes.**
14     Q.     At that particular time. Okay. Can
15 you tell me what's your understanding as to why the
16 sergeant indicated you should hang back and not get
17 directly involved?
18     **A.**     **He learned that the reason for the stop**
19 **was only a traffic violation.**
20     Q.     Can you tell me how he learned that?
21     **A.**     **I don't know.**
22     Q.     Do you know whether or not you had
23 actually made a communication which the sergeant
24 was aware of during this particular incident?

---

23

1     **A.**     **Can you say -- rephrase?**
2     Q.     Yes. At some point Sergeant Schmidt
3 communicates with you, right?
4     **A.**     **Yes.**
5     Q.     Directly?
6     **A.**     **Yes.**
7     Q.     And he advises you not to get involved
8 directly. Is that a fair assessment?
9     **A.**     **Yes.**
10     Q.     And he advised you not to get involved
11 because this stop involves simply a traffic
12 violation, correct?
13     **A.**     **Correct.**
14     Q.     What would be the reason to not involve
15 yourself in a traffic stop of this nature, can you
16 tell me?
17     MR. JACOBI: Foundation.
18     MS. OSTVIG: Speculation.
19 BY MR. BROOKS:
20     Q.     You can answer it.
21     **A.**     **Could you rephrase it?**
22     Q.     All right. Your sergeant advised you
23 not to get involved in this incident because it was
24 simply a traffic stop. Fair enough?

---

24

1     **A.**     **I would say at that point it was more**
2 **than a traffic stop.**
3     Q.     But your sergeant advised you not to
4 get involved, right?
5     **A.**     **Correct.**
6     Q.     And he specifically said or at least
7 asked you for some information about the nature of
8 the incident, correct?
9     **A.**     **I believe it was more of a broader**
10 **question to either one of us as far as myself or**
11 **Deputy Elder knew the reason for the stop.**
12     Q.     When the sergeant communicated, is that
13 something Elder would also hear?
14     **A.**     **Yes.**
15     Q.     Did you ever communicate to the
16 sergeant that this particular incident with
17 Nathaniel Edwards before the shooting that it was
18 more than a traffic stop?
19     **A.**     **Not that I recall.**
20     Q.     If it was more than a traffic stop
21 before the shooting of Nathaniel Edwards, would you
22 have advised your sergeant?
23     **A.**     **In this circumstance, no, because he**
24 **was already monitoring the radio traffic.**

---

25

1    Q.    You don't believe that the sergeant had
2 any more information that would lead him to think
3 that this was more than a traffic stop, do you?
4    A.    At that time, no.
5    Q.    Again, we're talking before the
6 shooting, correct?
7    A.    Right.
8    Q.    Does Whiteside County have some policy
9 that the sergeant was following in terms of him
10 directing you not to get involved in a traffic
11 stop?
12   A.    In a pursuit.
13   Q.    Explain that to me.
14   A.    When he advised me to not get directly
15 involved, he was communicating the best part of the
16 pursuit.  So he was directing me not to get any
17 more further involved in the pursuit.
18   Q.    I gather from what you're saying that
19 your department generally prohibits pursuits --
20 police pursuits for merely traffic violations?
21   A.    Correct.
22   Q.    Is that a written policy?
23   A.    Yes.
24   Q.    Do you know how long that written

26

1 policy has been in effect, approximately?
2    A.    No.
3    Q.    Would it be your understanding based on
4 your experience with Whiteside County that that is
5 a reasonable policy to have in place when it
6 relates to potentially pursuing a traffic violator?
7          MR. JACOBI:  Form.
8          MS. OSTVIG:  Foundation.
9 BY MR. BROOKS:
10   Q.    Now, when the sergeant basically
11 directs you not to get involved, is he also
12 communicating that to Elder?
13         MR. JACOBI:  Foundation.
14         MS. OSTVIG:  Speculation.
15   A.    As far as the pursuit?
16 BY MR. BROOKS:
17   Q.    Yes.
18   A.    Yes.
19   Q.    How do you know that?
20   A.    Because we've worked together for four
21 years, at that point, and I feel like I have a
22 pretty rounded knowledge of what he means when he's
23 talking.
24   Q.    But how do you know Elder, that

27

1 communication, was also being -- that direction was
2 also being given to Elder as well?  How do you know
3 that?
4    A.    Well, I guess I don't know.  I could
5 speculate or assume.
6    Q.    Your presumption is that when this
7 sergeant went on the radio and communicated, he was
8 communicating generally to Whiteside officers not
9 to get involved because it's a mere traffic
10 violation, correct?
11   A.    Correct.
12   Q.    That's right?
13         MS. OSTVIG:  Object to characterization
14 of mere traffic violation.
15 BY MR. BROOKS:
16   Q.    You can answer.  Is that correct?
17   A.    Yes.
18   Q.    Deputy Coutts, can you tell me a little
19 bit about your educational background starting with
20 graduation from high school?  I'd like to know
21 where you graduated from?
22   A.    Oregon High School.  From there, I
23 attended Kishwaukee College first semester.  From
24 there, I went to Sauk Valley Community College.

28

1    Q.    S-a-u-k?
2    A.    Yes.
3    Q.    Now, Kishwaukee is a little bit of a
4 distance from this area, isn't it?
5    A.    Yes.
6    Q.    When you went to Kishwaukee, can you
7 tell me what course of study that you were
8 pursuing?
9    A.    General education.
10   Q.    What about Sauk Valley?
11   A.    The same.
12   Q.    Did you obtain any type of degree?
13   A.    No.
14   Q.    Can you give me a sense of how many
15 course hours you might have college related?
16   A.    More than 50.
17   Q.    Is it your expectation that at some
18 point you will further pursue a degree?
19   A.    It's possible.
20   Q.    Do you have any special license,
21 certification, beyond, let's say, your credentials
22 in the law enforcement field?
23   A.    Pertaining or as far as --
24   Q.    Any subject, trade, something of that

**EXHIBIT D**

Transcript of Deputy Sean Coutts

Conducted on November 19, 2019

---

**29**

1 nature?

2    **A.**    **No trade, just certifications through**

3 **training with law enforcement.**

4    Q.    By the way, at the time of this

5 incident with Nathaniel Edwards, were you certified

6 to carry a taser?

7    **A.**    **Yes.**

8    Q.    When did you become certified to carry

9 a taser?

10    **A.**    **I don't remember.**

11    Q.    Can you give me an approximation?

12    **A.**    **Probably early 2014.**

13    Q.    And I take it as of today you are

14 certified to carry a taser?

15    **A.**    **Yes.**

16    Q.    Do you routinely carry your taser?

17    **A.**    **Yes.**

18    Q.    Can you tell me why?

19    **A.**    **It is a tool that is less lethal.**

20    Q.    I take it as a law enforcement officer,

21 first of all, the use of your weapon is to be a

22 last resort in terms of use of force, right?

23    **A.**    **If it's needed, yes.**

24    Q.    But, you know, just in terms of

---

**31**

1 escalation of an incident, right?

2    **A.**    **Yes.**

3    Q.    Can you tell me the general nature of

4 the incident which prompted you to use the taser?

5    **A.**    **It was on an arrest where a passenger**

6 **of the vehicle was becoming agitated to the point**

7 **where I felt he might become combative.**

8    Q.    As far as the driver is concerned of

9 that particular vehicle, there was no issue with

10 the driver?

11    **A.**    **Not to my recollection.**

12    Q.    The incident that you're describing,

13 did it start out as a traffic stop?

14    **A.**    **Yes.**

15    Q.    Was it for a minor traffic offense?

16    **A.**    **I don't know.**

17    Q.    Fair enough. You said the passenger

18 started to become agitated. Can you explain that a

19 little further?

20    **A.**    **He started pacing back and forth,**

21 **clenching his fists, mumbling to himself, and then**

22 **eventually took his coat off and started stepping**

23 **towards myself and another deputy.**

24    Q.    Who was the other deputy?

---

**30**

1 performing your duty as a general rule, that should

2 be the last use of force that's deployed, and I'm

3 talking about the firing of your firearm, correct?

4    **A.**    **Last resort, yes.**

5    Q.    The taser, obviously, is a less lethal

6 weapon than the firearm, right?

7    **A.**    **Yes.**

8    Q.    Have you, during your career as a

9 Whiteside County deputy, deployed your taser in the

10 field?

11    **A.**    **I've deployed it, but not used it, if**

12 **that makes sense.**

13    Q.    When you deployed it, was that in

14 connection of actually interaction with a citizen?

15    **A.**    **Yes.**

16    Q.    Can you tell me the circumstance of

17 that?

18    **A.**    **It was to prevent an incident from**

19 **escalating further than it had.**

20    Q.    What was --

21    **A.**    **Recalling my memory, I have used it.**

22 **Not on a person, actually, on a dog.**

23    Q.    All right. So going back to the point

24 where you said you used the taser to prevent the

---

**32**

1    **A.**    **Sergeant Kris Schmidt.**

2    Q.    At some point you deployed your taser,

3 right?

4    **A.**    **Yes.**

5    Q.    When you used your taser on the

6 individual who you describe was becoming agitated

7 and was approaching, did the taser disable the

8 person to some extent?

9    **A.**    **Without firing it, yes.**

10    Q.    Explain that to me.

11    **A.**    **So when you say deploy, it means comes**

12 **out of the holster and aimed at someone?**

13    Q.    Yes.

14    **A.**    **Disable the person as far as their**

15 **advancement?**

16    Q.    Yes.

17    **A.**    **Yes.**

18    Q.    Your pulling out the taser, directing

19 it towards that person actually disabled the person

20 in the sense the person stopped?

21    **A.**    **Yes.**

22    Q.    Was that person ultimately placed under

23 arrest?

24    **A.**    **No.**

---

**EXHIBIT D**

Transcript of Deputy Sean Coutts

Conducted on November 19, 2019

9 (33 to 36)

---

**33**

1    Q.    What was the outcome?

2    **A.    They left.**

3    Q.    You had given the person some

4 directions, I take it?

5    **A.    Yes.**

6    Q.    Your final directions after you pulled

7 the taser, what was that to the person?

8    **A.    To leave.**

9    Q.    Did you search the person or something

10 of that nature?

11    **A.    The person that I had pointed the taser**

12 **at?**

13    Q.    Yes.

14    **A.    No.**

15    Q.    Was there a search of anyone?

16    **A.    I don't remember.**

17    Q.    Fair enough.  Beyond that situation you

18 just described, any other incidents where you may

19 have either pulled the taser or actually shot your

20 taser?

21    **A.    I deployed it, but I can't**

22 **remember -- I know that I have more than that, but**

23 **I can't recall specifics about it.**

24    Q.    Do you know when you actually shot your

---

**34**

1 taser in the field if the genesis of that was a

2 traffic stop?

3    **A.    Can you rephrase that?**

4    Q.    You told me that you have actually shot

5 your taser in the field in the course of carrying

6 out your duties as a police officer, right?

7    **A.    Yes.**

8    Q.    When you have actually shot your taser,

9 was the initial interaction which led to your using

10 your taser, shooting it, from a traffic stop?

11    **A.    No.**

12    Q.    What is your understanding, just in

13 terms of use of force, you've heard terms such as

14 assailant?

15    **A.    Yes.**

16    Q.    You've heard the term active assailant?

17    **A.    Yes.**

18    Q.    What do you understand an active

19 assailant to be?

20    **A.    Actively assailing someone.**

21    Q.    So resisting in some fashion?

22    **A.    It could be.**

23    Q.    Would it be appropriate just in terms

24 of using force as a law enforcement official to

---

**35**

1 deploy, and I mean initially point a taser at a

2 person in a stopped vehicle who was not initially

3 honoring your directions?

4        MR. JACOBI:  Form.  Foundation.  Go

5 ahead.

6    **A.    Depending on the circumstances, sure.**

7 **BY MR. BROOKS:**

8    Q.    All right.  When you say depending on

9 the circumstances, what specific circumstances

10 would dictate your not using that taser on that --

11 in terms of deploying or showing it?

12        MR. JACOBI:  Form.  Go ahead.

13    **A.    The events that led up to the point of**

14 **noncompliance.**

15 **BY MR. BROOKS:**

16    Q.    So can you give me an example?

17    **A.    Of noncompliance?**

18    Q.    Well, you said the events that led up

19 to the noncompliance, so I gather what you're

20 saying if the events were more significant leading

21 up to the noncompliance, then in that scenario, you

22 might not use your taser, right?

23    **A.    Correct.**

24    Q.    What would be certain events leading up

---

**36**

1 to whether or not you use the taser?  Do you

2 understand what I'm saying?

3        MR. JACOBI:  Form.

4        MS. OSTVIG:  Speculation.

5 **BY MR. BROOKS:**

6    Q.    I can restate it.  You told me that

7 there are certain factors that may dictate whether

8 you're going to use that taser in a scenario that I

9 describe where you have a motorist seated in the

10 car, based on what may have happened before that

11 motorist came to a stop, right?

12    **A.    Yes.**

13    Q.    Can you give me an example of some

14 behavior that would say to you, okay, the taser

15 wouldn't be appropriate?

16    **A.    If they were driving in a manner in**

17 **which -- or if you were in a position which the**

18 **vehicle could be used as a weapon.**

19    Q.    All right.  Fair enough.  At any point

20 when you saw Nathaniel Edwards driving, did he ever

21 use the vehicle as a weapon before he pulls into

22 the driveway?

23    **A.    As far as attempting to harm anyone**

24 **when I saw him?**

---

**EXHIBIT D**

Transcript of Deputy Sean Coutts

Conducted on November 19, 2019

---

37

1　Q.　　Yes.

2　**A.　　No.**

3　Q.　　In fact, when you saw him -- let me

4　restate it.

5　　　　Can you tell me specifically the route

6　that you saw Mr. Edwards travel until the point

7　that he pulls into the driveway, can you tell us

8　what that was?

9　**A.　　The route of travel?**

10　Q.　　That you actually saw.

11　**A.　　From Martin Road north to Franklin**

12　**Street; Franklin Street east to Ann Street; Ann**

13　**Street north to -- I couldn't remember the next**

14　**street's name, but the next possible left turn,**

15　**from there west back to Martin Road, south on**

16　**Martin Road back to Franklin Street.**

17　Q.　　How long would you say that took in

18　terms of the route that you just described?

19　**A.　　Less than five minutes.**

20　Q.　　Would you agree that throughout the

21　travel that you just -- would you agree that

22　throughout the time that you saw Mr. Edwards travel

23　from Martin and various other streets ultimately

24　leading into the driveway where the shooting takes

---

38

1　place, he was always traveling at a low speed?

2　**A.　　Yes.**

3　Q.　　Would you also agree that at some point

4　as Mr. Edwards is traveling along the various

5　streets, whether it's Martin, Ann Street, and so

6　forth, at no point did he ever strike a vehicle?

7　**A.　　Not that I could recall.**

8　Q.　　In fact, at some point did you see

9　where one of the Rock Falls officers had positioned

10　their vehicle in the street to block the roadway

11　that Mr. Edwards was traveling?

12　**A.　　Yes.**

13　Q.　　Would you agree with me that when that

14　occurred where a Rock Falls officer was blocking

15　the roadway, Mr. Edwards carefully drove around the

16　police car that was blocking the roadway?

17　　　　MS. OSTVIG: Object to

18　characterization.

19　　　　MR. JACOBI: Form.

20　BY MR. BROOKS:

21　Q.　　You can answer it.

22　**A.　　I wouldn't have described it as**

23　**carefully, but he did drive around the squad car.**

24　Q.　　Well, he drove around the squad car

---

39

1　such that he would not strike the squad car, right?

2　　　　MS. OSTVIG: Objection. Speculation.

3　Foundation.

4　**A.　　He did not strike the squad car.**

5　**BY MR. BROOKS:**

6　Q.　　How many times did you see Mr. Edwards

7　drive around a squad car so as to avoid making

8　contact with the squad car?

9　**A.　　Two.**

10　Q.　　As you're watching this unfold, that is

11　Mr. Edwards traveling slowly down the roadway with

12　police cars following him, did you ever come to the

13　thought that potentially Mr. Edwards was

14　intoxicated?

15　**A.　　It was certainly possible.**

16　Q.　　Did that thought ever come to your

17　mind?

18　**A.　　I don't remember.**

19　Q.　　Has anyone and, more specifically, did

20　Deputy Elder tell you that given the travel of

21　Mr. Edwards from one point to the next point and

22　his avoiding striking or hitting a police car that,

23　in his mind, he thought Mr. Edwards might be

24　intoxicated?

---

40

1　**A.　　Not to my knowledge. I don't recall.**

2　Q.　　The fact that Mr. Edwards was able to

3　drive around police cars that were blocking the

4　road, would that lead you to think, more likely

5　than not, he was not intoxicated?

6　**A.　　No.**

7　Q.　　Beyond your interview with the Illinois

8　State Police, have you given interviews to any

9　other persons? I'm not talking about lawyers and

10　things of that nature.

11　　　　MR. JACOBI: Regarding this incident?

12　　　　MR. BROOKS: Yes.

13　**A.　　As far as?**

14　**BY MR. BROOKS:**

15　Q.　　Just providing factual information

16　concerning this incident?

17　**A.　　The only other time that I can think of**

18　**specifically is at the debrief after the incident.**

19　Q.　　Where did the debriefing take place at?

20　**A.　　I think it was the community center.**

21　Q.　　Community center in Rock Falls?

22　**A.　　I think.**

23　Q.　　How close in time did the debriefing

24　take place after the shooting?

---

**EXHIBIT D**

Transcript of Deputy Sean Coutts

Conducted on November 19, 2019

---

41

1      A.      I want to say it was within two weeks.
2  I don't recall, specifically.
3      Q.      Who made you aware that you were going
4  to participate in a debriefing?
5      A.      Well, it wasn't an order.  It was,
6  obviously, put out as an offer if you felt it was
7  necessary for yourself to attend.
8      Q.      What was the purpose of the debriefing?
9      A.      Well, to communicate about what
10 happened, to help understand what took place, I
11 guess.
12     Q.      Did the debriefing involve private
13 citizens?
14     A.      I don't think -- I don't know.  Not
15 that I can recall.
16     Q.      Give me your best recall of persons who
17 were present for the debriefing.
18     A.      The only person that I could say
19 specifically was Officer Sugars.  I think Officer
20 Riley was there as well.
21     Q.      Are you sure Officer Cater was not
22 there?
23     A.      I don't recall.  He might have been.
24 I'm not sure.  I can't -- it's been so long.

---

42

1      Q.      Who else from Whiteside County was
2  present?
3      A.      I don't remember.
4      Q.      How long did the debriefing take?
5      A.      Maybe an hour.
6      Q.      Who would you say presided over the
7  debriefing?
8      A.      I don't remember.
9      Q.      Someone took the lead, though, right?
10     A.      Yeah.
11     Q.      Can you tell me what was the first
12 subject matter that was discussed?
13     A.      I don't remember.
14     Q.      Do you know if anyone took any notes?
15     A.      No.
16     Q.      Were any of your superior officers
17 present for the debriefing?
18     A.      I don't remember.
19     Q.      Beyond Sugars, Riley, yourself, you
20 said Elder was present?
21     A.      I don't remember if he was there.
22     Q.      Were there any personnel from the
23 Illinois State Police?
24     A.      I don't remember.

---

43

1      Q.      Was there any personnel from Sterling?
2      A.      I don't remember.
3      Q.      Give me your best recollection of how
4  many people were present?
5      A.      Less than 20.
6      Q.      And your best recollection is that all
7  of these folks who were present for the debriefing
8  were law enforcement persons?
9             MS. OSTVIG:  I'm going to object and
10 say that mischaracterizes his previous testimony.
11 BY MR. BROOKS:
12     Q.      You can answer.
13     A.      I don't remember.
14     Q.      Well, fair to say what you do remember
15 is that in terms of names of persons, the only
16 names that you can recall are law enforcement
17 officers, right?
18     A.      Yes.
19     Q.      And you believe that at this debriefing
20 there were, just in terms of sheer numbers, less
21 than 20?
22     A.      Yes.
23     Q.      Beyond that, you can't give me anything
24 more precise?

---

44

1      A.      No.
2      Q.      And you know the debriefing lasted for
3  about an hour?
4      A.      Give or take, yeah.
5      Q.      Was there any material provided to the
6  law enforcement officers who were present at the
7  debriefing?
8      A.      I don't remember.
9      Q.      You don't recall if you received a
10 handout, report, or anything of that nature?
11     A.      No.
12     Q.      Did you review any video?
13     A.      No.
14     Q.      Photographs?
15     A.      No.
16     Q.      There was some discussion about the
17 shooting of Nathaniel Edwards, right?
18     A.      Yes.
19     Q.      Who led that discussion?
20     A.      I don't remember.
21     Q.      Fair to say that you didn't lead the
22 discussion?
23     A.      Correct.
24     Q.      You don't recall Elder leading the

---

**EXHIBIT D**
Transcript of Deputy Sean Coutts

12 (45 to 48)

Conducted on November 19, 2019

---

45

1 debriefing, do you?
2     **A.**    **No.**
3     Q.    Was there -- was part of the debriefing
4 to show support for Officer Cater?
5         MR. JACOBI: Foundation.
6     **A.**    **Honestly, I think it was more to work**
7 **through the traumatic event that happened to make**
8 **sure that every one was all right emotionally.**
9 **BY MR. BROOKS:**
10    Q.    Give me your best recollection of what
11 was said in terms of the shooting itself.
12    **A.**    **I don't remember if there was anything**
13 **specifically mentioned about firing. It was more**
14 **of understanding where -- what took place.**
15    Q.    What do you mean by that?
16    **A.**    **Like, that it had happened. I don't**
17 **remember anything specifically about the pulling of**
18 **the trigger. I'll leave it at that.**
19    Q.    Have you had any conversations with
20 Officer Cater concerning this issue?
21    **A.**    **No, I've only asked him if he was okay.**
22    Q.    Have you had any conversations with
23 Deputy Elder about the shooting?
24    **A.**    **Yes.**

46

1     Q.    When was the last time that you had a
2 conversation with Elder about the shooting?
3         MR. JACOBI: Outside of counsel.
4     **A.**    **The last time that I could tell you**
5 **specifically was the day of the incident.**
6 **BY MR. BROOKS:**
7     Q.    So the day or the night that
8 Mr. Edwards was shot, you and Elder had a
9 conversation about the shooting?
10    **A.**    **Yes.**
11    Q.    Where did that conversation take place?
12    **A.**    **His residence.**
13    Q.    How is it that it came to be that you
14 were at Elder's residence after the shooting?
15    **A.**    **We were sent home. I wasn't able to**
16 **sleep, so ended up at his house.**
17    Q.    So when you say that you were sent
18 home, the department sent you home?
19    **A.**    **Yes.**
20    Q.    You went home, how long would you say
21 that you were there before you either reached out
22 to Elder or he reached out to you?
23    **A.**    **Inside of an hour.**
24    Q.    Did you call him or he called you?

47

1     **A.**    **I don't remember.**
2     Q.    How is it that it came to be that you
3 went to his house as opposed to him coming to your
4 home?
5     **A.**    **That's typical of when we spend time**
6 **together.**
7     Q.    Did you mention to Elder that you were
8 having trouble sleeping prior to your coming to his
9 home?
10    **A.**    **Yeah.**
11    Q.    Does that mean that you called him?
12    **A.**    **I don't remember if it was a phone call**
13 **or not.**
14    Q.    When you went to Elder's home, tell me
15 what you said to him and what he said to you.
16    **A.**    **I can't tell you anything specifically.**
17 **I just know that we discussed that I had never**
18 **experienced tunnel vision such as that after the**
19 **incident. Basically, just making sure that both of**
20 **us were emotionally okay.**
21    Q.    During your period of time as a law
22 enforcement officer, have you ever fired your
23 weapon in the course of performing your duties, not
24 firing at the range or training?

48

1     **A.**    **Yes, but not involving another person,**
2 **dispatching an animal, deer, specifically.**
3     Q.    You didn't shoot the deer, did you?
4     **A.**    **Yes.**
5     Q.    You shot the deer?
6     **A.**    **All right. Okay.**
7     Q.    Other than that incident where you shot
8 a deer?
9     **A.**    **Fire it, no.**
10    Q.    You mentioned that you had never
11 experienced tunnel vision before, right?
12    **A.**    **To that magnitude, correct.**
13    Q.    How would you describe, for a
14 layperson; what does that mean, tunnel vision?
15    **A.**    **Basically, looking through a paper**
16 **towel roll at one specific thing, not being aware**
17 **of what was going on outside of that small picture.**
18    Q.    How does that relate to the shooting of
19 Nathaniel Edwards?
20    **A.**    **During and after the shots were being**
21 **fired, all I could see was Nate.**
22    Q.    You could see Mr. Edwards?
23    **A.**    **Yes.**
24    Q.    So explain to me when you say you could

**EXHIBIT D**

Transcript of Deputy Sean Coutts

13 (49 to 52)

Conducted on November 19, 2019

---

49

1 see Nate, let's say moments before the shots you
2 could see him?
3     **A.**    **Yes.**
4     Q.    What did you see moments before the
5 shots, as far as Nate is concerned?
6     **A.**    **I saw him -- I just remember him**
7 **sitting in the driver's seat.**
8     Q.    And then you remember shots being
9 fired?
10    **A.**    **Yes.**
11    Q.    Can you tell me when the shots were
12 fired, were you still focused on Nate?
13    **A.**    **I couldn't tell you what I was focused**
14 **on at that point.**
15    Q.    At some point when you got out of your
16 car, Mr. Edwards has pulled into the driveway,
17 right?
18    **A.**    **Yes.**
19    Q.    When you got out of your car, you
20 didn't run up to his car, right?
21    **A.**    **No.**
22    Q.    Why not?
23    **A.**    **Because there was already three**
24 **officers there.**

---

50

1     Q.    Fair to say that when you got out of
2 the car, you didn't feel that there was a rush or
3 need to immediately go up to Mr. Edwards' car?
4    **A.**    **For me, no.**
5    Q.    You've seen the video of yourself
6 getting out of the car?
7    **A.**    **Yes.**
8    Q.    Fair to say you're just taking what
9 appears to be a leisurely pace, would you agree
10 with that?
11       MR. JACOBI: I'll object to that.
12 Form.
13    **A.**    **Leisurely, no.**
14 **BY MR. BROOKS:**
15    Q.    How would you describe it?
16    **A.**    **Typical.**
17    Q.    All right. You're not running?
18    **A.**    **Correct.**
19    Q.    And, in fact, after you get out of the
20 car, you see that there is a young lady also
21 outside the home where Nate has pulled into the
22 driveway?
23    **A.**    **Yes.**
24    Q.    Do you know -- did you know who that

---

51

1 person was?
2    **A.**    **No.**
3    Q.    You do know who that person is today,
4 right?
5    **A.**    **Yes, but I can't recall her name.**
6    Q.    Does the first name Carli --
7    **A.**    **Yes.**
8    Q.    So when you get out of the car, and you
9 start approaching, let's say, the area where
10 Mr. Edwards' white Cadillac is situated, where is
11 Carli?
12    **A.**    **I remember she's standing on the front**
13 **porch.**
14    Q.    Did you hear her say anything?
15    **A.**    **There was -- no, there was a lot of**
16 **yelling.**
17    Q.    When you say there was a lot of
18 yelling, who was yelling?
19    **A.**    **Officer Cater and Officer Sugars.**
20    Q.    What was Officer Cater yelling?
21    **A.**    **Giving the driver commands.**
22    Q.    Tell me what those commands were, the
23 best that you recall.
24    **A.**    **Don't move. Don't back up. Show me**

---

52

1 **your hands.**
2    Q.    Anything else?
3    **A.**    **I remember you're going to get shot.**
4    Q.    Who said that?
5    **A.**    **Sugars.**
6    Q.    When Sugars said, you're going to get
7 shot, Mr. Edwards was seated in his car?
8    **A.**    **Yes.**
9    Q.    The car was not moving?
10    **A.**    **I don't know if it was moving or not at**
11 **that point.**
12    Q.    Do you have any recollection of it
13 moving when Sugars says, you're going to get shot?
14    **A.**    **No.**
15    Q.    Where was Carli at when those words
16 were being yelled and directed at Mr. Edwards?
17    **A.**    **I can't remember.**
18    Q.    Moments before the shots were fired,
19 from your recollection, was Carli still in that
20 general area where you first saw her?
21    **A.**    **I don't remember.**
22    Q.    In law enforcement, have you heard the
23 term business officer?
24    **A.**    **No.**

---

**EXHIBIT D**

Transcript of Deputy Sean Coutts

Conducted on November 19, 2019

14 (53 to 56)

---

53

1    Q.    That doesn't mean anything to you?

2    **A.    No.**

3    Q.    Let me give you a scenario where you

4 have a traffic stop or you have a stop of a citizen

5 and there are multiple officers involved in the

6 stop, I'm told that one officer will typically take

7 on the role as the business officer to basically be

8 the one uttering the commands. Have you ever heard

9 of anything of that nature?

10    **A.    As far as business officer, no.**

11    Q.    Specifically with that term?

12    **A.    No.**

13    Q.    Is that your understanding -- let's

14 exclude the term business officer, but where you

15 have a situation where there are several officers

16 interacting with a citizen that normally one

17 officer will take the lead in terms of

18 communicating demands?

19    **A.    Depending on the situation, yes.**

20    Q.    Would you agree with me when you have

21 multiple officers giving commands, commands which

22 may differ, that it can create confusion?

23    **A.    I could see where it's possible.**

24    Q.    Would you also agree with me that when

---

54

1 you have circumstance where officers are

2 interacting with an individual and multiple

3 officers are giving -- when I say giving, yelling

4 and directing and providing orders, that that can

5 escalate the situation?

6    **A.    I wouldn't necessarily agree with that.**

7    Q.    Do you recall when Mr. Edwards was

8 seated in the car a law enforcement voice yelling

9 for him to get out of the car?

10    **A.    I don't recall.**

11    Q.    Would you agree with me if you have a

12 situation where there are multiple officers

13 interacting with a citizen and one officer is

14 saying don't move and another officer is saying get

15 out of the car or another officer is saying show me

16 your hands, that that can create confusion?

17    **A.    Yes.**

18    Q.    When we have confusion, that can

19 escalate the interaction between the officers and

20 the citizen, right?

21    MR. JACOBI: Object to form.

22 Foundation. Go ahead.

23    **A.    It could, but I don't necessarily**

24 **agree, like I said.**

---

55

1 **BY MR. BROOKS:**

2    Q.    Now, Deputy Coutts, the dash cam video

3 that you reviewed, I want to focus on Elder's dash

4 cam. Elder's vehicle was how far away when it

5 captures the shooting, can you tell us?

6    **A.    I don't know that it captured the**

7 **actual shooting, but assuming the position of his**

8 **car when that took place, probably Martin Road and**

9 **Franklin Street.**

10    Q.    So you believe he's actually at the

11 corner?

12    **A.    Yes.**

13    Q.    So Elder's car would not actually be on

14 the block itself, Franklin?

15    **A.    It could be right in that area.**

16    Q.    All right.

17    (Exhibits 2 and 3 were marked for

18    identification.)

19 BY MR. BROOKS:

20    Q.    Deputy Coutts, you have in front of you

21 what has been marked as Deposition Exhibits 2 and

22 3. You are familiar with what's shown in each of

23 those photographs, right?

24    **A.    Yes.**

---

56

1    Q.    In Exhibit No. 2, it shows the location

2 of Mr. Edwards' white Cadillac after he was removed

3 from his car and after the shooting, correct?

4    **A.    Yes.**

5    Q.    In Exhibit 3, can you identify the

6 vehicles that are shown?

7    **A.    This one was Officer Cater and Officer**

8 **Riley.**

9    Q.    So you are starting from the left side

10 of the photograph?

11    **A.    Yes.**

12    Q.    All right.

13    **A.    Next to the right would be Officer**

14 **Sugars and the white car is Nathaniel Edwards'**

15 **vehicle.**

16    Q.    At the time of the shooting, Sugars'

17 vehicle is shown where it was situated at the time

18 of the shooting, right?

19    **A.    At the time that this photograph was**

20 **taken, I had left, so I don't know if it was moved**

21 **or not.**

22    Q.    Based on the positioning of the

23 vehicles that you see in Exhibit 3, do you have any

24 reason to believe that the location where the

---

**EXHIBIT D**
Transcript of Deputy Sean Coutts
Conducted on November 19, 2019

15 (57 to 60)

57

1 vehicles are is different than the location of the
2 vehicles at the time of the shooting?
3    **A.    No.**
4    Q.    Or moments after the shooting?
5    **A.    No.**
6         MS. OSTVIG:  I think -- I don't have
7 the right exhibit.  I don't think I'm looking at
8 the same --
9         MR. BROOKS:  No, that's a different --
10 BY MR. BROOKS:
11    Q.    It has a Bates number on it.
12    **A.    2485.**
13    Q.    Exhibit No. 3 is Rock Falls, Bates
14 2485.  All right.  And Exhibit No. 2 is Rock Falls
15 2474.
16    **A.    Yes.**
17    Q.    To the right of Mr. Edwards' vehicle
18 you see some cones, orange cones?
19    **A.    Yes.**
20    Q.    Do you know who placed those cones?
21    **A.    No.**
22    Q.    Were you present when those cones were
23 placed?
24    **A.    Not that I recall.**

58

1    Q.    Do you know what the cones are
2 documenting?
3    **A.    No.**
4    Q.    Did you at some point see shell casings
5 from Officer Cater's weapon after they were fired?
6    **A.    No.**
7    Q.    You didn't, I take it, you didn't look
8 for any?
9    **A.    No.**
10    Q.    Fair to say that you were surprised by
11 the shooting?
12    **A.    I wouldn't say surprised, but I**
13 **wouldn't really know how to describe it.**
14    Q.    Fair to say that the shooting was
15 unexpected?
16    **A.    At the time of the incident, no.**
17    Q.    Fair to say that at no point as you
18 approached Mr. Edwards' car did you ever pull your
19 weapon, right?
20    **A.    Not until after shots were fired.**
21    Q.    Just so we're clear, from the point
22 that you got out of your car until the first time
23 that you heard a shot, you had not pulled your
24 weapon?

59

1    **A.    Correct.**
2    Q.    You had not directed your weapon
3 towards Mr. Edwards' car, correct?
4    **A.    Correct.**
5    Q.    You had not directed your weapon
6 towards Mr. Edwards at all, correct?
7    **A.    Correct.**
8    Q.    After the shots were fired into
9 Mr. Edwards' car and body, did you see him move at
10 all?
11    **A.    Yes.**
12    Q.    What did you see him do?
13    **A.    He grasped his chest.  That's the only**
14 **thing that I can remember.**
15    Q.    You put your hands up by your chest
16 area, both hands?
17    **A.    Yes.**
18    Q.    I think that you had actually somewhat
19 of a fist?
20    **A.    I'm not trying to recreate what he did.**
21 **It was just a general motion.**
22    Q.    What you saw was Mr. Edwards grab
23 towards his chest area?
24    **A.    Yes.**

60

1    Q.    Did you see anything else in terms of
2 Mr. Edwards movement?
3    **A.    Not that I can recall specifically.**
4    Q.    Did you get Mr. Edwards out of his car?
5    **A.    No.**
6    Q.    Who took him out of his car?
7    **A.    I believe it was Officer Sugars and**
8 **Deputy Elder.**
9    Q.    Did you assist in providing any medical
10 care to Mr. Edwards?
11    **A.    CPR?**
12    Q.    Yes.
13    **A.    Yes.**
14    Q.    Tell us specifically what you did in
15 terms of providing medical care to Mr. Edwards once
16 he was removed from the car?
17    **A.    Chest compressions.**
18    Q.    Who else provided medical care prior to
19 medical personnel arriving?
20    **A.    Deputy Elder and then I'm not sure who**
21 **placed the AED on Mr. Edwards.**
22    Q.    Did you see any of the officers from
23 Rock Falls providing medical care to Mr. Edwards?
24    **A.    Not that I can recall.**

**61**

1    Q.    You only remember yourself and Elder
2 specifically in terms of providing care, medical
3 care, to Mr. Edwards after he was shot?
4    **A.    Yes.**
5    Q.    How long would you say both you and
6 Elder provided some medical assistance to
7 Mr. Edwards?
8    **A.    10 minutes.**
9    Q.    When you concluded -- or you and Elder
10 concluded providing medical attention to
11 Mr. Edwards, did the paramedics take over?
12    **A.    I believe so.**
13    Q.    Looking at Exhibit No. 2 also to the
14 right of Mr. Edwards' white Cadillac, there appears
15 to be an open grassy yard, correct?
16    **A.    Yes.**
17    Q.    When you were approaching Mr. Edwards
18 car, after you pulled up along Franklin Street, did
19 you walk in that grassy area?
20    **A.    Yes.**
21    Q.    Can you -- in Exhibit Nos. 2 or 3, do
22 you see the area where you would have been at at
23 the time the shots were fired?
24    **A.    The general area, yeah.**

**62**

1    Q.    Well, let's look at Exhibit No. 2,
2 first of all.  You see Mr. Edwards' white Cadillac,
3 correct?
4    **A.    Yes.**
5    Q.    The area where you would have been
6 standing when the shots were fired, is it shown in
7 Exhibit 2?
8    **A.    Possibly.  I think that I was further**
9 **away than that.**
10    Q.    When you say further away?
11    **A.    So from the position that the**
12 **photographer is at, behind them further outside of**
13 **the frame of the picture.**
14    Q.    Can you tell me how far that grassy
15 area extends to the right of Mr. Edwards' vehicle?
16    **A.    We're still looking at 2?**
17    Q.    Yes.
18    **A.    To the right?**
19    Q.    Yes.
20    **A.    In this direction?**
21    Q.    Adjacent to the walkway.
22    **A.    So this way?**
23    Q.    Yes.
24    **A.    Probably 25 yards, approximately, 30**

**63**

1 yards.
2    Q.    So if you keep going to the right of
3 Mr. Edwards' Cadillac as shown in Exhibit 2, does
4 that grassy area continue along the -- what appears
5 to be a walkway?
6    **A.    Yes.**
7    Q.    Does it extend from one house to the
8 next house?
9    **A.    Based off these pictures, I can't tell**
10 **you.  I don't remember.**
11    Q.    On this particular side of the block on
12 Franklin Street, within the front of those homes,
13 do any of the homes have a gate which would prevent
14 you, if you were in the grassy area that's shown in
15 Exhibit No. 2, and you continued to walk to the
16 right away from the white Cadillac, would you be
17 stopped at some point?
18    **A.    I don't know.**
19    Q.    And when I say stopped, physically by a
20 fence?
21    **A.    I'm not sure.**
22    Q.    You don't have any recollection of
23 seeing any fences along the area as you continued
24 to go to the right of Mr. Edwards' vehicle, do you?

**64**

1    **A.    No.**
2    Q.    Would you agree with me when Officer
3 Cater fired his weapon, that grassy area that's to
4 the right of Mr. Edwards' vehicle was unobstructed?
5        MR. JACOBI:  Form.
6    **A.    Can you rephrase that?**
7        MR. BROOKS:  Could I have it read back.
8        (Requested portion of the record read
9 back.)
10    **A.    Based on my memory of where that took**
11 **place, there is a tree in the -- to the right of**
12 **the vehicle, so I don't necessarily -- I wouldn't**
13 **say it's unobstructed.**
14 BY MR. BROOKS:
15    Q.    Are you telling us that there is a tree
16 somewhere within that grassy area that is further
17 to the right of the imagine that's shown in Exhibit
18 No. 2?
19    **A.    Yes.**
20    Q.    How much further?
21    **A.    From the vehicle?**
22    Q.    Yes.
23    **A.    10 or 15 feet.**
24    Q.    You would agree with the image that's

**EXHIBIT D**

Transcript of Deputy Sean Coutts

Conducted on November 19, 2019

---

65

1  shown in Exhibit No. 2 that the view of the grassy
2  area that we see extends more than 20 feet?
3  **A.     Depending on which direction you're**
4  **meaning, it could, yes.**
5      Q.    I'm talking about to the right of
6  Mr. Edwards' vehicle, the passenger side of his
7  vehicle, that grassy area extends at least 20 feet
8  before you get to what you believe is a tree?
9          MR. JACOBI:  Asked and answered.  Form.
10  **A.    No.**
11  BY MR. BROOKS:
12      Q.    You don't believe so?
13  **A.    I just depending on where you're going**
14  **from the vehicle, if you were going from the**
15  **bumper, I would say 10 or 15.**
16      Q.    You have in front of you 2485, which is
17  Exhibit No. 3?
18  **A.    Yes.**
19      Q.    You told me, or you told us, that there
20  was a tree to the right of Mr. Edwards' white
21  Cadillac, right?
22  **A.    Yes.**
23      Q.    Do you see a tree?
24  **A.    Yes.**

---

66

1      Q.    You're talking about the tree that's on
2  the driver's side of his car?
3  **A.    No.**
4      Q.    Where is the tree?
5  **A.    (Witness indicating.)**
6      Q.    I want you to circle what you believe
7  to be the tree that you say somehow would have
8  acted as an obstruction to the right of
9  Mr. Edwards' vehicle.
10          MR. JACOBI:  Before you do that, for
11  the record, I'll object to the extent that marking
12  on a photograph is in question under Rule 30.  The
13  question has not been posed and marking on a
14  photograph is not an answer to a question or
15  interrogatory as permitted by Rule 30 and that the
16  marking on a photograph is subject to misuse and
17  misinterpretation, but with that objection stated
18  for the record, I'll allow the witness to answer.
19  BY MR. BROOKS:
20      Q.    So if you could mark, Deputy Coutts, if
21  you could circle the tree that you believe served
22  as somewhat of an obstruction to the right of
23  Mr. Edwards' white Cadillac when the shots were
24  fired?

---

67

1          MR. JACOBI:  Counsel, I don't know if
2  you're going to have him mark on a lot of pictures,
3  but can my objection just stand?
4          MR. BROOKS:  Definitely.
5  BY MR. BROOKS:
6      Q.    Officer Coutts you just circled an area
7  with a red pen on Exhibit No. 3, which is Bates
8  stamp Rock Falls 2485; is that right?
9  **A.    Yes.**
10      Q.    And if you could for me put a t
11  underneath that circle.
12  **A.    (Witness complies.)**
13      Q.    When Officer Cater fired his weapon,
14  did you actually see him fire his weapon?
15  **A.    I don't remember.  I remember hearing**
16  **it.**
17      Q.    All right.  Can you tell me
18  how -- based on what you're telling us here today,
19  you didn't see Officer Cater fire his weapon; is
20  that right?
21          MR. JACOBI:  Asked and answered.
22  BY MR. BROOKS:
23      Q.    You can answer.
24  **A.    The first shot that was fired, I was**

---

68

1  **not looking at Officer Cater.**
2      Q.    Would you agree with me that the shots
3  were in rapid succession?
4  **A.    Yes.**
5      Q.    The shots occurred within a matter of
6  seconds?
7  **A.    Yes.**
8      Q.    Is it your testimony that within that
9  sequence of a matter of seconds, you saw Cater?
10  **A.    Yes.**
11      Q.    Is it your testimony that you actually
12  saw Cater fire his weapon?
13          MR. JACOBI:  Asked and answered.
14  **A.    I couldn't specifically tell you if I**
15  **was looking at him when he pulled the trigger or**
16  **not.  I just remember the vehicle and that at some**
17  **point I looked at him, and that's all that I could**
18  **answer to as far as specifics.**
19  BY MR. BROOKS:
20      Q.    When you say that you looked at him,
21  are you referring to Mr. Edwards?
22  **A.    Mr. Edwards and Officer Cater.**
23      Q.    Were you looking at Officer Cater
24  moments before a shot was fired?

---

**EXHIBIT D**

Transcript of Deputy Sean Coutts

18 (69 to 72)

Conducted on November 19, 2019

---

**69**

1    A.    No -- could you explain that?
2    Q.    Well, you told me that the shooting
3 sequence took place within a matter of seconds,
4 correct?
5    A.    Yes.
6    Q.    How many shots did you hear?
7    A.    Four.
8    Q.    You heard four shots within a matter of
9 seconds, correct?
10    A.    Yes.
11    Q.    When those four shots were fired, were
12 you looking at Mr. Edwards?
13    A.    I would say in the direction of him. I
14 can't say specifically at him.
15    Q.    Were you looking at Officer Cater when
16 the four shots were fired?
17    A.    In that direction.
18    Q.    Does that mean he was in your
19 peripheral vision?
20    A.    Yes.
21    Q.    Where were you in reference to, let's
22 say, the front driver passenger area of
23 Mr. Edwards' car?
24        MR. JACOBI:  When?

**70**

1 BY MR. BROOKS:
2    Q.    When you heard a shot?
3    A.    As it sits in this picture?
4    Q.    Well, using his car and focused on the
5 front driver/passenger area, where would you have
6 been in reference to that portion of his car when
7 you heard a shot?
8    A.    Nearly in line with the B pillar as to
9 where it was parked prior to reverse.
10    Q.    You said near the B pillar, right, that
11 is the -- essentially the --
12    A.    Where the door portion that's furthest
13 open closes.
14    Q.    All right.  It's like the divider
15 between the front door and the passenger door?
16    A.    Yes.
17    Q.    On the driver's side?
18    A.    Passenger side.
19    Q.    I'm sorry.  That's right.  How close
20 were you actually to Mr. Edwards' vehicle when you
21 heard a shot?
22    A.    I would say between 10 and 12 yards.
23    Q.    Within that space of 10 to 12 yards --
24 are you sure?

**71**

1    A.    Yes.
2    Q.    Within that space of 10 to 12 yards,
3 when you heard -- when you first heard a shot, what
4 did you do?
5    A.    Backed up, I believe.
6    Q.    When you say backed up --
7    A.    Stepped back.
8    Q.    Did you back pedal?
9        MR. JACOBI:  Form.
10 BY MR. BROOKS:
11    A.    You can answer.
12    A.    That's what I do when I back up.
13    Q.    You didn't run, did you?
14    A.    No.
15    Q.    Why didn't you run?
16    A.    Because I wasn't in fear that I was
17 going to get hit with any bullets.
18    Q.    Did you take cover?
19    A.    No.
20    Q.    You just backed up?
21    A.    Yes.
22    Q.    When you were backing up and back
23 pedaling, you weren't running in a back pedaling
24 fashion, were you?

**72**

1    A.    No.
2    Q.    When did you become aware that it was
3 Cater who had fired his weapon?
4    A.    Well, immediately, I would say.
5    Q.    How did you become aware that this was
6 Cater who fired?
7    A.    Specifically Cater some time after the
8 shooting.
9    Q.    Fair to say moments after the shots
10 were fired, you do not know which officer fired
11 their weapon, correct?
12    A.    Specifically, no.
13    Q.    It was some time later after
14 Mr. Edwards was removed from his car and you
15 provided some medical assistance that you learned
16 who had fired their weapon?
17    A.    For sure, yes.
18    Q.    How is it that that came to your
19 attention?
20    A.    I don't recall.
21    Q.    Did Cater specifically tell that to
22 you?
23    A.    No, I don't recall that.  I don't
24 remember talking to Cater at any point after that.

**EXHIBIT D**
Transcript of Deputy Sean Coutts
Conducted on November 19, 2019

---

73

1    Q.    So on the scene of the shooting, you
2  didn't talk to Cater?
3    **A.    Not that I can recall.**
4    Q.    But again when you had the debriefing,
5  potentially, Cater could have been present for
6  that?
7    **A.    Potentially.**
8    Q.    You just don't recall one way or
9  another?
10   **A.    Yes.**
11   Q.    You told you it was Cater who fired his
12 weapon when you were there at the scene, if you
13 learned it at the scene?
14       MS. OSTVIG:  I would say asked and
15 answered.
16       MR. JACOBI:  Joined.
17   **A.    I don't remember.**
18 **BY MR. BROOKS:**
19   Q.    What was told to you in terms of the
20 firing of the weapon at the scene?
21   **A.    Could you rephrase that?**
22   Q.    When you were at the scene, you
23 obviously learned that it's a police officer who
24 fired their weapon, right?

---

74

1    **A.    Yes.**
2    Q.    What were you told while at the scene
3  relative to anyone firing their weapon?
4        MS. OSTVIG:  Hearsay.
5    **A.    I don't remember if I was told**
6  **anything.  It was more a process of elimination of**
7  **who was still active in the scene and who wasn't.**
8  **BY MR. BROOKS:**
9    Q.    Explain that to me.
10   **A.    I remember Cater specifically stepping**
11 **off to the side after the incident took place.**
12   Q.    So that led you to believe that he was
13 the one who fired his weapon?
14   **A.    Yes.**
15   Q.    Why?
16   **A.    That's typical protocol from an officer**
17 **firing a weapon in the line of duty to separate**
18 **themselves from the incident.**
19   Q.    So based on Cater's somehow stepping
20 away from the scene, you came to the conclusion it
21 must have been Cater who fired his weapon?
22   **A.    Yes.**
23   Q.    No Rock Falls officer ever told you at
24 the scene Cater fired his weapon?

---

75

1    **A.    I don't remember specifically being**
2  **told anything about Cater firing his gun.**
3    Q.    No officer at the scene ever told you
4  why Cater fired his weapon, correct?
5    **A.    No.**
6    Q.    That's correct, right?
7    **A.    Correct.**
8    Q.    When you were at the debriefing, did
9  anyone discuss why Cater fired his weapon?
10       MS. OSTVIG:  Objection.  Hearsay.
11   **A.    I don't remember.**
12 **BY MR. BROOKS:**
13   Q.    When you say that you don't remember,
14 you're not saying that the subject wasn't
15 discussed, are you?
16       MS. OSTVIG:  Asked and answered.
17 BY MR. BROOKS:
18   Q.    You can answer.
19   **A.    I don't recall the specifics of the**
20 **conversation, no.**
21   Q.    That subject could have been discussed?
22   **A.    It's possible.**
23   Q.    Do you know if Rock Falls did any type
24 of internal investigation relative to this

---

76

1  shooting, officer involved shooting?
2    **A.    I'm not aware of anyone.**
3    Q.    Has anyone from the Rock Falls Police
4  Department interviewed you about the circumstances
5  of the shooting?
6    **A.    No.**
7    Q.    Has anyone from the Sterling Police
8  Department interviewed you about the circumstances
9  of the shooting?
10   **A.    No.**
11   Q.    Relative to Whiteside County, did the
12 county do any type of investigation surrounding
13 this shooting?
14   **A.    No official from Whiteside County ever**
15 **interviewed me, no.**
16   Q.    You are familiar with what law
17 enforcement calls a walkthrough?
18   **A.    As far as a scene?**
19   Q.    Yes.
20   **A.    Yes.**
21   Q.    Do you know if a walkthrough took place
22 in reference to the shooting of Nathaniel Edwards?
23   **A.    I don't know.**
24   Q.    You were not involved in a walkthrough,

---

**EXHIBIT D**

Transcript of Deputy Sean Coutts

Conducted on November 19, 2019

---

77

1 were you?
2    A.    No.
3    Q.    Have you had any contact or did you
4 have any contact with Mr. Edwards' family after the
5 shooting?
6    A.    As far as?
7    Q.    Any contact?
8    A.    Yes.
9    Q.    And we're talking after the shooting?
10    A.    Immediately after?
11    Q.    I'm not talking immediately.  It could
12 be at any point after the shooting, though.  All
13 right?
14           With that caveat, you have had some
15 contact with the family of Mr. Edwards, right?
16    A.    Yes.
17    Q.    Tell me the nature of it and when was
18 it.
19    A.    I believe I had contact with his
20 daughter the summer following the incident that
21 we're here talking about.  I'm not sure of the
22 specifics of the reason why, but she was
23 transported to the hospital for some sort of either
24 psychological or physical evaluation, and then I

---

78

1 believe I had contact with Carli.  I don't know if
2 you consider her family or not.
3    Q.    Well, I would consider her somewhat
4 family, yes.
5    A.    Okay.  After that, I was sent to that
6 address for what was reported as a home invasion.
7    Q.    When was that?
8    A.    I want to say around the same time over
9 the summer.
10    Q.    All right.  When you went to Carli's
11 home, did you go there with several officers?
12    A.    Just one.
13    Q.    It was just one.  You were told it was
14 a home invasion?
15    A.    Yes.
16    Q.    When you came to Carli's home, were
17 there cars parked outside her home?
18    A.    I don't remember.
19    Q.    Were you working with a female officer
20 that day?
21    A.    For Whiteside?
22    Q.    Yes.
23    A.    No.
24    Q.    Do you recall a female officer being

---

79

1 present at the scene when you went to Carli's home
2 due to this so-called home invasion?
3    A.    No.
4    Q.    You don't recall one way or the other?
5    A.    No.
6    Q.    Did you speak with Carli?
7    A.    I don't remember if I did or not.
8    Q.    You do recall another officer being
9 present, though, right?
10    A.    Yes.
11    Q.    Can you tell me who that was?
12    A.    Sergeant George Depuy.
13    Q.    Can you spell that?
14    A.    D-e-p-u-y.
15    Q.    Was it the sergeant who had some
16 communication with Carli?
17    A.    It's possible.  I don't believe I was
18 the first one to arrive there.
19    Q.    Can you tell me how many officers
20 arrived there?
21    A.    Just the two of us.
22    Q.    Well, just in terms of interaction with
23 Carli, vocal interaction, that would have been the
24 sergeant as opposed to you?

---

80

1    A.    I don't remember the specifics of the
2 conversation, if there was one or not.
3    Q.    If you would agree that this was
4 within, what, less than a month after the incident?
5    A.    No.  Greater than.
6    Q.    How much greater?
7    A.    Possibly more than five.
8    Q.    I take it that you ultimately
9 discovered that there had not been a home invasion,
10 right?
11    A.    That was what was conveyed, yeah.
12    Q.    You said at some point you interacted
13 or had some contact with Mr. Edwards' daughter,
14 right?
15    A.    Yes.
16    Q.    Tell me when that was, approximately?
17    A.    I couldn't tell you.  So over the
18 summer.
19    Q.    Did you receive the assignment to go?
20    A.    I don't remember.
21    Q.    How was it that you came to actually
22 interact with Mr. Edwards' daughter?
23    A.    I responded to the call of a medical
24 assistance, I believe, and the subject was being

---

**EXHIBIT D**
Transcript of Deputy Sean Coutts
Conducted on November 19, 2019

81
1  combative or -- I don't know if that was the right
2  word.
3      Q.    You ultimately determined that
4  Mr. Edwards' daughter needed to go to the hospital,
5  right?
6      A.    I did not make that determination.
7      Q.    Who made that determination?
8      A.    I believe the ambulance did.
9      Q.    Do you believe that in terms of the
10 need for Mr. Edwards' daughter to be transported to
11 the hospital, that it was due to some mental health
12 issue?
13         MR. JACOBI:  Foundation.
14     A.    I don't know.
15 BY MR. BROOKS:
16     Q.    Well, what is your understanding of why
17 she was being transported?
18         MS. OSTVIG:  I'll say asked and
19 answered.
20     A.    I believe she was in and out of
21 consciousness at the time that we were there.  And
22 then from there, I'm assuming that that's what they
23 base their transport to the hospital off of.
24 BY MR. BROOKS:

82
1      Q.    Did you assist in the transport?
2      A.    As far as physically taking her to the
3  hospital, no.
4      Q.    What was your role?
5      A.    Basically, my role was to respond to
6  that area because it was known for -- I mean, less
7  than what I would call safe for one or two people
8  to be.  So that's why I went there to make sure
9  that there was no further incident.
10     Q.    Was this in Sterling or Rock Falls?
11     A.    Rock Falls.
12     Q.    Can you tell me the name of
13 Mr. Edwards' daughter?
14     A.    Not without getting it wrong.
15     Q.    All right.  Let me see if this name
16 rings a bell, Naesha (phonetic).
17     A.    Yes.
18     Q.    Have you seen Naesha since that
19 incident?
20     A.    Not that I can recall.
21     Q.    Just a couple of additional questions,
22 Deputy Coutts.  At some point was Mr. Edwards'
23 vehicle searched?
24     A.    I don't know.

83
1      Q.    From all indications, at least your
2  knowledge, Mr. Edwards didn't physically have a
3  weapon on him, did he?
4      A.    Not that I know of.
5      Q.    No one has ever told you that?
6      A.    I haven't heard otherwise.
7      Q.    In terms of Mr. Edwards being seated in
8  the car moments before shots were fired, give me
9  your best recollection of how much of his body you
10 could see?
11     A.    Probably the side profile from his ear
12 forward and maybe to about between his sternum and
13 his belly button halfway.
14     Q.    Could you see his hands?
15     A.    I don't remember.
16         MR. BROOKS:  I don't think I have any
17 other questions.
18         MR. JACOBI:  Let's take a quick break.
19         (Recess taken.)
20
21            EXAMINATION
22 BY MS. OSTVIG:
23     Q.    All right.  Deputy Coutts, my name is
24 Debbie Ostvig, and I represent the defendants in

84
1  this case, Rock Falls and Officer Cater.  And I
2  just have a few questions to follow up.
3         So when counsel was first asking you
4  questions with regard to this particular traffic
5  stop, you said that you thought that it was more
6  than a typical traffic stop.  Why did you say that?
7  What's your reasoning behind that?
8      A.    Any time somebody's not stopping for
9  the police, it's just a general rule of thumb or
10 safe assumption that it could be more than just a
11 regular traffic stop.
12         That particular case at that time I was
13 looking for someone who could have been up to some
14 sort of activity that's unfavorable, so I thought
15 the chance of it possibly being involved with that
16 could have been possible.
17     Q.    Okay.  And you would agree with me that
18 Mr. Edwards never did stop his car until he was at
19 Ms. Fischbach's house; is that correct?
20     A.    I believe he might have stopped briefly
21 in the street prior to pulling in the driveway, but
22 other than that, no.
23     Q.    And you discussed with counsel, with
24 Mr. Brooks, about Mr. Edwards driving around the

Case: 3:18-cv-50035 Document #: 138-4 Filed: 06/14/21 Page 23 of 68 PageID #:868
EXHIBIT D
Transcript of Deputy Sean Coutts
Conducted on November 19, 2019

22 (85 to 88)

85

1 Rock Falls police cars; is that correct?
2    A.    Yes.
3    Q.    And is it your understanding that the
4 Rock Falls police cars were in the street as a
5 block to get Mr. Edwards to stop his vehicle?
6    A.    Yes.
7    Q.    And that driving around that vehicle
8 would be in an effort to evade stopping?
9    A.    Yes.
10   Q.    And would you call that actively
11 assailing the police?
12   A.    I wouldn't call it assailing.  I would
13 call it disregarding.
14   Q.    Would you call it evading arrest?
15   A.    Yes.
16   Q.    And with regard to -- and you said
17 that -- counsel talked to you about how he went
18 around those police cars, and you said that it
19 wouldn't necessarily lead you to believe that he
20 wasn't intoxicated.  Why did you state that?
21   A.    I mean, at that particular time, there
22 was no reason for me to formulate an opinion
23 whether he was or wasn't.
24   Q.    Okay.  Let's look at Exhibit 1, your

86

1 report.  Let's go to page 2 of your report.  It's
2 marked Rock Falls 222, and it's the last paragraph,
3 I guess, the fourth paragraph on that page.
4         It says here that you pulled,
5 approximately, 100 feet onto Franklin Street.  I
6 was instructed by my supervisor to pull off the
7 pursuit.  I pulled off the pursuit, and then
8 Officers Cater and Riley passed me.
9         So when we were talking about
10 previously, what's the difference between engaging
11 in arrest and pulling off the pursuit.  Can you
12 kind of distinguish that for me?
13   A.    Uh --
14   Q.    I think how it was described before
15 that you were involved with a traffic stop and
16 counsel characterized it as not becoming involved
17 with a traffic stop.  So could you tell me what the
18 difference is between pulling off the pursuit and
19 not becoming involved with the traffic stop, if
20 there is one?
21         MR. JACOBI:  I'm going to object to
22 form.  Go ahead.
23   A.    So essentially from the beginning of my
24 involvement in this incident was mainly due to the

87

1 fact that there was only one officer behind the car
2 and because we did not know the specific reason
3 behind why this was happening.  Up and to the point
4 where more officers from Rock Falls Police
5 Department arrived, and my supervisor became more
6 aware of why they were following this Nate Edwards,
7 he declared at that time it was not necessary for
8 me to continue in the capacity that I was in at
9 that time.
10 BY MS. OSTVIG:
11   Q.    And what capacity were you in?
12   A.    Being the second car in what you would
13 consider the pursuit.
14   Q.    And so did that necessarily mean that
15 you were supposed to disengage and leave and make
16 yourself open?
17   A.    No.
18   Q.    So pulling off the pursuit, what does
19 that mean?  I guess, how come you continued to
20 follow the officers even though you were supposed
21 to pull off the pursuit?
22         MR. JACOBI:  Object as to form.  Go
23 ahead.
24   A.    When I was called to pull off the

88

1 pursuit, shortly after that is when Mr. Edwards
2 pulled into the driveway.  So almost immediately
3 after being told to stop, I stopped following them
4 in that capacity.
5 BY MS. OSTVIG:
6    Q.    Okay.  And then what capacity were you
7 in after the pursuit stopped?
8    A.    One that you would consider usual for a
9 high risk traffic stop as providing cover to the
10 officers that are already on scene.
11   Q.    Was that in any way disobeying the
12 orders from the officer?
13   A.    No.
14   Q.    And why wasn't it disobeying orders?
15   A.    Because there is no policy as far as
16 backing up officers on traffic stops.
17   Q.    So you after observing the situation
18 and even though you were ordered not to follow any
19 further, you still felt there was a need for cover
20 at that point, is that correct, with regard to the
21 specific stop?
22   A.    Due to our specific policy as far as
23 pursuing vehicles, I felt that the situation had
24 transformed from that to something else to where I

EXHIBIT D

Transcript of Deputy Sean Coutts

Conducted on November 19, 2019

23 (89 to 92)

---

89

1 could be involved in it.

2    Q.    Okay. And here it says if we continue

3 reading, I observed the white vehicle pull into

4 driveway -- a nearby driveway. Officer Sugars

5 pulled up at an angle to the driveway along with

6 Officer Cater and Riley. I observed the white

7 vehicle travel all the way up to the house, the

8 front of the house -- the front of the white

9 vehicle was, approximately, a foot past the front

10 of the house.

11    I observed Officer Sugars, Cater, and

12 Riley running up the driveway. I noticed a woman

13 running out of the house holding a phone in her

14 hand coming to the white vehicle.

15    So is the white vehicle you're

16 describing the same one that you see here in

17 Exhibit No. 2?

18    A.    Yes.

19    Q.    And that would be Mr. Edwards' vehicle?

20    A.    Yes.

21    Q.    And where in relation to this

22 photograph -- is this position that Mr. Edwards'

23 vehicle was in when he initially parked in the

24 driveway?

---

90

1    A.    As it's shown in this picture, no.

2    Q.    Where was the vehicle parked? You can

3 use either of the exhibits.

4    MR. JACOBI: When he first --

5 BY MS. OSTVIG:

6    Q.    When he first pulled into the driveway?

7    A.    So he drove up the driveway and parked

8 in this vicinity, so this being the front of the

9 house, nearly parallel or the bumper was past the

10 front of the house. So further down the driveway,

11 much more than a car's length down the driveway

12 than where he is in this picture.

13    Q.    So this in Exhibit No. 2, this is where

14 the car wound up after the shooting; is that

15 correct?

16    A.    Yes.

17    Q.    And you noted here that Officer Sugars,

18 Cater, and Riley were running up to the car; is

19 that correct?

20    A.    Yes.

21    Q.    And you talked to counsel about why you

22 weren't running. When you saw them running, why

23 didn't you join them in running up?

24    MR. JACOBI: Asked and answered.

---

91

1    A.    Because I didn't feel it was necessary

2 for me to run as they were already making contact

3 with him.

4 BY MS. OSTVIG:

5    Q.    And does -- by not running is that any

6 indication with regard to how serious you thought

7 the incident was?

8    A.    No.

9    Q.    So what was your view of the situation?

10 Did you find it a serious situation at this point

11 or potentially dangerous?

12    A.    Yes. High risk traffic stop, yes.

13    Q.    And if you flip over page 3, the last

14 sentence at the top of the paragraph on page 3

15 says, as the officers were running up to the white

16 vehicle, the female proceeded to run back into the

17 house.

18    With regard to this female that you

19 indicate here, would that have been Carli

20 Fischbach?

21    A.    Yes.

22    Q.    And does this refresh your recollection

23 as to whether or not she was in -- on the porch or

24 outside when the shooting took place?

---

92

1    MR. BROOKS: Objection. Form.

2    A.    Yes.

3 BY MS. OSTVIG:

4    Q.    And how does this refresh your

5 recollection?

6    A.    I feel like it would be one of my main

7 concerns to pay attention to what she was doing at

8 the time rather than focusing on what was going on

9 at the car. So I feel like if she was still

10 outside, my attention would have been drawn more

11 towards her.

12    Q.    So based on this, you believe that she

13 was in the house when the shooting took place?

14    A.    Yes.

15    Q.    Then if we go to the first full

16 paragraph, let's see, possibly the fifth from the

17 last sentence, it starts, I could only hear. Did

18 you find that?

19    A.    Yep.

20    Q.    I could only hear the driver mumbling

21 and observe a lot of hand movements. The driver

22 looked pissed off based on his body movements. The

23 windows on the white vehicle that I could see were

24 rolled up. The driver was not getting out of his

---

**EXHIBIT D**

Transcript of Deputy Sean Coutts

Conducted on November 19, 2019

---

93

1  vehicle as ordered.  At that time, I do not believe
2  Officer Sugars had his firearm drawn.  Did I read
3  that correctly?
4      **A.    Yes.**
5      Q.    So based on this, does this refresh
6  your recollection as to whether Mr. Edwards was
7  just sitting in his car?
8      **A.    Yes.**
9      Q.    And was he reacting to what the
10 officers were telling him?
11     **A.    Complying with orders?**
12     Q.    Right.
13     **A.    No.**
14     Q.    And he seemed to be speaking to the
15 officers; is that correct?
16     **A.    It appeared that way.**
17     Q.    And he was making a lot of hand
18 movements, correct?
19     **A.    Yes.**
20     Q.    And you thought he was angry; is that
21 correct?
22     **A.    It appeared that way, yes.**
23     Q.    And it says that, again, he did not get
24 out of his vehicle as ordered; is that correct?

---

94

1      **A.    Correct.**
2      Q.    Go to the next paragraph.  It says,
3  Officer Sugars yelled, you're going to get shot,
4  don't back up.  Officer Cater yelled, don't back up
5  once or twice.  As Officer Sugars bent down to;
6  pick up the baton, the driver backed up his
7  vehicle.  As the vehicle backed up, I could hear
8  the sound of the vehicle accelerating.  I thought
9  Officer Cater was going to be run over by the white
10 vehicle.  The vehicle continued to back up and
11 struck Officer Cater.  I remember seeing Officer
12 Cater with both hands on his gun, his upper torso
13 laid across the trunk of the white vehicle because
14 the white vehicle struck him.  Officer Cater's gun
15 was nearly touching the rear window.  Officer Cater
16 sprawled his legs backward to avoid being caught
17 and pulled under the vehicle.  Officer Cater moved
18 off of the truck and started to shoot his firearm
19 as the vehicle was still traveling backwards.  I
20 remembered hearing four shots.  I observed the
21 driver grab his chest and was rocking back and
22 forth in the driver's seat then the driver went
23 limp.
24         With regard to this description, is it

---

95

1  your opinion that at this point when Mr. Edwards
2  started backing up his vehicle that he was using
3  his vehicle as a weapon against the officers?
4      MR. BROOKS: Objection. Form.
5  Foundation.
6      **A.    I can't say whether or not -- I don't**
7  **know what he was thinking at that time as far as**
8  **Nate's concerned, but I could see that Officer**
9  **Cater was definitely in danger.**
10 BY MS. OSTVIG:
11     Q.    Did it appear to you that he was using
12 his vehicle as a weapon?
13     **A.    Yes.**
14     MR. BROOKS: Objection. Form.
15 Foundation.
16 BY MS. OSTVIG:
17     Q.    And would you say that Officer Cater
18 was in danger because I think you say here that he
19 was -- the car had struck Officer Cater?
20     MR. BROOKS: Objection. Form.
21     **A.    Yes.**
22 **BY MS. OSTVIG:**
23     Q.    And it says here that I remember seeing
24 Officer Cater with both hands -- and you say here

---

96

1  that Officer Cater was almost pulled under the
2  vehicle; is that correct?
3      **A.    Sprawled his legs to avoid being caught**
4  **under the vehicle.  So in a different position than**
5  **he was in it was certainly possible for him to fall**
6  **underneath the vehicle.**
7      Q.    Okay.  And this reflects that you did
8  hear the sound of the vehicle accelerating; is that
9  correct?
10     **A.    Yes.**
11     Q.    Did you see Mr. Edwards put the car
12 into reverse?
13     **A.    I don't remember.**
14     Q.    In this situation, I know that you
15 talked to counsel about using a taser.  In this
16 situation, would a taser had de-escalated the
17 situation, in your opinion?
18     MR. JACOBI: Foundation.
19     **A.    No.**
20 **BY MS. OSTVIG:**
21     Q.    And why not?
22     **A.    Well, it was obvious that the point**
23 **where anybody would have had a taser deployed, at**
24 **least from where I was standing, it wouldn't have**

---

**EXHIBIT D**

Transcript of Deputy Sean Coutts

25 (97 to 100)

Conducted on November 19, 2019

97

1  been effective either way given the windows were
2  rolled up it, it appeared.
3      Q.    Is it true and I don't know a lot about
4  tasers.  So is it true that even if you fire a
5  taser, it doesn't go through glass; is that
6  correct?
7      A.    I've never seen it go through glass.
8      Q.    And when a taser is deployed, does it
9  come out with electrodes; is that how it works?
10     A.    Yes.
11           MR. JACOBI:  You mean when it's shot?
12           MS. OSTVIG:  When it's shot.
13           MR. JACOBI:  I want to make sure we're
14 using deployed and shot.
15           MS. OSTVIG:  No, fair enough.  Again,
16 I'm not as familiar with the technical terms.
17 BY MS. OSTVIG:
18     Q.    So deployed means to take it out; is
19 that correct?
20     A.    Correct.
21     Q.    And shot means that you actually pull
22 the trigger and the electrodes come out; is that
23 right?
24     A.    Yes.

98

1      Q.    So with regard to deploying, do you
2  think deploying a taser would have de-escalated
3  this situation as we read it in your report?
4      A.    No.
5      Q.    And do you think that shooting the
6  taser would have been effective in this situation
7  as we read it in your report?
8      A.    No.
9      Q.    Let's go ahead to the next paragraph.
10 It says here that, I went to my squad car.  It's
11 the third sentence.  Do you see that?
12     A.    Yes.
13     Q.    I went to my squad car to retrieve an
14 AED.  Officer Sugars and Deputy Elder opened the
15 driver's door of the white vehicle and pulled the
16 driver out.  Officer Riley got his AED out after
17 noticing I did not have pads with my AED.  I began
18 cutting the driver's shirt off with my knife.  I
19 kept calling the driver Tyrone Long, as I thought
20 the driver was Long.  I later realized that while I
21 recognized his face, he was not Long, but I was not
22 sure his actual name.  The driver smelled like a
23 wet cigarettes, alcohol, and marijuana.  The AED
24 pads went onto the driver and advised no shock.

99

1  Deputy Elder began doing chest compressions on the
2  driver.  Deputy Elder and I switched back and forth
3  doing chest compressions.  The AED analyzed the
4  driver three times.  CPR continued until the
5  ambulance arrived.
6           So from the time that the driver,
7  Mr. Edwards, went limp in the driver's seat until
8  you were cutting off his shirt, how many minutes or
9  how long do you think that took?
10     A.    Say that one more time.
11     Q.    From the time that you observed
12 Mr. Edwards grab his chest and went limp in the
13 driver's seat to the point that he was pulled out
14 of the car, and you were cutting his shirt, do you
15 know how much time had passed?
16           MR. JACOBI:  Form.  Compound.  Go
17 ahead.
18     A.    I can't imagine it was any longer than
19 a minute or two.
20 BY MS. OSTVIG:
21     Q.    Okay.  And in that time, did
22 Mr. Edwards ever speak to you?
23     A.    No.
24     Q.    Did you ever -- did Mr. Edwards ever

100

1  shout out in pain?
2      A.    No.
3      Q.    Did you see him ever take a breath?
4      A.    I do remember that.
5      Q.    Was it when you were cutting his shirt,
6  do you know when?
7      A.    No, it was during CPR.
8      Q.    Did he ever open up his eyes?
9      A.    It's possible, but I don't remember
10 specifically.
11     Q.    Okay.  Did the AED ever register a
12 pulse?
13     A.    The only thing it registered was when
14 we did compressions.
15     Q.    Did you observe, besides the initial
16 Mr. Edwards grabbing his chest, did you observe any
17 signs that he felt any pain?
18           MR. BROOKS:  Objection.  Form.
19 Foundation.
20     A.    After the chest movement?
21 BY MS. OSTVIG:
22     Q.    Well, after you observed him grab his
23 chest and was rocking back and forth and went limp
24 in his car, from that time through the time that

**EXHIBIT D**
Transcript of Deputy Sean Coutts
Conducted on November 19, 2019

26 (101 to 104)

---

101

1 you were suing the AED and doing the chest
2 compressions, did you ever observe that Mr. Edwards
3 was in any pain?
4     **A.     There was no audible noise or physical**
5 **movement made by him to suggest that.**
6     Q.     Okay. All right. And even though you
7 weren't sure when you were following him whether or
8 not he was intoxicated at the time that you
9 were -- that he was out of the car and you were
10 close enough, you did smell alcohol on his breath;
11 is that correct?
12     **A.     Yes.**
13     Q.     And you did also smell marijuana, was
14 that correct?
15     **A.     Yes.**
16     Q.     And cigarettes?
17     **A.     Yes.**
18     Q.     Do you know how long it took for the
19 ambulance -- how much time after you had started
20 doing the chest compressions that the ambulance
21 arrived?
22     **A.     As I said earlier, I believe we did it**
23 **for about 10 minutes, so somewhere around that**
24 **time.**

---

102

1     Q.     Okay.
2     **A.     We didn't stop until they got there,**
3 **put it that way.**
4     Q.     Okay. Fair enough. You also testified
5 that you did not pull your weapon. Did not pulling
6 your weapon again signify anything with regard to
7 the dangerousness of the situation?
8         MR. BROOKS: Objection. Form.
9     **A.     No.**
10 BY MS. OSTVIG:
11     Q.     Did you feel that this was a dangerous
12 situation, dangerous traffic stop?
13     **A.     Yes.**
14     Q.     And why did you consider it a dangerous
15 traffic stop?
16     **A.     The basic noncompliance by the driver,**
17 **the fact that they pulled into a residence that we**
18 **had no idea where they -- or what relation they**
19 **were. There was enough time to elapse from when I**
20 **got involved to when they parked to potentially set**
21 **up some sort of interaction with people inside the**
22 **residence. Just the unknown -- the possibility of**
23 **the unknown.**
24     Q.     I do have a question, you said that you

---

103

1 don't believe anybody told you that Sergeant Cater
2 had fired the weapon, but it was protocol for the
3 officer to remove himself from the scene. Do you
4 know why that's typical protocol when an officer is
5 involved in a shooting?
6     **A.     No.**
7     Q.     I guess, then, do you know why it's in
8 place, the protocol is in place?
9         MR. BROOKS: Objection. Foundation.
10         MR. JACOBI: Asked and answered. Go
11 ahead.
12     **A.     To possibly keep that same officer from**
13 **making any decision based off emotion, maintaining**
14 **any integrity of whatever they might convey to**
15 **investigating officers without being influenced by**
16 **what they hear or see afterwards. That's it.**
17 BY MS. OSTVIG:
18     Q.     Okay. So essentially it's to, if I
19 understand you correctly, it's to preserve the
20 scene; is that correct?
21         MR. JACOBI: Foundation. Asked and
22 answered.
23     **A.     Yes.**
24 BY MS. OSTVIG:

---

104

1     Q.     And would it be in your opinion to also
2 preserve, for example, the reports of the various
3 officers with regard to what happened at the scene?
4         MR. BROOKS: Objection. Foundation.
5 Form.
6     **A.     Yes.**
7 BY MS. OSTVIG:
8     Q.     And would it be for the safety of the
9 victim involved with the shooting, in your opinion?
10         MR. JACOBI: Would what be? Objection.
11 Form.
12     **A.     Could you repeat?**
13 BY MS. OSTVIG:
14     Q.     An officer who was involved in the
15 shooting removing himself from the scene, would
16 that be for the safety of the potential victim?
17     **A.     I don't know if I would say that, no.**
18     Q.     Okay. Fair enough. With regard -- do
19 you know whether an investigation took place with
20 regard to the shooting of Mr. Edwards?
21     **A.     Yes.**
22     Q.     And do you know who did that
23 investigation?
24     **A.     I believe it was Illinois State Police,**

---

**EXHIBIT D**

Transcript of Deputy Sean Coutts

Conducted on November 19, 2019

105

1 two investigations.

2    Q.    So there was an investigation done,

3 right?

4    A.    Yes.

5    Q.    You said when there is a canine officer

6 involved, that a second officer is there to assess

7 the situation, is that right, that the canine -- if

8 I remember your testimony correctly, the canine

9 officer is there to observe the cues of the dog and

10 then the other officer is there to observe what's

11 going on on the scene; is that correct?

12    A.    The canine handler typically pays

13 attention to what the dog is doing, so the cues of

14 the dog. The cover officer, as we call the person

15 with the canine officer, pays attention to what's

16 going on around them so that the canine officer

17 isn't oblivious to any danger or anything like

18 that.

19    Q.    So the second officer is for the safety

20 of the canine officer; is that correct?

21    A.    Yes.

22        MS. OSTVIG: I think that's all the

23 questions that I have.

24

106

1        EXAMINATION

2 BY MR. BROOKS:

3    Q.    Just a couple of follow-up questions.

4 Deputy Coutts, Officer Cater testified that he was

5 never struck by Mr. Edwards' vehicle. Considering

6 that testimony, can you explain your statement

7 which suggested that he was struck and actually on

8 top of the trunk?

9    A.    That's what it appeared from where I

10 was standing.

11    Q.    And how close were you to Cater?

12    A.    Between 10 and 12 yards away from the

13 vehicle.

14    Q.    Were you just simply mistaken when you

15 provided this information to the Illinois State

16 Police?

17        MR. JACOBI: Form. Go ahead.

18    A.    I was providing information based off

19 of my memory.

20 BY MR. BROOKS:

21    Q.    You told us that at some point one

22 could consider this to be more than just a simple

23 traffic stop, right?

24    A.    Yes.

107

1    Q.    You labeled it as being somewhat of a

2 heightened level traffic stop, right?

3    A.    Yes.

4    Q.    Fair to say when Mr. Edwards pulled

5 into the driveway on Franklin Street, there was

6 enough time to generate information about the

7 ownership of that particular car, right?

8    A.    Yes.

9    Q.    Did you have that information prior to

10 Mr. Edwards pulling into the driveway?

11    A.    No.

12    Q.    Do you know whether or not a licensed

13 plate check was done prior to that car pulling in

14 the driveway?

15    A.    I don't know.

16    Q.    You wouldn't find it unusual if during

17 the process of this pursuit a license plate check

18 was run, right?

19    A.    Say that again.

20    Q.    You would not expect it to be unusual

21 that police who are pursuing a car the way they did

22 Mr. Edwards car would have run a license plate

23 check?

24    A.    Correct.

108

1    Q.    Did you ever check with any dispatcher

2 as to whether or not a license plate check was done

3 on this car during the course of this slow speed

4 pursuit?

5    A.    Not that I can recall.

6    Q.    Fair to say there was ample opportunity

7 to run some type of license plate check by the time

8 this car, Nathaniel's car, pulled into the

9 driveway?

10    A.    Sure.

11    Q.    All right. You also knew by the time

12 Mr. Edwards pulled into the driveway that you were

13 dealing with an African-American male, correct?

14    A.    No.

15    Q.    When did you learn that you were

16 dealing with an African-American male?

17    A.    I don't remember.

18    Q.    Well, when you got out of the car, you

19 saw Mr. Edwards, right?

20    A.    Sure.

21    Q.    You could see that he was

22 African-American, right?

23    A.    Certainly possible, but I don't

24 remember specifically noting that to myself.

**EXHIBIT D**

Transcript of Deputy Sean Coutts

28 (109 to 112)

Conducted on November 19, 2019

---

109

1    Q.    When did you become aware that sitting
2 in that white Cadillac was an African-American
3 male?
4         MR. JACOBI:  Asked and answered.
5    **A.    For sure when he was removed to do CPR.**
6 **BY MR. BROOKS:**
7    Q.    Moments before the shots you didn't
8 realize that?
9    **A.    To be honest with you, I wasn't really**
10 **paying attention.**
11   Q.    Was that because the shooting happened
12 so quickly after you got out of the car?
13   **A.    No.**
14   Q.    You told us earlier that you could see
15 Mr. Edwards' profile before shots were fired?
16   **A.    Yes.**
17   Q.    How long did you look at Mr. Edwards'
18 profile before shots were fired?
19   **A.    I'm not sure.  Not very long.**
20   Q.    Give me your best approximation.
21        MR. JACOBI:  Asked and answered.
22   **A.    A minute or two.**
23 **BY MR. BROOKS:**
24   Q.    You're telling us that you were

---

110

1 watching Mr. Edwards' profile for a minute or two
2 when he's parked in the driveway and before shots
3 were fired?
4         MR. JACOBI:  Form.
5    **A.    To the best of my knowledge, maybe a**
6 **minute.**
7 **BY MR. BROOKS:**
8    Q.    Okay.  So that's about 60 seconds,
9 right?
10   **A.    Yes.**
11   Q.    So for about 60 seconds you're looking
12 at the profile of Mr. Edwards?
13   **A.    Not the entire 60 seconds.**
14   Q.    How much during that 60 seconds?
15   **A.    Less than 30.**
16   Q.    So 30 seconds or less you're looking at
17 Mr. Edwards' profile, and you didn't realize that
18 he was African-American; is that what you're
19 telling us?
20   **A.    Yes.**
21   Q.    You also knew before the shots were
22 fired that at least your impression there was
23 someone at this house who knew that individual in
24 the car, right?

---

111

1    **A.    Based off the reaction that she gave**
2 **when she came outside.**
3    Q.    What was her reaction?
4    **A.    The fact that she came outside.**
5    Q.    Did she say anything?
6    **A.    I don't remember.**
7    Q.    And we're talking about Carli, right?
8    **A.    Yeah.**
9    Q.    Did Carli have a cell phone when she
10 came out?
11   **A.    I think that I remember her having a**
12 **phone.**
13   Q.    Mr. Edwards also had a cell phone in
14 his hand, didn't he?
15   **A.    I don't remember.**
16   Q.    You remember him with a cell phone at
17 some point, don't you?
18   **A.    No.**
19   Q.    Was it reported to you during the
20 course of this slow speed following or pursuit that
21 Mr. Edwards was on his cell phone?
22   **A.    I don't remember.**
23   Q.    Before the shooting, did you see
24 Mr. Edwards at all with a cell phone in his hand?

---

112

1         MR. JACOBI:  Asked and answered.
2    **A.    I don't remember.**
3 **BY MR. BROOKS:**
4    Q.    When you say you don't remember --
5    **A.    I don't remember seeing him with a**
6 **phone.**
7    Q.    Fair enough.  When you pulled up at
8 this home, this driveway on Franklin Street, was
9 there some thought in your mind that the driver of
10 this car may exit and start running?
11   **A.    Yes.**
12   Q.    Assuming Mr. Edwards exited, got out of
13 his car, and started running away from police,
14 would it be appropriate at that particular time to
15 use deadly force against him?
16   **A.    Simply running away from?**
17   Q.    Yes.
18   **A.    No.**
19   Q.    Add in the additional factors that he
20 has disobeyed various orders and directions of the
21 police officers, gets out of the car, starts
22 running, would it be appropriate under those
23 circumstances to use deadly force?
24   **A.    No.**

---

**EXHIBIT D**

Transcript of Deputy Sean Coutts

Conducted on November 19, 2019

---

**113**

1 Q. Is it your testimony based on this
2 statement that you gave to the Illinois State
3 Police that after Officer Cater, his torso was on
4 the trunk of the vehicle, he then started firing
5 shots?
6 **A. Based off my testimony on the report,**
7 **yes.**
8 Q. You're saying based on this report?
9 **A. Yes.**
10 Q. When you say in this report, and I'm
11 only focused on this report, Officer Cater moved
12 off of the trunk and started to shoot his firearm
13 as the vehicle was still traveling backwards, did
14 all of the shots as you describe in this report
15 happen after Cater was off the trunk or did part of
16 it take place on the trunk?
17 **A. I believe it was after.**
18 Q. How did the car come to a stop?
19 **A. No idea. It just stopped moving.**
20 Q. You told us earlier you heard the car
21 accelerating?
22 **A. Yes.**
23 Q. You've seen the video, that is the dash
24 cam video, from Sugars' vehicle; you've seen that?

**114**

1 **A. Yes.**
2 Q. Fair to say when you see that car
3 moving backwards, it's moving backwards at a slow
4 rate of speed?
5 **A. When it rolls into the view of the**
6 **camera, yes.**
7 Q. If the car was accelerating backwards,
8 how did it come to a physical stop?
9 MR. JACOBI: Foundation.
10 MS. OSTVIG: Objection. Speculation.
11 Asked and answered.
12 **A. One would assume the brakes were being**
13 **pressed.**
14 BY MR. BROOKS:
15 Q. Did you ever see the brakes being
16 pressed?
17 **A. No.**
18 Q. Did you ever see any indication that
19 the brakes were being pressed?
20 **A. Not that I can remember.**
21 Q. If Mr. Edwards' vehicle is accelerating
22 backwards, at some point the car has to be put back
23 in gear, right?
24 **A. In order to go backwards?**

**115**

1 Q. Well, if it's in reverse, at some point
2 it has to be put in some gear where it's going to
3 stop, right?
4 **A. Not necessarily.**
5 Q. Is it your testimony when Mr. Edwards
6 was removed from his vehicle, the car was in
7 reverse?
8 MR. JACOBI: Foundation.
9 **A. I never removed him from his vehicle,**
10 **so I don't know what gear it was in.**
11 BY MR. BROOKS:
12 Q. You have absolutely no idea what gear
13 his vehicle was in when he was removed from his
14 car?
15 MS. OSTVIG: Asked and answered.
16 MR. JACOBI: Asked and answered.
17 BY MR. BROOKS:
18 Q. You can answer.
19 **A. At the time that he was removed, I had**
20 **no idea what gear his vehicle was in.**
21 Q. When Mr. Edwards is removed from his
22 car, did any police officer enter his car and touch
23 the gears to that particular vehicle?
24 MR. JACOBI: Foundation.

**116**

1 **A. I don't recall.**
2 **BY MR. BROOKS:**
3 Q. You didn't see anyone do that, did you?
4 **A. Touch the gears, no, I don't remember.**
5 Q. You didn't mess with the gears in
6 Mr. Edwards' car, did you?
7 **A. No.**
8 Q. Did Elder mess with the gears in
9 Mr. Edwards' car?
10 MR. JACOBI: Foundation.
11 **A. I don't know.**
12 BY MR. BROOKS:
13 Q. You never saw Elder reach inside the
14 car to touch the gears in Mr. Edwards' Cadillac,
15 did you?
16 **A. I don't recall.**
17 Q. Well, when you say that you don't
18 recall, are you suggesting to us that he possibly
19 did that?
20 **A. Elder?**
21 Q. Yes.
22 **A. No.**
23 Q. Did you see any Rock Falls officers
24 after the shooting touch the gears, the mechanism,

**EXHIBIT D**

Transcript of Deputy Sean Coutts

Conducted on November 19, 2019

30 (117 to 120)

---

117

1 inside Mr. Edwards' car?

2    **A.  No.**

3    Q.   I want to go back to your testimony

4 about Mr. Edwards being on the ground. Fair to say

5 from the time Mr. Edwards is shot, he didn't die

6 instantly, correct?

7      MR. JACOBI: Foundation.

8    **A.  I don't know.**

9 **BY MR. BROOKS:**

10   Q.   Well, you saw him move, make some

11 movement in the car after he was shot, right?

12   **A.  Yes.**

13   Q.   You saw him indicate some form of

14 injury to his body, correct?

15   **A.  Yes.**

16   Q.   You saw him indicate some sign of pain

17 to his body, right?

18   **A.  Yes.**

19   Q.   And that was by Mr. Edwards either

20 grabbing his chest or grasping his chest in some

21 fashion with his hands, correct?

22   **A.  Yes.**

23   Q.   When you had Mr. Edwards on the ground,

24 you said at some point you saw some reaction in

---

118

1 Mr. Edwards, right, when you had him on the ground?

2   **A.  Gasping sound coming from his mouth.**

3   Q.   All right. Can you describe it to us?

4   **A.  A gasp.**

5   Q.   Like deep breathing, trying to get air?

6   **A.  I wouldn't consider it deep breathing.**

7 **It was more of just one single gasp.**

8   Q.   As if he was gasping for air?

9   **A.  Inhale, yes.**

10      MR. BROOKS: I don't have any other

11 questions.

12

13        EXAMINATION

14 BY MS. OSTVIG:

15   Q.   My only question is: Do you know who

16 owned the white Cadillac?

17   **A.  No.**

18   Q.   And to this day, you don't know who

19 owns the white Cadillac?

20   **A.  No.**

21   Q.   If you ran the license plate and

22 determined that Mr. Edwards was driving someone

23 else's car, would that again lend itself to

24 heighten -- make this traffic stop from a simple

---

119

1 traffic stop to a heightened traffic stop?

2      MR. BROOKS: Objection. Form.

3 Foundation.

4   **A.  Can you restate?**

5 **BY MS. OSTVIG:**

6   Q.   Sure. If you had been the officer to

7 run the license plate on this particular car, the

8 white Cadillac, and it came back and it was

9 determined that the owner was a woman, would that

10 be one of the factors that you would consider in

11 considering that potentially this is a heightened

12 traffic stop versus a normal kind of traffic stop,

13 simple traffic stop?

14   **A.  Not necessarily. Definitely poses**

15 **questions, but I don't think I would consider it a**

16 **factor in making it more dangerous.**

17   Q.   Okay. If you'd run the license plate

18 and the person was evading, driving as Mr. Edwards

19 had, evading the car, not stopping, would that

20 bring any question to your mind if the license

21 plate came up with another person's name, female?

22      MR. BROOKS: Objection. Form.

23 Foundation.

24   **A.  Can you restate it again?**

---

120

1 **BY MS. OSTVIG:**

2   Q.   Sure. If you had run the license plate

3 after Mr. Edwards had evaded the Rock Falls Police

4 Department twice and gone into the ditch and driven

5 around and not obeying orders, you run the license

6 plate and determined that the car was owned by a

7 female, would that in any way, with those factors,

8 lend itself in your mind to be more of a heightened

9 situation with regard to this stop?

10   **A.  Not necessarily.**

11   Q.   Okay. Why not?

12   **A.  To me, the fact that the vehicle at**

13 **that time I did not know who was driving, but the**

14 **particulars of who the vehicle was registered to,**

15 **as far as their gender, wouldn't necessarily make**

16 **me think that the situation was any more dangerous**

17 **than if it was a male or female.**

18   Q.   Okay. All right.

19      MS. OSTVIG: Those are all the

20 questions that I have.

21      MR. BROOKS: I'm done.

22      MR. JACOBI: We'll reserve.

23      (Proceeding concluded at 1:44 p.m.)

24

---

**EXHIBIT D**

Transcript of Deputy Sean Coutts
Conducted on November 19, 2019

31 (121 to 124)

121

1  STATE OF ILLINOIS )
              ) ss.
2  ROCK ISLAND COUNTY)

3

4        I, KONNI L. STAPF, a Certified Shorthand
   Reporter in and for the States of Illinois, Iowa,
5  and Arizona, do hereby certify that the facts as
   stated in the caption hereto are true; that the
6  witness named on the face sheet was by me sworn to
   testify to the truth and nothing but the truth
7  concerning the matters in controversy in this
   cause; that said witness was thereupon examined
8  under oath and the examination reduced to writing
   under my supervision, consisting of the foregoing
9  pages, and the computer-aided transcript is a true
   record of the testimony given by said witness and
10 all objections made.

11

        I further certify that I am neither
12 attorney or counsel for, nor related to or employed
   by any of the parties to the action in which this
13 deposition is taken; and, further, that I am not a
   relative or employee of any attorney or counsel
14 employed by the parties hereto or financially
   interested in the action.

15

16      In witness whereof I have hereunto set my
   hand this 10th day in December, 2019.

17

18

19      *Konni L. Stapf*

20

21     KONNI L. STAPF, CSR, RPR
       Registered Professional Reporter
22     Illinois CSR License No.
            084-004144
23     Iowa CSR License No. 1168
       Arizona CSR

24

**EXHIBIT D**

Transcript of Deputy Sean Coutts
Conducted on November 19, 2019                                    32

| A |
|---|

**able**
40:2, 46:15
**about**
6:15, 7:6,
7:12, 13:17,
16:3, 16:6,
24:7, 27:19,
28:10, 30:3,
33:23, 40:9,
41:9, 44:3,
44:16, 45:13,
45:17, 45:23,
46:2, 46:9,
65:5, 66:1,
75:2, 76:4,
76:8, 77:21,
83:12, 84:24,
85:17, 86:9,
90:21, 96:15,
97:3, 101:23,
107:6, 110:8,
110:11, 111:7,
117:4
**absolutely**
115:12
**accelerating**
94:8, 96:8,
113:21, 114:7,
114:21
**accommodate**
5:19
**accomplish**
17:3
**across**
94:13
**acted**
66:8
**action**
121:21, 121:25
**activated**
19:20
**active**
34:16, 34:18,
74:7
**actively**
34:20, 85:10

**activity**
84:14
**actual**
14:13, 21:19,
55:7, 98:22
**actually**
14:23, 15:5,
18:13, 22:23,
30:14, 30:22,
32:19, 33:19,
33:24, 34:4,
34:8, 37:10,
55:10, 55:13,
59:18, 67:14,
68:11, 70:20,
80:21, 97:21,
106:7
**add**
5:20, 112:19
**additional**
11:17, 82:21,
112:19
**address**
78:6
**adjacent**
62:21
**advancement**
32:15
**advised**
23:10, 23:22,
24:3, 24:22,
25:14, 98:24
**advises**
23:7
**aed**
60:21, 98:14,
98:16, 98:17,
98:23, 99:3,
100:11, 101:1
**african-american**
108:13, 108:16,
108:22, 109:2,
110:18
**after**
6:22, 15:6,
20:3, 20:23,
20:24, 21:1,
33:6, 40:18,

40:24, 46:14,
47:18, 48:20,
50:19, 56:2,
56:3, 57:4,
58:5, 58:20,
59:8, 61:3,
61:18, 72:7,
72:9, 72:13,
72:24, 74:11,
77:4, 77:9,
77:10, 77:12,
78:5, 80:4,
88:1, 88:3,
88:7, 88:17,
90:14, 98:16,
100:20, 100:22,
101:19, 109:12,
113:3, 113:15,
113:17, 116:24,
117:11, 120:3
**afterwards**
103:16
**again**
10:21, 15:2,
25:5, 73:4,
93:23, 97:15,
102:6, 107:19,
118:23, 119:24
**against**
95:3, 112:15
**agent**
16:1
**agitated**
31:6, 31:18,
32:6
**agnew**
1:8
**ago**
15:10, 15:12
**agree**
8:24, 37:20,
37:21, 38:3,
38:13, 50:9,
53:20, 53:24,
54:6, 54:11,
54:24, 64:2,
64:24, 68:2,
80:3, 84:17

**ahead**
35:5, 35:12,
54:22, 86:22,
87:23, 98:9,
99:17, 103:11,
106:17
**aimed**
32:12
**air**
118:5, 118:8
**al**
1:18
**alcohol**
98:23, 101:10
**all**
4:17, 6:5,
6:21, 10:21,
11:15, 14:11,
14:19, 21:12,
23:22, 29:21,
30:23, 35:8,
36:19, 43:6,
45:8, 48:6,
48:21, 50:17,
55:16, 56:12,
57:14, 59:6,
59:10, 62:2,
67:17, 68:17,
70:14, 77:12,
78:10, 82:15,
83:1, 83:23,
89:7, 101:6,
105:22, 108:11,
111:24, 113:14,
118:3, 120:18,
120:19, 121:17
**allow**
66:18
**almost**
88:2, 96:1
**along**
38:4, 61:18,
63:4, 63:23,
89:5
**already**
24:24, 49:23,
88:10, 91:2
**also**
7:7, 19:11,

**EXHIBIT D**

Transcript of Deputy Sean Coutts

Conducted on November 19, 2019

33

24:13, 26:11,
27:1, 27:2,
38:3, 50:20,
53:24, 61:13,
101:13, 102:4,
104:1, 108:11,
110:21, 111:13
**always**
38:1
**ambulance**
81:8, 99:5,
101:19, 101:20
**ample**
108:6
**analyzed**
99:3
**angle**
89:5
**angry**
93:20
**animal**
48:2
**ann**
37:12, 38:5
**anne**
2:14
**annie**
1:8
**another**
9:17, 31:23,
48:1, 54:14,
54:15, 73:9,
79:8, 119:21
**answer**
5:11, 5:20,
6:4, 16:19,
23:20, 27:16,
38:21, 43:12,
66:14, 66:18,
67:23, 68:18,
71:11, 75:18,
115:18
**answered**
17:1, 21:15,
65:9, 67:21,
68:13, 73:15,
75:16, 81:19,
90:24, 103:10,

103:22, 109:4,
109:21, 112:1,
114:11, 115:15,
115:16
**anticipate**
5:5
**anticipated**
20:19
**any**
5:12, 6:12,
6:20, 10:17,
12:22, 13:2,
13:13, 15:17,
17:11, 19:14,
21:14, 25:2,
25:16, 28:12,
28:20, 28:24,
33:18, 36:19,
40:8, 42:14,
42:16, 42:22,
43:1, 44:5,
44:12, 45:19,
45:22, 52:12,
56:23, 58:8,
60:9, 60:22,
63:13, 63:22,
63:23, 71:17,
72:24, 75:23,
76:12, 77:3,
77:4, 77:7,
77:12, 83:16,
84:8, 88:11,
88:18, 91:5,
99:18, 100:16,
100:17, 101:3,
103:13, 103:14,
105:17, 108:1,
114:18, 115:22,
116:23, 118:10,
119:20, 120:7,
120:16, 121:21,
121:23
**anybody**
96:23, 103:1
**anyone**
33:15, 36:23,
39:19, 42:14,
74:3, 75:9,

76:2, 76:3,
76:7, 116:3
**anything**
7:19, 10:7,
10:8, 21:10,
43:23, 44:10,
45:12, 45:17,
47:16, 51:14,
52:2, 53:1,
53:9, 60:1,
74:6, 75:2,
102:6, 105:17,
111:5
**appear**
95:11
**appearances**
2:1
**appeared**
93:16, 93:22,
97:2, 106:9
**appears**
18:13, 50:9,
61:14, 63:4
**applicable**
4:17
**approached**
58:18
**approaching**
32:7, 51:9,
61:17
**appropriate**
34:23, 36:15,
112:14, 112:22
**approximately**
6:18, 15:10,
17:2, 26:1,
62:24, 80:16,
86:5, 89:9
**approximation**
29:11, 109:20
**april**
6:19
**area**
28:4, 51:9,
52:20, 55:15,
59:16, 59:23,
61:19, 61:22,
61:24, 62:5,

62:15, 63:4,
63:14, 63:23,
64:3, 64:16,
65:2, 65:7,
67:6, 69:22,
70:5, 82:6
**arizona**
121:7, 121:38
**around**
8:19, 38:15,
38:23, 38:24,
39:7, 40:3,
78:8, 84:24,
85:7, 85:18,
101:23, 105:16,
120:5
**arrest**
31:5, 32:23,
85:14, 86:11
**arrive**
79:18
**arrived**
79:20, 87:5,
99:5, 101:21
**arriving**
20:2, 60:19
**aside**
13:4
**asked**
17:1, 19:6,
21:15, 24:7,
45:21, 65:9,
67:21, 68:13,
73:14, 75:16,
81:18, 90:24,
103:10, 103:21,
109:4, 109:21,
112:1, 114:11,
115:15, 115:16
**asking**
84:3
**assailant**
34:14, 34:16,
34:19
**assailing**
34:20, 85:11,
85:12
**assess**
105:6

**EXHIBIT D**

Transcript of Deputy Sean Coutts
Conducted on November 19, 2019

34

assessment
23:8
assignment
80:19
assist
60:9, 82:1
assistance
61:6, 72:15,
80:24
associated
12:16
assume
27:5, 114:12
assuming
20:3, 55:7,
81:22, 112:12
assumption
84:10
attempting
9:24, 36:23
attend
41:7
attended
27:23
attention
12:12, 12:13,
61:10, 72:19,
92:7, 92:10,
105:13, 105:15,
109:10
attorney
121:20, 121:23
audible
101:4
audio
19:14, 19:18,
20:1, 20:14,
21:1
avoid
39:7, 94:16,
96:3
avoiding
39:22
aware
22:24, 41:3,
48:16, 72:2,
72:5, 76:2,
87:6, 109:1

away
55:4, 62:9,
62:10, 63:16,
74:20, 106:12,
112:13, 112:16

**B**

back
22:6, 22:16,
30:23, 31:20,
37:15, 37:16,
51:24, 64:7,
64:9, 71:7,
71:8, 71:12,
71:22, 71:23,
91:16, 94:4,
94:10, 94:21,
99:2, 100:23,
114:22, 117:3,
119:8
backed
71:5, 71:6,
71:20, 94:6,
94:7
background
27:19
backing
71:22, 88:16,
95:2
backward
94:16
backwards
94:19, 113:13,
114:3, 114:7,
114:22, 114:24
banks
2:15
base
81:23
based
10:2, 10:3,
26:3, 36:10,
56:22, 63:9,
64:10, 67:18,
74:19, 92:12,
92:22, 93:5,
103:13, 106:18,
111:1, 113:1,

113:6, 113:8
basic
102:16
basically
8:16, 26:10,
47:19, 48:15,
53:7, 82:5
bates
57:11, 57:13,
67:7
baton
94:6
became
87:5
because
7:12, 9:8,
19:20, 20:3,
23:11, 23:23,
24:23, 26:20,
27:9, 49:23,
71:16, 82:6,
87:2, 88:15,
91:1, 94:13,
95:18, 109:11
become
29:8, 31:7,
31:18, 72:2,
72:5, 109:1
becoming
31:6, 32:6,
86:16, 86:19
been
4:2, 6:9, 7:12,
13:21, 20:1,
26:1, 41:23,
41:24, 55:21,
61:22, 62:5,
66:13, 70:6,
73:5, 74:21,
75:21, 79:23,
80:9, 84:13,
84:16, 91:19,
92:10, 97:1,
98:6, 119:6
before
4:21, 5:21,
7:20, 17:6,
18:9, 24:17,

24:21, 25:5,
36:10, 36:21,
46:21, 48:11,
49:1, 49:4,
52:18, 65:8,
66:10, 68:24,
83:8, 86:14,
109:7, 109:15,
109:18, 110:2,
110:21, 111:23
began
98:17, 99:1
beginning
86:23
behalf
2:3, 2:12, 2:21
behavior
36:14
behind
62:12, 84:7,
87:1, 87:3
being
27:1, 27:2,
48:16, 48:20,
49:8, 52:16,
75:1, 78:24,
79:8, 80:24,
81:17, 83:7,
84:15, 87:12,
88:3, 90:8,
94:16, 96:3,
103:15, 107:1,
114:12, 114:15,
114:19, 117:4
believe
11:1, 11:4,
15:18, 16:1,
16:6, 16:16,
16:23, 17:15,
19:16, 19:22,
21:14, 21:18,
24:9, 25:1,
43:19, 55:10,
56:24, 60:7,
61:12, 65:8,
65:12, 66:6,
66:21, 71:5,
74:12, 77:19,

**EXHIBIT D**

Transcript of Deputy Sean Coutts
Conducted on November 19, 2019

35

78:1, 79:17,
80:24, 81:8,
81:9, 81:20,
84:20, 85:19,
92:12, 93:1,
101:22, 103:1,
104:24, 113:17
**bell**
82:16
**belly**
83:13
**benjamin**
2:23
**bent**
94:5
**besides**
100:15
**best**
18:18, 21:12,
25:15, 41:16,
43:3, 43:6,
45:10, 51:23,
83:9, 109:20,
110:5
**better**
14:14, 16:11
**between**
54:19, 70:15,
70:22, 83:12,
86:10, 86:18,
106:12
**beyond**
10:7, 10:8,
10:18, 12:22,
28:21, 33:17,
40:7, 42:19,
43:23
**bit**
20:7, 27:19,
28:3
**bjacobi@okgc**
2:28
**block**
38:10, 55:14,
63:11, 85:5
**blocking**
38:14, 38:16,
40:3

**body**
59:9, 83:9,
92:22, 117:14,
117:17
**both**
5:14, 16:21,
47:19, 59:16,
61:5, 94:12,
95:24
**bottom**
18:8
**brakes**
114:12, 114:15,
114:19
**break**
5:17, 5:18,
5:21, 83:18
**breath**
100:3, 101:10
**breathing**
118:5, 118:6
**briefly**
84:20
**bring**
119:20
**broader**
24:9
**brooks**
2:5, 3:6, 4:7,
4:14, 4:19,
10:10, 11:14,
15:3, 17:20,
19:2, 20:5,
21:16, 23:19,
26:9, 26:16,
27:15, 35:7,
35:15, 36:5,
38:20, 39:5,
40:12, 40:14,
43:11, 45:9,
46:6, 50:14,
55:1, 55:19,
57:9, 57:10,
64:7, 64:14,
65:11, 66:19,
67:4, 67:5,
67:22, 68:19,
70:1, 71:10,

73:18, 74:8,
75:12, 75:17,
81:15, 81:24,
83:16, 84:24,
92:1, 95:4,
95:14, 95:20,
100:18, 102:8,
103:9, 104:4,
106:2, 106:20,
109:6, 109:23,
110:7, 112:3,
114:14, 115:11,
115:17, 116:2,
116:12, 117:9,
118:10, 119:2,
119:22, 120:21
**bullets**
71:17
**bumper**
65:15, 90:9
**business**
52:23, 53:7,
53:10, 53:14
**busy**
7:12
**button**
83:13

| C |
| --- |

**c-o-u-t-t-s**
4:10
**cadillac**
11:1, 51:10,
56:2, 61:14,
62:2, 63:3,
63:16, 65:21,
66:23, 109:2,
116:14, 118:16,
118:19, 119:8
**call**
18:22, 46:24,
47:12, 80:23,
82:7, 85:10,
85:12, 85:13,
85:14, 105:14
**called**
46:24, 47:11,
87:24

**calling**
98:19
**calls**
76:17
**cam**
12:20, 13:5,
13:7, 13:10,
13:13, 13:18,
19:10, 19:14,
20:8, 20:13,
20:22, 20:24,
21:4, 21:20,
55:2, 55:4,
113:24
**came**
6:21, 36:11,
46:13, 47:2,
72:18, 74:20,
78:16, 80:21,
111:2, 111:4,
111:10, 119:8,
119:21
**camera**
114:6
**can't**
33:21, 33:23,
41:24, 43:23,
47:16, 51:5,
52:17, 63:9,
69:14, 95:6,
99:18
**canine**
11:21, 11:24,
12:2, 12:5,
12:11, 105:5,
105:7, 105:8,
105:12, 105:15,
105:16, 105:20
**capacity**
8:12, 87:8,
87:11, 88:4,
88:6
**caption**
121:8
**captured**
13:4, 20:2,
55:6
**captures**
55:5

**EXHIBIT D**

Transcript of Deputy Sean Coutts
Conducted on November 19, 2019

36

car
13:12, 19:15,
20:3, 20:10,
21:2, 36:10,
38:16, 38:23,
38:24, 39:1,
39:4, 39:7,
39:8, 39:22,
49:16, 49:19,
49:20, 50:2,
50:3, 50:6,
50:20, 51:8,
52:7, 52:9,
54:8, 54:9,
54:15, 55:8,
55:13, 56:3,
56:14, 58:18,
58:22, 59:3,
59:9, 60:4,
60:6, 60:16,
61:18, 66:2,
69:23, 70:4,
70:6, 72:14,
83:8, 84:18,
87:1, 87:12,
90:14, 90:18,
92:9, 93:7,
95:19, 96:11,
98:10, 98:13,
99:14, 100:24,
101:9, 107:7,
107:13, 107:21,
107:22, 108:3,
108:8, 108:18,
109:12, 110:24,
112:10, 112:13,
112:21, 113:18,
113:20, 114:2,
114:7, 114:22,
115:6, 115:14,
115:22, 116:6,
116:9, 116:14,
117:1, 117:11,
118:23, 119:7,
119:19, 120:6
car's
90:11
care
60:10, 60:15,

60:18, 60:23,
61:2, 61:3
career
30:8
carefully
38:15, 38:23
carli
51:6, 51:11,
52:15, 52:19,
78:1, 79:6,
79:16, 79:23,
91:19, 111:7,
111:9
carli's
78:10, 78:16,
79:1
carried
19:23
carry
19:21, 29:6,
29:8, 29:14,
29:16
carrying
34:5
cars
13:9, 39:12,
40:3, 78:17,
85:1, 85:4,
85:18
case
84:1, 84:12
casings
58:4
casual
6:1
cater
8:10, 41:21,
45:4, 45:20,
51:19, 51:20,
56:7, 64:3,
67:13, 67:19,
68:1, 68:9,
68:12, 68:22,
68:23, 69:15,
72:3, 72:6,
72:7, 72:21,
72:24, 73:2,
73:5, 73:11,

74:10, 74:21,
74:24, 75:2,
75:4, 75:9,
84:1, 86:8,
89:6, 89:11,
90:18, 94:4,
94:9, 94:11,
94:12, 94:15,
94:17, 95:9,
95:17, 95:19,
95:24, 96:1,
103:1, 106:4,
106:11, 113:3,
113:11, 113:15
cater's
58:5, 74:19,
94:14
caught
94:16, 96:3
cause
121:12
caveat
77:14
cell
111:9, 111:13,
111:16, 111:21,
111:24
center
40:20, 40:21
certain
8:19, 8:21,
18:10, 35:24,
36:7
certainly
11:12, 39:15,
96:5, 108:23
certification
28:21
certifications
29:2
certified
29:5, 29:8,
29:14, 121:5
certify
121:7, 121:19
chance
84:15
characterization
27:13, 38:18

characterized
86:16
charger
19:24, 20:4
check
107:13, 107:17,
107:23, 108:1,
108:2, 108:7
chest
59:13, 59:15,
59:23, 60:17,
94:21, 99:1,
99:3, 99:12,
100:16, 100:20,
100:23, 101:1,
101:20, 117:20
chicago
2:8, 2:17
cigarettes
98:23, 101:16
circle
66:6, 66:21,
67:11
circled
67:6
circumstance
24:23, 30:16,
54:1
circumstances
8:21, 15:11,
35:6, 35:9,
76:4, 76:8,
112:23
citizen
30:14, 53:4,
53:16, 54:13,
54:20
citizens
41:13
city
1:18
civil
4:17
clarify
16:24
clear
58:21
clenching
31:21

**EXHIBIT D**

Transcript of Deputy Sean Coutts
Conducted on November 19, 2019

37

close
14:22, 15:4,
40:23, 70:19,
101:10, 106:11
closer
14:8
closes
70:13
co-administrators
1:10
coat
31:22
cochran
2:6
collaborate
8:21
college
27:23, 27:24,
28:15
com
2:10, 2:19,
2:28
combative
31:7, 81:1
come
5:4, 39:12,
39:16, 87:19,
97:9, 97:22,
113:18, 114:8
comes
7:24, 32:11
coming
20:12, 20:18,
47:3, 47:8,
89:14, 118:2
commands
51:21, 51:22,
53:8, 53:21
common
4:11
communicate
22:1, 24:15,
41:9
communicated
24:12, 27:7
communicates
23:3
communicating
25:15, 26:12,

27:8, 53:18
communication
9:14, 10:4,
10:13, 10:18,
22:4, 22:5,
22:23, 27:1,
79:16
communications
13:3, 20:12
community
27:24, 40:20,
40:21
completed
17:5
complies
67:12
complying
93:11
compound
99:16
compressions
60:17, 99:1,
99:3, 100:14,
101:2, 101:20
computer
16:17
computer-aided
121:15
concerned
8:1, 18:24,
31:8, 49:5, 95:8
concerning
40:16, 45:20,
121:11
concerns
92:7
conclude
10:14
concluded
61:9, 61:10,
120:23
conclusion
74:20
cones
57:18, 57:20,
57:22, 58:1
confusion
53:22, 54:16,

54:18
connection
30:14
consciousness
81:21
consider
13:16, 18:21,
19:7, 78:2,
78:3, 87:13,
88:8, 102:14,
106:22, 118:6,
119:10, 119:15
considering
106:5, 119:11
consisting
121:14
contact
39:8, 77:3,
77:4, 77:7,
77:15, 77:19,
78:1, 80:13,
91:2
contained
18:17
continue
20:22, 63:4,
87:8, 89:2
continued
63:15, 63:23,
87:19, 94:10,
99:4
controversy
121:11
conversation
6:1, 46:2,
46:9, 46:11,
75:20, 80:2
conversations
45:19, 45:22
convey
103:14
conveyed
80:11
cook
2:24
corner
55:11
correct
10:16, 15:15,

18:2, 18:14,
18:18, 20:14,
23:12, 23:13,
24:5, 24:8,
25:6, 25:21,
27:10, 27:11,
27:16, 30:3,
35:23, 44:23,
48:12, 50:18,
56:3, 59:1,
59:3, 59:4,
59:6, 59:7,
61:15, 62:3,
69:4, 69:9,
72:11, 75:4,
75:6, 75:7,
84:19, 85:1,
88:20, 90:15,
90:19, 93:15,
93:18, 93:21,
93:24, 94:1,
96:2, 96:9,
97:6, 97:19,
97:20, 101:11,
101:14, 103:20,
105:11, 105:20,
107:24, 108:13,
117:6, 117:14,
117:21
corrections
17:9, 17:11
correctly
93:3, 103:19,
105:8
could
11:23, 12:7,
23:21, 27:4,
34:22, 36:18,
38:7, 41:18,
46:4, 48:21,
48:22, 48:24,
49:2, 53:23,
54:23, 55:15,
64:7, 65:4,
66:20, 66:21,
67:10, 68:17,
69:1, 73:5,
73:21, 75:21,

**EXHIBIT D**

Transcript of Deputy Sean Coutts
Conducted on November 19, 2019

38

77:11, 83:10,
83:14, 84:10,
84:13, 84:16,
86:17, 89:1,
92:17, 92:20,
92:23, 94:7,
95:8, 104:12,
106:22, 108:21,
109:14
**couldn't**
12:5, 37:13,
49:13, 68:14,
80:17
**counsel**
2:1, 4:24,
46:3, 67:1,
84:3, 84:23,
85:17, 86:16,
90:21, 96:15,
121:20, 121:23
**county**
6:7, 6:10,
6:13, 7:22, 8:1,
8:20, 9:4, 9:7,
11:16, 11:18,
20:7, 25:8,
26:4, 30:9,
42:1, 76:11,
76:12, 76:14,
121:3
**couple**
5:3, 82:21,
106:3
**course**
5:18, 28:7,
28:15, 34:5,
47:23, 108:3,
111:20
**court**
1:4, 4:9, 5:7,
5:23, 6:3
**coutts**
1:23, 3:3, 4:1,
4:10, 4:16,
12:15, 17:21,
27:18, 55:2,
55:20, 66:20,
67:6, 82:22,

**83:23, 106:4**
**cover**
71:18, 88:9,
88:19, 105:14
**cpr**
60:11, 99:4,
100:7, 109:5
**create**
53:22, 54:16
**credentials**
28:21
**criminal**
7:19
**csr**
1:33, 121:33,
121:35, 121:37,
121:38
**cues**
12:12, 105:9,
105:13
**cutting**
98:18, 99:8,
99:14, 100:5
**cv**
1:16

**D**

**d-e-p-u-y**
79:14
**danger**
95:9, 95:18,
105:17
**dangerous**
91:11, 102:11,
102:12, 102:14,
119:16, 120:16
**dangerousness**
102:7
**dash**
12:20, 13:5,
13:7, 13:10,
13:13, 13:18,
19:10, 19:14,
20:8, 20:13,
20:22, 20:24,
21:4, 21:20,
55:2, 55:3,
113:23

**daughter**
77:20, 80:13,
80:22, 81:4,
81:10, 82:13
**day**
46:5, 46:7,
78:20, 118:18,
121:28
**de-escalated**
96:16, 98:2
**deadly**
112:15, 112:23
**dealing**
108:13, 108:16
**dearborn**
2:7
**debbie**
83:24
**deborah**
2:14
**debrief**
40:18
**debriefing**
40:19, 40:23,
41:4, 41:8,
41:12, 41:17,
42:4, 42:7,
42:17, 43:7,
43:19, 44:2,
44:7, 45:1,
45:3, 73:4, 75:8
**december**
6:11, 6:19,
8:17, 121:28
**decision**
103:13
**declared**
87:7
**deep**
118:5, 118:6
**deer**
48:2, 48:3,
48:5, 48:8
**defendant(s**
2:12
**defendants**
1:20, 83:24
**definitely**
67:4, 95:9,

**119:14**
**degree**
28:12, 28:18
**demands**
53:18
**department**
6:7, 6:15,
6:24, 7:1, 7:8,
7:11, 19:4,
25:19, 46:18,
76:4, 76:8,
87:5, 120:4
**department's**
18:24
**departments**
18:22
**depending**
20:17, 35:6,
35:8, 53:19,
65:3, 65:13
**deploy**
12:5, 32:11,
35:1
**deployed**
30:2, 30:9,
30:11, 30:13,
32:2, 33:21,
96:23, 97:8,
97:14, 97:18
**deploying**
35:11, 98:1,
98:2
**deposition**
1:22, 4:15,
4:21, 4:24, 5:2,
15:13, 55:21,
121:22
**deputy**
1:23, 3:3, 4:1,
4:15, 4:20,
7:21, 8:2, 9:17,
9:19, 9:21,
11:10, 11:19,
12:1, 12:4,
12:15, 13:11,
17:21, 19:12,
20:7, 24:11,
27:18, 30:9,

**EXHIBIT D**

Transcript of Deputy Sean Coutts
Conducted on November 19, 2019

39

31:23, 31:24,
39:20, 45:23,
55:2, 55:20,
60:8, 60:20,
66:20, 82:22,
83:23, 98:14,
99:1, 99:2,
106:4
**depuy**
79:12
**describe**
32:6, 36:9,
48:13, 50:15,
58:13, 113:14,
118:3
**described**
33:18, 37:18,
38:22, 86:14
**describing**
31:12, 89:16
**description**
3:15, 10:18,
94:24
**details**
17:1
**determination**
81:6, 81:7
**determined**
81:3, 118:22,
119:9, 120:6
**dictate**
35:10, 36:7
**die**
117:5
**differ**
53:22
**difference**
86:10, 86:18
**different**
19:4, 57:1,
57:9, 96:4
**difficult**
5:7, 6:3
**directed**
52:16, 59:2,
59:5
**directing**
25:10, 25:16,

32:18, 54:4
**direction**
27:1, 62:20,
65:3, 69:13,
69:17
**directions**
33:4, 33:6,
35:3, 112:20
**directly**
9:16, 22:17,
23:5, 23:8,
25:14
**directs**
26:11
**disable**
32:7, 32:14
**disabled**
32:19
**discovered**
80:9
**discovery**
4:15
**discrepancies**
15:17
**discuss**
75:9
**discussed**
42:12, 47:17,
75:15, 75:21,
84:23
**discussion**
44:16, 44:19,
44:22
**disengage**
87:15
**disobeyed**
112:20
**disobeying**
88:11, 88:14
**dispatch**
13:2, 20:12
**dispatcher**
22:1, 108:1
**dispatching**
48:2
**disregarding**
85:13
**distance**
28:4

**distinguish**
86:12
**district**
1:4, 1:5, 4:18,
6:14, 7:16
**ditch**
120:4
**divider**
70:14
**division**
1:3, 1:6
**documenting**
58:2
**dog**
12:12, 30:22,
105:9, 105:13,
105:14
**doing**
92:7, 99:1,
99:3, 101:1,
101:20, 105:13
**done**
12:5, 105:2,
107:13, 108:2,
120:21
**door**
70:12, 70:15,
98:15
**dostvig@schainba-
nks**
2:19
**down**
5:24, 6:3,
15:6, 16:15,
39:11, 90:10,
90:11, 94:5
**drawn**
92:10, 93:2
**drive**
38:23, 39:7,
40:3
**driven**
120:4
**driver**
31:8, 31:10,
51:21, 69:22,
70:5, 92:20,
92:21, 92:24,

94:6, 94:21,
94:22, 98:16,
98:19, 98:20,
98:22, 98:24,
99:2, 99:4,
99:6, 102:16,
112:9
**driver's**
49:7, 66:2,
70:17, 94:22,
98:15, 98:18,
99:7, 99:13
**driveway**
36:22, 37:7,
37:24, 49:16,
50:22, 84:21,
88:2, 89:4,
89:5, 89:12,
89:24, 90:6,
90:7, 90:10,
90:11, 107:5,
107:10, 107:14,
108:9, 108:12,
110:2, 112:8
**driving**
11:22, 20:13,
36:16, 36:20,
84:24, 85:7,
118:22, 119:18,
120:13
**drove**
12:1, 38:15,
38:24, 90:7
**due**
79:2, 81:11,
86:24, 88:22
**duly**
4:2
**dundee**
2:25
**during**
16:10, 22:24,
30:8, 47:21,
48:20, 100:7,
107:16, 108:3,
110:14, 111:19
**dustin**
9:12

**EXHIBIT D**

Transcript of Deputy Sean Coutts
Conducted on November 19, 2019                                    40

| | | | |
|---|---|---|---|
| **duties** | 46:2, 46:8, | 97:15, 101:10, | 75:3, 76:14, |
| 34:6, 47:23 | 46:22, 47:7, | 102:4, 102:19, | 83:5, 99:22, |
| **duty** | 60:8, 60:20, | 104:18, 107:6, | 99:24, 100:3, |
| 5:17, 30:1, | 61:1, 61:6, | 112:7 | 100:8, 100:11, |
| 74:17 | 61:9, 98:14, | **enter** | 101:2, 108:1, |
| **E** | 99:1, 99:2, | 115:22 | 114:15, 114:18 |
| **e-r-i-e** | 116:8, 116:13, | **entire** | **every** |
| 7:1 | 116:20 | 110:13 | 45:8 |
| **each** | **elder's** | **erie** | **everything** |
| 18:4, 18:6, | 19:12, 19:15, | 6:24, 7:2 | 18:17 |
| 18:14, 55:22 | 21:4, 21:13, | **escalate** | **examination** |
| **ear** | 21:20, 46:14, | 54:5, 54:19 | 3:1, 3:5, 4:6, |
| 83:11 | 47:14, 55:3, | **escalating** | 83:21, 106:1, |
| **earlier** | 55:4, 55:13 | 30:19 | 118:13, 121:13 |
| 14:1, 101:22, | **electrodes** | **escalation** | **examined** |
| 109:14, 113:20 | 97:9, 97:22 | 31:1 | 4:4, 121:12 |
| **early** | **elimination** | **essentially** | **example** |
| 29:12 | 74:6 | 70:11, 86:23, | 35:16, 36:13, |
| **east** | **else** | 103:18 | 104:2 |
| 1:29, 37:12 | 42:1, 52:2, | **estate** | **exclude** |
| **education** | 60:1, 60:18, | 1:11 | 53:14 |
| 28:9 | 88:24 | **et** | **exhibit** |
| **educational** | **else's** | 1:18 | 3:15, 17:18, |
| 27:19 | 118:23 | **evade** | 17:21, 56:1, |
| **effect** | **emotion** | 85:8 | 56:5, 56:23, |
| 26:1 | 103:13 | **evaded** | 57:7, 57:13, |
| **effective** | **emotionally** | 120:3 | 57:14, 61:13, |
| 97:1, 98:6 | 45:8, 47:20 | **evading** | 61:21, 62:1, |
| **effort** | **employed** | 85:14, 119:18, | 62:7, 63:3, |
| 10:4, 85:8 | 6:9, 121:20, | 119:19 | 63:15, 64:17, |
| **either** | 121:24 | **evaluation** | 65:1, 65:17, |
| 7:11, 12:16, | **employee** | 77:24 | 67:7, 85:24, |
| 24:10, 33:19, | 121:23 | **even** | 89:17, 90:13 |
| 46:21, 77:23, | **ended** | 87:20, 88:18, | **exhibits** |
| 90:3, 97:1, | 46:16 | 97:4, 101:6 | 3:14, 55:17, |
| 117:19 | **enforcement** | **event** | 55:21, 90:3 |
| **elapse** | 28:22, 29:3, | 11:22, 45:7 | **exit** |
| 102:19 | 29:20, 34:24, | **events** | 112:10 |
| **elder** | 43:8, 43:16, | 35:13, 35:18, | **exited** |
| 9:19, 9:22, | 44:6, 47:22, | 35:20, 35:24 | 112:12 |
| 11:10, 11:19, | 52:22, 54:8, | **eventually** | **expect** |
| 12:1, 12:4, | 76:17 | 31:22 | 107:20 |
| 13:11, 24:11, | **engaging** | **ever** | **expectation** |
| 24:13, 26:12, | 86:10 | 21:6, 24:15, | 28:17 |
| 26:24, 27:2, | **enough** | 36:20, 38:6, | **experience** |
| 39:20, 42:20, | 5:21, 13:6, | 39:12, 39:16, | 26:4 |
| 44:24, 45:23, | 23:24, 31:17, | 47:22, 53:8, | **experienced** |
| | 33:17, 36:19, | 58:18, 74:23, | 47:18, 48:11 |

**EXHIBIT D**

Transcript of Deputy Sean Coutts
Conducted on November 19, 2019

41

explain
16:22, 25:13,
31:18, 32:10,
48:24, 69:1,
74:9, 106:6
explained
4:24
express
1:28
extend
63:7
extends
62:15, 65:2,
65:7
extent
32:8, 66:11
eyes
100:8

**F**

face
98:21, 121:9
fact
37:3, 38:8,
40:2, 50:19,
87:1, 102:17,
111:4, 120:12
factor
119:16
factors
36:7, 112:19,
119:10, 120:7
facts
17:15, 121:7
factual
40:15
failing
10:1
fair
5:21, 13:6,
23:8, 23:24,
31:17, 33:17,
36:19, 43:14,
44:21, 50:1,
50:8, 58:10,
58:14, 58:17,
72:9, 97:15,
102:4, 104:18,

107:4, 108:6,
112:7, 114:2,
117:4
fall
96:5
falls
1:18, 1:30,
7:5, 9:24,
10:14, 11:2,
11:6, 11:16,
13:21, 38:9,
38:14, 40:21,
57:13, 57:14,
60:23, 67:8,
74:23, 75:23,
76:3, 82:10,
82:11, 84:1,
85:1, 85:4,
86:2, 87:4,
116:23, 120:3
familiar
55:22, 76:16,
97:16
family
77:4, 77:15,
78:2, 78:4
far
7:24, 8:5,
8:23, 11:19,
13:15, 18:24,
20:2, 24:10,
26:15, 28:23,
31:8, 32:14,
36:23, 40:13,
49:5, 53:10,
55:4, 62:14,
68:18, 76:18,
77:6, 82:2,
88:15, 88:22,
95:7, 120:15
fashion
34:21, 71:24,
117:21
fatal
19:5
fear
71:16
federal
4:16

feel
17:13, 26:21,
50:2, 91:1,
92:6, 92:9,
102:11
feet
64:23, 65:2,
65:7, 86:5
felt
11:12, 31:7,
41:6, 88:19,
88:23, 100:17
female
78:19, 78:24,
91:16, 91:18,
119:21, 120:7,
120:17
fence
63:20
fences
63:23
few
84:2
field
28:22, 30:10,
34:1, 34:5
fifth
92:16
final
33:6
financially
121:24
find
91:10, 92:18,
107:16
fire
48:9, 67:14,
67:19, 68:12,
97:4
firearm
30:3, 30:6,
93:2, 94:18,
113:12
fired
47:22, 48:21,
49:9, 49:12,
52:18, 58:5,
58:20, 59:8,

61:23, 62:6,
64:3, 66:24,
67:13, 67:24,
68:24, 69:11,
69:16, 72:3,
72:6, 72:10,
72:16, 73:11,
73:24, 74:13,
74:21, 74:24,
75:4, 75:9,
83:8, 103:2,
109:15, 109:18,
110:3, 110:22
firing
30:3, 32:9,
45:13, 47:24,
73:20, 74:3,
74:17, 75:2,
113:4
firm
2:6
first
4:2, 11:1,
27:23, 29:21,
42:11, 51:6,
52:20, 58:22,
62:2, 67:24,
71:3, 79:18,
84:3, 90:4,
90:6, 92:15
fischbach
91:20
fischbach's
84:19
fist
59:19
fists
31:21
five
37:19, 80:7
fled
11:23
flip
91:13
focus
55:3
focused
49:12, 49:13,

Transcript of Deputy Sean Coutts
Conducted on November 19, 2019                42

70:4, 113:11
**focusing**
92:8
**folks**
43:7
**follow**
84:2, 87:20,
88:18
**follow-up**
106:3
**following**
25:9, 39:12,
77:20, 87:6,
88:3, 101:7,
111:20
**follows**
4:4
**foot**
89:9
**force**
29:22, 30:2,
34:13, 34:24,
112:15, 112:23
**foregoing**
121:14
**form**
10:9, 15:1,
18:23, 21:15,
26:7, 35:4,
35:12, 36:3,
38:19, 50:12,
54:21, 64:5,
65:9, 71:9,
86:22, 87:22,
92:1, 95:4,
95:14, 95:20,
99:16, 100:18,
102:8, 104:5,
104:11, 106:17,
110:4, 117:13,
119:2, 119:22
**format**
19:1, 19:3
**formulate**
85:22
**forth**
31:20, 38:6,
94:22, 99:2,

**forward**
100:23
83:12
**foundation**
11:11, 18:23,
19:19, 23:17,
26:8, 26:13,
35:4, 39:3,
45:5, 54:22,
81:13, 95:5,
95:15, 96:18,
100:19, 103:9,
103:21, 104:4,
114:9, 115:8,
115:24, 116:10,
117:7, 119:3,
119:23
**four**
16:7, 16:8,
16:10, 17:2,
26:20, 69:7,
69:8, 69:11,
69:16, 94:20
**fourth**
86:3
**frame**
62:13
**franklin**
37:11, 37:12,
37:16, 55:9,
55:14, 61:18,
63:12, 86:5,
107:5, 112:8
**friendship**
8:23
**front**
51:12, 55:20,
63:12, 65:16,
69:22, 70:5,
70:15, 89:8,
89:9, 90:8,
90:10
**full**
4:8, 92:15
**fully**
5:10, 5:11
**further**
25:17, 28:18,

30:19, 31:19,
62:8, 62:10,
62:12, 64:16,
64:20, 82:9,
88:19, 90:10,
121:19, 121:22
**furthest**
70:12

**G**

**gala**
4:23
**gasp**
118:4, 118:7
**gasping**
118:2, 118:8
**gate**
63:13
**gather**
25:18, 35:19
**gave**
14:1, 14:9,
14:12, 16:23,
17:13, 17:14,
18:1, 111:1,
113:2
**gear**
114:23, 115:2,
115:10, 115:12,
115:20
**gears**
115:23, 116:4,
116:5, 116:8,
116:14, 116:24
**geitner**
2:24
**gender**
120:15
**general**
7:16, 28:9,
30:1, 31:3,
52:20, 59:21,
61:24, 84:9
**generally**
25:19, 27:8
**generate**
12:22, 107:6
**genesis**
34:1

**george**
79:12
**getting**
11:8, 50:6,
82:14, 92:24
**give**
4:24, 5:9,
5:10, 7:16,
15:7, 19:6,
28:14, 29:11,
35:16, 36:13,
41:16, 43:3,
43:23, 44:4,
45:10, 53:3,
83:8, 109:20
**given**
4:20, 12:20,
17:8, 27:2,
33:3, 39:20,
40:8, 97:1,
121:16
**giving**
51:21, 53:21,
54:3
**glass**
97:5, 97:7
**go**
35:4, 35:12,
50:3, 54:22,
63:24, 78:11,
80:19, 81:4,
86:1, 86:22,
87:22, 92:15,
94:2, 97:5,
97:7, 98:9,
99:16, 103:10,
106:17, 114:24,
117:3
**goes**
12:10
**going**
11:10, 11:12,
12:4, 30:23,
36:8, 41:3,
43:9, 48:17,
52:3, 52:6,
52:13, 63:2,
65:13, 65:14,

**EXHIBIT D**

Transcript of Deputy Sean Coutts
Conducted on November 19, 2019

43

| | | | |
|---|---|---|---|
| 67:2, 71:17, 86:21, 92:8, 94:3, 94:9, 105:11, 105:16, 115:2 | **handle** 7:17 | **heighten** 118:24 | 79:1, 79:2, 80:9, 112:8 |
| **gone** 120:4 | **handler** 11:21, 12:11, 105:12 | **heightened** 107:2, 119:1, 119:11, 120:8 | **homes** 63:12, 63:13 |
| **grab** 59:22, 94:21, 99:12, 100:22 | **handout** 44:10 | **help** 20:6, 41:10 | **honest** 109:9 |
| **grabbing** 100:16, 117:20 | **hands** 52:1, 54:16, 59:15, 59:16, 83:14, 94:12, 95:24, 117:21 | **here** 7:6, 67:18, 77:21, 86:4, 89:2, 89:16, 90:17, 91:19, 95:18, 95:23, 95:24, 98:10 | **honestly** 45:6 |
| **graduated** 27:21 | **hang** 22:6, 22:16 | | **honoring** 35:3 |
| **graduation** 27:20 | **happen** 113:15 | **hereby** 121:7 | **hospital** 77:23, 81:4, 81:11, 81:23, 82:3 |
| **grasped** 59:13 | **happened** 11:13, 16:24, 36:10, 41:10, 45:7, 45:16, 104:3, 109:11 | **herein** 4:2 | **hour** 7:6, 42:5, 44:3, 46:23 |
| **grasping** 117:20 | | **hereto** 121:8, 121:24 | |
| **grassy** 61:15, 61:19, 62:14, 63:4, 63:14, 64:3, 64:16, 65:1, 65:7 | **happening** 87:3 | **hereunto** 121:27 | **hours** 16:7, 16:8, 16:10, 17:3, 28:15 |
| | **happens** 5:2, 5:6 | **high** 27:20, 27:22, 88:9, 91:12 | **house** 46:16, 47:3, 63:7, 63:8, 84:19, 89:7, 89:8, 89:10, 89:13, 90:9, 90:10, 91:17, 92:13, 110:23 |
| **greater** 80:5, 80:6 | **harm** 36:23 | **himself** 9:9, 11:10, 12:6, 31:21, 103:3, 104:15 | |
| **ground** 5:1, 117:4, 117:23, 118:1 | **health** 81:11 | | |
| | **hear** 9:16, 10:17, 24:13, 51:14, 69:6, 92:17, 92:20, 94:7, 96:8, 103:16 | **hired** 8:16 | **huh-uh** 6:2 |
| **guess** 27:4, 41:11, 86:3, 87:19, 103:7 | | **hit** 71:17 | **I** |
| **gun** 75:2, 94:12, 94:14 | | **hitting** 39:22 | **idea** 102:18, 113:19, 115:12, 115:20 |
| **H** | **heard** 9:13, 9:21, 10:13, 21:6, 34:13, 34:16, 52:22, 53:8, 58:23, 69:8, 70:2, 70:7, 70:21, 71:3, 83:6, 113:20 | **holding** 89:13 | **identification** 17:19, 55:18 |
| **half** 6:15, 7:6 | | **holiday** 1:28 | **identify** 56:5 |
| **halfway** 83:13 | | **holster** 32:12 | **il** 2:8, 2:17, 2:26 |
| **hand** 89:14, 92:21, 93:17, 111:14, 111:24, 121:28 | **hearing** 21:10, 67:15, 94:20 | **home** 46:15, 46:18, 46:20, 47:4, 47:9, 47:14, 50:21, 78:6, 78:11, 78:14, 78:16, 78:17, | **illinois** 1:1, 1:5, 1:30, 4:18, 7:2, 12:23, 14:2, 14:12, 15:7, 15:19, 16:4, |
| | **hearsay** 74:4, 75:10 | | |

**EXHIBIT D**

Transcript of Deputy Sean Coutts

Conducted on November 19, 2019                                    44

16:12, 16:19,
17:14, 18:1,
40:7, 42:23,
104:24, 106:15,
113:2, 121:1,
121:6, 121:35
**image**
64:24
**imagine**
64:17, 99:18
**immediately**
50:3, 72:4,
77:10, 77:11,
88:2
**implement**
11:23
**important**
17:15
**impression**
110:22
**incident**
6:22, 9:3, 9:9,
9:11, 9:15,
9:23, 11:9,
21:24, 22:24,
23:23, 24:8,
24:16, 29:5,
30:18, 31:1,
31:4, 31:12,
40:11, 40:16,
40:18, 46:5,
47:19, 48:7,
58:16, 74:11,
74:18, 77:20,
80:4, 82:9,
82:19, 86:24,
91:7
**incidents**
33:18
**independent**
1:9
**index**
3:1, 3:14
**indicate**
91:19, 117:13,
117:16
**indicated**
22:6, 22:16

**indicating**
66:5
**indication**
91:6, 114:18
**indications**
83:1
**individual**
32:6, 54:2,
110:23
**influenced**
103:15
**information**
10:2, 10:17,
24:7, 25:2,
40:15, 106:15,
106:18, 107:6,
107:9
**inhale**
118:9
**initial**
34:9, 100:15
**initially**
15:18, 16:24,
35:1, 35:2,
89:23
**initiated**
9:8, 9:10
**injury**
117:14
**inn**
1:28
**inside**
20:2, 20:10,
46:23, 102:21,
116:13, 117:1
**instance**
9:3, 20:11
**instantly**
117:6
**instructed**
86:6
**integrity**
103:14
**intend**
5:5
**interact**
80:22
**interacted**
80:12

**interacting**
53:16, 54:2,
54:13
**interaction**
30:14, 34:9,
54:19, 79:22,
79:23, 102:21
**interested**
121:25
**internal**
75:24
**interrogatory**
66:15
**interview**
14:9, 16:3,
16:8, 17:6, 40:7
**interviewed**
16:18, 76:4,
76:8, 76:15
**interviews**
40:8
**intoxicated**
39:14, 39:24,
40:5, 85:20,
101:8
**invasion**
78:6, 78:14,
79:2, 80:9
**investigating**
103:15
**investigation**
12:17, 75:24,
76:12, 104:19,
104:23, 105:2
**investigations**
105:1
**investigator**
16:12
**investigators**
15:7
**involve**
11:10, 23:14,
41:12
**involved**
9:5, 9:7, 9:15,
9:22, 11:8,
11:18, 21:24,
22:17, 23:7,

23:10, 23:23,
24:4, 25:10,
25:15, 25:17,
26:11, 27:9,
53:5, 76:1,
76:24, 84:15,
86:15, 86:16,
86:19, 89:1,
102:20, 103:5,
104:9, 104:14,
105:6
**involvement**
86:24
**involves**
23:11
**involving**
9:3, 9:23,
11:9, 48:1
**iowa**
121:6, 121:37
**island**
121:3
**issue**
31:9, 45:20,
81:12
**itself**
15:21, 16:5,
45:11, 55:14,
118:23, 120:8

**J**

**jacobi**
2:23, 10:9,
11:11, 15:1,
18:23, 19:19,
21:15, 23:17,
26:7, 26:13,
35:4, 35:12,
36:3, 38:19,
40:11, 45:5,
46:3, 50:11,
54:21, 64:5,
65:9, 66:10,
67:1, 67:21,
68:13, 69:24,
71:9, 73:16,
81:13, 83:18,
86:21, 87:22,

**EXHIBIT D**

Transcript of Deputy Sean Coutts
Conducted on November 19, 2019                45

90:4, 90:24,
96:18, 97:11,
97:13, 99:16,
103:10, 103:21,
104:10, 106:17,
109:4, 109:21,
110:4, 112:1,
114:9, 115:8,
115:16, 115:24,
116:10, 117:7,
120:22
**join**
90:23
**joined**
73:16
**jonathan**
8:9
**june**
7:12, 7:13
**jurisdiction**
6:13
**jurisdictions**
6:20, 8:19

**K**

**k-r-i-s**
22:10
**keep**
63:2, 103:12
**kenny**
2:15
**kept**
98:19
**kind**
86:12, 119:12
**kishwaukee**
27:23, 28:3,
28:6
**knew**
10:4, 11:9,
24:11, 108:11,
110:21, 110:23
**knife**
98:18
**know**
5:13, 5:18,
8:9, 8:12,
22:21, 22:22,

25:24, 26:19,
26:24, 27:2,
27:4, 27:20,
29:24, 31:16,
33:22, 33:24,
41:14, 42:14,
44:2, 47:17,
50:24, 51:3,
52:10, 55:6,
56:20, 57:20,
58:1, 58:13,
63:18, 67:1,
72:10, 75:23,
76:21, 76:23,
78:1, 81:1,
81:14, 82:24,
83:4, 87:2,
95:7, 96:14,
97:3, 99:15,
100:6, 101:18,
103:4, 103:7,
104:17, 104:19,
104:22, 107:12,
107:15, 115:10,
116:11, 117:8,
118:15, 118:18,
120:13
**knowledge**
17:16, 19:5,
26:22, 40:1,
83:2, 110:5
**known**
8:14, 82:6
**konni**
1:33, 121:5,
121:33
**kosoff**
2:24
**kris**
22:10, 32:1

**L**

**labeled**
107:1
**lack**
14:13, 16:11
**lady**
50:20

**laid**
94:13
**last**
4:9, 13:22,
14:4, 29:22,
30:2, 30:4,
46:1, 46:4,
86:2, 91:13,
92:17
**lasted**
44:2
**later**
72:13, 98:20
**law**
28:22, 29:3,
29:20, 34:24,
43:8, 43:16,
44:6, 47:21,
52:22, 54:8,
76:16
**lawyers**
40:9
**layperson**
48:14
**lead**
25:2, 40:4,
42:9, 44:21,
53:17, 85:19
**leading**
35:20, 35:24,
37:24, 44:24
**learn**
108:15
**learned**
22:18, 22:20,
72:15, 73:13,
73:23
**least**
24:6, 65:7,
83:1, 96:24,
110:22
**leave**
33:8, 45:18,
87:15
**led**
9:15, 10:13,
15:11, 34:9,
35:13, 35:18,

44:19, 74:12
**left**
17:6, 33:2,
37:14, 56:9,
56:20
**legs**
94:16, 96:3
**leisurely**
50:9, 50:13
**lend**
118:23, 120:8
**length**
90:11
**less**
29:19, 30:5,
37:19, 43:5,
43:20, 80:4,
82:6, 110:15,
110:16
**let's**
13:17, 20:23,
28:21, 49:1,
51:9, 53:13,
62:1, 69:21,
83:18, 85:24,
86:1, 92:16,
98:9
**lethal**
29:19, 30:5
**level**
8:4, 107:2
**license**
28:20, 107:17,
107:22, 108:2,
108:7, 118:21,
119:7, 119:17,
119:20, 120:2,
120:5, 121:35,
121:37
**licensed**
107:12
**lights**
10:1, 19:20
**likely**
20:15, 20:16,
40:4
**limp**
94:23, 99:7,

**EXHIBIT D**

Transcript of Deputy Sean Coutts

Conducted on November 19, 2019                    46

99:12, 100:23

**lincoln**
11:4
**line**
70:8, 74:17
**listening**
21:21, 22:3
**little**
20:6, 27:18,
28:3, 31:19
**llc**
2:24
**location**
56:1, 56:24,
57:1
**long**
6:9, 8:14,
16:4, 25:24,
37:17, 41:24,
42:4, 46:20,
61:5, 98:19,
98:20, 98:21,
99:9, 101:18,
109:17, 109:19
**longer**
99:18
**look**
58:7, 62:1,
85:24, 109:17
**looked**
68:17, 68:20,
92:22
**looking**
48:15, 57:7,
61:13, 62:16,
68:1, 68:15,
68:23, 69:12,
69:15, 84:13,
110:11, 110:16
**looks**
5:17
**lot**
51:15, 51:17,
67:2, 92:21,
93:17, 97:3
**low**
38:1
**luke**
16:1

**M**

**made**
22:23, 41:3,
81:7, 101:5,
121:17
**madison**
2:16
**magnitude**
48:12
**main**
92:6
**mainly**
86:24
**maintaining**
103:13
**make**
5:14, 10:5,
10:15, 17:9,
17:11, 18:10,
45:7, 81:6,
82:8, 87:15,
97:13, 117:10,
118:24, 120:15
**makes**
5:7, 6:2, 30:12
**making**
39:7, 47:19,
91:2, 93:17,
103:13, 119:16
**male**
108:13, 108:16,
109:3, 120:17
**manner**
36:16
**many**
13:6, 28:14,
39:6, 43:4,
69:6, 79:19,
99:8
**marijuana**
98:23, 101:13
**mark**
66:20, 67:2
**marked**
17:18, 55:17,
55:21, 86:2
**marking**
66:11, 66:13,

66:16
**martin**
11:5, 37:11,
37:15, 37:16,
37:23, 38:5,
55:8
**material**
12:16, 44:5
**matter**
42:12, 68:5,
68:9, 69:3, 69:8
**matters**
7:17, 121:11
**maybe**
42:5, 83:12,
110:5
**mbrooks@cochranf-
irm**
2:10
**mean**
21:9, 35:1,
45:15, 47:11,
48:14, 53:1,
69:18, 82:6,
85:21, 87:14,
87:19, 97:11
**meaning**
65:4
**means**
26:22, 32:11,
97:18, 97:21
**mechanism**
116:24
**media**
13:14
**medical**
60:9, 60:15,
60:18, 60:19,
60:23, 61:2,
61:6, 61:10,
72:15, 80:23
**melvin**
2:5
**memory**
30:21, 64:10,
106:19
**mental**
81:11

**mention**
5:3, 47:7
**mentioned**
45:13, 48:10
**mere**
27:9, 27:14
**merely**
25:20
**mess**
116:5, 116:8
**microphone**
19:21, 19:23,
20:4
**might**
13:21, 19:4,
28:15, 31:7,
35:22, 39:23,
41:23, 84:20,
103:14
**mind**
39:17, 39:23,
112:9, 119:20,
120:8
**minor**
31:15
**minute**
99:19, 109:22,
110:1, 110:6
**minutes**
37:19, 61:8,
99:8, 101:23
**mischaracterizes**
43:10
**misinterpretation**
66:17
**mistaken**
106:14
**misuse**
66:16
**moments**
49:1, 49:4,
52:18, 57:4,
68:24, 72:9,
83:8, 109:7
**monitoring**
24:24
**month**
80:4

**EXHIBIT D**

Transcript of Deputy Sean Coutts
Conducted on November 19, 2019

47

more
12:13, 24:1,
24:9, 24:18,
24:20, 25:2,
25:3, 25:17,
28:16, 33:22,
35:20, 39:19,
40:4, 43:24,
45:6, 45:13,
65:2, 74:6,
80:7, 84:5,
84:10, 87:4,
87:5, 90:11,
92:10, 99:10,
106:22, 118:7,
119:16, 120:8,
120:16
morrison
7:1, 7:8
most
5:17, 20:15,
20:16
mostly
7:18
motion
59:21
motorist
36:9, 36:11
mouth
118:2
move
51:24, 54:14,
59:9, 117:10
moved
56:20, 94:17,
113:11
movement
60:2, 100:20,
101:5, 117:11
movements
92:21, 92:22,
93:18
moving
52:9, 52:10,
52:13, 113:19,
114:3
much
64:20, 80:6,

83:9, 90:11,
99:15, 101:19,
110:14
multiple
53:5, 53:21,
54:2, 54:12
mumbling
31:21, 92:20
must
74:21
myself
24:10, 31:23,
108:24

**N**

naesha
82:16, 82:18
name
4:8, 4:9,
37:14, 51:5,
51:6, 82:12,
82:15, 83:23,
98:22, 119:21
named
121:9
names
43:15, 43:16
narrative
16:20, 16:23
nate
1:11, 48:21,
49:1, 49:5,
49:12, 50:21,
87:6
nate's
95:8
nathan
8:9, 9:23,
11:9, 12:17,
21:24
nathaniel
1:11, 9:4,
24:17, 24:21,
29:5, 36:20,
44:17, 48:19,
56:14, 76:22
nathaniel's
108:8

nature
7:17, 23:15,
24:7, 29:1,
31:3, 33:10,
40:10, 44:10,
53:9, 77:17
nayshawn
1:8
near
70:10
nearby
89:4
nearly
70:8, 90:9,
94:15
necessarily
54:6, 54:23,
64:12, 85:19,
87:14, 115:4,
119:14, 120:10,
120:15
necessary
41:7, 87:7,
91:1
need
5:16, 5:18,
11:17, 50:3,
81:10, 88:19
needed
29:23, 81:4
neither
121:19
never
47:17, 48:10,
84:18, 97:7,
106:5, 115:9,
116:13
new
7:24
news
13:15, 13:16,
13:17, 13:19
next
8:4, 15:9,
37:13, 37:14,
39:21, 56:13,
63:8, 94:2, 98:9
night
46:7

noise
101:4
noncompliance
35:14, 35:17,
35:19, 35:21,
102:16
nope
4:22
normal
119:12
normally
5:2, 53:16
north
37:11, 37:13
northbrook
2:26
northern
1:5, 4:18
nos
61:21
noted
90:17
notes
16:13, 16:17,
42:14
nothing
4:3, 121:10
notice
15:13, 15:17
noticed
89:12
noticing
98:17
noting
108:24
november
1:25
number
57:11
numbers
43:20

**O**

o'halloran
2:24
oath
121:13
obeying
120:5

**EXHIBIT D**

Transcript of Deputy Sean Coutts
Conducted on November 19, 2019                    48

object
27:13, 38:17,
43:9, 50:11,
54:21, 66:11,
86:21, 87:22
objection
39:2, 66:17,
67:3, 75:10,
92:1, 95:4,
95:14, 95:20,
100:18, 102:8,
103:9, 104:4,
104:10, 114:10,
119:2, 119:22
objections
121:17
oblivious
105:17
observe
92:21, 100:15,
100:16, 101:2,
105:9, 105:10
observed
89:3, 89:6,
89:11, 94:20,
99:11, 100:22
observing
88:17
obstruction
66:8, 66:22
obtain
28:12
obtained
7:20
obvious
96:22
obviously
5:10, 5:24,
30:5, 41:6,
73:23
occurred
38:14, 68:5
offense
31:15
offer
41:6
officer
6:16, 7:24,

8:9, 9:8, 9:10,
9:12, 9:14,
10:15, 11:2,
11:16, 11:18,
13:11, 19:4,
22:12, 29:20,
34:6, 38:14,
41:19, 41:21,
45:4, 45:20,
47:22, 51:19,
51:20, 52:23,
53:6, 53:7,
53:10, 53:14,
53:17, 54:13,
54:14, 54:15,
56:7, 56:13,
58:5, 60:7,
64:2, 67:6,
67:13, 67:19,
68:1, 68:22,
68:23, 69:15,
72:10, 73:23,
74:16, 74:23,
75:3, 76:1,
78:19, 78:24,
79:8, 84:1,
87:1, 88:12,
89:4, 89:6,
89:11, 90:17,
93:2, 94:3,
94:4, 94:5,
94:9, 94:11,
94:14, 94:15,
94:17, 95:8,
95:17, 95:19,
95:24, 96:1,
98:14, 98:16,
103:3, 103:4,
103:12, 104:14,
105:5, 105:6,
105:9, 105:10,
105:14, 105:15,
105:16, 105:19,
105:20, 106:4,
113:3, 113:11,
115:22, 119:6
officers
8:20, 10:14,

11:2, 27:8,
38:9, 42:16,
43:17, 44:6,
49:24, 53:5,
53:15, 53:21,
54:1, 54:3,
54:12, 54:19,
60:22, 78:11,
79:19, 86:8,
87:4, 87:20,
88:10, 88:16,
91:15, 93:10,
93:15, 95:3,
103:15, 104:3,
112:21, 116:23
official
18:22, 19:8,
34:24, 76:14
okay
22:14, 36:14,
45:21, 47:20,
48:6, 78:5,
84:17, 85:24,
88:6, 89:2,
96:7, 99:21,
100:11, 101:6,
102:1, 102:4,
103:18, 104:18,
110:8, 119:17,
120:11, 120:18
once
60:15, 94:5
one
5:4, 12:10,
18:16, 21:5,
24:10, 38:9,
39:21, 45:8,
48:16, 53:6,
53:8, 53:16,
54:13, 56:7,
63:7, 73:8,
74:13, 78:12,
78:13, 79:4,
79:18, 80:2,
82:7, 83:5,
86:20, 87:1,
88:8, 89:16,
92:6, 99:10,

106:21, 114:12,
118:7, 119:10
only
5:19, 5:24,
22:19, 40:17,
41:18, 43:15,
45:21, 59:13,
61:1, 87:1,
92:17, 92:20,
100:13, 113:11,
118:15
open
61:15, 70:13,
87:16, 100:8
opened
98:14
opinion
85:22, 95:1,
96:17, 104:1,
104:9
opportunity
4:23, 5:9,
5:11, 17:8,
108:6
opposed
47:3, 79:24
orange
57:18
order
41:5, 114:24
ordered
88:18, 93:1,
93:24
orders
54:4, 88:12,
88:14, 93:11,
112:20, 120:5
ordinance
7:18
oregon
6:14, 7:15,
27:22
ostvig
2:14, 3:7,
23:18, 26:8,
26:14, 27:13,
36:4, 38:17,
39:2, 43:9,

**EXHIBIT D**

Transcript of Deputy Sean Coutts
Conducted on November 19, 2019

49

57:6, 73:14,
74:4, 75:10,
75:16, 81:18,
83:22, 83:24,
87:10, 88:5,
90:5, 91:4,
92:3, 95:10,
95:16, 95:22,
96:20, 97:12,
97:15, 97:17,
99:20, 100:21,
102:10, 103:17,
103:24, 104:7,
104:13, 105:22,
114:10, 115:15,
118:14, 119:5,
120:1, 120:19
**other**
5:16, 5:23,
6:12, 6:13,
6:20, 7:21,
10:17, 10:20,
21:5, 31:24,
33:18, 37:23,
40:9, 40:17,
48:7, 79:4,
83:17, 84:22,
105:10, 118:10
**otherwise**
83:6
**out**
31:13, 32:12,
32:18, 34:6,
41:6, 46:21,
46:22, 49:15,
49:19, 50:1,
50:6, 50:19,
51:8, 54:9,
54:15, 58:22,
60:4, 60:6,
81:20, 89:13,
92:24, 93:24,
97:9, 97:18,
97:22, 98:16,
99:13, 100:1,
101:9, 108:18,
109:12, 111:10,
112:12, 112:21

**outcome**
33:1
**outside**
46:3, 48:17,
50:21, 62:12,
78:17, 91:24,
92:10, 111:2,
111:4
**over**
13:24, 15:5,
15:14, 18:17,
42:6, 61:11,
78:8, 80:17,
91:13, 94:9
**owned**
118:16, 120:6
**owner**
119:9
**ownership**
107:7
**owns**
118:19

---

**P**

**pace**
50:9
**pacing**
31:20
**pads**
98:17, 98:24
**page**
3:5, 3:15,
5:15, 18:6,
18:8, 18:10,
18:14, 86:1,
86:3, 91:13,
91:14
**pages**
18:4, 121:15
**pain**
100:1, 100:17,
101:3, 117:16
**paper**
48:15
**paragraph**
86:2, 86:3,
91:14, 92:16,
94:2, 98:9

**parallel**
90:9
**paramedics**
61:11
**park**
6:14, 7:15
**parked**
70:9, 78:17,
89:23, 90:2,
90:7, 102:20,
110:2
**part**
5:18, 25:15,
45:3, 113:15
**part-time**
6:21, 6:23, 7:7
**participate**
41:4
**particular**
10:3, 18:13,
22:14, 22:24,
24:16, 31:9,
63:11, 84:4,
84:12, 85:21,
107:7, 112:14,
115:23, 119:7
**particulars**
120:14
**parties**
121:21, 121:24
**passed**
86:8, 99:15
**passenger**
31:5, 31:17,
65:6, 69:22,
70:5, 70:15,
70:18
**past**
89:9, 90:9
**patrolling**
20:8
**pay**
12:12, 92:7
**paying**
109:10
**pays**
12:13, 105:12,
105:15

**peal**
16:2
**pedal**
71:8
**pedaling**
71:23
**pen**
16:16, 67:7
**pending**
5:20
**people**
43:4, 82:7,
102:21
**performing**
30:1, 47:23
**period**
47:21
**peripheral**
69:19
**permitted**
66:15
**person**
11:22, 12:10,
12:13, 19:22,
19:23, 30:22,
32:8, 32:14,
32:19, 32:20,
32:22, 33:3,
33:7, 33:9,
33:11, 35:2,
41:18, 48:1,
51:1, 51:3,
105:14, 119:18
**person's**
119:21
**personal**
19:23
**personnel**
42:22, 43:1,
60:19
**persons**
40:9, 41:16,
43:8, 43:15
**pertaining**
28:23
**phone**
47:12, 89:13,
111:9, 111:12,

**EXHIBIT D**

Transcript of Deputy Sean Coutts

Conducted on November 19, 2019

50

111:13, 111:16,
111:21, 111:24,
112:6
**phonetic**
82:16
**photograph**
56:10, 56:19,
66:12, 66:14,
66:16, 89:22
**photographer**
62:12
**photographs**
3:17, 3:18,
44:14, 55:23
**phrase**
18:13
**physical**
77:24, 101:4,
114:8
**physically**
63:19, 82:2,
83:2
**pick**
20:9, 20:14,
20:19, 94:6
**picture**
48:17, 62:13,
70:3, 90:1,
90:12
**pictures**
63:9, 67:2
**pillar**
70:8, 70:10
**pissed**
92:22
**place**
26:5, 38:1,
40:19, 40:24,
41:10, 45:14,
46:11, 55:8,
64:11, 69:3,
74:11, 76:21,
91:24, 92:13,
103:8, 104:19,
113:16
**placed**
32:22, 57:20,
57:23, 60:21

**plaintiff(s**
2:3
**plaintiffs**
1:14
**plate**
107:13, 107:17,
107:22, 108:2,
108:7, 118:21,
119:7, 119:17,
119:21, 120:2,
120:6
**please**
6:4
**point**
9:4, 14:8,
14:20, 21:23,
22:4, 23:2,
24:1, 26:21,
28:18, 30:23,
31:6, 32:2,
35:1, 35:13,
36:19, 37:6,
38:3, 38:6,
38:8, 39:21,
49:14, 49:15,
52:11, 58:4,
58:17, 58:21,
63:17, 68:17,
72:24, 77:12,
80:12, 82:22,
87:3, 88:20,
91:10, 95:1,
96:22, 99:13,
106:21, 111:17,
114:22, 115:1,
117:24
**pointed**
33:11
**police**
6:12, 6:15,
6:16, 6:20,
6:24, 7:1, 7:8,
8:19, 12:21,
12:24, 14:2,
14:13, 15:7,
15:19, 16:4,
16:13, 16:19,
17:14, 18:2,

25:20, 34:6,
38:16, 39:12,
39:22, 40:3,
40:8, 42:23,
73:23, 76:3,
76:7, 84:9,
85:1, 85:4,
85:11, 85:18,
87:4, 104:24,
106:16, 107:21,
112:13, 112:21,
113:3, 115:22,
120:3
**policy**
25:8, 25:22,
26:1, 26:5,
88:15, 88:22
**porch**
51:13, 91:23
**portion**
64:8, 70:6,
70:12
**posed**
66:13
**poses**
119:14
**position**
7:21, 36:17,
55:7, 62:11,
89:22, 96:4
**positioned**
38:9
**positioning**
56:22
**possession**
14:7, 14:14,
14:15
**possibility**
102:22
**possible**
28:19, 37:14,
39:15, 53:23,
75:22, 79:17,
84:16, 96:5,
100:9, 108:23
**possibly**
62:8, 80:7,
84:15, 92:16,

103:12, 116:18
**potential**
104:16
**potentially**
26:6, 39:13,
73:5, 73:7,
91:11, 102:20,
119:11
**practice**
12:8, 12:9
**precise**
43:24
**prefer**
12:8
**preferred**
12:9
**present**
41:17, 42:2,
42:17, 42:20,
43:4, 43:7,
44:6, 57:22,
73:5, 79:1, 79:9
**preserve**
103:19, 104:2
**presided**
42:6
**pressed**
114:13, 114:16,
114:19
**presuming**
22:5
**presumption**
27:6
**pretty**
26:22
**prevent**
30:18, 30:24,
63:13
**previous**
43:10
**previously**
86:10
**prior**
8:8, 8:14,
11:8, 14:16,
14:20, 14:23,
20:1, 47:8,
60:18, 70:9,

**EXHIBIT D**

Transcript of Deputy Sean Coutts
Conducted on November 19, 2019

51

84:21, 107:9,
107:13
**private**
41:12
**probably**
29:12, 55:8,
62:24, 83:11
**procedure**
4:17
**proceeded**
91:16
**proceeding**
120:23
**process**
74:6, 107:17
**professional**
8:13, 121:34
**professionally**
8:24
**profile**
83:11, 109:15,
109:18, 110:1,
110:12, 110:17
**prohibits**
25:19
**promotion**
8:5
**prompted**
9:22, 31:4
**protocol**
74:16, 103:2,
103:4, 103:8
**provide**
16:20, 19:6
**provided**
12:23, 15:18,
44:5, 60:18,
61:6, 72:15,
106:15
**providing**
16:11, 40:15,
54:4, 60:9,
60:15, 60:23,
61:2, 61:10,
88:9, 106:18
**psychological**
77:24
**pull**
20:23, 20:24,

58:18, 86:6,
87:21, 87:24,
89:3, 97:21,
102:5
**pulled**
33:6, 33:19,
49:16, 50:21,
58:23, 61:18,
68:15, 86:4,
86:7, 88:2,
89:5, 90:6,
94:17, 96:1,
98:15, 99:13,
102:17, 107:4,
108:8, 108:12,
112:7
**pulling**
32:18, 45:17,
84:21, 86:11,
86:18, 87:18,
102:5, 107:10,
107:13
**pulls**
36:21, 37:7
**pulse**
100:12
**purpose**
41:8
**pursuant**
4:16
**pursue**
28:18
**pursuing**
26:6, 28:8,
88:23, 107:21
**pursuit**
25:12, 25:16,
25:17, 26:15,
86:7, 86:11,
86:18, 87:13,
87:18, 87:21,
88:1, 88:7,
107:17, 108:4,
111:20
**pursuits**
25:19, 25:20
**put**
41:6, 59:15,

67:10, 96:11,
102:3, 114:22,
115:2

---

**Q**

**quality**
20:17
**question**
5:5, 5:10,
5:13, 5:20,
5:21, 16:19,
24:10, 66:12,
66:13, 66:14,
102:24, 118:15,
119:20
**questions**
17:1, 82:21,
83:17, 84:2,
84:4, 105:23,
106:3, 118:11,
119:15, 120:20
**quick**
83:18
**quickly**
109:12

---

**R**

**radio**
20:18, 24:24,
27:7
**ran**
118:21
**range**
47:24
**rapid**
68:3
**rate**
114:4
**rather**
92:8
**reach**
116:13
**reached**
46:21, 46:22
**reacting**
93:9
**reaction**
111:1, 111:3,

117:24
**read**
15:5, 15:14,
18:9, 18:17,
64:7, 64:8,
93:2, 98:3, 98:7
**reading**
89:3
**realize**
109:8, 110:17
**realized**
98:20
**really**
58:13, 109:9
**rear**
94:15
**reason**
22:18, 23:14,
24:11, 56:24,
77:22, 85:22,
87:2
**reasonable**
26:5
**reasoning**
84:7
**recall**
13:1, 21:5,
21:7, 21:8,
21:12, 22:3,
22:7, 24:19,
33:23, 38:7,
40:1, 41:2,
41:15, 41:16,
41:23, 43:16,
44:9, 44:24,
51:5, 51:23,
54:7, 54:10,
57:24, 60:3,
60:24, 72:20,
72:23, 73:3,
73:8, 75:19,
78:24, 79:4,
79:8, 82:20,
108:5, 116:1,
116:16, 116:18
**recalling**
30:21
**receive**
80:19

**EXHIBIT D**

Transcript of Deputy Sean Coutts
Conducted on November 19, 2019                    52

received
44:9
recess
83:19
recognize
17:22
recognized
98:21
recollection
18:19, 31:11,
43:3, 43:6,
45:10, 52:12,
52:19, 63:22,
83:9, 91:22,
92:5, 93:6
record
4:14, 21:1,
64:8, 66:11,
66:18, 121:16
recorded
21:19
recording
20:9, 21:6
recreate
59:20
red
67:7
reduced
121:13
reference
7:4, 14:12,
69:21, 70:6,
76:22
referring
68:21
reflect
4:14
reflects
96:7
refresh
91:22, 92:4,
93:5
regard
84:4, 85:16,
88:20, 91:6,
91:18, 94:24,
98:1, 102:6,
104:3, 104:18,

104:20, 120:9
regarding
40:11
register
100:11
registered
100:13, 120:14,
121:34
regular
84:11
relate
48:18
related
12:16, 28:15,
121:20
relates
10:21, 26:6
relation
89:21, 102:18
relative
74:3, 75:24,
76:11, 121:23
remember
13:20, 17:12,
21:9, 21:10,
21:21, 29:10,
33:16, 33:22,
37:13, 39:18,
42:3, 42:8,
42:13, 42:18,
42:21, 42:24,
43:2, 43:13,
43:14, 44:8,
44:20, 45:12,
45:17, 47:1,
47:12, 49:6,
49:8, 51:12,
52:3, 52:17,
52:21, 59:14,
61:1, 63:10,
67:15, 68:16,
72:24, 73:17,
74:5, 74:10,
75:1, 75:11,
75:13, 78:18,
79:7, 80:1,
80:20, 83:15,
94:11, 95:23,

96:13, 100:4,
100:9, 105:8,
108:17, 108:24,
111:6, 111:11,
111:15, 111:16,
111:22, 112:2,
112:4, 112:5,
114:20, 116:4
remembered
94:20
remove
103:3
removed
56:2, 60:16,
72:14, 109:5,
115:6, 115:9,
115:13, 115:19,
115:21
removing
104:15
repeat
104:12
rephrase
5:13, 14:10,
23:1, 23:21,
34:3, 64:6,
73:21
report
12:20, 12:22,
18:22, 19:8,
44:10, 86:1,
98:3, 98:7,
113:6, 113:8,
113:10, 113:11,
113:14
reported
78:6, 111:19
reporter
4:9, 5:8, 5:24,
6:3, 121:6,
121:34
reports
104:2
represent
83:24
requested
64:8
reserve
120:22

residence
46:12, 46:14,
102:17, 102:22
resisting
34:21
resort
29:22, 30:4
respond
82:5
responded
80:23
responses
6:1
restate
5:13, 36:6,
37:4, 119:4,
119:24
retrieve
98:13
reverse
70:9, 96:12,
115:1, 115:7
review
44:12
reviewed
12:15, 12:19,
13:2, 13:7,
13:13, 14:5,
14:19, 14:23,
15:5, 19:11,
55:3
reviewing
15:12
riley
41:20, 42:19,
56:8, 86:8,
89:6, 89:12,
90:18, 98:16
rings
82:16
risk
88:9, 91:12
road
2:25, 11:5,
37:11, 37:15,
37:16, 40:4,
55:8
roadway
38:10, 38:15,

Transcript of Deputy Sean Coutts
Conducted on November 19, 2019 53

rock
1:18, 1:30,
7:4, 9:24,
10:14, 11:2,
11:6, 11:15,
13:21, 38:9,
38:14, 40:21,
57:13, 57:14,
60:23, 67:8,
74:23, 75:23,
76:3, 82:10,
82:11, 84:1,
85:1, 85:4,
86:2, 87:4,
116:23, 120:3,
121:3
rocking
94:21, 100:23
role
53:7, 82:4,
82:5
roll
48:16
rolled
92:24, 97:2
rolls
114:5
rounded
26:22
route
37:5, 37:9,
37:18
routinely
29:16
rpr
121:33
rule
30:1, 66:12,
66:15, 84:9
rules
4:16, 4:17, 5:1
run
49:20, 71:13,
71:15, 91:2,
91:16, 94:9,
107:18, 107:22,
108:7, 119:7,

119:17, 120:2,
120:5
running
20:13, 20:23,
21:1, 50:17,
71:23, 89:12,
89:13, 90:18,
90:22, 90:23,
91:5, 91:15,
112:10, 112:13,
112:16, 112:22
rush
50:2

**S**

s-a-u-k
28:1
s-c-h-m-i-d-t
22:11
s-e-a-n
4:12
safe
82:7, 84:10
safety
104:8, 104:16,
105:19
said
16:15, 24:6,
30:24, 31:17,
35:18, 42:20,
45:11, 47:15,
52:4, 52:6,
54:24, 70:10,
80:12, 84:5,
85:16, 85:18,
101:22, 102:24,
105:5, 117:24,
121:12, 121:16
same
5:6, 5:15,
9:17, 28:11,
57:8, 78:8,
89:16, 103:12
sat
15:6
sauk
27:24, 28:10
saw
11:1, 13:18,

13:22, 15:9,
19:11, 21:13,
36:20, 36:24,
37:3, 37:6,
37:10, 37:22,
49:6, 52:20,
59:22, 68:9,
68:12, 90:22,
108:19, 116:13,
117:10, 117:13,
117:16, 117:24
say
6:2, 12:5,
15:2, 16:5,
20:16, 20:23,
21:8, 23:1,
24:1, 28:21,
32:11, 35:8,
36:14, 37:17,
41:1, 41:18,
42:6, 43:10,
43:14, 44:21,
46:17, 46:20,
48:24, 49:1,
50:1, 50:8,
51:9, 51:14,
51:17, 54:3,
58:10, 58:12,
58:14, 58:17,
61:5, 62:10,
63:19, 64:13,
65:15, 66:7,
68:20, 69:13,
69:14, 69:22,
70:22, 71:6,
72:4, 72:9,
73:14, 75:13,
78:8, 81:18,
84:6, 95:6,
95:17, 95:18,
95:24, 99:10,
104:17, 107:4,
107:19, 108:6,
111:5, 112:4,
113:10, 114:2,
116:17, 117:4
saying
10:11, 25:18,

35:20, 36:2,
54:14, 54:15,
75:14, 113:8
says
18:5, 18:9,
52:13, 86:4,
89:2, 91:15,
93:23, 94:2,
95:23, 98:10
scenario
35:21, 36:8,
53:3
scene
73:1, 73:12,
73:13, 73:20,
73:22, 74:2,
74:7, 74:20,
74:24, 75:3,
76:18, 79:1,
88:10, 103:3,
103:20, 104:3,
104:15, 105:11
schain
2:15
schmidt
22:10, 23:2,
32:1
school
27:20, 27:22
schwartz
2:15
sean
1:23, 3:3, 4:1,
4:10, 4:11, 4:16
search
33:9, 33:15
searched
82:23
seat
49:7, 94:22,
99:7, 99:13
seated
36:9, 52:7,
54:8, 83:7
second
12:13, 87:12,
105:6, 105:19
seconds
68:6, 69:9,

**EXHIBIT D**

Transcript of Deputy Sean Coutts
Conducted on November 19, 2019

54

69:3, 69:9,
110:8, 110:11,
110:13, 110:14,
110:16
**see**
18:11, 38:8,
39:6, 48:21,
48:22, 49:1,
49:2, 49:4,
50:20, 53:23,
56:23, 57:18,
58:4, 59:9,
59:12, 60:1,
60:22, 61:22,
62:2, 65:2,
65:23, 67:14,
67:19, 82:15,
83:10, 83:14,
89:16, 92:16,
92:23, 95:8,
96:11, 98:11,
100:3, 103:16,
108:21, 109:14,
111:23, 114:2,
114:15, 114:18,
116:3, 116:23
**seeing**
63:23, 94:11,
95:23, 112:5
**seemed**
93:14
**seen**
13:13, 13:16,
50:5, 82:18,
97:7, 113:23,
113:24
**seldom**
7:19
**semester**
27:23
**sense**
7:16, 28:14,
30:12, 32:20
**sent**
46:15, 46:17,
46:18, 78:5
**sentence**
91:14, 92:17,

98:11
**separate**
19:21, 74:17
**sequence**
68:9, 69:3
**sergeant**
8:7, 22:5,
22:10, 22:16,
22:23, 23:2,
23:22, 24:3,
24:12, 24:16,
24:22, 25:1,
25:9, 26:10,
27:7, 32:1,
79:12, 79:15,
79:24, 103:1
**serious**
91:6, 91:10
**served**
66:21
**session**
16:20
**set**
102:20, 121:27
**several**
18:5, 53:15,
78:11
**sheer**
43:20
**sheet**
121:9
**shell**
58:4
**sheriff's**
6:7
**shift**
9:18
**shirt**
98:18, 99:8,
99:14, 100:5
**shock**
98:24
**shoot**
48:3, 94:18,
113:12
**shooting**
8:8, 8:15,
12:17, 19:5,

24:17, 24:21,
25:6, 34:10,
37:24, 40:24,
44:17, 45:11,
45:23, 46:2,
46:9, 46:14,
48:18, 55:5,
55:7, 56:3,
56:16, 56:18,
57:2, 57:4,
58:11, 58:14,
69:2, 72:8,
73:1, 76:1,
76:5, 76:9,
76:13, 76:22,
77:5, 77:9,
77:12, 90:14,
91:24, 92:13,
98:5, 103:5,
104:9, 104:15,
104:20, 109:11,
111:23, 116:24
**shorthand**
121:5
**shortly**
88:1
**shot**
33:19, 33:24,
34:4, 34:8,
46:8, 48:5,
48:7, 52:3,
52:7, 52:13,
58:23, 61:3,
67:24, 68:24,
70:2, 70:7,
70:21, 71:3,
94:3, 97:11,
97:12, 97:14,
97:21, 117:5,
117:11
**shots**
48:20, 49:1,
49:5, 49:8,
49:11, 52:18,
58:20, 59:8,
61:23, 62:6,
66:23, 68:2,
68:5, 69:6,

69:8, 69:11,
69:16, 72:9,
83:8, 94:20,
109:7, 109:15,
109:18, 110:2,
110:21, 113:5,
113:14
**should**
4:14, 22:6,
22:16, 30:1
**shout**
100:1
**show**
45:4, 51:24,
54:15
**showing**
35:11
**shown**
17:5, 55:22,
56:6, 56:17,
62:6, 63:3,
63:14, 64:17,
65:1, 90:1
**shows**
56:1
**side**
56:9, 63:11,
65:6, 66:2,
70:17, 70:18,
74:11, 83:11
**sign**
18:5, 117:16
**signature**
18:4, 18:6
**signature-k9lvk**
121:30
**signatures**
18:5
**significant**
35:20
**signify**
102:6
**signing**
18:9
**signs**
100:17
**simple**
106:22, 118:24,

**EXHIBIT D**

Transcript of Deputy Sean Coutts

Conducted on November 19, 2019

55

119:13
**simply**
16:20, 23:11,
23:24, 106:14,
112:16
**since**
7:12, 8:16,
82:18
**single**
118:7
**sir**
4:8
**site**
13:14
**sits**
70:3
**sitting**
49:7, 93:7,
109:1
**situated**
51:10, 56:17
**situation**
33:17, 53:15,
53:19, 54:5,
54:12, 88:17,
88:23, 91:9,
91:10, 96:14,
96:16, 96:17,
98:3, 98:6,
102:7, 102:12,
105:7, 120:9,
120:16
**situations**
8:21
**six**
6:11
**sleep**
46:16
**sleeping**
47:8
**slow**
108:3, 111:20,
114:3
**slowly**
39:11
**small**
48:17
**smell**
101:10, 101:13

**smelled**
98:22
**so-called**
79:2
**social**
13:14
**some**
5:1, 7:21, 9:4,
9:13, 10:4,
12:15, 13:16,
14:8, 14:20,
18:22, 19:5,
19:11, 21:23,
22:4, 23:2,
24:7, 25:8,
28:17, 32:2,
32:8, 33:3,
34:21, 36:13,
38:3, 38:8,
44:16, 49:15,
57:18, 58:4,
61:6, 63:17,
68:16, 72:7,
72:13, 72:15,
77:14, 77:23,
79:15, 80:12,
80:13, 81:11,
82:22, 84:13,
102:21, 106:21,
108:7, 111:17,
112:9, 114:22,
115:1, 115:2,
117:10, 117:13,
117:16, 117:20,
117:24
**somebody's**
84:8
**somehow**
9:14, 66:7,
74:19
**someone**
32:12, 34:20,
42:9, 84:13,
110:23, 118:22
**something**
24:13, 28:24,
33:9, 88:24
**sometimes**
6:1

**somewhat**
59:18, 66:22,
78:3, 107:1
**somewhere**
64:16, 101:23
**sorry**
70:19
**sort**
77:23, 84:14,
102:21
**sound**
20:9, 20:17,
21:6, 21:14,
21:19, 94:8,
96:8, 118:2
**south**
2:7, 37:15
**space**
70:23, 71:2
**speak**
4:3, 79:6,
99:22
**speaking**
93:14
**special**
16:1, 28:20
**specific**
35:9, 48:16,
87:2, 88:21,
88:22
**specifically**
13:20, 21:11,
24:6, 37:5,
39:19, 40:18,
41:2, 41:19,
45:13, 45:17,
46:5, 47:16,
48:2, 53:11,
60:3, 60:14,
61:2, 68:14,
69:14, 72:7,
72:12, 72:21,
74:10, 75:1,
100:10, 108:24
**specifics**
33:23, 68:18,
75:19, 77:22,
80:1

**speculate**
27:5
**speculation**
23:18, 26:14,
36:4, 39:2,
114:10
**speed**
38:1, 108:3,
111:20, 114:4
**spell**
4:9, 79:13
**spelling**
4:11
**spend**
47:5
**sprawled**
94:16, 96:3
**squad**
13:11, 13:12,
20:3, 38:23,
38:24, 39:1,
39:4, 39:7,
39:8, 98:10,
98:13
**ss**
1:2, 121:2
**stamp**
67:8
**stand**
67:3
**standing**
51:12, 62:6,
96:24, 106:10
**stapf**
1:33, 121:5,
121:33
**start**
31:13, 51:9,
112:10
**started**
31:18, 31:20,
31:22, 94:18,
95:2, 101:19,
112:13, 113:4,
113:12
**starting**
27:19, 56:9
**starts**
92:17, 112:21

**EXHIBIT D**

Transcript of Deputy Sean Coutts
Conducted on November 19, 2019

56

**state**
1:1, 4:8, 4:18,
12:21, 12:23,
14:2, 14:12,
15:7, 15:19,
16:4, 16:12,
16:19, 17:14,
18:1, 40:8,
42:23, 85:20,
104:24, 106:15,
113:2, 121:1
**stated**
66:17, 121:8
**statement**
3:16, 12:23,
14:2, 14:5,
14:8, 14:11,
14:15, 14:23,
15:6, 15:8,
15:9, 15:21,
16:5, 16:11,
17:5, 17:13,
17:24, 18:1,
18:10, 18:16,
18:18, 18:21,
19:6, 19:7,
106:6, 113:2
**states**
1:4, 121:6
**step**
21:2
**stepped**
71:7
**stepping**
31:22, 74:10,
74:19
**sterling**
43:1, 76:7,
82:10
**sternum**
83:12
**still**
20:4, 21:1,
49:12, 52:19,
62:16, 74:7,
88:19, 92:9,
94:19, 113:13
**stop**
9:24, 10:5,

10:7, 10:8,
10:15, 10:19,
10:22, 11:3,
20:24, 22:18,
23:11, 23:15,
23:24, 24:2,
24:11, 24:18,
24:20, 25:3,
25:11, 31:13,
34:2, 34:10,
36:11, 53:4,
53:6, 84:5,
84:6, 84:11,
84:18, 85:5,
86:15, 86:17,
86:19, 88:3,
88:9, 88:21,
91:12, 102:2,
102:12, 102:15,
106:23, 107:2,
113:18, 114:8,
115:3, 118:24,
119:1, 119:12,
119:13, 120:9
**stopped**
32:20, 35:2,
63:17, 63:19,
84:20, 88:3,
88:7, 113:19
**stopping**
10:20, 84:8,
85:8, 119:19
**stops**
88:16
**street**
1:29, 2:7,
2:16, 11:4,
37:12, 37:13,
37:16, 38:5,
38:10, 55:9,
61:18, 63:12,
84:21, 85:4,
86:5, 107:5,
112:8
**street's**
37:14
**streets**
37:23, 38:5

**strike**
38:6, 39:1,
39:4
**striking**
39:22
**struck**
94:11, 94:14,
95:19, 106:5,
106:7
**study**
28:7
**subject**
28:24, 42:12,
66:16, 75:14,
75:21, 80:24
**succession**
68:3
**sugars**
9:12, 9:14,
13:12, 41:19,
42:19, 51:19,
52:5, 52:6,
52:13, 56:14,
56:16, 60:7,
89:4, 89:11,
90:17, 93:2,
94:3, 94:5,
98:14, 113:24
**suggest**
101:5
**suggested**
106:7
**suggesting**
116:18
**suing**
101:1
**suite**
2:7, 2:16
**suites**
1:28
**summer**
77:20, 78:9,
80:18
**superior**
22:12, 42:16
**supervision**
121:14
**supervisor**
86:6, 87:5

**support**
45:4
**supposed**
87:15, 87:20
**sure**
4:20, 4:24,
5:14, 9:2, 15:4,
19:9, 20:21,
35:6, 41:21,
41:24, 45:8,
47:19, 60:20,
63:21, 70:24,
72:17, 77:21,
82:8, 97:13,
98:22, 101:7,
108:10, 108:20,
109:5, 109:19,
119:6, 120:2
**surprised**
58:10, 58:12
**surrounding**
76:12
**surroundings**
12:14
**switched**
99:2
**sworn**
4:2, 121:9

———————— T ————————

**take**
5:16, 5:21,
5:24, 6:3, 8:1,
9:13, 14:7,
14:19, 15:14,
18:16, 20:23,
29:13, 29:20,
33:4, 40:19,
40:24, 42:4,
44:4, 46:11,
53:6, 53:17,
58:7, 61:11,
71:18, 80:8,
83:18, 97:18,
100:3, 113:16
**taken**
4:16, 56:20,
83:19, 121:22

**EXHIBIT D**

Transcript of Deputy Sean Coutts
Conducted on November 19, 2019

57

takes
37:24
taking
16:13, 16:17,
50:8, 82:2
talk
5:6, 13:17,
73:2
talked
85:17, 90:21,
96:15
talking
25:5, 26:23,
30:3, 40:9,
65:5, 66:1,
72:24, 77:9,
77:11, 77:21,
86:9, 111:7
taser
29:6, 29:9,
29:14, 29:16,
30:5, 30:9,
30:24, 31:4,
32:2, 32:5,
32:7, 32:18,
33:7, 33:11,
33:19, 33:20,
34:1, 34:5,
34:8, 34:10,
35:1, 35:10,
35:22, 36:1,
36:8, 36:14,
96:15, 96:16,
96:23, 97:5,
97:8, 98:2, 98:6
tasers
97:4
technical
97:16
tell
9:21, 10:24,
12:19, 13:6,
13:9, 13:18,
14:22, 15:4,
19:17, 22:15,
22:20, 23:16,
27:18, 28:7,
29:18, 30:16,

31:3, 37:5,
37:7, 39:20,
42:11, 46:4,
47:14, 47:16,
49:11, 49:13,
51:22, 55:5,
60:14, 62:14,
63:9, 67:17,
68:14, 72:21,
77:17, 79:11,
79:19, 80:16,
80:17, 82:12,
86:17
telling
64:15, 67:18,
93:10, 109:24,
110:19
term
34:16, 52:23,
53:11, 53:14
terms
5:1, 15:18,
19:10, 22:3,
25:9, 29:22,
29:24, 34:13,
34:23, 35:11,
37:18, 43:15,
43:20, 45:11,
53:17, 60:1,
60:15, 61:2,
73:19, 79:22,
81:9, 83:7,
97:16
testified
4:4, 102:4,
106:4
testify
121:10
testimony
21:18, 43:10,
68:8, 68:11,
105:8, 106:6,
113:1, 113:6,
115:5, 117:3,
121:16
th
121:28
themselves
74:18

thereupon
121:12
thing
5:16, 5:19,
5:23, 48:16,
59:14, 100:13
things
5:3, 6:2, 40:10
think
13:20, 25:2,
40:4, 40:17,
40:20, 40:22,
41:14, 41:19,
45:6, 57:6,
57:7, 59:18,
62:8, 83:16,
86:14, 95:18,
98:2, 98:5,
99:9, 105:22,
111:11, 119:15,
120:16
thinking
95:7
third
98:11
thought
39:13, 39:16,
39:23, 84:5,
84:14, 91:6,
93:20, 94:8,
98:19, 112:9
three
13:8, 49:23,
99:4
through
13:14, 20:12,
20:18, 21:19,
29:2, 45:7,
48:15, 97:5,
97:7, 100:24
throughout
37:20, 37:22
thumb
84:9
time
5:4, 5:7, 5:12,
10:3, 11:21,
13:22, 14:4,

14:8, 14:22,
15:5, 15:9,
19:22, 22:13,
22:14, 25:4,
29:4, 37:22,
40:17, 40:23,
46:1, 46:4,
47:5, 47:21,
56:16, 56:17,
56:19, 57:2,
58:16, 58:22,
61:23, 72:7,
72:13, 78:8,
81:21, 84:8,
84:12, 85:21,
87:7, 87:9,
92:8, 93:1,
95:7, 99:6,
99:10, 99:11,
99:15, 99:21,
100:24, 101:8,
101:19, 101:24,
102:19, 107:6,
108:7, 108:11,
112:14, 115:19,
117:5, 120:13
times
39:6, 99:4
title
6:16, 7:20, 8:2
today
14:24, 29:13,
51:3, 67:18
together
26:20, 47:6
told
14:1, 19:10,
34:4, 36:6,
53:6, 65:19,
69:2, 73:11,
73:19, 74:2,
74:5, 74:23,
75:2, 75:3,
78:13, 83:5,
88:3, 103:1,
106:21, 109:14,
113:20
took
16:5, 17:2,

**EXHIBIT D**

Transcript of Deputy Sean Coutts
Conducted on November 19, 2019

58

31:22, 37:17,
41:10, 42:9,
42:14, 45:14,
55:8, 60:6,
64:10, 69:3,
74:11, 76:21,
91:24, 92:13,
99:9, 101:18,
104:19
**tool**
29:19
**top**
91:14, 106:8
**torso**
94:12, 113:3
**touch**
115:22, 116:4,
116:14, 116:24
**touching**
94:15
**towards**
31:23, 32:19,
59:3, 59:6,
59:23, 92:11
**towel**
48:16
**trade**
28:24, 29:2
**traffic**
10:5, 10:7,
10:8, 10:15,
10:18, 10:21,
20:24, 22:19,
23:11, 23:15,
23:24, 24:2,
24:18, 24:20,
24:24, 25:3,
25:10, 25:20,
26:6, 27:9,
27:14, 31:13,
31:15, 34:2,
34:10, 53:4,
84:4, 84:6,
84:11, 86:15,
86:17, 86:19,
88:9, 88:16,
91:12, 102:12,
102:15, 106:23,

107:2, 118:24,
119:1, 119:12,
119:13
**training**
29:3, 47:24
**transcript**
121:15
**transcription**
14:13
**transformed**
88:24
**transport**
81:23, 82:1
**transported**
77:23, 81:10,
81:17
**traumatic**
45:7
**travel**
37:6, 37:9,
37:21, 37:22,
39:20, 89:7
**traveling**
38:1, 38:4,
38:11, 39:11,
94:19, 113:13
**tree**
64:11, 64:15,
65:8, 65:20,
65:23, 66:1,
66:4, 66:7,
66:21
**trigger**
45:18, 68:15,
97:22
**trouble**
47:8
**truck**
94:18
**true**
18:18, 97:3,
97:4, 121:8,
121:15
**trunk**
94:13, 106:8,
113:4, 113:12,
113:15, 113:16
**truth**
4:3, 18:11,

121:10
**trying**
10:15, 11:2,
21:17, 59:20,
118:5
**tunnel**
47:18, 48:11,
48:14
**turn**
37:14
**twice**
94:5, 120:4
**two**
15:10, 15:12,
39:9, 41:1,
79:21, 82:7,
99:19, 105:1,
109:22, 110:1
**type**
7:17, 15:22,
28:12, 75:23,
76:12, 108:7
**typed**
15:24
**typical**
47:5, 50:16,
74:16, 84:6,
103:4
**typically**
12:7, 53:6,
105:12
**tyrone**
98:19

| U |
| --- |

**uh**
86:13
**uh-huh**
5:22, 6:2
**ultimately**
32:22, 37:23,
80:8, 81:3
**under**
32:22, 66:12,
94:17, 96:1,
96:4, 112:22,
121:13, 121:14
**underneath**
67:11, 96:6

**understand**
5:12, 6:6,
8:18, 10:11,
20:6, 21:17,
34:18, 36:2,
41:10, 103:19
**understanding**
19:3, 22:15,
26:3, 34:12,
45:14, 53:13,
81:16, 85:3
**unexpected**
58:15
**unfavorable**
84:14
**unfold**
39:10
**united**
1:4
**unknown**
102:22, 102:23
**unobstructed**
64:4, 64:13
**until**
6:19, 37:6,
58:20, 58:22,
84:18, 99:4,
99:7, 102:2
**unusual**
107:16, 107:20
**upper**
94:12
**use**
11:24, 29:21,
29:22, 30:2,
31:4, 34:13,
35:22, 36:1,
36:8, 36:21,
90:3, 112:15,
112:23
**using**
34:9, 34:24,
35:10, 70:4,
95:2, 95:11,
96:15, 97:14
**usual**
88:8
**usually**
12:10

**EXHIBIT D**

Transcript of Deputy Sean Coutts
Conducted on November 19, 2019

59

**uttering**
53:8

## V

**valley**
27:24, 28:10
**various**
7:18, 37:23,
38:4, 104:2,
112:20
**vehicle**
10:1, 11:23,
12:1, 19:12,
21:13, 31:6,
31:9, 35:2,
36:18, 36:21,
38:6, 38:10,
55:4, 56:15,
56:17, 57:17,
62:15, 63:24,
64:4, 64:12,
64:21, 65:6,
65:7, 65:14,
66:9, 68:16,
70:20, 82:23,
85:5, 85:7,
89:3, 89:7,
89:9, 89:14,
89:15, 89:19,
89:23, 90:2,
91:16, 92:23,
93:1, 93:24,
94:7, 94:8,
94:10, 94:13,
94:14, 94:17,
94:19, 95:2,
95:3, 95:12,
96:2, 96:4,
96:6, 96:8,
98:15, 106:5,
106:13, 113:4,
113:13, 113:24,
114:21, 115:6,
115:9, 115:13,
115:20, 115:23,
120:12, 120:14
**vehicles**
56:6, 56:23,

57:1, 57:2,
88:23
**verbal**
5:24
**versus**
119:12
**vicinity**
90:8
**victim**
104:9, 104:16
**video**
13:14, 13:16,
13:18, 19:11,
19:12, 19:15,
20:8, 21:5,
21:13, 44:12,
50:5, 55:2,
113:23, 113:24
**videos**
12:20, 13:5,
13:7, 13:10
**view**
65:1, 91:9,
114:5
**violation**
22:19, 23:12,
27:10, 27:14
**violations**
7:18, 25:20
**violator**
26:6
**vision**
47:18, 48:11,
48:14, 69:19
**vocal**
79:23
**voice**
54:8
**vs**
1:16

## W

**walk**
61:19, 63:15
**walkthrough**
76:17, 76:21,
76:24
**walkway**
62:21, 63:5

**want**
5:14, 16:3,
41:1, 55:3,
66:6, 78:8,
97:13, 117:3
**wanted**
17:9
**watched**
21:4
**watching**
39:10, 110:1
**way**
8:8, 15:21,
21:5, 29:4,
62:22, 73:8,
79:4, 88:11,
89:7, 93:16,
93:22, 97:1,
102:3, 107:21,
120:7
**we'll**
120:22
**we're**
25:5, 58:21,
62:16, 77:9,
77:21, 97:13,
111:7
**we've**
26:20
**weapon**
29:21, 30:6,
36:18, 36:21,
47:23, 58:5,
58:19, 58:24,
59:2, 59:5,
64:3, 67:13,
67:14, 67:19,
68:12, 72:3,
72:11, 72:16,
73:12, 73:20,
73:24, 74:3,
74:13, 74:17,
74:21, 74:24,
75:4, 75:9,
83:3, 95:3,
95:12, 102:5,
102:6, 103:2
**weeks**
15:10, 15:12,

41:1
**welcome**
4:23
**went**
27:7, 27:24,
28:6, 46:20,
47:3, 47:14,
78:10, 79:1,
82:8, 85:17,
94:22, 98:10,
98:13, 98:24,
99:7, 99:12,
100:23
**weren't**
10:20, 71:23,
90:22, 101:7
**west**
2:16, 7:6,
37:15
**western**
1:3, 1:6
**wet**
98:23
**whatever**
103:14
**whereof**
121:27
**whether**
22:22, 36:1,
36:7, 38:5,
85:23, 91:23,
93:6, 95:6,
101:7, 104:19,
107:12, 108:2
**white**
11:1, 51:10,
56:2, 56:14,
61:14, 62:2,
63:16, 65:20,
66:23, 89:3,
89:6, 89:8,
89:14, 89:15,
91:15, 92:23,
94:9, 94:13,
94:14, 98:15,
109:2, 118:16,
118:19, 119:8
**whiteside**
6:6, 6:10,

6:13, 7:22, 8:1,
8:17, 8:20, 9:4,
9:7, 11:16,
11:17, 20:7,
25:8, 26:4,
27:8, 30:9,
42:1, 76:11,
76:14, 78:21
**window**
94:15
**windows**
92:23, 97:1
**wise**
8:5
**within**
41:1, 63:12,
64:16, 68:5,
68:8, 69:3,
69:8, 70:23,
71:2, 80:4
**without**
32:9, 82:14,
103:15
**witness**
2:21, 3:3,
3:16, 4:2, 66:5,
66:18, 67:12,
121:9, 121:12,
121:16, 121:27
**woman**
89:12, 119:9
**word**
14:14, 16:12,
81:2
**words**
52:15
**work**
6:21, 7:7, 45:6
**worked**
6:12, 6:14,
7:11, 7:15,
26:20
**working**
9:17, 78:19
**works**
97:9
**wouldn't**
36:15, 38:22,

54:6, 58:12,
58:13, 64:12,
85:12, 85:19,
96:24, 107:16,
118:6, 120:15
**wound**
90:14
**writing**
16:15, 16:16,
121:13
**written**
14:23, 15:6,
17:24, 25:22,
25:24
**wrong**
82:14

---
**Y**

**yard**
61:15
**yards**
62:24, 63:1,
70:22, 70:23,
71:2, 106:12
**yeah**
21:10, 42:10,
44:4, 47:10,
61:24, 80:11,
111:8
**year**
6:15, 7:13,
13:24
**years**
6:11, 26:21
**yelled**
52:16, 94:3,
94:4
**yelling**
51:16, 51:18,
51:20, 54:3,
54:8
**yep**
92:19
**yesterday**
14:6, 14:16,
14:20
**yield**
10:1

**young**
50:20
**yourself**
23:15, 41:7,
42:19, 50:5,
61:1, 87:16

---
**.**

**.2880**
2:9
**.5700**
2:18
**.8405**
2:27

---
**0**

**00**
1:26
**004144**
1:33, 121:36
**084**
1:33, 121:36

---
**1**

**1**
120:23
**10**
61:8, 64:23,
65:15, 70:22,
70:23, 71:2,
101:23, 106:12,
121:28
**100**
86:5
**1020**
2:7
**106**
3:6
**11**
1:26
**1168**
121:37
**118**
3:7
**12**
70:22, 70:23,
71:2, 106:12
**140**
2:7

**15**
64:23, 65:15
**18**
1:16, 3:16
**19**
1:25

---
**2**

**20**
1:25, 43:5,
43:21, 65:2,
65:7
**2012**
6:19
**2013**
6:19, 8:17
**2014**
29:12
**2019**
1:25, 121:28
**222**
86:2
**224.406**
2:27
**2474**
57:15
**2485**
57:12, 57:14,
65:16, 67:8
**25**
62:24
**2nd**
1:29

---
**3**

**30**
62:24, 66:12,
66:15, 110:15,
110:16
**301**
1:29
**312.262**
2:9
**312.345**
2:18

---
**4**

**44**
120:23

**EXHIBIT D**

Transcript of Deputy Sean Coutts
Conducted on November 19, 2019          61

**475**
2:25

| 5 |
| --- |

**50**
28:16
**50035**
1:16
**5300**
2:16
**55**
3:17, 3:18

| 6 |
| --- |

**60**
110:8, 110:11,
110:13, 110:14
**60062**
2:26
**60602**
2:17
**60603**
2:8
**650**
2:25

| 7 |
| --- |

**70**
2:16

| 8 |
| --- |

**83**
3:7

**EXHIBIT D**

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

## ILLINOIS STATE POLICE
ZONE 2 STERLING



Case No:     18-10494ST
Date:        1/31/18
Start Time:  9:55AM

# STATEMENT

| **Name:** | Sean J. Coutts | **DOB:** | 5-10-91 | **Department:** | Whiteside County Dept. |

My name is Sean J. Coutts and I am employed as a Sheriff Deputy for the Whiteside County Sheriff's Department. With me is Illinois Fraternal Order of Police Labor Council Union Representative Jay Titus. Today, January 31st, 2018, I provided this statement to Special Agent L. Kuehl and Special Agent V. Rhodes from the Illinois State Police Zone 2 Investigations. Prior to today's interview at approximately 9:00AM I reviewed my in car video from 1-26-18.

I have been employed with the Whiteside County Sheriff's Department for approximately 4 years. Prior to the Whiteside County Sheriff's Department I worked for the Oregon Park Police Department.

On 1-26-18 I started my shift at 5:30PM with my actual shift going from 6:00PM to 6:00AM. Prior to my shift I had two days off from work. On 1-26-18 I went to sleep at approximately 2-2:30AM and woke up around 2:00PM. When I woke up I ate some food and went to the gym to work out. After my work out I went home and relaxed for an hour before getting ready for work at approximately 4:45PM. On 1-26-18 my assignment was patrol duties. I wore a fully marked Whiteside County Sheriff's Office uniform which is brown in color and drove a fully marked Whiteside County Sheriff's Department squad car. My duty weapon is a Glock 22 40 caliber pistol loaded to capacity with one round in the chamber.

At the start of my shift I drove to the Whiteside County Highway building to get gas for my squad car. After getting gas I received a call for service for a vehicle in the ditch on Tampico Road. I responded to the registered owners address and spoke with the driver of the vehicle in Tampico. While in Tampico I received a call for service of a suspicious person on Lincoln Street in Rock Falls. The suspicious person was described as a black male around 5'9", medium length hair, in a dark newer vehicle knocking on a resident's door asking for a person named Angela. I drove to the area of the suspicious person call at approximately 7:30PM. I did not make contact with the complainant of the call but checked the area for the vehicle.

In the area of Dixon Avenue and Avenue E I activated my in car camera in case I made contact with the suspicious person. I traveled to Martin Road and went northbound until coming to Lincoln Street. As I traveled near Emmons Avenue and Lincoln Street I observed a vehicle that matched the description from the suspicious call. I attempted to make contact at the residence where the vehicle was parked at. I eventually made contact with a female at the

Before signing, I have read/or had read to me this page to make certain that it is my statement and that it is the truth.

Witness  SA ___ ___ 6414          Signed: _____

Date: 1-31-18

Witness  S/A ___ 5756             Time Completed: 1:55 pm

**EXHIBIT**
**1**

Page 1                                    **Rock Falls  0221**

**EXHIBIT D**

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**ILLINOIS STATE POLICE**
ZONE 2 STERLING

Case No:  18-10494ST

CONTINUATION OF STATEMENT OF  Sean J. Coutts

residence who stated the vehicle belonged to a family member and determined not to be of the person described in the call for service.

After making contact with the registered owner of the vehicle I heard Deputy Elder state on the radio Rock Falls Police were attempting to stop a vehicle that was not stopping. I got inside my squad car and told my dispatcher that I would go and assist Rock Falls Police Department. I drove east on Lincoln Street. Halfway between Martin Road and Emmons Avenue I observed a white vehicle being followed by a marked Rock Falls squad car with emergency lights and sirens activated. The white vehicle and the marked Rock Falls squad car were traveling at approximately 10-15 MPH.

The white vehicle with the marked Rock Falls squad car following traveled northbound on Martin Road. Approximately a block south of Franklin Street, I turned my emergency lights on. The white vehicle and Rock Falls squad car turned east onto Franklin Street. The white vehicle and Rock Falls squad car drove slow at approximately 10 MPH. The white vehicle turned north onto Anne Street. As the white vehicle turned onto Anne Street I turned my spot light on the white vehicle to see who was driving but I could not see who was driving the white vehicle. The white vehicle turned onto an unknown street traveling westbound from Anne Street. Rock Falls Police Officer Sugars was in front of me with our squad cars staggered. I noticed a second marked Rock Falls squad car traveling eastbound then blocking both lanes of travel. The white vehicle drove around the second marked Rock Falls squad car through the north ditch and back onto the roadway. At first I thought it was a kid or an elderly person driving the white vehicle but I was now sure the driver was being non-compliant or evasive and the driver appeared to be talking on a cell phone.

The Rock Falls unit that blocked the road pulled into a nearby driveway. Officer Sugars and I continued to pursue the white vehicle. The white vehicle turned south on Martin Road. The white vehicle was driving southbound in the northbound lane of traffic. The Rock Falls squad car pulled alongside the white vehicle on the passenger side. The white vehicle traveled into the east ditch hitting the street sign with the driver's side. The white vehicle turned east onto Franklin Street. The order of squad cars at this time was Officer Sugars, myself, and Officer Cater with Officer Riley.

Approximately 100 feet onto Franklin Street I was instructed by my supervisor to pull off the pursuit. I pulled off the pursuit and let Officers Cater and Riley past me. I observed the white vehicle pull into a nearby drive way. Officer Sugars pulled up at an angle to the drive way along with Officers Cater and Riley. I observed the white vehicle travel all the way up to the house. The front of the white vehicle was approximately a foot past the front of the house. I observed Officers Sugars, Cater, and Riley running up the drive way. I noticed a woman running out of the house holding a phone in her hand coming to the white vehicle. I was still sitting in my squad car at this time. I heard Officer Cater and Officer Sugars yelling at the driver of the white vehicle. Officer Cater yelled don't

Before signing, I have read/or had read to me this page to make certain that it is my statement and that it is the truth.

Witness  SA  Ds.4 Kl 6414          Signed:  _____

                                     Date:  1-31-18

Witness  Shr JClgh     5256         Time Completed:  1 53 pm

**Rock Falls 0222**

**EXHIBIT D**

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**ILLINOIS STATE POLICE**
ZONE 2 STERLING

Case No: __18-10494ST__

CONTINUATION OF STATEMENT OF __Sean J. Coutts__

move shit head. Officer Sugars was telling the driver to show me your hands over and over again. As the officers were running up to the white vehicle the female proceeded to run back in the house.

I got out of my squad car. I saw a male standing at the house next door later identified as Sonny Russell and told him to go back inside his house. I observed Officer Sugars standing at the driver's door of the white vehicle. Officer Riley was standing 45 degrees off the rear driver's side of the white vehicle. Officer Cater was standing directly behind the passenger side rear taillight. I walked into the front yard of the residence. I was approximately 10-12 yards off of the drive way. I could not see the driver as the pillar was blocking my view of the driver. Officer Cater and Officer Riley had their firearms out. Officers Sugars asked for a baton. Officer Cater passed the baton across the roof of the white vehicle but the baton fell on the ground. I could only hear the driver mumbling and observed a lot hand movements. The driver looked pissed off based on his body movements. The windows on the white vehicle that I could see were rolled up. The driver was not getting out of his vehicle as ordered. At that time I do not believe Officer Sugars had his firearm drawn.

Officer Sugars yelled you're going to get shot don't back up. Officer Cater yelled don't back up once or twice. As Officer Sugars bent down to pick up the baton the driver backed his vehicle up. As the vehicle backed up I could hear the sound of the vehicle accelerating. I thought Officer Cater was going to be run over by the white vehicle. The vehicle continued to back up and struck Officer Cater. I remembered seeing Officer Cater with both hands on his gun, his upper torso laid across the trunk of the white vehicle because the white vehicle struck him. Officer Cater's gun was nearly touching the rear window. Officer Cater sprawled his legs backward to avoid being caught and pulled under the vehicle. Officer Cater moved off of the trunk and started to shoot his firearm as the vehicle was still traveling backwards. I remembered hearing four shots. I observed the driver grab his chest and was rocking back and forth in the driver's seat then the driver went limp.

The white vehicle came to a stop but I don't remember how it stopped. Officer Sugars broke out the rear driver's side window. Deputy Elder broke out the front passenger window and turned the vehicle off. I went to my squad car to retrieve an AED. Officer Sugars and Deputy Elder opened the driver's door of the white vehicle and pulled the driver out. Officer Riley got his AED out after noticing I did not have pads with my AED. I began cutting the driver's shirt off with my knife. I kept calling the driver Tyrone Long as I thought the driver was Long. I later realized that while I recognized his face he was not Long, but I was not sure his actual name. The driver smelled like a wet cigarette, alcohol, and marijuana. The AED pads went onto the driver and advised no shock. Deputy Elder began doing chest compressions on the driver. Deputy Elder and I switched back and forth doing chest compressions. The AED analyzed the driver 3 times. CPR continued until the ambulance arrived. Sgt. Pat Bartel from Sterling PD separated Officer Cater from the scene. Once the ambulance personnel arrived they took over medical care.

Before signing, I have read/or had read to me this page to make certain that it is my statement and that it is the truth

Witness __SA ____ 6414__          Signed: _____

Witness __S/s ____ 5756__          Date: __1-31-18__

                                    Time Completed: __1:55 PM__

**EXHIBIT D**

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**
**ILLINOIS STATE POLICE**
ZONE 2 STERLING

Case No:   18-10494ST

CONTINUATION OF STATEMENT OF  Sean J. Coutts

I spoke with my supervisor Sgt. Kris Schmidt on scene.  Shortly after Rob Luyando my local union representative arrived.  Just prior to leaving the scene my squad car video camera was shut off and the SD card was taken out of the squad car.  Deputy Elder and I drove to the Whiteside County Sheriff's Office in Morrison to have the videos downloaded.  I copied my squad car video onto the Sheriff's Department V drive.  Everything on the video from 1-26-18 was downloaded to the V drive.  Deputy Elder drove me home at approximately 10:30.  I was directed to go home by Rob Luyando per Deputy Chief Andy Henson.

End of Statement

Before signing, I have read/or had read to me this page to make certain that it is my statement and that it is the truth.

Witness  _SA Dale Kal 6414_ 　　 Signed: _____

　　　　　　　　　　　　　　　　　Date: ___1.31.18_____

Witness  _S/r Mlodes 6754_ 　　 Time Completed: ___1:55 pm___

Page 4 　　　　　　　　　 **Rock Falls  0224**

**EXHIBIT D**

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER



tabbles®

EXHIBIT

2

Rock Falls 2474

**EXHIBIT D**

**CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER**



**EXHIBIT**

**3**

tabbies®

**Rock Falls 2485**