**EXHIBIT U**



# Preliminary Investigative Report

## Estate of Nathaniel Edwards v Jonathan Cater & City of Rock Falls

ESI Project No: 80287P

Client File No: 18 CV 50035

**EXHIBIT U**



700 S Industrial Way
Seattle, WA 98108

# Preliminary Investigative Report

## Estate of Nathaniel Edwards v Jonathan Cater & City of Rock Falls

ESI Project No: 80287P
Client File No: 18 CV 50035

**Report Prepared For**

Michael Kujawa
Schain, Banks, Kenny & Schwartz, Ltd
Three West national Plaza
70 West Madison St
Suite 5300
Chicago, IL 60602

**Submitted by:**

|  |  |
|---|---|
| **Dale C. Mann, F-ABC, CFI**<br>**Senior Managing Consultant** | December 14, 2020<br>**Date** |

**Technical Review by:**

|  |  |
|---|---|
| Michael M. Fitz, P.E.<br>Senior Managing Consultant | December 14, 2020<br>**Date** |

This report and its contents are the Work Product of Engineering Systems Inc. (ESI). This report should only be duplicated or distributed in its entirety. This report may contain confidential or court protected information; please contact an authorized entity prior to distributing. Conclusions reached and opinions offered in this report are based upon the data and information available to ESI at the time of this report and may be subject to revision after the date of publication, as additional information or data becomes available.

Copyright ESI © 2020 - All Rights Reserved

**EXHIBIT U**

# Introduction

ESi was requested on October 19, 2020 by Michael Kujawa, counsel for Jonathan Cater and the City of Rock Falls, to evaluate the file material related to the shooting death of Nathan Edwards (Edwards). Specifically, ESi was requested to define the positions of individuals and reconstruct the series of events using the data contained in the file materials as well as on information acquired from the inspection of the subject vehicle, site, and subject side arm.

# Basis for this Report

This report, and the opinions and conclusions stated throughout, are based on the education, training, and experience of the authors, as well as on the analysis and review of materials that have been conducted in this matter to date. Stated opinions may be modified in the future should additional information become available or additional testing be conducted.

This is a preliminary report, and as such, it is not intended to provide final conclusions or opinions. Such opinions will be provided in a final report after the testing outlined in this report is completed and vetted. This report is intended to provide the current status of the investigation and relevant data which may impact final conclusions.

## Material Reviewed

ESi has reviewed the following material in this matter:

- Photographs taken by the Illinois State Police (ISP) Crime Scene Investigation Unit (CSI) at the site of the shooting.
- Photographs taken by the ISP CSI during the inspection of the subject vehicle.
- Photographs taken during the autopsy of Edwards.
- Photographs taken at the hospital emergency room including the body of Edwards.
- Photographs taken of the officers and equipment involved in the incident.
- Dash cam video of three law enforcement vehicles responding during the incident.
- Audio recordings from body microphones and radio traffic involved in the incident.
- ISP CSI written summary reports, sketches, and documentation related to the scene and vehicle inspections.
- Autopsy reports, crime laboratory reports, crash data from the subject vehicle, and other assorted documentation related to the incident.
- Interview statements and/or audio recordings of interviews of involved law enforcement personnel including:
  - Jonathan Cater, Rock Falls Police Department (RFPD)
  - Dustin Sugars, RFPD
  - Ethan Riley, RFPD
  - Sean Coutts, Whiteside County Sherriff's Department (WCSO)
  - Rollie Elder, WCSO
  - Dan Erickson, ISP CSI
  - Stephen Olson ISP CSI
  - Jeff Thew, ISP CSI

**EXHIBIT U**

- o Assorted other law enforcement officers who were not first-hand witnesses to the incident
- Interview statement and/or audio recording of Mark Peters, MD, Forensic Pathologist
- Interview statements and/or audio of interviews with neighborhood witnesses including:
  - o Amber Clark, owner of the 1995 Cadillac Deville
  - o Carly Fischbach, 1304 Franklin St
  - o Debra Yarbough, 1304 Franklin St
  - o Jacob Anderson, 1300 Franklin St
  - o Jordan Babbit, 1300 Franklin St
  - o Ethan Smit, 1311 Franklin St
  - o Penny Smit, 1311 Franklin St
  - o Nicole Sanders, 1311 Franklin St
  - o Michael Carroll, 213 ½ Martin Road
  - o Emily Reed, 1206 Franklin St
  - o Alvin (Sonny) Russell, 1302 Franklin St
  - o Jacob Calhoun, 313 Martin Road
  - o Leslie Spangler, 1403 Franklin
  - o Katie Billings, 1310 Franklin
  - o Diana Skrogstad, 1309 franklin
  - o Brandon Kreczmer, 1308 Franklin

## Methodology and Analysis Activities

During the course of the investigation and analysis in this matter, to date, ESI has performed the following activities:

- Reviewed the provided file materials
- Enhanced the dash cam video footage of the time span relevant to the shooting using FARO results and visualization software
- Produced an accurately scaled rendering of the incident site using ISP CSI site measurements, Google imaging and FARO scanning of the site and subject vehicle
- Further documented the subject vehicle and bullet trajectories using FARO scanning of the vehicle, ISP CSI scene and subject vehicle measurements, and analysis of potential bullet trajectories
- Documented the cartridge case ejection patterns using the subject side arm and department issued ammunition
- Produced this preliminary report

## Background

The shooting incident occurred on January 26, 2018 at approximately 1950 hrs (7:50PM) in the driveway of a residence located at 1304 Franklin St, Rock Falls, IL. Note the reported time is based on Unit WSCO K9317 dash cam video time stamps. The event was recorded by dash cam video on three of the responding law enforcement vehicles and numerous body audio. However, the field of view on two of the videos does not contain the initial position of the Cadillac nor its motion prior to its resting position. The third video was captured from a distance as the responding

**EXHIBIT U**

vehicle approached the scene; some of the events are obstructed by objects in the foreground and the video is of low resolution. The lighting of the scene is hindered by the flashing lights on the response vehicles.

Edwards was driving a 1995 Cadillac Deville (vehicle) and was shot as the vehicle was moving in reverse while sitting in the driver's seat of the vehicle. The shooting followed a low-speed pursuit of the vehicle by officers from RFPD and WCSO. The vehicle pulled into the driveway at 1304 Franklin St and came to a stop initially at a point approximately even with the residence.

Following a brief verbal confrontation with responding officers, Edwards reversed the vehicle while officers were located near the rear of the vehicle. Subsequently, shots were fired by Officer Cater using his service weapon, a Glock 22 .40 caliber handgun. Edwards expired a short time later from the gunshot wounds.

A total of six rounds were fired, four which entered the back-chest area of Edwards and one which pierced his right shoulder. Five spent cartridge casings were recovered from the sidewalk and front lawn adjacent to the driveway of 1304 Franklin St. One cartridge case was not recovered.

The shooting scene was investigated by ISP CSI team members on the night of the shooting. The vehicle was inspected on January 29, 2018 at ISP District 1 Headquarters.

## Summary of officer statements

Law enforcement officers' initial statements, audio recorded interviews and depositions were evaluated for consistency and to develop the general sequence of events and orientation and positions of the responding individuals. Refer to figure 1 for a scaled depiction of the neighborhood. The following is the general sequence as per the reviewed officer recounting:

- The vehicle pulled into the driveway of 1304 Franklin St and proceeded forward sufficient for the front bumper to be approximately even with the residence. A 1976 Buick Park Avenue was parked somewhat in the middle of the driveway, necessitating the Cadillac's passenger tires to be on the grass. The initial three responding law enforcement vehicles parked in the street in front of the residence at various angles.
- Four officers proceeded onto the property to confront Edwards. Sugars (RFPD) was located on the driver's side of the vehicle, eventually positioned adjacent to the driver's window. Riley (RFPD) was positioned behind and to the left of the Cadillac. Cater (RFPD) was positioned at the rear of the Cadillac, approximately behind the passenger taillight. Coutts (WCSO) was located on the passenger side approximately 10-12 feet from the vehicle.
- Edwards did not exit the vehicle as demanded by the responding officers. He then put his vehicle into reverse, revved the engine and proceeded in reverse. Cater fired his weapon and evaded the reversing vehicle by stepping to the right, out of the path of the moving vehicle. Statements were not uniform in that Cater cannot remember being hit by the moving vehicle while Couts stated the Cater was struck by the vehicle and was temporarily sprawled onto the trunk prior to the fired shots. The vehicle braked to a stop with the rear bumper approximately even with the rear tires of the Buick.

**EXHIBIT U**





**Figure 1: The Rock Falls neighborhood where the incident occurred in the driveway of 1304. Other labelled residences are those of identified witnesses to the incident.**

## Summary of neighbor/witness statements

Statements from neighborhood witnesses varied. For instance, the numbers and locations of responding officers was not consistent and the reversing of the Cadillac was not uniformly recounted. Some witnesses reported hearing the vehicle engine revving, others did not. Time lapse estimates for all statements were inaccurate. Neighbors closest to 1304 Franklin generally had better views and their statements contained more details as follows:

- Alvin (Sonny) Russel, a witness residing in the adjacent house, 1302 Franklin, was outside in his driveway and observed the incident. He reported the vehicle reversed slowly, hitting Cater's knees. From his location he could not see the rear taillights of the Cadillac and did not hear the engine revving. He heard the shots after Cater was impacted by the vehicle. He estimated the Cadillac backed up approximately 10 feet.

- Ethan and Penny Smit reside across the street at 1311 Franklin. Both were on the front porch observing the incident. Ethan's recollection was somewhat disjointed with a female exiting the passenger side of the Cadillac (most likely inferring the female resident of 1304 Franklin who approached the vehicle early in the incident) and too many initially responding officers. The remainder of his statements were consistent with the events as captured on dash cam video and audio. He observed the vehicle's back-up lights, heard the engine rev, thought the vehicle actually rose a bit due to the revving, and then back up 3-4 feet before hearing the shots. The officer at the rear of the vehicle fired the shots.

- Penny Smit reported the back-up lights on the Cadillac illuminated and the vehicle moved pretty quickly backwards. She stated that it appeared the driver had pressed on the accelerator and thought the officer was going to be hit. She did not observe the vehicle striking the officer and did not see an officer move out of the away of the moving vehicle. She thought the driver's side officer did the shooting.

- Nicole Sanders, the sister to Penny Smit was also at the 1311 Franklin residence on the night of the incident. She remained in the house and witnessed the event via the front picture window. She recounted a total of four officers approaching the Cadillac, two on the left (driver's side), one on the back-right side and one on the right (passenger side). She

**EXHIBIT U**

reported the back-up lights illuminating and the vehicle reversing 3-4 feet. She believed the vehicle was put in reverse and the driver hit the gas, based on the way the vehicle jerked as it reversed. She does not recall seeing the vehicle hit an officer. Shots were fired after the car was in motion.

- The two occupants of 1304 Franklin at the time of the incident were Carli Fischbach and Debra Yarbrough. Carli was ordered back into the residence as officers approached the Cadillac. She returned into the residence via the back door and was in the living room at the instant of the shooting. The front curtains were drawn, and Carli observed the remainder of the incident via the side window. She reported she did not hear the Cadillac rev nor accelerate backwards. She reported two officers, both on the driver's side of the vehicle. Following the shooting, she came out onto the front porch and was directed again to return into the residence.

- Debra Yarbrough recalled witnessing the event via the open front door of the residence. She observed Carli be directed to return to the residence by the officers which she did via the back door. Debra reported hearing the shots and closing the front door. She reported no vehicle acceleration and did not see the vehicle accelerate or move. She reported the Cadillac was initially parked even with her Buick. Debra admitted to poor night vision and is blind in her left eye.

- Carly Fischbach was reported to be on her cell phone with Edwards when he turned the Cadillac into the driveway. She came outside and was ordered to return to the residence by the responding officers. She was inside the residence at the time shots were fired and did not hear the vehicle rev nor see the reverse acceleration.

- Jacob Anderson resides at 1300 Franklin (2 houses from the incident) and witnessed the event from near his driveway. He consistently recalled the Cadillac reversing in his statements using terms such as quick, car accelerated, aggressively reversed and officers could have been hit.

- Jordan Babbitt also lives at 1300 Franklin. She was outside near the driveway to witness the incident. A truck in the driveway of 1302 Franklin partially obscured her view of the subject vehicle. She recalled the Cadillac parked partway into the driveway. She reported hearing the engine revving then shots. She did not recall the vehicle reversing.

Table 1 contains a summary of the relevant witness statements from both the interviews conducted on the night of the incident and from depositions.

**EXHIBIT U**

**Vehicle References**

| Address | Witness | Cadillac Initial Location | Acceleration | Cadillac Displacement | Other | Notes |
|---------|---------|---------------------------|--------------|----------------------|-------|-------|
| 1304 | C. Fischbach | | did not hear car rev | | | in house |
| 1304 | D. Yarbrough | in line with front door (at open door) | did not hear/see | | | in house<br>vision impaired |
| | Cater | even w front of residence | not slow<br>car revs | | does not recall being struck<br>~1' back | |
| | S. Coutts | front bumper even with house | heard car accelerating | | bump, sprawled legs<br>gun nearly touching window<br>head near rear window<br>gun in both hands | <10' away, pass side |
| | E. Riley | | hear car revving<br>went back very, very quickly | | | behind/left of Cad |
| 1302 | D. Sugars | rear door even with XXXX | heard engine rev<br>unknown speed | ~10 ft | car moves ~2' prior to shots | at driver window |
| 1302 | A. Russell | | did not hear revving<br>car reversed slowly | ~10 ft | backed into legs<br>hit Cater's knees<br>shots fired after hit | |
| 1311 | E. Smit | | car lifted up when revved<br>engine revved | | | |
| 1311 | P. Smit | | car moved pretty quickly<br>appeared dr pressed on acc<br>5mph | 3' | thought officer was going to be hit<br>no officer struck | |
| 1311 | N. Sanders | | 5 mph<br>reverse and hit gas<br>car jerked back | 3-4' | officer not struck<br>attempted to hit 2 officers<br>any faster, officer would have been hit | |
| 1300 | J. Anderson | | Cad backs up quick<br>hitting the gas<br>car revved, car accelerated<br>aggressively reversed | 10 ' | could have been hit<br>officers in danger | |
| 1300 | J. Babbitt | | engine revving<br>unaware of reversing | | driver tried to run officer over | |

Table 1: Summary of witness statements regarding the Cadillac and Officer actions.

**EXHIBIT U**

# Dash cam video

Video footage from the dash cam that was positioned inside a Ford Expedition, Whiteside Co SO car #3, is being analyzed. Results of the analysis will be used to develop the approximate speed profile of the Cadillac as it was reversing. The camera is a Digital Ally model no: DVM-100 that is integral with the rear-view mirror.

The video shows a Nissan Sentra and Ford F150 parked in a neighboring driveway as the Ford is approaching the scene. The video frame rate will be determined. The frames will be identified where the Cadillac's rear end first appears in view of the camera. This starting position will be confirmed against witness accounts of the Cadillac front end being even with the north face of the house. For the starting position as well as several frames after and until the Cadillac comes to rest, a camera match technique utilizing visualization software and the Faro 3D scan data captured of the scene and vehicle will be used to reconstruct the positions of the Ford and Cadillac.[1]

Using the reconstructed positions at given frames, the average speed between each position can be calculated. The speed profile of the Cadillac will be plotted. The maximum acceleration will be determined.

# ISP CSI Vehicle Reconstruction

The subject Cadillac was towed to the ISP District 1 Headquarters and secured for further processing which occurred on January 29, 2018. Photographs taken at this inspection demonstrate the back window of the vehicle had totally disintegrated during the towing/storage process.

ISP CSI identified and marked "Defects" relevant to the incident. The driver's mirror was noted to be hanging from its mounted position. A projectile (bullet) was collected from the dashboard to the left of the steering wheel. Rods were inserted into the driver's seat-back penetrations to determine bullet trajectories relative to level (vertical) and angle from centerline of the vehicle (horizontal). Two measurements were collected, one from each penetration through the driver's seat-back. The penetrations in the steering wheel and head rest were not considered for the ISP trajectory analysis.

The angle measurements were as follows:

- Penetration 1    Horizontal angle:    59.2° (from perpendicular to centerline)

    Vertical angle:    13.65° (downwards)
- Penetration 2    Horizontal angle:    59.85° (from perpendicular to centerline)

    Vertical angle:    6.1°(downwards)

---

[1] SAE 2018-01-0532

**EXHIBIT U**

It was determined that a vertical angle of 6.1° resulted in a trajectory which did not penetrate the rear window of the Cadillac (Figure 2). It was also determined that penetration 1 was the result of two rounds (refer to ESI Vehicle Reconstruction section) making the penetration larger. The trajectory rod through this hole was loose and able to be manipulated such that precise angle determinations were not possible.



**Figure 2: 6.1°vertical angle bullet trajectory as determined by ISP; note the line penetrates the vehicle rear below the rear window.**

## ESi Vehicle Reconstruction

The subject 1995 Cadillac Deville was inspected on December 3, 2020 at the Rock Falls Police Department impound warehouse. The inspection was non-destructive. Faro scanning was performed on the exterior and interior of the vehicle to document the geometry of the relevant artifacts and provide a platform for future calculations.

The driver's side seat-back position was compared to its position during the ISP vehicle inspection. It appeared to be in the same position, however the headrest had been elevated. Three penetrating holes were documented near the top right edge of the seat back and headrest and the steering wheel had a single penetrating hole. A gouge/crater was present in the dashboard to the left of the steering wheel (where a bullet had been removed) and there was a nick on the driver's side front pillar. A second bullet had been previously recovered from the windshield crevice on the passenger side dashboard on the night of the incident. Two impact points were present in the driver's side windshield. Refer to photographs 1-5.

**EXHIBIT U**





**Photograph 1: The rear view of the driver's side seat back. Three penetrating holes are present, one through the bottom of the headrest and two thru the top edge of the seat back.**



**Photograph 2: Front view of the driver's seat depicting two penetrating holes in the seat back and one through the headrest.**

**EXHIBIT U**





**Photograph 3: Steering wheel with one penetrating hole.**



**Photograph 4: Gouge/crater in dashboard to the left of steering wheel where a bullet was recovered.**

**EXHIBIT U**





**Photograph 5: Gouge in driver's front pillar and two windshield fractures.**

Trajectory rods were used to track the hole penetrations in the seat back and provide initial estimates of the projectile trajectories (photographs 6 and 7). One of the holes in the seat-back was larger and did not provide a snug fit for the red trajectory rod. The other two rods were held tight by the seat cushion. When the inserted rods were visualized from the rear of the vehicle, it was apparent at least one of the extrapolated trajectories did not pass through the rear window.

Autopsy photographs documented four penetrations entering the right rear chest of Edwards and one through the right shoulder. Correlation of the penetrations in the driver's seat back to the autopsy report was conducted and it was determined that one of the penetrations was the result of two rounds. Refer to the Projectile (Bullet) Accountability and Vehicle Artifacts section for details. The cluster pattern in the driver's seat-back was consistent with the entrance wounds depicted in the autopsy photographs.

**EXHIBIT U**





**Photograph 6: The three seat-back penetrations marked with trajectory rods. The hole containing the red rod is loose and can be wriggled, rendering a precise trajectory difficult.**



**Photograph 7: Front of seat-back depicting the three penetrating holes and trajectory rods.**

**EXHIBIT U**



A photograph taken on the night immediately after the incident depicted an elongated hole in the rear window (photographs 8 and 9). The rear window was completely broken out when it was later transported to the ISP impound yard. Based on the inaccuracies in the ISP CSI vehicle inspection data, it was determined that using penetration rods would not yield accurate results. Therefore, an accurate template of the hole was made and positioned over the broken out rear window of the Cadillac for the December 3, 2020 inspection (photograph 10).

A Faro Focus x330 laser scanner was used to collect 3D point cloud data of the subject vehicle. Bullet trajectories were placed using 3/8" diameter steel rods inserted into holes in the driver's side seat-back and steering wheel of the subject vehicle. A scaled representation of the original hole in the right side of the rear window was placed using the posterboard template. This hole template was used to determine placement of the possible bullet trajectories from outside the vehicle. There were 7 total scenarios of bullet trajectories scanned. The scan data was post processed using the FARO Scene software to create a 3D point cloud. The 3D point cloud was imported into AutoCad and 3D lines of the bullet trajectories were created using the scan data. Vertical and horizontal angles of the 3D bullet trajectories were measured as well as a height dimension taken at the rear bumper of the vehicle. A range of muzzle locations was also created by depicting by a yellow highlighted ellipse placed at the rear bumper of the vehicle. (See .pdf file in report appendix).



**Photograph 8: Rear of Cadillac immediately after the incident.**

**EXHIBIT U**





**Photograph 9: Cropped and enlarged image depicting the hole in the rear window.**



**Photograph 10: Template prepared and positioned to replicate the initial elongated hole in the rear window of the Cadillac.**

**EXHIBIT U**



All the fired rounds would have traveled through the original hole in the rear window of the Cadillac prior to penetrating secondary objects inside the vehicle. Long rigid rods were positioned into the entrance holes in the steering wheel and the seat-back and extended through various points in the rear window template. The rod locations through the template were selected to estimate potential bullet trajectories at the most extreme angles possible (photographs 11-13). Maximum left-to-right and top-to-bottom trajectories were documented using FARO.



**Photograph 11: An example of a trajectory rod extending out of the rear window gap.**

**EXHIBIT U**





**Photograph 12: Interior view of a trajectory rod extending from a seat-back entrance hole through the gap in the rear window.**



**Photograph 13: Trajectory rod positioned in one of the entrance holes in the seat-back and the FARO imaging of the vehicle interior.**

**EXHIBIT U**

Several FARO scans were conducted using the following trajectories from entrance holes in the vehicle to various locations within the template hole placed on the rear window:

     1: From the steering wheel through the left side of template, maximum elevation

     2: From the steering wheel through the right side of the template, mid-elevation

     3: From the driver's side seat-back through the left side of the template, maximum height

     4: From the driver's side seat-back through the left side of the template, maximum height

     5: From the driver's side seat-back through the center of the template, mid-height

     6: From the driver's side seat-back through the center of the template, minimum height

     7: From the driver's side seat-back through the right side of the template, minimum height

The vertical angles and angles from vehicle centerline were calculated from the above scans as follows:

| Scan # | Vertical angle (°) | Angle from centerline of vehicle (°) |
|--------|--------------------|--------------------------------------|
| 1 | 11.2 | 12.4 |
| 2 | 10.3 | 21.3 |
| 3 | 18.7 | 14.7 |
| 4 | 21.1 | 25.1 |
| 5 | 17.1 | 24.7 |
| 6 | 13.6 | 25.0 |
| 7 | 13.7 | 28.7 |
| Average* | 15.1 | |

**\*value used in cartridge case ejection study**

Slice representations of potential muzzle positions from the compilation of the seven scans are presented in figures 3 and 4. The blue shading represents a muzzle proximal to the rear window. The yellow oval represents potential muzzle positions which are even with the rear bumper. Other potential positions would be between the two shaded areas. Potential muzzle heights at the rear bumper range from 4'7" to 6'. These heights will set limits on the position of Cater based on his stature and grip on the firearm. Likewise, the horizontal range will also be used to position Cater

**EXHIBIT U**



at the time the shots were fired. Summary figures of each of the FARO scans are included in Appendix A.



**Figure 3: Potential muzzle positions as viewed from the vehicle rear.**



**Figure 4: Potential muzzle positions from an oblique angle.**

**EXHIBIT U**

# Projectile (Bullet) Accountability and Vehicle Artifacts

Six shots were fired from Cater's handgun. Six bullets and five casings were recovered. The recovered bullets will be transferred to ESi for additional examination. The bullets were recovered from the following locations:

- One imbedded in dashboard to left of steering wheel
- One in windshield crevice on passenger side
- One in the driveway where CPR was conducted
- One on the floor in the emergency room
- Two from chest cavity at the time of autopsy

The autopsy report demonstrates there are four entrance holes and two exit holes in the chest cavity of Edwards and a right shoulder through-penetration. The bullets which penetrated the chest of Edwards were most likely those recovered in the driveway and emergency room. There is insufficient information at this time to determine which of the bullets recovered from inside the Cadillac penetrated the shoulder and which one missed Edwards.

There were four entrance holes in a tight cluster in the back of Edwards but only three penetrations of the seat-back. Therefore, the three holes in the driver's seat-back and headrest were made by the four rounds into the chest. One of the seat-back penetrations is larger and somewhat tattered. It is likely two bullets impacted in essentially the same spot, creating the larger hole (photograph 14).

The two defects present in the driver's side windshield contain loose glass fragments on the exterior surface and the interior surface of the windshield is undamaged. Cracking extends radially from each impact point. These features demonstrate the impacts responsible for these defects originated on the exterior side of the windshield. This window damage was recent but not related to potential bullet strikes originating from the vehicle interior. The cause of this damage has not been determined.

**EXHIBIT U**





**Photograph 14: Comparison of the two exit holes in the driver's seat-back. Note the tattered and elongated edge to the lower exit hole. This hole was also enlarged, demonstrating that two bullets penetrated the seat-back in essentially the same location.**

# Cartridge casing ejection patterns

The subject handgun and Department-issued ammunition (photographs 15 and 16) were used to determine cartridge casing ejection patterns. The handgun was propped into a tripod stand to control the orientation of the barrel. Barrel orientations used for the test firing were determined by the vertical trajectory angles measured during the vehicle inspection. Vehicle reconstruction estimated the minimum barrel angle at 9°and the maximum barrel angle at 20°, both downward angles. Therefore a 15°angle was used for the test firing (photograph 17).

Test firing with the muzzle level and grip vertical, cartridges casings were ejected to the right and behind the gun. There was no significant difference in the distance the casings traveled with respect to the height of the muzzle. Cartridge casings were ejected almost vertically when the grip was rotated 30°counterclockwise. Rotating the grip clockwise 30° resulted in shorter ejection distances. As the barrel of the handgun was tilted downward, cartridge cases landed in front of the muzzle. Table 3 contains the data from the test firing study.

**EXHIBIT U**





**Photograph 15: The subject Glock 22 .40 caliber handgun.**



**Photograph 16: Department-issued ammunition used on the night of the incident.**

**EXHIBIT U**





**Photograph 17: Test firing using a 15°downard angle with the grip vertical.**



**Photograph 18: Cartridge case ejection pattern when handgun barrel is 4'6'' high and horizontal (0° downward angle); ejection was generally to the right and behind the handgun. Arrow indicates the direction of discharge.**

**EXHIBIT U**





**Photograph 19: Cartridge case ejection pattern when handgun barrel is 4'6" high and is tilted downward 15°. Casings are generally ejected to the right and in front of the handgun. Arrow indicates direction of discharge.**

Cartridge casing ejection test results from Table 3 are shown visually in Figure 5 below, with groupings of a combination of different handgun height, handgun elevation angle, and handgun rotation. Each group consists of six measurements. The handgun location is at the center of the graph and the firing direction is towards the top of the plot.

The cartridge casing ejection test results are also shown in Figure 6 along with each group's 95% prediction interval, meaning that 95% of all future casings would be expected to fall within the elliptical region.[2] A subset of the test results is shown in Figure 7, with only the 0° (level) barrel angle and no hand grip rotation (grouped by handgun height). Another subset of the test results is shown in Figure 8, comparing the patterns resulting from two different barrel angles.

---

[2] H. Wickham. ggplot2: Elegant Graphics for Data Analysis. Springer-Verlag New York, 2016.

**EXHIBIT U**

80287P

CAR RID   CA   C ION PA   RN

| L I | AN L L | C ION PA | AND N RO A ION | DI ANC ri ht ac | ANC RO | AND N left for ard | | | |
|---|---|---|---|---|---|---|---|---|---|
| 4' | 0 (hori ontal) | | 0 (grip is vertical) | /2'0 | '2 /2'5 | '2 /4'2 | '4 /4' | 10'1 /0' | 12'3 /1' |
| | | | 30 (rotation to left) | 2'11 /2' | 3'10 /3' | 2' /5' | -2'5 /4'0 | -2'1 /0' | -2'5 /4'2 |
| | | | -30 (rotation to right) | ' /3'3 | ' /5'2 | ' /1'11 | 10'1 /0'1 | 10'1 /1' | 12' /2'1 |
| 5'0 | | | 0 (grip is vertical) | '11 /3' | ' /2' | '1 /-0'4 | '3 /-1'11 | ' /3' | 11' /0'4 |
| | | | 30 (rotation to left) | all pro imal to shooter, some off body | | | | | |
| | | | -30 (rotation to right) | '4 /2'3 | '10 /4' | 11'4 /-0' | 13'0 /0' | 15'0 /-0'10 | 1 ' /3' |
| 4'0 | | | 0 (grip is vertical) | ' /-0'1 | /5 /2' | ' /5'10 | 4' / '4 | 10'3 /1'10 | 13'0 /2' |
| 5'0 | 15 (down) | | 0 (grip is vertical) | '10 /-3' | '4 /-3'4 | '10 /-3'2 | 10' /-4'1 | 11' /-4' | 5'10 /2'0 |
| 4' | 15 (down) | | 0 (grip is vertical) | '2 /1'3 | '0 /0'0 | ' /-1' | '0 /-4'4 | 10'10 /-5'0 | 11' /-4' |

**EXHIBIT U**





**Figure 5: Visualization of cartridge case ejection patterns.**



**Figure 6: 95% prediction intervals of all tested cartridge case ejection patterns.**

**EXHIBIT U**





**Figure 7: 95% prediction intervals of cartridge case ejection patterns varying only the handgun height. The barrel angle is 0° (level).**



**Figure 8: 95% prediction intervals of cartridge case ejection patterns varying the barrel angle regardless of height.**

**EXHIBIT U**



Figure 9 demonstrates the cartridge case trajectory distance when the handgun is fired at a 15° angle at 4.6' and 5' gun heights.



**Figure 9: 95% prediction intervals of cartridge case ejection patterns based on 15° downward angle for the barrel.**

# Incident site documentation

The site was also scanned using the FARO Focus x330 laser scanner. The scan data includes the intersection of Martin Rd. and Franklin St. going East on Franklin St. approximately 600 ft. to include the subject property. Figure 10 depicts the final resting place of the subject vehicle and spent cartridge casings in relation to the permanent landscape markers.

**EXHIBIT U**





**Figure 10: Depiction of incident site accurately scaled using FARO, google imaging and ISP crime scene measurements. The five red dots on/near the sidewalk are cartridge cases.**

# Conclusions

Analysis of the data collected on December 3 and 4, 2020 is ongoing and not yet complete. Final conclusions and scenario reconstructions are reserved until all available data is analyzed and vetted for accuracy.

ESI reserves the right to supplement or amend these findings and conclusions if additional information becomes available or based upon additional work or analysis in this matter.

**EXHIBIT U**



# Appendix A

**EXHIBIT U**



Steering wheel left side of hole

SCALE IN FEET

0    2    4

5'-2"

11.2°

**EXHIBIT U**



Steering wheel left side of hole

**EXHIBIT U**



Steering wheel left side of hole

**EXHIBIT U**



Steering wheel right side of hole

SCALE IN FEET

0          2          4

**EXHIBIT U**



Steering wheel right side of hole

SCALE IN FEET

0      2      4

21.3°

**EXHIBIT U**



Steering wheel right side of hole

**EXHIBIT U**



Seatback left side of hole max height

SCALE IN FEET

0    2    4

18.7°

5'-9"

**EXHIBIT U**



Seatback left side of hole max height

SCALE IN FEET

0   2   4

14.7°

**EXHIBIT U**



Seatback Left side of hole max height

**EXHIBIT U**



Seatback mid-hole max height

SCALE IN FEET

0    2    4

21.1°

6

**EXHIBIT U**



Seatback mid-hole max height

SCALE IN FEET

0  2  4

**EXHIBIT U**



Seatback mid-hole max height

**EXHIBIT U**



Seatback mid-hole min height

SCALE IN FEET

0    2    4

17.1°

5'-6¼"

**EXHIBIT U**



Seatback mid-hole min height

SCALE IN FEET

0    2    4

24.7"

**EXHIBIT U**



Seatback mid-hole min height

**EXHIBIT U**



Seatback mid-hole min height

SCALE IN FEET

0    2    4

**EXHIBIT U**



25.0°

Seatback mid-hole min height

SCALE IN FEET

0    2    4

**EXHIBIT U**



Seatback mid-hole min height

**EXHIBIT U**



Seatback right side of hole min height

SCALE IN FEET

0    2    4

**EXHIBIT U**



Seatback right side of hole min height

SCALE IN FEET

0 2 4

**EXHIBIT U**



Seatback right side of hole min height

**EXHIBIT U**



All seven trajectory cases potential muzzle locations depicted by yellow ellipse

**EXHIBIT U**



All seven trajectory cases potential muzzle locations depicted by yellow ellipse

**EXHIBIT U**



All seven trajectory cases side view

SCALE IN FEET

0   2   4

EXHIBIT U



# Investigative Report

## Estate of Nathaniel Edwards v Jonathan Cater & City of Rock Falls

ESI Project No: 80287P
Client File No: 18 CV 50035

**EXHIBIT U**



700 S Industrial Way
Seattle, WA 98108

# Investigative Report

## Estate of Nathaniel Edwards v Jonathan Cater & City of Rock Falls

ESI Project No: 80287P
Client File No: 18 CV 50035

**Report Prepared For**

Michael Kujawa
Schain, Banks, Kenny & Schwartz, Ltd
Three West national Plaza
70 West Madison St
Suite 5300
Chicago, IL 60602

**Submitted by:**

_____

**Dale C. Mann, F-ABC, CFI**
**Senior Managing Consultant**

February 4, 2021
_____
**Date**

**Technical Review by:**

_____

Michael M. Fitz, P.E.
Senior Managing Consultant

February 4, 2021
_____
**Date**

This report and its contents are the Work Product of Engineering Systems Inc. (ESI). This report should only be duplicated or distributed in its entirety. This report may contain confidential or court protected information; please contact an authorized entity prior to distributing. Conclusions reached and opinions offered in this report are based upon the data and information available to ESI at the time of this report and may be subject to revision after the date of publication, as additional information or data becomes available.

Copyright ESI © 2021 - All Rights Reserved

**EXHIBIT U**

# Introduction

ESi was requested on October 19, 2020 by Michael Kujawa, counsel for Jonathan Cater and the City of Rock Falls IL, to evaluate the file material related to the shooting death of Nathan Edwards (Edwards). Specifically, ESi was requested to define the positions of individuals and reconstruct the series of events using the data contained in the file materials as well as on information acquired from the inspection of the subject vehicle, site, and subject sidearm.

# Basis for This Report

This report, and the opinions and conclusions stated throughout, are based on the education, training, and experience of the authors, as well as on the analysis and review of materials that have been conducted in this matter to date. Stated opinions may be modified in the future should additional information become available or additional testing be conducted.

This is the second report for the investigation of the above incident, and as such, it includes all opinions related to the different aspects of the event investigated to date. Refer to the report issued December 14, 2020 for the preliminary results from the vehicle inspection and firearm test firing. This report is intended to provide the current status of the investigation and relevant data which may impact final conclusions.

Multiple individuals within ESi made major contributions to the contents of this report, based on the expertise required to evaluate and analyze the various data. Refer to Appendix A for the subject topics and associated individuals.

## Methodology and Analysis Activities

During the course of the investigation and analysis in this matter, to date, ESI has performed the following activities:

- Reviewed the provided file materials.

- Enhanced the dash cam video footage of the time span relevant to the shooting using FARO results and visualization software.

- Produced an accurately scaled rendering of the incident site using Illinois State Police (ISP) Crime Scene site measurements, Google imaging, and FARO scanning of the site and subject vehicle.

- Applied enhancement processes and analysis to incorporate the dash cam footage and audio records into the detailed FARO scan results to accurately estimate the vehicle positioning, acceleration, and velocity during the event.

- Correlated the audio of the gunshots with vehicle position during the shooting event.

- Further documented the subject vehicle and bullet trajectories using FARO scanning of the vehicle, ISP CSI scene and subject vehicle measurements, and analysis of potential bullet trajectories.

- Estimated potential positions for the firearm at the instant of discharge.

**EXHIBIT U**



- Documented the cartridge case ejection patterns using the subject sidearm and department issued ammunition.

- Applied a statistical analysis to the cartridge ejection patterns to estimate the potential positions of the subject sidearm during the shooting incident.

- Performed a laboratory microscopic examination of the six bullets recovered from the scene of the shooting, the hospital, and the autopsy.

- Produced this report.

# Background

The shooting incident occurred on January 26, 2018 at approximately 1950 hours (7:50PM) in the driveway of a residence located at 1304 Franklin St., Rock Falls, IL. Note the reported time is based on Unit WSCO K9317 dash cam video time stamps. The event was recorded by dash cam video on three of the responding law enforcement vehicles and numerous body audio.

Edwards was driving a 1995 Cadillac Deville and was shot as the vehicle was moving in reverse while sitting in the driver's seat of the vehicle. The shooting followed a low-speed pursuit of the vehicle by officers from RFPD and WCSO. The vehicle pulled into the driveway at 1304 Franklin St. and came to a stop initially at a point approximately even with the residence.

However, the field of view on two of the videos did not contain the initial position of the Cadillac nor its motion prior to its resting position. The third video was captured from a distance as the responding vehicle approached the scene; some of the events are obstructed by objects in the foreground and the video is of low resolution. The lighting of the scene is hindered by the flashing lights on the response vehicles.

Following a brief verbal confrontation with responding officers, Edwards reversed the vehicle while officers were located near the rear of the vehicle. Subsequently, shots were fired by Officer Cater using his service weapon, a Glock 22 .40 caliber handgun. Edwards expired a short time later from the gunshot wounds.

A total of six rounds were fired, four of which entered the back-chest area of Edwards and one which pierced his right shoulder. One shot missed Edwards altogether and was recovered from within the vehicle. Five spent cartridge casings were recovered from the sidewalk and front lawn adjacent to the driveway of 1304 Franklin St. One cartridge case was not recovered.

The shooting scene was investigated by ISP Crime Scene team members on the night of the shooting. The vehicle was inspected on January 29, 2018 at ISP District 1 Headquarters.

# Bullet Examination

Six shots were fired from Cater's handgun. Six bullets and five casings were recovered. The recovered bullets were transferred to ESi for additional examination. The autopsy report demonstrated there were four entrance holes and two exit holes in the chest cavity of Edwards and a right shoulder through-penetration.

**EXHIBIT U**



ISP labelled the six recovered bullets as follows:

- Exhibit 102: A bullet recovered from the driveway at the scene.

- Exhibit 103: A bullet recovered from on top of the passenger-side dashboard in the windshield crevasse.

- Exhibit 206: A bullet recovered from the emergency room floor.

- Exhibit 402: A bullet recovered from the chest cavity of Edwards during the autopsy.

- Exhibit 403: A bullet recovered from the chest cavity of Edwards during the autopsy.

- Exhibit 501: An imbedded bullet recovered from the driver's-side dashboard during the ISP vehicle inspection.

The bullets were examined and documented microscopically. Where necessary, loose fibers were removed for better clarity of the bullet surfaces. Adhering residues were analyzed using Fourier transform infrared spectrometry, energy dispersive x-ray spectroscopy, and/or polarized light microscopy.

- Exhibit 102: The bullet nose was deformed with multiple folds and cracks. Red, white, and black fibers were imbedded into the nose surface. Most of the adhering white residue on the nose was identified as glass. This bullet impacted glass, passed through the seat back, penetrated the back of Edwards most likely striking a rib, and exited his front. It was dislodged during CPR efforts at the scene.

- Exhibit 103: The bullet nose was deformed with multiple folds and cracks. No significant fibers were observed on the bullet. Glass, polyvinyl chloride (PVC)/plasticizer, polyethylene, and calcium carbonate residues were recovered from the bullet nose. This bullet did not strike Edwards and had adhering residues consistent with multiple polymeric materials commonly used in automotive interiors. It impacted glass, missed Edwards and penetrated the steering wheel, which deflected it upwards and onto the dashboard, coming to rest in the windshield crevasse.

- Exhibit 206: The bullet nose was deformed with multiple folds and cracks. White and black fibers were imbedded into the nose surface and red fibers were observed on one side. No glass was recovered from the bullet, indicating it did not penetrate the rear window glass, but travelled instead through the plane of the previously broken window. Body tissue was confirmed on the bullet. Traces of polyethylene and calcium carbonate were also identified on the bullet. The combined data demonstrates the bullet was not the first shot fired and penetrated the driver's seat and the clothing of Edwards. This shot penetrated through the body while most likely striking a rib and was dislodged during emergency room resuscitation efforts.

- Exhibit 402: This bullet was minimally deformed, indicating it most likely was the bullet which did not strike a rib upon entrance. No significant polymeric trace materials were observed on the bullet. A few white and black fibers were observed. Most of the adhering residue on the bullet was glass. This bullet impacted glass in the rear window of the Cadillac and penetrated through the driver's seat without collecting significant polymeric materials. The lack of imbedded polymetric materials indicate it was the second bullet which passed through the driver's seat via a preexisting bullet hole.

**EXHIBIT U**



- Exhibit 403: The bullet nose was deformed with multiple folds and cracks. White and black fibers were imbedded into the nose surface. No red fibers were observed. Glass and calcium carbonate deposits were identified on the bullet surfaces. This bullet penetrated the rear window glass and the driver's seat, contacting a material containing the carbonate before entering the body and most likely striking a rib.

- Exhibit 501: The bullet nose was deformed with multiple folds and cracks. Tufts of white and black fibers were imbedded in the bullet. Sparse red fibers were also observed. A few loose green fibers were present. Large quantities of glass and some polyethylene were identified adhering to the bullet. This bullet impacted glass in the rear window, passed through the shoulder of Edwards without striking the driver's seat and imbedding into the dashboard to the left of the steering wheel.

Reduced phenolphthalein was used to presumptively test for the presence of hemoglobin (blood) on the six bullets. No blood was indicated. File materials reviewed to date do not include information regarding the potential cleaning efforts performed by the ISP Crime Lab prior to the ballistics examination.

The specific sequence for the firing of the six rounds cannot be conclusively determined from the bullet examinations. However, applying data from multiple sources, the following was indicated:

- Exhibit 206 was not the first shot fired as it did not penetrate glass.

- Each of the other bullets broke out new glass as they penetrated the rear window of the vehicle.

- Exhibit 402 was likely the second bullet through the same hole made by a prior bullet penetrating through the driver's seat.

- The tight cluster of four shots penetrating the driver's seat were likely sequentially fired.

- The two shots not penetrating the driver's seat were high and to the right of the seat back, indicating they may have been sequentially fired.

# Video Analysis

The video footage from the dash camera that was positioned inside an approaching Whiteside County police vehicle was analyzed.[1] This was the third police vehicle to arrive at the scene. The footage from this video was used to reconstruct the motion of the Cadillac. The video camera microphone from this vehicle did not capture any useful audio.

The video shows that as the Whiteside County vehicle approached the scene, the Cadillac was initially obstructed by a vehicle parked in a neighbor's driveway. The Cadillac emerged from behind the parked vehicle traveling in reverse and then stopped. Using the video, in combination with an accurate, detailed FARO 3D scan of the site and a high-fidelity model of the Cadillac, camera match analysis was performed using visualization software (3D Studio Max from

---

[1] AVI File 1_2018-01-26_19-50-00_WCSO

**EXHIBIT U**



Autodesk) and selected video frames spanning the time the Cadillac becomes visible until it comes to rest.[2]

The dash camera video frame rate was 10 frames per second. Twenty frames were selected over a span of 5.6 seconds for the analysis as these frames provided the best accuracy when performing the camera match analysis. The Cadillac emerged from a location that was initially obstructed by a pickup truck parked in the adjacent neighbor's driveway. The Cadillac moved approximately 19 feet in 5.6 seconds from where it was first visible to the rest/stopped position. For the purposes of this analysis, the time associated with this first appearance of the rear of the Cadillac will be referred to as 0.0 seconds.

Two sequential frames after the Cadillac is visible provided a trend from which to estimate the speed of the Cadillac when it was first seen. The speed of the Cadillac for the two sequential frames, as determined using the camera match analysis, is 4.5 and 4.3 mph. The velocity demonstrates a decreasing trend moving forward in time. Thus, a conservatively low estimate for the speed of the Cadillac when it is first observed in the video recorded by the Whiteside County vehicle dash camera at time 0.0 is approximately 4.5 mph. Table 1 presents the results of the Cadillac speed output from the visualization software using the Whiteside County vehicle dash camera video and FARO scan documentation.

Additionally, a separate dash cam video was analyzed.[3] This other video camera microphone captured an engine revving sound followed by six gunshots as well as the end of the motion of the Cadillac as it reached its rest position. The motion of the Cadillac as it came to rest was used to synchronize the two dash cam videos. The engine revving sound was assumed to have come from the Cadillac.

The starting position and elapsed time to come into view was estimated using the audio recording and the digital sound wave from the audio recording. The revving sound (audio) began approximately 0.8 seconds before the Cadillac was first captured by the approaching police vehicle's camera.

Assuming the Cadillac began from rest and began to move at the start of the audible revving of the engine, the acceleration needed for the Cadillac to be traveling approximately 4.5 mph in 0.8 seconds is approximately 0.3g. This level of acceleration would increase if the Cadillac moved at any point after the start of the audible revving of the engine. This level of acceleration is characterized as rapid acceleration for passenger cars.[4]

---

[2] SAE 2018-01-0532
[3] AVI File 1_2018-01-26-_19-15-08_W316
[4] Traffic Accident Reconstruction Volume 2 of The Traffic Accident Investigation Manual. L.B. Fricke. Northwestern University Traffic Institute.

**EXHIBIT U**



| Frame (10 frames/sec) | Time (s) | Distance (ft) | Speed (mph) | Speed (ft/s) |
|---|---|---|---|---|
| 0 | 0.0 | 0.0 | 4.5 | 6.6 |
| 3 | 0.3 | 2.0 | 4.3 | 6.2 |
| 6 | 0.6 | 3.7 | 2.6 | 3.8 |
| 10 | 1.0 | 4.4 | 0.9 | 1.3 |
| 13 | 1.3 | 4.7 | 0.6 | 0.8 |
| 16 | 1.6 | 4.9 | 0.6 | 0.9 |
| 20 | 2.0 | 5.3 | 1.0 | 1.5 |
| 23 | 2.3 | 6.0 | 1.7 | 2.5 |
| 25 | 2.5 | 6.5 | 2.1 | 3.0 |
| 27 | 2.7 | 7.2 | 2.4 | 3.5 |
| 29 | 2.9 | 7.9 | 2.5 | 3.7 |
| 31 | 3.1 | 8.7 | 2.6 | 3.9 |
| 34 | 3.4 | 9.9 | 2.8 | 4.1 |
| 37 | 3.7 | 11.2 | 2.9 | 4.2 |
| 41 | 4.1 | 12.9 | 3.1 | 4.6 |
| 44 | 4.4 | 14.4 | 4.0 | 5.9 |
| 47 | 4.7 | 16.4 | 3.9 | 5.6 |
| 51 | 5.1 | 18.1 | 2.4 | 3.5 |
| 54 | 5.4 | 18.9 | 1.2 | 1.7 |
| 56 | 5.6 | 19.0 | 0.0 | 0.0 |

**Table 1: Speed output from the visualization software for the Cadillac motion in reverse.**

Based on the camera match analysis, the reconstructed positions of the Cadillac at the time it was first visible, at the time of each gunshot, and at its rest position are displayed in Figure 1. Figures 2 and 3 are summary plots that displays the Cadillac speed profile, distance traveled, acceleration, engine revving sound, and gun shots as a function of time. It has been shown that when 3D scan data is used to capture the site and vehicle of interest (the subject Cadillac), the reconstructed speed for a moving vehicle captured by a moving camera can be underestimated by 2.4%.[5]

---

[5] SAE 2018-01-0532

**EXHIBIT U**





**Figure 1: Reconstructed positions of the Cadillac using FARO 3D Scan data of the environment and the subject Cadillac.**

**EXHIBIT U**





**Figure 2:** A plot of distance in feet and time in seconds for the Cadillac. Additionally, the time of each gun shot is plotted as a green vertical bar, the engine rev is plotted as a shaded yellow region, and the moment the Cadillac becomes visible is time 0.0 seconds.



**Figure 3:** A plot of speed and acceleration in mph and g respectively vs time. Additionally, the gun shots are plotted as vertical bars, the engine rev is plotted as a shaded yellow region, and the moment the Cadillac becomes visible is time 0.0 seconds.

**EXHIBIT U**



The uncertainty in the reconstructed positions of the Cadillac is constrained by several known observations. One known observation is from the physical evidence obtained from scene photos, such as the rest position of the Cadillac. Another is the reverse movement of the Cadillac which can be constrained to have been a straight path. These constraints aid in establishing the motion of the vehicle with respect to the environment as depicted in the approaching Whiteside County police vehicle in the right to left direction. Discernable features on the Cadillac such as the rear bumper, wheels, pillars, and overall vehicle geometry can be tracked throughout the motion. Moreover, the measurements captured with a 3D laser scan of the site and the subject Cadillac were accurate to 0.22 and 0.06 inches, respectively.

Each frame image from the video was used to reconstruct the positions of the Cadillac is made up of pixels. Each pixel represents a dimension on a given object at a known distance from the camera, such as on the Cadillac. This dimension associated with the Cadillac varies as the Whiteside County vehicle approaches the scene as the distance between the camera and the vehicle is decreasing. The uncertainty in the placement of the Cadillac is greatest when the camera is the furthest away from the Cadillac, at time 0.0 seconds. This is the case as a pixel observed from this distance on the Cadillac has the greatest dimension. It was found that the uncertainty in the placement of the Cadillac for the first several frames was at most 5.9 inches. This uncertainty decreases to as little as 2.5 inches as the Whiteside County vehicle approaches the scene.

# Scenario Reconstruction Using FARO

FARO data was used extensively to position the Cadillac at the site at different time intervals during the incident using fixed reference landmarks. Site documentation conducted the night of the incident by ISP demonstrate the vehicle was reversing in a straight line as it came to a rest (Photograph 1). Given the constraints provided by shrubbery and the adjacent automobile, and the distance travelled, it is likely the vehicle reversed in a straight line parallel to the edge of the driveway the entire distance.

For the Cadillac to back in a straight line, the steering wheel would be in the "12 o'clock" position. This position was also verified by the documented deflection angle made by the bullet found on the dashboard as it passed through the steering wheel/airbag housing (Photograph 2). The bullet was deflected upward relative to the entrance hole in order to travel onto the top of the dashboard. This bullet missed Edwards completely. Therefore, this bullet's impact location can also be used as a point to determine bullet trajectory.

The range of bullet trajectories were determined during the vehicle inspection conducted on December 4, 2021. Observations and measurements made on that date were interfaced with graphing software available in Autodesk 3ds Max 2021 and Adobe Photoshop 2021 to produce the calculations and images presented in this report. Trajectory calculations were made using the bullet entrance holes in the vehicle driver's seat, steering wheel, and the broken-out portion of the rear window documented the night of the incident by ISP.

**EXHIBIT U**





**Photograph 1:** ISP scene photograph documenting the Cadillac tire tracks in the driveway which demonstrate the vehicle was reversing in a straight line and parallel to edge of the driveway as it came to a rest.



**Photograph 2:** Steering wheel of Cadillac with an approximately 30°counterclockwise rotation from "12 o'clock". The bullet entrance hole is visible on the front of the airbag module and broken plastic can be observed (yellow arrows) on the rear of the module. The exit hole located on the backside is vertically above/higher than the entrance hole. A rod placed into the entrance hole had to be bent up in order to exit the penetration.

**EXHIBIT U**



High energy penetrations (such as a bullet) through tempered glass immediately cause radial cracks originating from the impact location.[67] Circular failure patterns can then develop surrounding this impact location. Other circular failures in the glass which are larger in diameter than the projectile itself can also result from secondary impacts or other applied stress. The entire window can fail given time and additional stress such as vibration, etc. Note the Cadillac window failed completely when it was transported to the impound yard.

Radial cracks formed by the initial bullet penetration remained visible post event. The radial cracks visible in the scene photographs were used to locate the initial bullet impact location. Additionally, several arcs were present in the outline of the gap in the Cadillac window. These were traced to estimate potential bullet entrance points located at the loci of individual arcs. These entrance points were used as the first point for the bullet trajectory analysis (refer to photographs 3 and 4).

Bullet deflection fired through tempered glass have been studied.[8] This research found that bullets fired six feet from glass at a 45° angle deflect less than 1.2" vertically and 0.5" laterally at six feet beyond the glass. (The angle of the bullet trajectories through the rear window of the Cadillac in this case are approximately 54°.) The entrance holes in the driver's seat are depicted in Photograph 5. The potential rear window impact loci and the bullet entrance holes in the driver's seat and steering wheel were used to calculate and bracket the range of potential bullet trajectories. Side view elevation angles and top-down angles relative to the centerline on the Cadillac were calculated.



**Photograph 3: Broken rear window of the Cadillac the night of the shooting.**

[6] Fractography of Ceramics and Glasses, G. Quinn, NIST Publication, 560-16
[7] Determination of Unique Fracture Patterns in Glass and Glassy Polymers, Tulleners, Thorton, Baca, USDOJ, 2010-DN-BX-K219
[8] The Effects of Commercial Tempered Glass on Rifle Bullet Deflection, Henri C. Lambert, Master's Thesis, 1994

**EXHIBIT U**





**Photograph 4: Cropped and enlarged image depicting the hole in the rear window of the Cadillac post-shooting with possible penetration locations. The yellow lines mark radial cracks which formed as a result of the first bullet impact. The convergence of these radial cracks locates the location of initial impact location. The width of the gap is approximately 14 inches across and less than 3 inches high.**



**Photograph 5: Spacing of the four bullet holes in the driver's seat. Two bullets penetrated the hole marked by the red rod. Holes marked by the red and blue rods were used in the bullet trajectory calculations.**

Looking at the rear bumper of the vehicle as a reference, the dash camera video show Cater reversing and moving from left to right during the firing sequence. This is consistent with eyewitness accounts. The bullet penetrations through the rear window are approximately linear and parallel to the ground. The entrance holes in the driver's seat form a tight cluster for four of the six shots fired. One of the bullets missing the seat struck Edward's shoulder, approximately 6 inches from of the driver's seat cluster. This result indicates the gun was stable and was held in a controlled manner as Cater moved from left to right.

**EXHIBIT U**



Cater is 5'10" tall. The muzzle of his sidearm would be approximately 5' high if he were in the either the Isosceles, Weaver, or Fighting positions (typical stances for firing a handgun). The elevation for the muzzle of his gun would be less if he were bent at the waist or knees. Heights greater than this are unlikely as shot accuracy and reproducibility would be decreased as the gun would be less stable. It is also difficult to sight a weapon accurately when held at a higher elevation relative to shoulder height. Therefore, the maximum distances between Cater and the Cadillac were estimated by placing the gun at the 5' height and Cater with straight arms. A body position in a straight-arm firing stance relative to the muzzle of a handgun was estimated to be approximately 24".

Side-view renderings of the range of angles for potential bullet trajectories are depicted in Figures 4 and 5. Using the physical stature of Cater and assuming a gun height of 5'0", the maximum distance between Cater and the rear bumper of the Cadillac varies from approximately 36" for the lowest side-view trajectory angle to approximately 8" for the highest side-view trajectory angle. For all trajectories, Cater would be correspondingly closer to the bumper if the gun is fired from a lower height. If the gun was fired at the 4'6" height, Cater would be in contact with the rear bumper of the Cadillac. Note two eyewitnesses recalled that the Cadillac did impact Cater during the event. The dash camera video was of insufficient quality to document these eyewitness accounts.



**Figure 4: Profile view of the range of potential bullet trajectories. The gun is depicted at a 5' height for the two depictions. The gun would be closer to the rear window for lower gun heights.**

**EXHIBIT U**



**Figure 5: Side view angle calculations for the range of potential shots using the vertical range of potential rear window impact locations.**

The sequence of bullet impacts in the rear window were made as Cater was moving from his left-to-right to evade the reversing Cadillac. Based on the radial crack formation, the first bullet to penetrate the rear window was approximately centered in the gap (photograph 4). There is insufficient data to sequence the bullet impact locations in the driver's compartment. Therefore, no correlation can be made between the rear window impact loci and the terminal bullet strikes in the driver's compartment; none of the rear window bullet impact loci can be associated with a specific driver's compartment impact location.

Top-view renderings of the potential range of angles for potential bullet trajectories are depicted in Figures 6. Figure 6 illustrates Cater's potential positions for the first round fired, with an impact centered in the rear window gap and the seat back and steering wheel impact locations in the driver's compartment used as the terminal location. Note it is possible the first bullet penetrated to the left (relative to the rear view of the vehicle) of the location selected for the renderings in Figure 6. Moving the location of this first penetration will correspondingly shift the gun the left as well.

Using Figure 6 for reference, Cater was behind the moving Cadillac at the instant of the first shot irrespective of the gun height. If the gun is held 5' high and the first bullet impacted the steering wheel, then Cater was standing at a maximum distance of 2.5 feet behind the vehicle. He could have fired once more before being hit by the reversing Cadillac (Refer to figure 2). If the first round entered the driver's seat, then Cater would have been less than 1 foot from the vehicle bumper and would have to move briskly to avoid being struck. For either situation, if his gun were held at a lower height, he would have less time to evade the moving vehicle before being hit. Different renderings for each potential gun height can be produced.

Using the above assumptions and estimates, the reconstructed bullet trajectories place Cater a maximum of 2.5 feet behind the rear bumper of the Cadillac at the first shot in the firing sequence. Cater would necessarily be backing up at the same rate as the vehicle to maintain this distance. The vehicle's speed was approximately 3.5 mph at the instant of the first shot (Table 1). This correlates to a speed of 5.1 feet/sec and is generally considered a brisk-walking pace.[9] The

---

[9] General internet references on fitness sites

**EXHIBIT U**



vehicle had also rapidly accelerated in the interval prior to the first shot. The vehicle was slowing as the first round was fired (Figure 3).



**Figure 6: Depiction of the range of Cater's potential body positions (gun held at 5'0") at the first shot. The figure depicts potential positions aligning the initial rear window impact based on radial cracks and bullet hole locations in the driver's compartment. Lower gun heights decrease the distance between Cater and the vehicle. From the position of Cater in the left figure, a potential bullet trajectory can also be drawn through the right edge of the rear window gap and align with the driver's seat cluster.**

Using the estimated distance between Cater and the Cadillac (2.5 feet) at the first shot, and the time for the vehicle to travel that distance (Figure 2), he would have had 1.4 seconds to move before he was hit by the vehicle. If Carter were at the minimum estimated distance from the Cadillac at the first shot, he would have had less than 0.4 seconds to evade the moving vehicle. Again, these estimates are based on a gun height of 5'0". Lower gun heights decrease the response time.

Depending on the sequence of shots impacting in the driver's compartment, Caters position at the last shot is variable. For instance, if the last shot struck the steering wheel, then Cater would have still

**EXHIBIT U**



been partially behind the moving vehicle. If the last shot penetrated the driver's seat on the left side of the cluster, then Cater would have been marginally clear of the reversing Cadillac. The vehicle was reversing at 4.3 feet/second during the last shot (Figure 3).

# Cartridge Case Pattern Evaluation

Limited testing of Cater's sidearm and department-issued ammunition was conducted on December 5, 2020. Results for this testing were statistically analyzed for potential incorporation of the data into the reconstruction of the shooting scenario. Given the number of variables involved with the study conducted and the limited number of test shots, the information obtained was insufficient to provide any clarity when applied to the scenario. Extrapolation of the cartridge case landing locations to Cater's potential firing positions with each shot was not possible. Additional testing of the sidearm may yield the data required to make such a calculation should that be desired.

# Conclusions

ESi reserves the right to supplement or amend these findings and conclusions if additional information becomes available or based upon additional work or analysis in this matter.

1. Cater was behind the Cadillac at the passenger-side taillight when he fired the first shot.

2. Five of the six shots hit Edwards. Four shots entered his rear chest cavity and one passed through his right shoulder. One shot missed and passed through the steering wheel, deflecting onto the dashboard.

3. The Cadillac had rapidly accelerated and was traveling at a velocity of 6.6 ft/sec when first observed by the approaching dash camera.

4. The Cadillac was reversing at a velocity of 5.1 ft/sec at the time of the first shot.

5. Assuming the gun was held at an elevation of 5'0" and arms were straight, Cater was a maximum of 3 feet and as close as 8 inches from the rear of the vehicle at the instant of the first shot.

6. Lower gun heights decrease the distance from Cater to the rear bumper of the Cadillac.

7. Cater was backing up and moving from his left to his right during the shooting sequence.

8. Six shots were fired over a span of 3.3 seconds.

9. The Cadillac reversed nine feet over the course of the six shots.

10. Using the available data, the exact position for Cater at the instant of the last shot cannot be precisely determined. The range of potential positions span from alignment with the passenger rear corner to slightly offset from the edge of the vehicle.

11. The Cadillac reversed a total of approximately 19 feet from when it first became visible to the responding County vehicle dash camera.

**EXHIBIT U**



# Appendix A

Emmanuel J. Manuel, Senior Staff Consultant: Vehicle Motion Analysis, FARO data capture, and video-grammetry analysis.

Keith R. Thobe, P.E., Senior Staff Consultant: statistical analysis

Marla D. Bauer, Senior Graphics Technologist