IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Annie Agnew and Nayshawn Edwards, | ) | |
| *as Independent Co-administrators of the* | ) | |
| *Estate of Nathaniel (Nate) Edwards*, | ) | |
| Plaintiffs, | ) | Case No. 3:18-cv-50035 |
| | ) | |
| v. | ) | Honorable Iain D. Johnston |
| | ) | |
| Sergeant Jonathan Cater, *Individually*; and | ) | Magistrate Judge Margaret J. Schneider |
| The City of Rock Falls, Illinois, | ) | |
| Defendants. | ) | |
| | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiffs Agnew and Edwards, as co-administrators of the Estate of Nathaniel Edwards ("the Estate") bring suit against Sergeant Cater and the City of Rock Falls for excessive force and state law claims of wrongful death and survival. Before the Court is Plaintiffs' Motion to Disqualify and Bar Defendants' Expert [146]. For the reasons that follow, the motion to disqualify and bar expert Dale C. Mann is granted in part and denied in part.

I.     INTRODUCTION

This case involves the deadly encounter between Nate Edwards and City of Rock Falls Sergeant Jonathan Cater. Before the shooting, Edwards was engaged in what can be described as a low-speed chase. Edwards slowly drove a Cadillac and law enforcement followed. Edwards eventually pulled into a driveway. Sergeant Cater found himself somewhere near the rear of Edwards' vehicle, exactly where and how far away are critical facts in this case. Sergeant Cater's location is critical because after pulling into the driveway, Edwards reversed the vehicle and began to move out of the driveway. The velocity of the vehicle is also a critical fact. As Edwards drove the vehicle in reverse and as Sergeant Cater was somewhere near the rear of the

1

vehicle, Sergeant Cater fired numerous shots into the vehicle, most of which struck Edwards, resulting in his death. Various video recordings—mostly low grade—depict different aspects and perspectives of this deadly encounter. But no video definitively shows these precise events. The Estate claims that the use of force was excessive, characterizing the event as an older gentlemen driving his vehicle slowly out of a driveway in a way that was not dangerous. In contrast, Defendants characterize the event as a driver refusing directives and quickly backing up a large vehicle into a law enforcement officer, endangering his life. Because of these contrasting characterizations, which are important to determine whether Sergeant Cater's actions were reasonable, Defendants belatedly obtained the services of Engineering Systems, Inc. (ESi) to provide opinion testimony to support their version.

The parties were given until December 14, 2020, to disclose experts pursuant to Rule 26(a) and expert depositions were to be completed by January 14, 2021. Dkt. 119. In fact, on December 14, 2020, Defendants filed a certificate of service of their 26(a)(2)(B) disclosures. Dkt. 120.[1] During a telephonic conference on January 15, 2021, the Magistrate Judge granted Defendants' oral motion to extend discovery to February 15, 2021, which was presumably so that expert witness Dale Mann could be deposed. Dkt. 121. According to the Estate's subsequent motion to strike, Mann's deposition was scheduled for February 11, 2021, but on February 4, 2021, Defendants tendered via email a "supplemental report from Dale Mann."[2] Dkt. 123, 4. The

---

[1] Defendants' Preliminary Investigative Report is dated December 14, 2020. This report is all but useless and failed to comply with Rule 26(a)(2)(B).

[2] Defendants' "Final Investigative Report" is dated February 4, 2021. The Court expects attorneys to adhere to the rules of civil procedure. Neither the Preliminary Investigative Report (December 14, 2020) nor the Final Investigative Report on its own satisfies Rule 26(a)(2)(B), which states that a report, prepared and signed by the expert who will testify, must contain:

    (i)   a complete statement of all opinions the witness will express and the basis and reasons for them;
    (ii)  the facts or data considered by the witness in forming them;
    (iii) any exhibits that will be used to summarize or support them;

Magistrate Judge acknowledged the unjustified untimeliness of the February 4 report but denied the Estate's motion to strike because it did not show any prejudice as a result. Dkt. 132.

The February 4 report contains eleven "Conclusions," which the Court interprets as Mann's opinions Defendants seek to offer into evidence:[3]

1. Cater was behind the Cadillac at the passenger-side taillight when he fired the first shot.

2. Five of the six shots hit Edwards. Four shots entered his rear chest cavity and one passed through his right shoulder. One shot missed and passed through the steering wheel, deflecting onto the dashboard.

3. The Cadillac had rapidly accelerated and was traveling at a velocity of 6.6 ft/sec when first observed by the approaching dash camera.

4. The Cadillac was reversing at a velocity of 5.1 ft/sec at the time of the first shot.

---

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
(vi) a statement of the compensation to be paid for the study and testimony in the case.

The preliminary report does not include (i), the final report does not include (ii) or (iii), and neither report includes (iv), (v), or (vi). In fact, the Court has had to rely on Mann's deposition to ascertain what cases he has testified in and on what topic. Taken together, the reports do include the opinions/conclusions, the facts and data considered, and the exhibits used to support them. The final report also does not incorporate the preliminary report or its detailed descriptions of the evidence reviewed, exhibits used, and precise methodology. Based on the parties' reference to it as a "supplemental" report, the Court uses the ordinary meaning of the word supplemental and considers the two reports as one. Obviously, this is not best practices. These tactics are unacceptable. A party cannot tender a report that violates nearly every aspect of Rule 26(a)(2)(B) on an opposing party at the last minute, and then provide a "supplement" a week before the scheduled deposition of the expert. The Court reasonably experts more from the parties, their attorneys, and their retained experts, especially in a case of this nature and magnitude.

[3] The Court notes that the February 4 report contains a common escape hatch that many retained experts include in their reports: "ESi reserves the right to supplement or amend these findings and conclusions if additional information becomes available or based upon additional work or analysis in this matter." Dkt. 146-3 at 18. The inclusion of this type of language does not trump the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 16, 26(e). This Court will not allow retained experts to untimely change their opinions resulting in prejudice to the opposing party, the Court, or the other parties who have matters pending before the Court.

5. Assuming the gun was held at an elevation of 5'0" and arms were straight, Cater was a maximum of 3 feet and as close as 8 inches from the rear of the vehicle at the instant of the first shot.

6. Lower gun heights decrease the distance from Cater to the rear bumper of the Cadillac.

7. Cater was backing up and moving from his left to his right during the shooting sequence.

8. Six shots were fired over a span of 3.3 seconds.

9. The Cadillac reversed nine feet over the course of the six shots.

10. Using the available data, the exact position for Cater at the instant of the last shot cannot be precisely determined. The range of potential positions span from alignment with the passenger rear corner to slightly offset from the edge of the vehicle.

11. The Cadillac reversed a total of approximately 19 feet from when it first became visible to the responding County vehicle dash camera.

Dkt. 146-3 at 18.

The purpose and import of these opinions should be readily apparent in this excessive force case. If Sergeant Cater were standing in close proximity and directly behind Edwards' Cadillac while the vehicle quickly moved toward Cater, then the use of some force—even deadly force—is much more reasonable. But, if Sergeant Cater were standing further away or off to the side of Edwards' Cadillac while the vehicle slowly backed up, then the use of force—particularly deadly force—is dramatically less reasonable. And the difference between these two scenarios could be the difference between summary judgment in favor of Defendants, on the one hand, and a jury trial and potentially significant damages in favor of the Estate, on the other hand. To

introduce expert testimony supporting the former scenario, the February 4 report must marry multiple moving parts, which requires expert testimony as to not only bullet trajectory, but also incident reconstruction, analyzing the evidence to determine the velocity and location of the Cadillac as well as the location of Sergeant Cater at the time the shots were fired. Dkt. 154-1, at 13.[4]

Citing Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), the Estate moved to bar all opinions and disqualify the expert testimony of Dale Mann. Dkt. 146. But the Court analyzes each opinion individually in determining admissibility. *See Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016).

The Estate presents two primary arguments as to why Mann's testimony should be barred. First, the Estate argues that Mann is not qualified to be an expert in the subject matter of forensic ballistics and bullet trajectory, vehicle dynamics, and human factors regarding persons in an officer involved shooting. Dkt. 146, at 2. Next, the Estate argues that Mann is unreliable because he "lacks an understanding of the methodology underlying the purported opinions," and he neither collected nor analyzed the data himself. *Id.* at 6.

In response, Defendants argue that Mann's qualification is "based on experience or training," such as his experience "serving as an expert in police misconduct cases wherein he did

---

[4] To his credit, Mann was transparent in his description of the process: "[T]here are several teams of people working on this investigation that I would pull in to [sic] the case because of their expertise. And then we all overlap and talk together to kind of put the entire jigsaw puzzle together. We each have a piece of that puzzle." Dkt. 154-1, at 13. There is nothing inherently improper using this type of process. Indeed, this team process is often used, even in litigation. The problem occurs when only one person is designated as the testifying expert and that person does not have the expertise to validate the methodology of other team members and merely adopts their conclusions. "The ability of a testifying expert to understand and validate the work of an expert upon whom he or she relies is critical to the admissibility of the testifying expert's opinion." *Muhsin v. Pacific Cycle, Inc.*, Civil Action NO. 2010-060, 2012 U.S. Dist. LEXIS 80441, at *12 (D.V.I. Jun. 8, 2012). This problem is not new, and courts have consistently refused proffered expert testimony infected with that problem. *See, e.g., Muhsin*, 2012 U.S. Dist. LEXIS 80441, at *13 n.2 (collecting cases).

5

proximity and bullet trajectory analysis" and spent nearly twenty years working in a crime lab. Dkt. 153, at 2-3. As to reliability, Defendants argue that Mann "relied on data produced by his team members" and "did not simply parrot" the work of others in his report. *Id.* at 4. This, Defendants argue, goes to weight and not admissibility, and is best addressed through cross-examination. *Id.* at 5. Embedded in the response are two sub-arguments that can be dispatched quickly.

First, Defendants repeatedly argue that the Estate's concerns can be addressed by cross-examination. Dkt. 153, at 1, 5. But that thinking negates the entire reason *Daubert* and its gatekeeping requirement exists. There's a reason why it's called "gatekeeping" and not "clean up". The function keeps the opinions from being introduced to the factfinder in the first place. The rationale of *Daubert* is preventative, not curative. *See McKiver v. Murphy-Brown*, 980 F.3d 937, 1005 (4th Cir. 2020) ("The district court's failure to exercise its gatekeeping function was not cured by Murphy-Brown's robust cross-examination and introduction of counter-expert witness's testimony. As this Court recognized in *Nease*, cross examination does not serve as a substitute for the district court's failure to make the threshold gatekeeping decision as to the reliability and relevance of expert testimony.") *citing Nease v. Ford Motor Co.*, 848 F.3d 219, 231 (4th Cir. 2017); *see also Paramount Fin. Communs., Inc. v. Broadridge Inv'r Commun. Sols., Inc.*, No. 15-CV-405, 2018 U.S. Dist. LEXIS 223082, at *16 (E.D. Pa. Dec. 14, 2018) (cross-examination cannot save testimony that lacks a reliable methodology); *McDonald v. Wexford Health Sources, Inc.*, Case No. 09 C 4196, 2016 U.S. Dist. LEXIS 47286, at *25 (N.D. Ill. Apr. 7, 2016) ("Cross-examination and rebuttal are not cures for the failure to satisfy *Daubert*'s requirements, as the court must act as a 'gatekeeper' and determine if expert testimony is proper before it can be presented to the jury."); *Orthoflex, Inc. v. ThermoTek, Inc.*,

986 F. Supp. 2d 776, 798-99 (N.D. Tex. 2013) ("But the opportunity for cross-examination is not of itself sufficient to cure expert testimony that is unreliable under *Daubert*."); *Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 800 (N.D. Ill. 2005).

Second, Defendants make a straw man argument that requiring experts to personally collect all data used to formulate their opinions is a "ludicrous" standard, which if upheld by the Court is contrary to established law. Dkt. 153, at 4. This argument fails for two reasons. The Estate made no such argument. Dkt. 154, at 5. Moreover, as shown by the avalanche of cases cited in this order, the Court is imposing no such standard; instead, the Court is merely applying established law under Rule 702 and *Daubert*.

In reply, the Estate argues that when Mann was deposed, he "could not explain or describe the methods of data collection or analysis used to make his conclusions" and that he did not "have the capability to understand and analyze such data." Dkt. 154, 5. Further, the Estate argues that although relying on team members and assistants to gather data may be permitted, reliance on others is impermissible when those team members are not "data gatherers, but exercise professional judgment that is beyond the expert's ken." *Id.* (quoting *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002)).

II.     REQUIREMENTS OF RULE 702 AND *DAUBERT*

"Just as proof of negligence in the air will not do, neither will proof of expertise in the abstract." *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 320 (N.D. Ill. 2008) (citing *Palsgraf v. Long Island RR*, 248 N.Y. 339, 344 (1928) (Cardozo, C.J.)). Admissibility of expert testimony[5] is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharma.,*

---

[5] The expert report itself is inadmissible hearsay. *See, e.g., Sommerfield v. City of Chicago*, 254 F.R.D. 317, 328 (N.D. Ill. 2008); *Bianco v. Globus Med., Inc.*, 30 F. Supp. 3d 565, 570 (E.D. Tex. 2014).

7

*Inc.*, 509 U.S. 579 (1993). *Love v. United States*, 17 F.4th 753, 755 (7th Cir. 2021) (holding that "Rule 702 applies in all federal cases"). Rule 702 provides the requirements for the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> b) the testimony is based on sufficient facts or data;
> c) the testimony is the product of reliable principles and methods; and
> d) the expert has reliably applied the principles and methods to the facts of the case.

As proponents of Mann's opinion testimony, Defendants bear the burden of establishing the admissibility of his testimony. *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019).

The Supreme Court in *Daubert* provided factors by which the reliability of expert testimony can be evaluated:

> (1) whether the expert's conclusions are falsifiable;
> (2) whether the expert's method has been subject to peer review;
> (3) whether there is a known error rate associated with the technique; and
> (4) whether the method is generally accepted in the relevant scientific community.

*Brown v. Burlington N. Santa Fe Ry.*, 765 F.3d 765, 772 (7th Cir. 2014) (citing *Daubert*, 509 U.S. at 593-94). In *Kumho Tire Company, Ltd. v. Carmichael*, the Supreme Court extended *Daubert*'s standards for reliable scientific testimony to non-scientific testimony based on technical or other specialized knowledge. 526 U.S. 137, 141, 147-49 (1999). Taken together, these precedents aim "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Hartman v. EBSCO Indus.*, 758 F.3d 810, 818-19 (7th Cir. 2014) (quoting *Kumho*, 526 U.S. at 152).

The Court's function with respect to expert testimony is a "gatekeeping" one. *United States v. Ozuna*, 561 F.3d 728, 736 (7th Cir. 2009); *see also United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004) (noting that a district court's *Daubert* analysis is important because juries often give expert testimony a "talismanic significance"). The District Court must "prevent expert testimony from carrying more weight with the jury than it deserves." *Farmer v. DirectSat USA, LLC*, No. 08-CV-03962, 2013 U.S. Dist. LEXIS 39912, at *25 (N.D. Ill. Mar. 22, 2013). To fulfill its gatekeeping role, the Court must evaluate (a) the proposed expert's qualifications, (b) the reliability of the expert's methodology, and (c) the relevance of the expert's testimony so that it assists the trier of fact. *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 872 (7th Cir. 2021); *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017); *Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010).

**A. Qualifications**

An expert may be qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "Neither Rule 702 nor *Daubert* requires an expert to be the *most* qualified person to opine on the issue based on the narrowest, *most* specialized expertise; he need only have 'a body of specialized knowledge that can be helpful to the jury.'" *Prayitno v. Nextep Funding LLC*, No. 17 C 4310, 2019 U.S. Dist. LEXIS 208282, at *14 (N.D. Ill. Dec. 3, 2019) (emphasis in original). Mann has a general science background. He holds a Bachelor of Science in Chemistry and Oceanography. *See* Dkt. 146-4 (Mann CV), 2. But on his CV, all of his identified training is related to fire and drug analysis. *Id.* Additionally, his CV lists eleven areas of specialization, none of which specifically match up well with his proffered opinions for this case. He explained that he does not perform enough of the kind of work done in this case to dedicate a specific discussion on his resume. Dkt. 154-1, at 9. And there is some fodder for

9

cross examination. For example, Mann has never published a paper or presented on bullet trajectory, including trajectory after a bullet strikes glass or rubber. *See, e.g.,* Dkt. 154-1, at 9-10. Further, the work he performed for this case is not what he generally focuses on *currently*, which is why he describes the work as "odd ball requests." Dkt. 154-1, at 9. Nevertheless, Mann still does these one-off projects. *Id*. Despite these issues, the Court finds Defendants have met their burden to establish that Mann is qualified to testify as an expert in bullet trajectory, which is a subject that requires expertise. *See Garrit v. City of Chicago*, No. 16-cv-7319, 2022 U.S. Dist. LEXIS 6759, at *23 (N.D. Ill. Jan. 13, 2022) (specialized expertise is also necessary to render an opinion on bullet trajectory). Mann's expertise comes from specialized knowledge he obtained during his over 40 years of being involved in scene reconstruction, 17 of which he worked in a crime lab analyzing thousands of scenes. Dkt. 154-1, at 21-22. This type of expertise is sufficient in this case. *See United States v. Conn*, 297 F.3d 548, 556 (7th Cir. 2002); 2000 Advisory Committee Notes to Rule 702 (expertise may be based on experience).

But Defendants have failed to meet their burden to establish Mann has the qualifications to be an expert in determining vehicle dynamics and velocity by using video analysis. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (proponent of expert bears burden). The entire analysis relating to these subjects was performed under the direction of another person at ESi: Noel Manuel developed those opinions. Dkt. 154-1, at 13. This is not surprising because Mann does not perform traffic investigation or reconstruction work. Dkt. 154-1, at 12.[6] When asked if he determined vehicle velocity, Mann answered, "The section of

---

[6] Here are two questions and answers making this point clear: (1) "Q: So, the reference to the Traffic Accident Reconstruction or Investigation Manual, that's something that one of your colleagues referred to because you didn't specifically do that work? A: That's correct. . ." (2) "Q: But, you per se do not do traffic investigation work, do you? A: I do not." Dkt. 154-1, at 12. Noel Manuel used this publication to calculate the Cadillac's velocity. *Id*. The Estate's counsel risked gilding the lily with the following question and answer: "Q: And again, you didn't do the scene reconstruction, though, did you? A: I think

10

my report regarding the analysis of the video and determination of velocity and acceleration was done by a different group within ESi." Dkt. 154-1, at 12. He later elaborated by stating, "Anything involving the motion of the vehicle, velocity, acceleration, all that, that's done by another group. The reconstruction of the scene and the vehicle is done by another person when he does FARO scanning. I don't operate that FARO scan, so he collects all that Cloud data and produces that data set." Dkt. 154-1, at 12-13. Two sets of questions and answers drive home the point:

> Q: And again, just so I'm clear, you didn't generate the analysis of the data that was gathered:
>
> A: If you look at the section in the final report labeled "Video analysis," that particular section of the report had major contributions from Noel Manual. He was the primary author of that particular section.
>
> \* \* \*
>
> Q: Well, you used the term earlier that there was a group that did reconstruction of the scene.
>
> A: Okay. If you're just – if you're talking about the vehicle in the driveway, that is under the – and the sequence, the motion of the vehicle, that is all contained under video analysis, and that specific work would have been coordinated by Mr. Manuel.

Dkt. 154-1, at 13. When questioned about the timing of Cater firing his sidearm, the following colloquy occurred:

> Q: Did Cater fire his weapon before the vehicle moved?
>
> A: No.
>
> Q: And how do you know that?
>
> A: From the audio tapes. He fired his weapon at 1/3 seconds after the revving was first heard. The Cadillac becomes visible in the dash cam at the arbitrary time of zero seconds, that's our set point, and the first shots were fired 9.5 seconds after the

---

we've been through that. As far as the movement of the vehicle, no. That is provided by other people." Dkt. 154-1, at 19.

> Cadillac was first visible. The Cadillac when it was first visible is moving 4.5 miles per hour when it was first visible.
>
> Q: And by the way, relative to the analysis that you're citing to, you didn't do that analysis, right?
>
> A: No.
>
> Q: All right. In terms of the analysis done to gather that data, again the most knowledgeable person would be Mr. Manuel?
>
> A: Yes.
>
> Q: All right.
>
> A: It was his team – his team that evaluated the FARO data and the dash cam imaging and the audio – well, the microphone – what do we call it, audio records from the dash cams and whatever else we had.
>
> Q: Okay. You didn't do any analysis of the audio communications, did you?
>
> A: I listened to them, but I did not listen to them in terms of putting the data into the report format.
>
> Q: Again, that would be Mr. Manuel and his team?
>
> A: Correct.

Dkt. 154-1, at 39-40. In defense of Mann's qualifications to proffer opinions on these topics, Defendants simply cited to the following portion of Mann's deposition and nothing more:

> Q: So, any opinion in this report concerning vehicle velocity, that's not an opinion that you developed, correct?
>
> A: That's correct. I know – I know how the systems work. *I know quite a bit about the process that they are involved in*, but I do not actually do hands-on work in that area.

Dkt. 153, at 4 (citing Dkt. 154-1, at 12) (emphasis added).

But read in context, Mann was testifying that he understood how the FARO system worked, not that he understood the methodology Noel Manuel used, let alone that he knew how to validate Manuel's opinions. This interpretation is supported by Mann's repeated testimony disclaiming involvement in Exhibit A, which was Manuel's report and analysis. On "cross

12

examination" by Defendants' counsel, Mann stated that the February 4 report's "conclusions" were his based upon his education, training, experience, and the work that he did and the work by the people he supervised at ESi. Dkt. 154-1, at 40. But Mann never explained how he validated Manuel's work or even that he understood it. Indeed, earlier in his deposition, Mann described Manuel's work as "cutting edge stuff." Dkt. 154-1, at 35. Despite the Estate questioning Mann's qualifications in this regard during the pre-filing conference, Dkt. 136, and in the motion to bar, Dkt. 146, Defendants never offered an affidavit or declaration or any other evidentiary material to support Mann's qualifications regarding these issues or efforts he made to validate Manuel's opinions. And the venom in the response brief did nothing to bolster Mann's expertise in this area. Dkt. 153, at 4, 5

The Court is perplexed as to why Mann—and only Mann—is the proponent of this report. Mann and defense counsel curiously refer to the report as belonging to Engineering Systems, Inc., Mann's employer. Indeed, the report itself states, "Multiple individuals within ESi made major contributions to the contents of this report, based on the expertise required to evaluate and analyze the various data." Dkt. 138-17, at 58. The Federal Rules of Evidence and Civil Procedure cannot be satisfied if a corporation, not a natural person, is the "expert." The rules require testifying expert witnesses to provide reports detailing their qualifications, methodologies, and conclusions. The February 4 report was compiled by a team and Defendants offer one member of that team, Dale Mann, as the mouthpiece without providing any evidence that Mann understood and validated Manuel's methodologies.

To move this case toward resolution in accord with Federal Rule of Civil Procedure 1, as a preemptive strike, the Court will not allow Defendants to tender Manuel as an expert. *Muhsin*, 2012 U.S. Dist. LEXIS 80441, at *33-37; Fed. R. Civ. P. 16(b); Fed. R. Civ. P. 26(a)(2)(B); Fed.

13

R. Civ. P. 26(e); Fed. R. Civ. P. 37(b), (c). It is far too late in this 2018 case to proffer an expert opinion after the close of discovery and after summary judgment briefing is completed. A disclosure now would be prejudicial to the Estate and the Court and could not be substantially justified.

### B. Reliability

This Court must ensure that expert testimony is reliably based on facts and data before allowing it to proceed to the trier of fact. *See Smith v. Ill. Dep't of Transp.*, No. 15-C-02061, 2018 U.S. Dist. LEXIS 133810, at *37-38 (N.D. Ill. Aug. 8, 2018), *aff'd*, 936 F.3d 554 (7th Cir. 2019) ("Even if the witness qualifies as an expert, the district court still must ensure that the evidence 'is sufficiently reliable to qualify for admission.'") (internal citations omitted). In gauging reliability, "the district judge must determine whether the expert is qualified in the relevant field and whether the methodology underlying the expert's conclusions is reliable." *Ammons v. Aramark Unif. Servs.*, 368 F.3d 809, 816 (7th Cir. 2004) (citation omitted). When a district court gauges the reliability of expert testimony, "the correct inquiry focuses not on the ultimate correctness of the expert's conclusions, but rather on the soundness and care with which the expert arrived at her opinion." *Chen v. Yellen*, No. 3:14-cv-50164, 2021 U.S. Dist. LEXIS 175372, at *4-5 (N.D. Ill. Sep. 15, 2021) (internal citations omitted).

Rule 703 extends the foundational basis for expert testimony beyond personal observation to include "facts or data in the case that the expert has been made aware of," if it is of the type reasonably relied on by experts in the field. *Sommerfield*, 254 F.R.D. at 324; *but see Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005) ("Rule 703 . . . was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose

statements or opinions the expert purports to base his opinion"). When expert witnesses formulate their personal opinions, they are permitted to use and rely on assistants or team members, who themselves often do not have to testify as experts. *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002). For example, the leader of a medical or forensic team need not be "qualified as an expert in every individual discipline encompassed by the team in order to testify to the team's conclusion." *Id.* at 613. But the "[a]nalysis becomes more complicated if the assistants aren't merely gofers or data gatherers but *exercise professional judgment* that is beyond the expert's ken." *Id.* (emphasis added). "A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science." *Dura*, 285 F.3d at 614; *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert"). The Seventh Circuit explained this point in *In re James Wilson Associates*, 965 F.2d 160, 173 (7th Cir. 1992) (emphasis added):

> The issue was the state of the building, and the expert who had evaluated the state—the consulting engineer—was the one who should have testified. The architect could use what the engineer told him to offer an opinion *within the architect's domain of expertise*, but he could not testify for the purpose of vouching for the truth of what the engineer had told him—of becoming in short the engineer's spokesman. . . . [I]t is improper to use an expert witness as a screen against cross-examination.

The Seventh Circuit is hardly alone in not allowing a testifying expert to parrot the opinions of other experts upon whom they relied without sufficient evidence of the reliability of the underlying opinion. *See, e.g., TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993); *Legendary Art, LLC v. Godard*, No. 11-CV-0674, 2012 U.S. Dist. LEXIS 116270, at *12 (E.D. Pa. Aug. 17, 2012) ("Mr. Slocumb's reliance on projections supplied by Legendary Art,

15

without independent verification, renders his analysis unreliable.") (citing *ID Sec. Sys. Can., Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622, 695 (E.D. Pa. 2003); *Muhsin*, 2012 U.S. Dist. LEXIS 80441, at *23 ("As the cases demonstrate, an expert may rely and testify concerning the opinions of other experts only when the testifying expert has the specialized knowledge necessary to understand, corroborate, and articulate the science behind the opinion."); *Threet v. Corr. Health Care Mgmt. of Okla., Inc.*, No. CIV-07-0943-HE, 2009 U.S. Dist. LEXIS 96175, at *19-20 (W.D. Okla. Oct. 15, 2009) ("It is true that an expert may rely on facts and opinions not otherwise admissible if they are information of a type reasonably relied on by experts in that particular field. Fed. R. Evid. 703. That may include reliance on opinions of other experts *so long as it does not involve the wholesale adoption of another expert's opinions without attempting to assess the validity of the opinions relied on.*") (emphasis added). The Court will apply this established precedent and well-settled law.

Mann's deposition establishes that Manuel was the expert who provided the opinions regarding the movement and velocity of the Cadillac. Dkt. 154-1, at 18, 19. And when the Estate's counsel attempted to drill down as to the bases of Manuel's opinion, Mann punted. *Id*. This prevented the Estate's counsel from meaningfully cross-examining Mann not only about Mann's own opinions, but also Manuel's opinions because Mann's opinions relied extensively on Manuel's critical opinions. Dkt. 154-1, at 18 ("Well, the position of Cater is always going to be somewhat dependent on the position of the vehicle as it's moving. So, that is one variable that we have to define, and we try to define it as accurately as possible. We cannot begin to place him until we know where the vehicle is.").

**C. Relevance**

Under Rule 702, an expert's opinion is relevant "so long as it assists the jury in determining any fact at issue in the case." *Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 409 (7th Cir. 2014). A trial court must ask itself if the proffered expert testimony is relevant—that is, whether it will aid the jury in its deliberations, not whether it will instruct the jury as to legal issues or draw legal conclusions about the facts in evidence. *See Daubert*, 509 U.S. at 589. The opinions in the February 4 report are undoubtedly relevant to Defendants' contention that Sergeant Cater was behind the vehicle when Edwards accelerated at him. Relevance is not the Court's concern in this case.

### III. MANN MAY TESTIFY ONLY AS TO THOSE OPINIONS WITHIN HIS EXPERTISE THAT ARE RELIABLE AND RELEVANT.

Based on the foregoing, the motion is granted in part and denied in part. First, because Mann is qualified as an expert in bullet trajectory—and Defendants have shown the reliability of his opinions regarding bullet trajectory and the testimony will assist the trier of fact—the Court will admit some of Mann's opinion testimony. But, second, because Mann is not only unqualified as an expert in vehicle movement and velocity based on video analysis, but also failed to establish he understands and validated Manuel's opinions, Mann cannot testify as to the movement and velocity of the Cadillac. And because many of Mann's opinions are based upon Manuel's opinions, he cannot testify as to his opinions that relied upon Manuel's opinions. *See In re Imperial Credit Indus. Sec. Litig.*, 252 F. Supp. 2d 1005, 1017 n.5 (C.D. Cal. 2003) ("Because Moore himself is not qualified to perform residual valuation, he cannot 'validate' [the underlying expert's] opinions and, therefore, those opinions cannot be subjected to meaningful adversarial testing through cross-examination of Moore. As already noted, [the underlying expert] will not be a witness and therefore there will be no opportunity in this case for meaningful adversarial testing of [his] opinions.").

17

So, the Court rules as follows to each of Mann's opinions.

1. Mann is prohibited from offering opinion 1: Cater was behind the Cadillac at the passenger-side taillight when he fired the first shot. This opinion relies on Manuel's opinion.

2. Mann may offer opinion 2: Five of the six shots hit Edwards. Four shots entered his rear chest cavity and one passed through his right shoulder. One shot missed and passed through the steering wheel, deflecting onto the dashboard. This opinion is based on bullet trajectory and relies on autopsy findings. It is unrelated to Manuel's opinion.

3. Mann is prohibited from offering opinion 3: The Cadillac had rapidly accelerated and was traveling at a velocity of 6.6 ft/sec when first observed by the approaching dash camera. This opinion is based on Manuel's opinion.

4. Mann is prohibited from offering opinion 4: The Cadillac was reversing at a velocity of 5.1 ft/sec at the time of the first shot. This opinion is based on Manuel's opinion.

5. Mann is prohibited from offering opinion 5: Assuming the gun was held at an elevation of 5'0" and arms were straight, Cater was a maximum of 3 fee and as close as 8 inches from the rear of the vehicle at the instant of the first shot. This opinion is based on Manuel's opinion.

6. Mann may offer opinion 6: Lower gun heights decrease the distance from Cater to the rear bumper of the Cadillac. This opinion is based on bullet trajectory and methodologies within Mann's expertise.

7. Mann is prohibited from offering opinion 7: Cater was backing up and moving from his left to his right during the shooting sequence. This opinion is based on Manuel's

opinions. To the extent Cater can testify to this as a fact witness, it is admissible in that manner.

8. Mann may offer opinion 8: Six shots were fired over a span of 3.3 seconds. This opinion is based on Mann's expertise.

9. Mann is prohibited from offering opinion 9: The Cadillac reversed nine feet over the course of six shots. This opinion is based on Manuel's opinions.

10. Mann is prohibited from offering opinion 10: Using the available data, the exact position of Cater at the instant of the last shot cannot be precisely determined. The range of potential positions span from alignment with the passenger rear corner to slightly offset from the edge of the vehicle. This opinion is based on Manuel's opinions.

11. Mann is prohibited from offering opinion 11: The Cadillac reversed a total of approximately 19 feet from when it first became visible to the responding County vehicle dash camera. This opinion is based on Manuel's opinions.

Having gone through this exercise, the opinions that remain consist of evidence that the parties should consider stipulating to.

## IV. CONCLUSION

For these reasons, the Estate's motion to bar and disqualify expert witness Dale Mann is granted in part and denied in part.

Date: February 2, 2022    By: _____
IAIN D. JOHNSTON
United States District Judge