**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Annie Agnew and Nayshawn Edwards, | ) | |
| *as Independent Co-administrators of the* | ) | |
| *Estate of Nathaniel (Nate) Edwards*, | ) | |
| Plaintiffs, | ) | Case No. 3:18-cv-50035 |
| | ) | |
| v. | ) | Honorable Iain D. Johnston |
| | ) | |
| Sergeant Jonathan Cater, *Individually*; and | ) | |
| The City of Rock Falls, Illinois, | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

*Q: Did you see the Cadillac move at all before you heard the shots?*

*A: No, not that I can remember.*

This sworn deposition testimony is the most important fact for purposes of the motion pending before the Court.

\*    \*    \*

Plaintiffs Annie Agnew and Nayshawn Edwards, as co-administrators of the Estate of Nathaniel Edwards ("the Estate") sue Sergeant Jonathan Cater under 42 U.S.C. §1983 for excessive use of force and supplemental state-law claims of wrongful death and survival. The Estate also sues the City of Rock Falls for the supplemental state-law claims as well as indemnification. Before the Court is Defendants' Motion for Summary Judgment [137]. For the reasons that follow, the motion is denied.

## I.     FACTS UPON WHICH SUMMARY JUDGMENT WILL BE BASED[1]

### Initial Encounter and Pursuit

On January 26, 2018, Rock Falls Police Officer Dustin Sugars was on patrol when he

encountered a white Cadillac that was weaving, crossing the center line, and travelling 11 miles

per hour over the posted speed limit.  Dkt. 143, ¶¶ 1-2.  The decedent in this case, Nathaniel

(Nate) Edwards, was driving the vehicle.  *Id.*  Edwards' blood alcohol content was .189 (which is

over twice the legal limit to be operating a motor vehicle), and he also smoked cannabis (which

could be smelled on his person).  Dkt. 141(6), at 3:43; Dkt. 143, ¶¶ 45-46.[2]  There is no evidence

---

[1]  The facts are taken from Plaintiffs' response to Defendant's LR 56.1(a) Statement of Material Facts (Dkt. 143) and Defendants' response to Plaintiffs' LR 56.1(b)(3) Statement of Additional Facts (Dkt. 151) as well as deposition transcripts attached thereto.  Additionally, the Court relies upon its analysis of the multiple video and audio recordings filed with the Court.  Dkt. 141.  The Court pauses for a moment to discuss the video and audio recordings, which it and the Court's staff spent hours analyzing.  First, all the video was captured on dashcams from the squad cars.  No officers were equipped with body cameras.  As this Court has recently stated, body camera recordings can be critical in accurately and quickly determining the events at a scene.  *See Pennie v. City of Rockford*, No. 3:19-cv-50120, 2022 U.S. Dist. LEXIS 19632, at *1-2 (N.D. Ill. Feb. 3, 2022).  And the lack of audio and video recordings from body cameras can result in the denial of summary judgment because a question of fact exists, which may not have existed if body cameras were used.  *Id*.  Second, some of the dashcams did not capture audio recordings, and some audio recordings were very faint.  Third, because of the manner in which two squads were parked, the key moments of the incident were out of view.  Fourth, the dashcam of another squad was able to video record portions of the most critical moments of the incident, but that squad was driving to the scene.  As a result, the images are difficult to make out, as the view is occasionally blocked by objects, such as mailboxes, and the images are washed out by the flashing lights.  Moreover, and unfortunately, this squad's dashcam video does not provide a good perspective for the viewer to determine where Riley and Cater were standing at the time the Cadillac's engine revved, when the Cadillac moved back, the velocity of the Cadillac, and most critically, where Riley and Cater were standing at the time Cater fired six shots at Edwards, causing Edwards' death.  The Court is mindful that when video recordings are subject to different interpretations, a question of fact exists.  *See Jackson v. Curry*, 888 F.3d 259, 264 (7th Cir. 2018).  These videos are presented on the Court's docket as exhibits to Defendants' Statement of Facts, with hyperlinks to each of the nine videos listed in Document No. 141.  The Court has attempted to indicate as best as it could which video and audio recording is being cited in this order.  To facilitate this, the Court labels the hyperlinks 1 through 9, so the first link listed will be cited as Dkt. 141(1), and so on.  The approximate place will be cited using the run time on the actual video file (mm:ss), as opposed to the timestamp embedded within.  For further reference, Defendants' Statement of Facts (Dkt. 138) refers to video 9 as Exhibit F (Sugars' dashcam); video 3 as Exhibit G (Coutts' dashcam); videos 1, 2, 4, and 8 as Exhibit H (Elder's dashcam); and videos 5, 6, and 7 as Exhibit I (Coutts' dashcam).

[2] The Estate argues that these facts are irrelevant in this excessive force case.  Dkt. 143, ¶¶ 45-46; Dkt. 142, at 17.  The Estate also presents evidence that Cater and others did not know if Edwards was under

that Edwards was armed that night and no evidence that any law enforcement officer saw Edwards with a weapon that night. Dkt. 151, at 2, 7. Sugars followed Edwards for less than a mile, activated his lights, and called in the Cadillac's license plate. Dkt. 143, ¶ 3. Edwards did not immediately stop at that time. Indeed, the pursuit lasted several minutes. Dkt. 141(9), at 0:00-6:33. After Edwards failed to stop, Sugars radioed dispatch, seeking assistance. Dkt. 143, ¶ 4. Whiteside County Sheriff's Deputy Sean Coutts heard the call and responded to assist Sugars. Dkt. 143, ¶ 4. Rock Falls Sergeant Cater, who was providing field training with Probationary Officer Ethan Riley, likewise heard the call and went to assist Sugars. Dkt. 143, ¶¶ 4, 20.[3] Riley was a probationary officer but was driving Cater's squad car. Cater also activated his squad's lights. Dkt. 143, ¶ 4.

As Edwards began to drive through a residential neighborhood, he slowed the Cadillac substantially. Dkt. 143, ¶ 5; Dkt. 141(9), at 0:00-6:25. Edwards turned multiple times through the neighborhood. Dkt. 141(9), at 0:54-6:25. During this time, Edwards failed to stop at a stop

---

the influence at the time. Dkt. 151, ¶¶ 2-3. If a plaintiff's drug and alcohol use in an excessive force case is unknown to the officer, the evidence is generally inadmissible as to the level of force used. *Common v. City of Chicago*, 661 F.3d 940, 943-44 (7th Cir. 2011); *see also Hayes v. County of San Diego*, 736 F.3d 1223, 1232-33 (9th Cir. 2013). The Fourth Amendment requires an objective analysis, based on what law enforcement knew at the time. *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Carmichael v. Village of Palatine*, 605 F.3d 451, 457 (7th Cir. 2010). But this does not mean this evidence is not relevant for other purposes, including supporting an officer's version of the events. *Palmquist v. Selvik*, 111 F.3d 1332, 1341-42 (7th Cir. 1997) (citing *Saladino v. Winkler*, 609 F.3d 1211, 1214 (7th Cir. 1979)). The Court finds this evidence admissible and relevant for that purpose. The Court also finds that the probative value is not substantially outweighed by the prejudicial effect. *Saladin*, 609 F.3d at 1214; *Casares v. Bernal*, 790 F. Supp. 2d 769, 785-86 (N.D. Ill. 2011). The Estate also objects that Edwards' toxicology information is being made public. Dkt. 143, ¶¶ 45-46. But any information that influences or underpins a court's decision must be made public. *Baxter Int'l Inc. v. Abbott Labs.*, 297 F.3d 544, 545 (7th Cir. 2014). Having said that, counsel is strongly reminded to comply with the Court's sealing and protective orders.

[3] The Estate notes that Sugars, Coutts, and Cater knew each other and that Sugars considered Cater to be a friend. Dkt. 151, ¶¶ 9-10. Again, the Court does not understand the relevance of this evidence. A cynical person would think that it is an attempt to have the Court somehow discount their credibility. But, as the Estate admits, the Court cannot weigh witnesses' credibility at the summary judgment stage. Dkt. 142, at 2 (*citing Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).

sign. Dkt. 143, ¶ 5. While Sugars followed Edwards, who still would not stop, Riley positioned the squad across the street so as to block Edwards. Dkt. 143, ¶ 5; Dkt. 141(9), at 4:35. Instead of stopping, Edwards left the roadway and slowly drove around Cater's squad. Dkt. 143, ¶ 5; Dkt. 141(9), at 5:02; Dkt. 141(3), at 2:08. By driving off the roadway, Edwards was able to avoid striking Cater's squad. Dkt. 143, ¶ 5; Dkt. 141(3), at 2:08. Sugars continued to follow Edwards. Dkt. 141(9), at 5:02-6:25; Dkt. 141(3), at 2:08-3:35.

Then Sugars' squad passed Edwards' vehicle and cut in front of him to block it. Dkt. 141(3), at 2:41; Dkt. 141(9), at 5:35. This was the second attempt to physically block Edwards' vehicle. Edwards then slowly swerved to the left, again leaving the roadway, and drove around this squad. Dkt. 141(3), at 2:41; Dkt. 141(9), at 5:35. Edwards eventually slowed his vehicle substantially to "like ten miles an hour" in front of 1340 Franklin. Dkt. 151, ¶ 12; Dkt. 143, ¶ 5; Dkt. 141(9), at 6:07. Edwards' girlfriend, Carli Fischbach, resided at this address. Dkt. 151, ¶ 29. She had been talking to Edwards on his mobile phone during at least portions of the time the police were following Edwards. Dkt. 151, ¶¶ 2, 29.[4] Edwards momentarily stopped on Franklin before he turned into the driveway at 1340 Franklin. Dkt. 141(9), at 6:13. Edwards then drove into the driveway, during which time the right rear wheel went off the driveway. Dkt. 141(3), at 3:33. Another vehicle was already parked on the left side of the driveway. Dkt. 141(3), at 3:25;

---

[4] The Estate repeatedly notes that Edwards was African-American (using the term "Black") and that Carlie Fischbach, Edwards' girlfriend, was "Caucasian" or "White". Dkt. 142, at 1, 15-16; Dkt. 151, ¶¶ 16, 29. The Court is confused why this information is highlighted in this Fourth Amendment case. *See Scott v. Edinburg*, 346 F.3d 752, 756 (7th Cir. 2003) (under Fourth Amendment, officers' motives are irrelevant); *see also Whren v. United States*, 517 U.S. 806, 813 (1996) ("subjective intent alone . . . does not make otherwise lawful conduct illegal or unconstitutional") (internal quotes omitted). Moreover, no Equal Protection claim exists in this case. And even if there were an Equal Protection claim, this evidence would be irrelevant. *Ford v. Wilson*, 90 F.3d 245, 248-49 (7th Cir. 1996). The Court is even more confused as to the possible relevance of Fischbach's race.

Dkt. 141(9), at 6:20. This vehicle was a larger sedan and appeared to be either white or silver. Dkt. 141(9), at 6:30.

Deputy Coutts believed that this was a dangerous situation. He thought it was a high-risk traffic stop.[5] Dkt. 138-4, at 91:9-12, 102:11-13. While following Edwards, Cater did not conduct a license plate check on Edwards' Cadillac, correctly believing that Sugars had already done so. Dkt. 151, ¶ 33. Neither Cater nor Riley knew if the Cadillac was stolen or whether Edwards knew anybody at 1340 Franklin. Dkt. 143, ¶ 21.

**Stopping at 1340 Franklin**

After Edwards drove slowly into the driveway of 1340 Franklin, he parked the Cadillac, but the engine was still running. Dkt. 143, ¶ 6. The Cadillac's doors and windows were closed. On foot, Sugars approached Edwards' vehicle with his weapon drawn. Dkt. 143, ¶ 8; Dkt. 141(3), at 3:40; Dkt. 141(9), at 6:33. Both Sugars and Cater thought that Edwards might attempt to flee the Cadillac, running into the residence or through the backyard. Dkt. 143, ¶¶ 8, 23. When Edwards parked, Fischbach walked out of her house, but she was instructed to go back into the residence, which she did. Dkt. 151, ¶ 30; Dkt. 143, ¶ 9.

Riley and Cater left their squad and quickly approached the parked Cadillac in the driveway. Dkt. 143, ¶ 21; Dkt. 141(3), at 3:39. In fact, Cater jumped out of the squad before it was fully stopped. Dkt. 141(3), at 3:40. The Cadillac's engine was still running. Dkt. 138-2, at

---

[5] The Estate argues that the Court should not consider Coutts' deposition testimony on this point because it was based on leading questions, citing *Wilson v. Frito-Lay N. Am., Inc.*, 260 F. Supp. 3d 1202, 1210-11 (N.D. Cal. 2017). Dkt. 143, ¶ 7. The Court rejects this argument for at least three reasons. First, the questions were *not* leading, as they did not suggest an answer. *Leading Question*, Black's Law Dictionary (9th ed. 2009). Second, there was no objection to the questions as leading (which is also good evidence that they weren't), so any objection is now waived. Fed. R. Civ. P. 32(d)(3)(B)(i). Third, after reviewing the various recordings, no reasonable person could argue this was not a serious, dangerous situation. *See* Dkt. 141.

82:24-83:2. When Cater initially exited his squad, he did not have his weapon drawn. Dkt. 143, ¶ 22.

### Officers' Confrontation with Edwards Out of Cameras' View

It is important to understand that the facts described in the next few paragraphs occurred out of view from nearly all the dashcams' views because the squads faced either in the direction of Franklin or only slightly angled toward the driveway at 1340 Franklin. There is one 23-minute video recording of the full incident, but due to its position angled away from the Cadillac, it does not capture all the events and it is difficult to make out.[6]

### Officers' Approach of Cadillac

As the officers approached Edwards' vehicle, they were yelling, "Get out of the car!" "Open the door!". Dkt. 141(3), at 3:52. The commands were sometimes contradictory; these included "Don't move!", "Get out!" and "Get away from the car!" Dkt. 141(9), at 6:30-7:00. Cater yelled, "Don't move, shithead! Do not move!" Dkt. 141(9), at 6:42. Initially, according to Riley, Cater was behind the rear portion of the Cadillac. Dkt. 138-3, at 114:20-115:2. Cater must have moved back further because he testified that he drew his weapon when he moved

---

[6] Four copies of a video recording that captures some portions of the critical moments leading to and including the shooting. Dkts. 141(1), 141(2), 141(4), 141(8). These are four versions of the same recording. One video begins approximately 40 seconds before the others and runs just over three minutes beyond the others. Dkt. 141(8). All four recordings are from the same vehicle: three are split screen, one is not. None have audio. The recording captured possesses a point a view of a squad turning onto Franklin. Two vehicles are in the driveway and three squads are parked in the street. As the squad approaches, a viewer can see a person standing toward the rear passenger side of the vehicle closest to the camera and another person near the front passenger side of the vehicle. The vehicle in the driveway goes backwards, but some of that view is blocked by a mailbox as the squad comes to the scene. The vehicle then comes to a stop and remains stationary the remainder of the video. Then a person (probably Cater) can be seen adjacent to the rear passenger door, and another officer (probably Riley) comes around the back of the vehicle, possibly from behind the other parked vehicle in the driveway. The person at the rear passenger door of the vehicle (again, probably Cater) then takes a few steps back toward the rear windshield of the now stationary vehicle but does not go past the trunk area. Maddeningly, this video recording does not capture precisely where Cater and Riley were located at the time Cater shot Edwards. And because there is no audio, it is impossible to tell when the shots were fired in this sequence.

toward the rear of the Cadillac. Dkt. 143, ¶¶ 22-23. Then the commands became more consistent, such as "Open the door!" and "Open now!" Dkt. 141(3), at 3:58. Sugars approached the Cadillac's driver's side window while Edwards was seated in the driver's seat. Sugars was pointing his weapon at Edwards through the closed driver's side window. Dkt. 138-1, at 43:15-18, 45:21-24. In response, Edwards placed his head against the inside of the window where the barrel of the weapon was pointing. Dkt. 138-1, at 70:5-71:6. More yelling followed: "Get out of the car!" and "Open the door!" Dkt. 141(9), at 6:47. Edwards yelled back as well, saying "Fuck you!" Dkt. 138-1, at 53:5-9; Dkt. 141(9), at 6:48. An officer responded, "That's it!" and "Open the door!" Dkt. 141(9), at 6:54. Edwards is then warned: "You're gonna get shot!" Dkt. 141(9), at 6:55; Dkt. 138-3, at 96:1-12. Edwards' slurred response was "Fuck you, bitch! Fuck you." Dkt. 141(9), at 6:57. The Cadillac is stationary at this point. Dkt. 138-3, at 96:13-16. During this brief time, Sugars holstered his weapon so he could use his flashlight to break the driver's side window. Dkt. 143, ¶ 8. Sugars' attempt to break the window with the flashlight failed so he requested a baton, at which time he drew his weapon again. Dkt. 143, ¶¶ 8, 11-13. Cater threw his baton to Sugars but it bounced off the Cadillac's roof and fell to the ground, near the left front tire. Dkt. 143, ¶ 16. Sugars then re-holstered his weapon for a second time and bent down to pick up the baton, which he intended to use to break the window. Dkt. 143, ¶¶ 13, 17. Riley was toward the rear of the Cadillac between it and the other vehicle in the driveway. Dkt. 138-3, at 106:5-15; Dkt. 138-2, at 85:1-7. At this moment, the Cadillac was in reverse but was *not* moving backwards. Dkt. 138-3, at 96:4-20.

### Physical Locations of People

The events accelerated even more but simultaneously become more muddled. The Cadillac's engine revved.[7] At least one officer yelled, "Do not back up!" Dkt. 141(3), at 4:06. That much is clear. But less clear are some people's actions and very unclear are some people's physical locations.

It is critical to attempt to establish the locations of various people at this time using all available admissible evidence. The locations of four people are undisputed.

- Fischbach was in her house or on her front porch. Dkt. 138-1, at 36:11-12, 39:3-14; Dkt. 138-4, at 51:10-13.

- Edwards was in the driver's seat of the Cadillac, parked in the driveway next to the other vehicle; the vehicle's engine was running. Dkt. 141(9), at 6:28; Dkt. 143, ¶ 6; Dkt. 138-4, at 49:4-7.

- Sugars was toward the left front of the Cadillac, by the driver's side window or left front quarter panel, and not in the path of the Cadillac. Dkt. 151, ¶ 34. He was bending down to pick up the baton. Dkt. 138-2, at 85:22-86:7.

- Coutts was either off to the side of the Cadillac or back in the roadway behind the squads, but regardless he was not in the Cadillac's path. Dkt. 151, ¶ 35; Dkt. 138-3, at 100:12-24; Dkt. 138-4, at 61:17-62:13.

---

[7] The parties dispute whether Edwards' Cadillac's engine revved, citing to conflicting deposition testimony. Dkt. 143, ¶ 42. But the recordings that captured the audio of the events establish beyond doubt that the engine revved. Dkt. 141(9), at 7:11; Dkt. 141(3), at 4:16. *Scott v. Harris*, 550 U.S. 372, 378-81 (2007); *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) (although facts and inferences normally are drawn in favor of nonmovant, when video footage clearly contradicts nonmovant's claims, the court considers the video without favoring the nonmovant). There is no genuine dispute that the Cadillac's engine revved, so the Court finds that it did.

Cater's deposition testimony placed himself and Riley at the following locations when he first shot Edwards, during the shooting and when the final shot was fired. After Cater realized Edwards was not going to leave the Cadillac, he moved toward the rear of that vehicle and drew his weapon. Dkt. 143, ¶ 23. Cater was standing "at the rear passenger door of the vehicle" with his weapon drawn, looking at the driver. Dkt. 138-2, at 107:16-20. According to Cater, at the time of his first shot, he was in or near the grass, off of the driveway. Dkt. 138-2, at 70:12-71:14, p. 69 (Dep. Ex. 5); 72:1-15, p. 68 (Dep. Ex. 4). When the first shot was fired, Cater was less than a foot away but not in contact with the Cadillac. Dkt. 138-2, at 73:15-8, 74:10-13, 80:11-15. Cater was by the rear taillight, and his "muzzle probably was 8 to 10 inches from the [rear passenger] window." Dkt. 138-2, at 74:1-8, 107:16-23. And according to Cater, when he first shot Edwards, Riley was to Cater's left and behind, within a step or about an arm's length away. Dkt. 138-2, at 85:1-17. As Cater shot Edwards in quick succession, he backpedaled to his right into a grassy area. Dkt. 138-2, at 73:2-4, 75:16-21. No obstructions existed in this area; it was open; and nothing physically prevented Cater from moving to the right. Dkt. 138-2, at 75:22-76:4, 32. Cater moved back and to his right. Dkt. 138-2, at 72:20-73:4. Cater did not know how many steps he took and couldn't provide an estimate as to how far away he was from the Cadillac. Dkt. 138-2, at 80:5-21. According to Cater, while he was firing, Riley was backpedaling too. Dkt. 138-2, at 85:11-12.

Riley's deposition testimony placed himself and Cater at the following locations immediately before the shots were fired, when Cater first shot Edwards and when the final shot was fired. Moments before the shots were fired, Riley was between the Cadillac and the other vehicle, toward the rear of the Cadillac. Dkt. 138-3, at 41:22-42:5, 106:5-15. Riley had "canted [him]self a bit to make [him]self better able to move" if Edwards backed up. Dkt. 138-3, at

97:12-20. He had "moved . . . a little further from the side of the vehicle," so that he could move while also maintaining "a good line of sight on [Edwards]." Dkt. 138-3, at 96:23-97:8. Riley did not know where Cater was located. Dkt. 138-3, at 114:16-21. When Cater fired his first shot at Edwards, Riley described himself as "moving left," "exiting the rear path of the vehicle." Dkt. 138-3, at 107:4-8, 108:17-21. Riley was *not* in contact with the Cadillac when the first shot was fired and could not state with certainty how far he was from the Cadillac at the time. Dkt. 138-3, at 108:22-109:11. The video clearly shows Riley moving down the driveway on the far side of the parked vehicle as the shots were fired. Dkt. 141(9), at 7:12-7:18.

Comparing Cater and Riley's deposition testimony establishes conflicts as to their respective locations. At the time Cater first shoots Edwards, according to Cater, Riley is within arm's length, about three feet to Cater's left. In contrast, Riley places himself much further to Cater's left toward the left side of the Cadillac. Riley's testimony is corroborated by the video recording showing his movement after Cater shoots Edwards.

### The Cadillac Moves Backwards But When and How Fast

There is no dispute that the Cadillac moved backwards. But there is much dispute as to when the Cadillac started moving backwards—whether it moved before or after the shots. And the velocity of the Cadillac as it moved backwards is hotly contested.

The record contains evidence that Cater did not shoot until *after* the engine revved and the Cadillac started moving backwards. Dkt. 138-3, at 109:12-20. ("I heard the shot shortly after the vehicle started moving in reverse."); (the shot was a "split second" after the Cadillac moved). However, critically, the record also contains evidence that the Cadillac was *not* moving backwards at all when Cater shot Edwards. Dkt. 138-8, at 31:2-24 ("Q: Did you see the Cadillac move at all before you heard the shots? A: No, not that I can remember."). Again, no video

10

recordings capture this moment; the videos that show the whole driveway do not have audio, and the ones that have audio only show the Cadillac coming to a stop, not its initial movement.

The witnesses' testimonies as to the velocity of the Cadillac vary.[8]  According to Cater, he couldn't say if the Cadillac was accelerating and couldn't provide a rate or pace but believed it was not a slow pace.  Dkt. 138-2, at 81:15-82:13.  Riley likewise could not provide an estimate of the "speed of the vehicle" but characterized it as moving in reserve at a "rapid pace."  Dkt. 138-3, at 119:1-16.  Other witnesses' estimates were all over the lot.[9]  At least one witness testified that the Cadillac "moved pretty quickly backwards."  Dkt. 138-12, at 30:22-24.  Another witness similarly testified that Edwards "aggressively hit the gas" and "accelerate[d] backwards."  Dkt. 138-7, at 22:3-14, 28:14-17, 58:9-23.  However, in contrast, yet another witness testified that the Cadillac "just kind of slowly creeped back and it just stopped by itself."  Dkt. 138-6, at 36:2-10, 41:12-23.  And, most importantly, one witness testified that the Cadillac did not "move at all before [she] heard the shots."  Dkt. 138-8, at 31:2-24.  Again, the Court must view the facts and reasonable inferences from those facts in the light most favorable to the Estate.  This means the Court must accept the testimony that the Cadillac did not move before the shots.  This critical fact drives nearly the entire analysis in this case.

---

[8] The velocity of a vehicle is subject to lay opinion testimony.  *United States v. Conn*, 297 F.3d 548, 554 n.2 (7th Cir. 2002).

[9] Not surprisingly, some witnesses vacillated on their estimates depending on the question.  Dkt. 138-12, at 61:2-10 (vehicle started "super slow" but then "it sped up"); Dkt. 138-11, at 32:13-15 ("Q: And how fast did it move backwards? A: Not that I recall.  I'm not sure.  I'd say maybe 5 miles an hour."); Dkt. 138-10, at 49:17-21 ("I wouldn't agree with the 'slow fashion.'  I don't think it went fast, but I mean, I was too far away to see how fast it went back.").

### Cater Shoots Edwards

Cater fired six shots at Edwards, with five striking Edwards.[10] Dkt. 151, ¶ 25. Cater's shots were in rapid succession, occurring over a few seconds. Dkt. 141(9), at 7:11-7:14; Dkt. 141(3), at 4:17-4:20; Dkt. 138-3, at 107:12-20, 108:9-11; Dkt. 138-2, at 80:1-4. After being shot, Edwards grabbed at his chest and indicated he was in pain. Dkt. 143, ¶¶ 35-38. After Cater shot Edwards, Cater yelled, "Show me your hands!" Dkt. 141(3), at 4:27; Dkt. 138-2, at 107:8-19. Because the Cadillac moved backward, Cater was at the rear passenger door of the Cadillac then. Dkt. 138-2, at 107:16-20. From the time Edwards drove into the driveway until Cater fired the first shot, about 45 seconds elapsed. Dkt. 143, ¶ 34.

The Cadillac moved backwards less than a car length—or around 10 feet—before it stopped. Dkt. 138-3, at 119:17-21; Dkt. 138-1, at 67:2-23. Edwards' Cadillac did *not* strike Cater.[11] Although Riley did not know how the Cadillac stopped, Cater testified that after Edwards was shot, Edwards applied the brake and put the vehicle in park. Dkt. 138-2, at 76:24-79:21; Dkt. 138-3, at 110:17-111:2.

---

[10] The Estate submitted a Rock Falls Police Department policy, titled "Shooting At Or From Moving Vehicles," that discourages officers from firing their weapons into moving vehicles. Dkt. 151, ¶ 28. The Court does not consider this policy in determining the reasonableness of Cater's actions under the Fourth Amendment. *Collins v. Univ. Park*, No. 16-CV-2944, 2018 U.S. Dist. LEXIS 240548, at *2-3 (N.D. Ill. Sept. 25, 2018); *Brinkley v. Santiago*, No. 11-CV-6282, 2013 U.S. Dist. LEXIS 96551, at *14 (N.D. Ill. Jul. 11, 2013) (collecting cases); *Bruce v. City of Chicago*, No. 9-CV-4837, 2011 U.S. Dist. LEXIS 83421, at *6 (N.D. Ill. Jul. 29, 2011). In fact, the Seventh Circuit has already rejected a similar attempt to use an alleged violation of a similar police policy to establish a Fourth Amendment violation. *See Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003).

[11] The parties dispute whether Edwards struck Cater with the Cadillac. Dkt. 143, ¶ 27. Defendants presented at least one witness' testimony that the Cadillac hit Cater. *Id.* But Cater himself testified that he could not recall being struck by the Cadillac; other occurrence witnesses testified Cater was not struck, and there were no medical records presenting any injury. *Id.* None of the videos capture this moment. Because the Court must view the evidence in the light most favorable to the Estate, for purposes of this motion, Edwards did not strike Cater with the Cadillac.

**Post-Shooting Events Captured on Camera**

The following facts include events that are visible in the dashcam's view as captured by the recordings.

After Edwards was shot and the Cadillac stopped moving, Whiteside County Deputy Rollie Elder (who arrived at the scene) entered the vehicle on the passenger side and turned the key to shut off the engine. Dkt. 141(6), at 0:45; Dkt. 138-5, at 38:2-15. Elder did not know if he put the Cadillac in park. Dkt. 138-5, at 38:6-12. Elder and Sugars then pulled Edwards from the Cadillac. Dkt. 141(9), at 9:19-9:24. Dkt. 143, ¶ 36. At this point, two minutes had elapsed since Cater's sixth and final shot was fired. Dkt. 141(9), at 7:11-9:19. Witnesses on the scene at that time testified that Edwards did not speak, struggled to breathe, and gasped for air with short irregular breaths. Dkt. 143, ¶¶ 36, 38-39. Both Coutts and Riley ran to their respective squads cars to obtain first aid kits. Dkt. 141(6), at 0:51-1:20 (split screen shows Riley on the left and Coutts on the right); Dkt. 143, ¶ 38; Dkt. 138-4, at 98:9-17; Dkt. 138-5, at 39:21-40:12. Officers at the scene, including Elder, then began chest compressions, attached an AED, and administered medical aid. Dkt. 141(9), at 9:43; Dkt. 143, ¶ 37. At least one officer repeatedly, verbally encouraged Edwards to survive. Dkt. 141(6), at 3:37 ("Come on, buddy." "Hang in there, buddy."). Despite those efforts, Nate Edwards died of four of bullet wounds. Dkt. 143, ¶ 44. During the efforts to revive Edwards, an officer stated without prompting that he could smell the burnt cannabis. Dkt. 141(6), at 3:43. The medical examiner did not know whether Edwards died at the scene or whether he survived for any time after being shot. Dkt. 143, ¶¶ 47-48.

The Court decides Defendants' motion on these facts. [12]

---

[12] The parties' filings touch, but don't dwell, on two other considerations: (1) "expert" opinions regarding the incident, and (2) the Whiteside County State's Attorney's decision to not prosecute Cater. Dkt. 142, at 18; Dkt. 139, at 13; Dkt. 138, ¶¶ 49-51. As to the opinion testimony, the Court does not consider it for at least two reasons. Initially, the opinions are based upon credibility determinations as to whom to

## II.      LEGAL STANDARD

On summary judgment, the Court must construe the "evidence and all reasonable

inferences in favor of the party against whom the motion under consideration is made." *Rickher*

*v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008). The moving party bears the burden of

showing that "no genuine dispute as to any material fact" exists and that it is "entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986). A genuine dispute of material fact exists if a reasonable jury could return a verdict for the

non-movant when viewing the record and all reasonable inferences drawn from it in the light

most favorable to the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986); *Beardsall*, *v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020). Thus, to survive

summary judgment, the non-movant must set forth specific facts to show that there is a genuine

dispute of fact for trial. *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d

---

believe.  If the Court doesn't get to weigh witnesses' credibility on motions for summary judgment, then "experts" certainly don't get to do so.  But, more importantly, the opinions are not admissible.  The opinions are legal conclusions. Dkt. 138, ¶¶ 49-51.  That "evidence" is barred now and will be at trial. *See, e.g., Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1212-13 (D.C. Cir. 1997); *Hygh v. Jacobs*, 961 F.2d 359, 364-65 (2d Cir. 1991).  Indeed, in a previous case, the Court barred the Estate's expert witness for similar reasons.  *See Boyle v. Patridge*, No. 17-CV-50121 (N.D. Ill. Sept. 10, 2020).  The parties should not anticipate this type of testimony being introduced at trial.  Moreover, since the filing of this motion, the Court has barred most of Dale Mann's proposed testimony. *Agnew v. Cater*, No. 18-CV-50035, 2022 U.S. Dist. LEXIS 18734 (N.D. Ill. Feb. 2, 2022). As to the State's Attorney's declination to prosecute Cater, that is irrelevant to the issue of whether Cater used excessive force. Defendants seek to introduce the fact that the Whiteside County State's Attorney's investigation into Cater's actions did not result in charges against Cater. Dkt. 138, ¶ 49. The Estate objects on the basis that this fact is immaterial (LR 56.1 uses the term "material" not "relevant") to the claims here. Dkt. 143, ¶ 49; Dkt. 142, at 18. The Court agrees. The State's Attorney's decision was based on Illinois law, not federal Fourth Amendment excessive use of force jurisprudence.  *See* Dkt. 138-14, at 8-9. Not only are the elements different, but also the burden of proof is different.  Fed. R. Evid. 401.  Further, the minimal probative value—if any—of the State's Attorney's decision is substantially outweighed by its prejudicial effect, and the Estate's objection to this fact is granted. *See* Fed. R. Evid. 403.  The Court does not consider this evidence.  *See Castro v. County of Los Angeles*, No. 13-CV-06631, 2015 U.S. Dist. LEXIS 103945, at *4 (C.D. Cal. Aug. 3, 2015).

869, 876 (7th Cir. 2021) (citing *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) ("As the put up or shut up moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial.")). "Summary judgment is only warranted if . . . [the court] determine[s] that no jury could reasonably find in the nonmoving party's favor." *Blasius v. Angel Auto, Inc.*, 839 F.3d 639, 644 (7th Cir. 2016). Although facts and reasonable inferences are normally drawn in favor of nonmovant, when video footage or audio recordings clearly contradict a *nonmovant's* claims, courts consider the video and audio evidence without favoring the nonmovant. *See Horton*, 883 F.3d at 944 (following *Scott v. Harris*, 550 U.S. 372 (2007), for video evidence); *see also Smith v. Adams*, 804 F. App'x 390, 392 (7th Cir. 2020) (applying *Scott* to audio recordings); *Coble v. City of White House*, 634 F.3d 865, 868-69 (6th Cir. 2011) (finding *Scott* applicable to audio recordings). And, not surprisingly, this principle works on the flipside. So, when audio or video recordings contradict a *movant's* factual representation, the recording trumps the representation. *See Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgement."); *Horton*, 883 F.3d at 944 ("When video footage firmly settles a factual issue, there is no genuine dispute about it, and we will not indulge stories clearly contradicted by the footage.").

Like many district courts, the United States District Court for the Northern District of Illinois possesses a local rule theoretically designed to streamline summary judgment filings. In practice, however, the parties' application of the rule—or lack thereof—often results in the rule's goal being unfulfilled. Instead, as in this case, the parties engage in bickering over the

15

statements of fact, invariably resulting in each side arguing that the other side's facts be stricken or ignored. Because summary judgement motions can be dispositive and because the reasonable inferences drawn from facts—not necessarily the facts themselves—can be outcome determinative, the process is often a messy battle despite the goal and clear language of Local Rule 56.1.

In this case, the parties sometimes complied with the requirements, but at other times they didn't. The Court will not detail each party's violations. Instead, the Court merely reminds the parties to read the rule carefully and to comply with the rule in all respects.

As it does with all summary judgment motions, the Court expended considerable time and effort to determine which material facts were genuinely disputed. And, having determined which facts were not genuinely disputed, the Court then viewed those facts and all reasonable inferences from those facts in the light most favorable to the nonmovant—in this case, the Estate. So, the parties can be confident that the Court complied with Local Rule 56.1 and Federal Rule of Civil Procedure 56 as well as controlling case law in deciding this motion.

As should be evident, the Court has scoured the record and analyzed the record evidence, particularly the video recordings. The Court did not engage in this process to advocate for any particular party nor to second guess Cater's actions with 20/20 hindsight years later from the comfort of chambers. Neither of those purposes would be appropriate. *See Horton*, 883 F.3d at 950 (courts "must refuse to view the events through hindsight's distorting lens."); *Scully v. Goldenson*, 751 F. App'x 905, 909 (7th Cir. 2018) (judges are not advocates for parties). Instead, the Court engaged in this process because it is required by the Seventh Circuit's repeated directive in these types of cases. *See King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 985 (7th Cir. 2020) ("To ensure fairness to a deceased plaintiff whose representative alleges an

16

impermissible use of deadly force, given the impossibility of victim testimony to rebut the officers' account, we scrutinize all the evidence to determine whether the officers' story is consistent with other known facts."); *Abdullahi v. City of Madison*, 423 F.3d 763, 772 n.7 (7th Cir. 2005); *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994) ("The award of summary judgment to the defense in deadly force cases may be made *only with particular care where the officer defendant is the only witness left alive to testify*. In any self-defense case, a defendant knows that the only person likely to contradict him or her is beyond reach.") (emphasis added).

### III. ANALYSIS

#### A. <u>Count I: Excessive Use of Force</u>

##### i. **Fourth Amendment Analysis**

The Fourth Amendment's right to be free from unreasonable seizures also limits an officer's use of deadly force. *Horton*, 883 F.3d at 948. Courts look to the totality of the circumstances and undertake "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395-96 (1989)). To balance these factors, the court considers "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

If "an officer reasonably believes an assailant's actions place him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." *Horton*, 883 F.3d at 949 (internal quotations omitted). For example, "if the suspect threatens the officer with a weapon or there is probable

cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985). But "summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010) (finding this to be "particularly relevant where, as here, the one against whom force was used has died, because the witness most likely to contradict the officer's testimony—the victim—cannot testify"). Because the *Graham* reasonableness inquiry generally requires a court to sift through disputed factual contentions, and to draw inferences therefrom, summary judgment in excessive force cases should be granted sparingly. *Abdullahi*, 423 F.3d at 773.

In this case, the parties offer two competing narratives. Defendants claim that Edwards "turn[ed] what would have been a routine traffic stop into a high risk and dangerous situation" when he ran stop signs and drove around police blockades before pulling into a residential driveway. Dkt. 139, at 3. Defendants argue that Edwards was aggressive, and immediately before Cater shot Edwards, Edwards threw the Cadillac into reverse, and accelerated at a rapid pace while he and Riley were standing directly behind the vehicle and in doing so Edwards struck Cater with the Cadillac. Dkt. 139, at 7, Dkt. 152, at 3. So, according to Defendants, because Edwards was using the Cadillac as a deadly weapon, Cater reasonably shot Edwards to protect himself, Riley, and Sugars.[13] Dkt. 139, at 3. Although this would be a fine closing argument, this narrative does not fly at the summary judgment stage based on the facts the Court must use in deciding the motion. Defendants present a narrative of the facts in the light most

---

[13] Defendants do not explain how Sugars, who was admittedly nowhere in the possible path of the Cadillac, was in danger of Edwards allegedly backing up at a "rapid pace."

favorable to them, drawing all reasonable inferences in their favor, and even assert disputed facts in their favor.

This narrative can be easily picked apart based on the record evidence that this Court must use in deciding summary judgment. First, there is no evidence that Edwards was "aggressive," despite Defendants' repeated assertions that he was. Dkt. 139, at 1, 7; Dkt. 152, at 2. Not only do Defendants not offer a citation to the record for this characterization, but also Riley's deposition testimony—or at least a reasonable inference drawn in the Estate's favor— indicates Edwards was *not* aggressive. Dkt. 138-3, at 92:2-6. Second, and most critically, there is evidence that the Cadillac was *not moving at all* when Cater fired the first shot. Dkt. 138-8, at 31:2-24. Third, the location of both Cater and Riley is unclear based on video recordings as well as their own respective deposition testimony. Riley placed himself at the left rear side of the Cadillac between it and the other vehicle in the driveway but Cater placed himself and Riley within arm's length of each other behind the Cadillac. In fact, Riley's deposition testimony that he moved to the left of the Cadillac so that he could be out of its path while simultaneously having a line of sight on Edwards could reasonably be understood to mean that Riley was almost even with Sugars at the driver's side window. Fourth, the Cadillac did not strike Cater. This is the only factual inference this Court can draw based on the following: Cater testified that he could not recall being struck by the Cadillac, there was no medical record evidencing any injury, and at least one occurrence witness testified that Cater was not struck by the Cadillac.[14]

---

[14] Defendants' characterization of the video recordings simply does not square with the recordings themselves. Dkt. 152, at 3. And their characterization is certainly not one viewed in the light most favorable to the Estate. The Court recognizes that video recordings can be subject to different interpretations. That certainly seems to be true in this case. And when video recordings are subject to different interpretations, a question of fact exists. *Jackson*, 888F.3d at 264. As this Court noted previously, the location of Cater, the location of the officers he was purportedly trying to protect, the position of the vehicle, and the vehicle's velocity—*if it was moving at all when Cater first shot*—are all critical facts in resolving this case.

Instead of Defendants' narrative, viewing the disputed and undisputed facts in light most favorable to the Estate and drawing all reasonable inferences from those facts, the following are the facts the Court must use to decide this motion. For several minutes, Edwards engaged in a slow-speed chase, refusing to stop for law enforcement and even avoiding two roadblocks in the process. Edwards then pulled into a driveway and was quickly surrounded by law enforcement. Although Edwards was clearly non-compliant with their commands, he did not threaten them. Dkt. 138-1, at 70. There is no evidence that Edwards was armed with a firearm or that Cater thought Edwards was armed. Likewise, there is no evidence that the Cadillac was stolen or that Cater had information that it was stolen. It is undisputed that Edwards committed no felony of any kind—let alone a violent one—and Cater did not observe Edwards commit a felony. Specifically, as to the use of deadly force, for purposes of this motion, the Court must find that Edwards was seated in the Cadillac with the engine running, while Sugars was at the left front quarter panel, Riley was to the left of the Cadillac between it and the other vehicle, and Cater was off to the right rear side of the Cadillac in the grass with an unobstructed path to safety. While in the Cadillac, Edwards revved the engine, at which time Cater immediately fired six shots at Edwards (with five striking Edwards, four of which were fatal) *when the vehicle had not yet moved*. Based on these facts, a reasonable jury could find that it was unreasonable for Cater to empty his clip at Edwards.[15]

Under *the Estate's version of events*, a reasonable jury could conclude that Cater's use of force was unreasonable because neither he nor the other officers were in the path of a moving

---

[15] The Court does not mean to diminish the seriousness and dangerousness of the situation. In fact, a reasonable jury could easily conclude that the situation was extremely dangerous, requiring the use of deadly force. This is particularly true because unlike the Court, a jury will not be required to view all the facts—disputed and undisputed—in favor of the Estate and draw reasonable inferences in the Estate's favor as well.

vehicle before Cater used deadly force. In contrast, under *Defendants' version of events*, a reasonable jury could conclude that Cater's use of force was reasonable because he and Riley were behind a rapidly moving vehicle headed in their direction. These genuine issues of material fact preclude summary judgment on whether Cater's use of deadly force was reasonable. *See Weinmann*, 787 F.3d at 449 (denial of summary judgment was proper where material facts as to reasonableness factors were disputed); *Coleman v. Wiencek*, No. 08-CV-5275, 2010 U.S. Dist. LEXIS 36907, at *14 (N.D. Ill. Apr. 13, 2010) (denying summary judgment where a jury could reasonably find, under one version of events, that decedent's actions did not pose a threat such as to justify deadly force).

To support summary judgment, without elaboration, explanation, or analysis, Defendants cited three cases: *Horton v. Pobjecky*, 883 F.3d 941 (7th Cir. 2018); *Scott v. Edinburg*, 346 F.3d 752 (7th Cir. 2003); and *Tolliver v. City of Chicago*, 820 F.3d 237 (7th Cir. 2016). Dkt. 139, at 5-8; Dkt. 152, at 2-3. The lack of any developed argument about these cases results in forfeiture. *Scheidler v. Indiana*, 914 F.3d 535, 540 (7th Cir. 2019). The Court will address them, nevertheless. Each case is factually distinguishable in important ways.

*Horton* involved an attempted armed robbery of Marie's Pizza in Rockford by a crew that stormed into the restaurant, resulting in an immediate melee in which the participants were struggling over numerous firearms. *Horton*, 883 F.3d at 944-45. In the process, Pojecky—an off-duty Winnebago County Sheriff's Deputy—shot Horton. There is no factual similarity between *Horton* and this case, other than that deadly force was used and that the traumatic events were captured on video.

*Scott* comes closer to the mark but is nevertheless easily distinguishable. In *Scott*, the decedent attempted to steal the defendant's vehicle at a gas station, which is obviously a felony,

and in doing so, drove through the parking lot where other people were located while the defendant fired fatal shots at the decedent. *Scott*, 346 at 754-55. Importantly, the Seventh Circuit rejected summary judgment based on the defendant's argument that the deadly force was reasonable to protect himself. The Seventh Circuit rejected this argument because the defendant fired at the decedent right as he drove away from the defendant. *Scott*, 346 F.3d at 757-58. The Seventh Circuit, however, affirmed summary judgment on the theory that the defendant reasonably used deadly force to protect others in the immediate vicinity while the decedent tore through the parking lot. *Scott*, 346 F.3d at 758-59. Besides the fact that the decedent in *Scott* had committed two felonies and Edwards had committed none, the critical and obvious distinction between *Scott* and this case is that Edwards' Cadillac was not moving at all when Cater fired on Edwards. Cater could not have been protecting himself or even bystanders from a vehicle—assuming they were in the *immediate vicinity*—if the Cadillac was not moving *at all*.

Any reliance on *Tolliver* fails for similar reasons. Again, that case involved law enforcement shooting into a vehicle. But Tolliver was criminally charged and pleaded guilty to aggravated battery to a peace officer. *Tolliver*, 820 F.3d at 239. The stipulation to support the guilty plea and subsequent conviction explicitly stated that Tolliver drove his vehicle towards the officer, and in an attempt to escape from the vehicle, the officer fell and injured his ankle. *Tolliver*, 820 F.3d at 241. In his civil rights suit, Tolliver maintained that he was seated in his stationary vehicle when he was shot multiple times. *Id.* But that contention would necessarily call into question the validity of his criminal conviction and was therefore *Heck* barred.[16] *Id.* at

---

[16] A *Heck* bar prevents a civil plaintiff from seeking damages when doing so invalidates a criminal conviction. *Heck v. Humphrey*, 512 U.S. 477, 486 (1994) ("[T]o recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a §1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a

243 ("Tolliver's version of the shooting thus implies the invalidity of his conviction. That is, if the finder of fact were to accept his version of the event, the officers shot him as he sat impassively in his car, posing no threat to the officers."); *id.* at 243 ("But if the plaintiff's factual claims in the civil suit necessarily imply the invalidity of the criminal conviction, then *Heck* bars the civil suit."). So, the plaintiff's attempt to create a question of fact to preclude summary judgment in *Tolliver* was unavailable due to the *Heck* bar. Again, based upon sworn deposition testimony, the Court must decide this motion based on the assumption that Cater fired into a stationary vehicle. In contrast, the officers in *Tolliver* did not; the court was required to decide the motion on the assumption that Tolliver drove at the officers and that an officer was injured while trying to escape the path of the vehicle. *Id.*

## ii. Qualified Immunity Analysis

Cater raises an affirmative defense of qualified immunity. Dkt. 139, at 8. Once the defense of qualified immunity is raised, a plaintiff "must show (1) that the defendant violated a constitutional right, and (2) that the right was clearly established at the time so that it would have been clear to a reasonable officer that her conduct was unlawful in the situation." *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017) (explaining that "qualified immunity shields from liability [defendants] who act in ways they reasonably believe to be lawful").

In support of Cater's affirmative defense of qualified immunity, he relies on both *Scott* and *Tolliver*. But as previously discussed, those cases are factually distinguishable on a critical issue. In both of those cases, it was undisputed that the vehicle was being driven at pedestrians. But, in this case, because there is sworn deposition testimony that Edwards' Cadillac was stationary when Cater shot Edwards, the Court must accept that fact as true.

---

writ of habeas corpus, 28 U.S.C. §2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under §1983.").

Importantly, Cater did not argue that it was not clearly established that a law enforcement officer could not fire deadly shots into a stationary vehicle. This is unsurprising. "[I]t was clearly established as of 2013 that an officer confronted with a stationary vehicle and a driver who had not exhibited dangerous behavior would not be entitled to use deadly force." *Rand v. Lavoie*, Case No. 14-cv-570, 2017 U.S. Dist. LEXIS 142755, at *12 n.3 (D.N.H. Sept. 5, 2017) (citing decisions from four different Circuit Courts dating back to 2007); *see also Stewart v. City of Euclid*, 970 F.3d 667, 681-84 (6th Cir. 2020) (Donald, J., concurring in part, dissenting in part) (collecting cases from across the country). Albeit an out-of-circuit decision, the 2005 opinion in *Smith v. Cupp*, 430 F.3d 766 (6th Cir. 2005), is instructive. In that case, the Sixth Circuit found that as far back as 2002, it was clearly established that a law enforcement officer could not use deadly force by shooting at a non-violent motorist when pedestrians were not in harm's way of the vehicle, despite the rapidly developing events confronting the officer. *Smith*, 430 F.3d at 775-76. And if a law enforcement officer cannot shoot at a moving vehicle that was not in danger of striking an officer and bystander, then an officer certainly cannot shoot a motorist in a stationary vehicle.

Alternatively, the disputed facts, including the locations of Cater and Riley, prevent this Court from determining whether Edwards' clearly established rights were violated. *See Strand v. Minchuk*, 910 F.3d 909, 918 (7th Cir. 2018) (holding that "a dispute of fact regarding the circumstances surrounding an officer's use of force may prevent [the court] from determining whether an individual's clearly established rights have been violated"); *Gonzales v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009) (denying summary judgment "when the qualified immunity inquiry cannot be disentangled from disputed facts"). These are jury questions, so the Court cannot resolve the issue of qualified immunity.

24

Therefore, the Court denies summary judgment as to Count I, both on the merits and qualified immunity.

### B. <u>Counts II and III: Illinois Wrongful Death and Survival Claims</u>

Defendants argue the wrongful death claim in passing, explaining that because the analysis of an excessive force claim and a wrongful death claim is the same, and Cater's actions did not involve an unreasonable use of force, the wrongful death claim also fails. Dkt. 139, at 11 (citing *Muhammed v. City of Chicago*, 316 F.3d 680 (7th Cir. 2002)); Dkt. 152, at 7 (same). But if a Fourth Amendment excessive force claim survives summary judgment, the wrongful death claim survives as well. *See Childs v. City of Chicago*, No. 13-CV-07451, 2017 U.S. Dist. LEXIS 45156, at *26 (N.D. Ill. Mar. 28, 2017) (holding that wrongful death claim "withstand[s] summary judgment because the Fourth Amendment claim does"). Because genuine issues of material fact preclude Defendants' motion for summary judgment on the Fourth Amendment claim, the wrongful death claim must be decided by a jury as well.

As to the survival claim, Defendants allege that there is no evidence of conscious pain and suffering, which is required for survival in Illinois. Dkt. 139, at 11-12. Defendants contend that Edwards was not conscious after being shot, so he had no conscious pain and suffering, which is an essential element of a survival claim. Dkt. 152, at 6-7; Dkt. 139, at 11-12. This is a bizarre argument because Cater—a defendant in this case—testified that after Edwards was shot, Edwards applied the brakes and put the Cadillac in park. Dkt. 138-2, at 77:19-22, 79:21-24. The Estate argues that at least one person testified to hearing Edwards gasping after being shot, but more importantly, that there are disputed genuine material facts at issue. Dkt. 150, at 21-22; Dkt. 143, ¶ 40. Citing only a single case, Defendants insist that the testimony is merely speculative

and cannot support a survival claim. Dkt. 139, at 11-12; Dkt. 152, at 6-7 (citing *Ellig v. Delnor Commun. Hosp.*, 237 Ill. App. 3d 396, 402 (2d Dist. 1992)).

Illinois law does *not* require medical testimony to establish consciousness before death to prevail on a survival claim; instead, Illinois courts routinely rely on lay testimony describing the decedent's actions before death to determine if sufficient evidence exists to support damages. *Moore v. Swoboda*, 213 Ill. App. 3d 217, 234-35 (4th Dist. 1991). Indeed, the case upon which Defendants rely—*Ellig*—supports that proposition. *Ellig*, 237 Ill. App. 3d at 402. Illinois case law establishes that lay testimony that a decedent was moaning or groaning is sufficient for a survival claim to go to a jury. *See*, *e.g.*, *Racky v. Belfor United States Grp., Inc.*, 2017 IL App (1st) 153446, ¶ 132; *Cooper v. Chicago Trans. Auth.*, 153 Ill. App. 3d 511, 523 (1st Dist. 1987). In fact, evidence of a physical manifestation of pain and suffering is not necessarily required. *Racky*, 2017 IL App (1st) 153446, ¶ 137. Following Illinois law, in *Murphy v. Schneider Nat'l Carriers, Inc.*, No. 04-1280, 2006 U.S. Dist. LEXIS 65289, at *6 (C.D. Ill. Sep. 12, 2006), the court denied the defendant's summary judgment motion on a survival claim when the only evidence to support the claim that the decedent was conscious and suffering before her death was a lay witness' opinion testimony that the decedent was "gasping" for breath.

Viewed in the light most favorable to the Estate and drawing all reasonable inferences in its favor, admissible evidence exists that immediately after Edwards was shot, he grabbed his chest (indicating he was in pain), struggled to take short breaths, and gasped for air. Dkt. 143, ¶¶ 35-36, 38-39. Moreover, it is undisputed that Edwards was shot five times and died of four gunshot wounds. Dkt. 143, ¶ 44. But, according to Cater, before succumbing to his injuries, Edwards was able to apply the Cadillac's brakes and put the vehicle in park. Dkt. 138-2, at 77:19-79:24. No reasonable person could find that those are the actions of an unconscious

person.  Under Illinois law, this is sufficient evidence to defeat summary judgment and allow the survival claim to go to a jury for determination.

## IV.     CONCLUSION

For these reasons, the Court denies Defendants' motion for summary judgment [137].  In denying the motion, the Court is not stating an opinion on the merits of the case.  Rather, the Court merely holds that genuine issues of material fact exist, so that summary judgment is not appropriate.  *See Liberty Lobby*, 477 U.S. at 248.  Viewing all the facts—even the disputed ones—and all reasonable inferences drawn from those facts in favor of the Estate, reasonable people could come to different conclusions as to the reasonableness of Cater's use of deadly force.  This is a case a jury must decide.

The case is referred to Magistrate Judge Schneider to discuss whether a settlement conference would be a useful exercise.  If settlement is unlikely and a settlement conference would be a waste of resources, then the parties can begin preparing the Final Pretrial Order.


Date:   February 23, 2022                    By:  _____
                                                  IAIN D. JOHNSTON
                                                  United States District Judge